# EXHIBIT H

**S&P Global**
Market Intelligence

# Amgen Inc. NasdaqGS:AMGN
# Company Conference Presentation
## Wednesday, May 11, 2022 5:20 PM GMT

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

# Table of Contents

Call Participants ...................................................................................... 3

Presentation ...................................................................................... 4

Question and Answer ...................................................................................... 5

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Call Participants

**EXECUTIVES**

**Peter H. Griffith**
*Executive VP & CFO*

**Rob Lenz**
*Senior Vice President of Global
Development*

**ANALYSTS**

**Geoffrey Christopher Meacham**
*BofA Securities, Research Division*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Geoffrey Christopher Meacham**
*BofA Securities, Research Division*

Welcome to the second day of the Bank of America Healthcare Conference. My name is Geoff Meacham. I'm the senior biopharma analyst here. And we are thrilled to have with us on stage, Amgen. And speaking on behalf of Amgen, we have Peter Griffith, CFO; and Rob Lenz, Senior Vice President, Global Development. Welcome, guys.

**Peter H. Griffith**
*Executive VP & CFO*

Great to be here.

**Rob Lenz**
*Senior Vice President of Global Development*

Great to be here.

**Peter H. Griffith**
*Executive VP & CFO*

Thank you so much to Bank of America, BofA, for inviting us.

**Geoffrey Christopher Meacham**
*BofA Securities, Research Division*
Great to do the meeting in person, too, right?

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Geoffrey Christopher Meacham**
*BofA Securities, Research Division*

Let's talk a little bit about -- let's start off with just the lingering as we move from pandemic to endemic, there's a lot of sort of questions on COVID. And you guys and a few other of the bigger biotechs or pharmas, you still have a little bit of a residual effect from COVID on the business. So where are you with respect to the return to normal flow of patient visits and drug volumes?

**Peter H. Griffith**
*Executive VP & CFO*

Well, again, thank you, Geoff, for having us here. And I might just interject a few comments, too, before we start. And I think Rob might, too. But let me just say on return to normal. I was laughing with my colleagues this morning. I don't mean to not take it seriously, but when 8 other people got on the elevator on the first 5 floors, I realized the world is back to normal. There's no -- when you're on there with 8 of your closest friends, you say, "You know what, the switch is switched." So thank you.

Well, look, we talk about it as a continuing cumulative effect of COVID. I think our colleagues in the industry do, too. January and February, we certainly saw some lingering effects of Omicron there. We'll see what other surges come, variants of concern. Through the rest of the year, we watch that closely. But at the end of the day, in cardiology, for example, that feels like it came back a little bit faster. Oncology came back during last year and through the current phase, I would say some of the inflam category, probably a little bit slower than the other 2.

But look, we're making our way through it. We've learned how to deal with it in 2.5 years. At Amgen, we're always thinking about the patients. We want to be resilient and work our way through that. So that's really important to us.

I think -- so just pause for a minute. Maybe look at the first quarter and just say we were on track to deliver. 6% on revenue, up 15% on EPS, good execution. So we had the surge of Omicron, but we worked our way through that.

And we also talked about in the first quarter, now we've got -- in addition to COVID, we've got foreign exchange headwinds for most companies. Last on my check, the euro was, I think, hanging around 105, 106, down a bit there. So we've got -- we've indicated $400 million of headwinds to revenue this year now, up from a couple of hundred million. Certainly, we've also increased our other income and expense guidance to $1.6 billion to $1.8 billion of net expense from our previous range just on kind of rising interest rates to go along with strengthening the dollar and certainly our share of BeiGene's results, which we recorded in the equity method.

So there's a lot of different dynamics around COVID, and we're watching it. We'll continue to execute through it. I think Rob could speak a little bit to COVID and how we're working our way through the development side. He's -- and being a head of global development, he's done a great job on that for us, making sure we continue trials and make our way through that, too.

So Rob, maybe I'll...

**Rob Lenz**
*Senior Vice President of Global Development*

Sure. Well, I thought maybe it'd be helpful just to give a quick overview of the key assets within the clinical development pipeline and maybe just highlight those in particular that have what we think are particularly important, either study starts or data readouts, which I think will help be the foundation for some other questions.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

So focusing on inflammation first. We're continuing to pretty aggressively pursue life cycle development of TEZSPIRE. We now have 4 additional indications beyond the severe asthma indication. In addition, within severe asthma, we just announced we're kicking off 2 additional studies in that space.

Moving into the pipeline, our OX40 program, that's our AMG 451 for moderate to severe atopic dermatitis, progressing well. It's a comprehensive program called ROCKET, and we're on track to initiate that comprehensive Phase III program this summer.

And then in oncology, with LUMAKRAS recently announced -- or presented data, 2-year data at the AACR conference on these refractory non-small cell patients who after 2 years on LUMAKRAS were experiencing. About 1/3 of them are still alive. So continue to bolster our confidence in that product.

In terms of sort of additional key data readouts this year with LUMAKRAS is notably the Phase III confirmatory versus docetaxel in non-small cell lung cancer, additional to dose comparison study as well. And then we actually just submitted some data that will be presented late summer. We anticipated a medical conference for our combination cohorts for PD-L1 or PD-1 combo as well as SHIP2.

And then in the pipeline, in terms of oncology, bemarituzumab, that's our FGFR2b monoclonal antibody for gastric cancer in that Phase III program in first-line gastric cancer is underway. And then we're also just kicked off a signal-seeking study in squamous non-small cell lung cancer for bemarituzumab as well.

And then across our BiTE or bispecific portfolio, we're actually seeing a number of molecules with some pretty compelling data in the solid cancer space. I'll mention Tarlatamab or AMG 757, this is being -- this is our DLL3 antibody for small cell lung cancer based on the Phase I data that we saw there, quite compelling. We advanced into potentially registration-enabling study in third-line small cell. And then we're doing -- initiating the combo combination work that would support advancing that molecule into earlier line, including frontline studies in small cell lung cancer.

We have 3 assets targeting metastatic prostate cancer, looking at 2 different targets, including AMG 340. This is our low affinity, BiTE that's targeting PSMA, that's progressing well through dose escalation, as is AMG 509, which targets a novel target called STEAP 1, also in dose escalation. We shared some pretty encouraging data at the business update in February there and hope to progress that to expansion cohort soon.

And then in -- just pivoting to general medicine. Quickly, we shared recently the top line results of the long-term safety of Repatha. This is -- where importantly, we demonstrated there were no new safety signals in patients who received the drug up to 8.5 years. So tremendous safety data set there. In addition, a large majority of those patients were able to achieve their LDL targets, less than 40 mg per deciliter. So I look forward to sharing more of that data.

And then I'll just mention Olpasiran, that's our first siRNA program, targeting Lp(a). That Phase IIb is going to be reading out the first half of this year, and we're planning very much for success with that program and an ability to pivot quickly into Phase II should those data read out as we hope them to.

And then I'll just end maybe with the biosimilars, we have 3 biosimilar programs that have Phase III readouts this year, one for EYLEA, one for SOLIRIS and one for Stelara, and we just recently announced positive results for the Stelara Phase III. So I think on the whole, we feel like we're pretty well positioned to be advancing the pipeline, delivering novel innovative therapies for patients and hopefully, shareholder return in the near and long term.

**Geoffrey Christopher Meacham**
*BofA Securities, Research Division*

Perfect. Thank you, Rob. Yes. So well, let's kick off the pipeline sort of question with LUMAKRAS. And so the launch has gone well so far, but maybe just help us with your comfort level or your confidence in G12C testing overall. Is that still a gating factor to rolling a patient on? What's the awareness that will look like for that? And then beyond that combination is the next sort of leg up, are you guys thinking more beyond PD-1 combinations? There is there a potential for other targeted therapy combinations looking to long and other tumor types.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**AMGEN INC. COMPANY CONFERENCE PRESENTATION | MAY 11, 2022**

**Rob Lenz**
*Senior Vice President of Global Development*

Yes. So I can start off. Peter, do you want to start off with the financials? I'll let you cover the financials. So yes, I mean, I think there's some foundational aspects on the LUMAKRAS launch that we're very comfortable with, and Peter can certainly address the financials.

One is we have now approvals in almost 40 jurisdictions and countries around the world. Within the U.S., we have very broad coverage, greater than 90% coverage. And the testing rate, specifically that you mentioned, is greater than 80%. So those are, we think, are sort of important or foundational. And we have a broad prescriber base, over 1,500 unique prescribers. So those all, we think, bode well for the program, specifically around the G12C testing that you mentioned. So greater -- 80%, that's great.

The key is now to enable the physicians who are the prescribers who are literally sitting in the office when that patient progresses from frontline in the second line, that they have immediate access within the EHR, within the health care system to that testing data. And that's an opportunity that we see for improvements. Our medical and commercial teams are squarely focused on helping enabling that literally on an institution by institution.

So Peter, I don't know if you want to add in any of the...

**Peter H. Griffith**
*Executive VP & CFO*

I would just add in, like we were very pleased with $62 million in product sales in the first quarter. It's on track to where we want it to be. I think Rob's point about making sure when they get to second line, they see the report on the mutation. That will be helpful, and commercial is very focused on that. We want to make sure as many patients as can get to LUMAKRAS get there. It's just a fabulous treatment for patients, and so we're doing everything we can, and the financials will take care of themselves on that. We're very confident in that.

**Geoffrey Christopher Meacham**
*BofA Securities, Research Division*

And other nuances between different geographies that you see as you roll it out in testing rates and patient sort of capture?

**Rob Lenz**
*Senior Vice President of Global Development*

I can speak to the epidemiology at least. So we see about non-small cell lung cancer being 12% and 13% of patients have G12C, harbor that mutation. And that's very similar in Europe in terms of the overall epidemiology which represents a meaningful opportunity, we think, in Europe as well. When you look into the Asia population, it's less. It's around 3% to 4%. So we think that's still an important contributor, but not on the same sort of scale as the U.S. and Europe.

**Geoffrey Christopher Meacham**
*BofA Securities, Research Division*

But there's not a barrier, for example, in Europe, to G12C testing per se?

**Rob Lenz**
*Senior Vice President of Global Development*

Not the -- no, not that we've heard of. Still early days, but not that we've heard of.

**Geoffrey Christopher Meacham**
*BofA Securities, Research Division*

And then the combination, there's a lot of excitement on the potential for PD-1 combinations, but there's a lot of other targeted therapies. And so I know you guys did the CodeBreaKer study, where you looked at

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

a bunch of different tumor types. Is there sort of a basket trial down the road that you could do looking at other targeted therapy like RAS or other 2, 3 drug combos that LUMAKRAS could be a part of that?

**Rob Lenz**
*Senior Vice President of Global Development*

Yes, yes. So the combination approach is really part of what I think is a broader strategy, and that's how do we develop the data to advance LUMAKRAS into earlier lines of therapy across different indications to start on non-small cell, and so there's sort of a multipronged approach that we're taking there.

One is the combination. Another is to look at where the highest unmet need is, where the patient -- what's the patient population, that really is sort of what I'll call sub-optimally treated today. And that is, in the non-small cell space, is really in the patients who have no PD-L1, what we call no PD-L1 expression, right? And that represents about 1/3 of the total non-small cell patient population. So there's an opportunity there that has compelled us to initiate quite a while back a monotherapy study looking at those patients that are not expressing PD-L1 or who also have another co-mutation that we know is generally more refractory to available therapy. So in that case, it's STK11. That trial is ongoing.

It also creates opportunities for combinations outside of PD-1 like chemotherapy. So we have a chemotherapy combination cohort ongoing. We're encouraged by the data that we've seen there that might represent an opportunity to go into, again, that PD-L1 low or negative.

And then in terms of the combination, we actually have -- we're taking a science-based approach but will ultimately be driven by the clinical data, and so that's why we've taken such a broad approach. We actually have over 10 combination cohorts that are underway, of which the PD-1 -- PD-L1 is one of those cohorts as is the SHIP2 and a number of others. So that's -- we've taken this multipronged approach, trying to get into that earlier line of therapy.

**Geoffrey Christopher Meacham**
*BofA Securities, Research Division*

Makes sense. Well, let's talk about TEZSPIRE. You mentioned the investments you're making there, but maybe take a step back. And with the asthma market, there -- a lot of these inflammation markets, right, are intensely competitive. Just give us maybe some anecdotes of the early part of the launch, so far this year, the level of awareness of the drug and just kind of the marketing, blocking and tackling as it stands now.

**Peter H. Griffith**
*Executive VP & CFO*

Well, let me just jump in. First quarter, we had $7 million of product sales. We disclosed the number. We wanted to make sure people understood we're making good progress. We are extremely excited about this. It's a great opportunity for us.

And let me let Rob get into kind of the eosinophilic levels and how the pulmonologists and the allergists are dealing with it both in the same way but slightly differently since the pulms don't tend to want to test quite as much or don't test quite as much as the allergists do. They find this to be a wonderful therapy, I think, at least as we understand it, to prescribe for any of their patients with severe asthma, which is such a difficult situation for -- many of us have relatives or colleagues or friends with this. I mean this is a very serious situation, emergency room visits and so forth. So it's a great medicine for that.

And then over on the allergist side, they're doing more testing, but I think as Rob will explain. And as I said in my words, those eosinophilic levels can go up and down and vary during the person's life. So it's a wonderful therapy for that, at least certainly to get them on as quickly as possible. So Rob, I'll throw it over to you.

**Rob Lenz**
*Senior Vice President of Global Development*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Yes. I mean it's obviously early days in the launch, but I'd say there's some early indicators that give us some high degree of encouragement. One is this idea of awareness, so the unaided awareness since launch has increased to greater than 65%. So clearly, physicians are becoming more comfortable and aware of the product.

And when we've talked with a number of them, I'd say uniformly, the message there is they're very encouraged with the broad profile that it brings, right? And then the allergists and the pulmonologists sort of remind us that it's actually often the case that there aren't these sort of clear distinctions of patient is either allergic or eosinophilic or nonallergic, that actually there is a large portion of patients that manifest both of those as drivers of their disease.

And even if you take a given patient at a given time who may look eosinophilic or predominantly eosinophilic and then test them again in 6 months, they may not, right? So these patients ebb and flow. So the idea of having a single solution that's targeting the broader population and then importantly that same patient over the course of time is something that they've found very compelling and to not have to sort of chase the biomarker has been a recurring theme that we've heard there. So encouraged by what we're hearing from those physicians.

**Geoffrey Christopher Meacham**
*BofA Securities, Research Division*

Perfect. Okay. There's a lot to cover, so let me just go sort of product by product. So Otezla, very impactful to the P&L. The contribution is pretty meaningful. I think the -- like a lot of inflammation products, there was a bit of a COVID sensitivity to it. But now we're like you said, Peter, just getting close to back to normal.

But I think investors have been asking a lot on the competitive landscape with respect to sort of the TYK2 threat. So I wanted to kind of get your perspective as we get close to ducravacitinib launching, what is your confidence level and Otezla, what investments are you making commercially to try to continue to grow that brand?

**Peter H. Griffith**
*Executive VP & CFO*

That's a great question, Geoff. Thank you. Now Otezla is a strong part of our priority growth brands. 7% volume growth in the first quarter we'll continue to push really hard on volume growth. We felt January and February were probably modest to moderately affected by the variant to some -- to a degree, but now we're feeling like we're seeing some demand trends that are stronger in Otezla. We continue to be very optimistic about Otezla and its new indication, mild to moderate broadly across psoriasis, and we think that's going to be very helpful.

So in the first quarter, we also took advantage of being stronger on the co-pay. You'll see pricing was down a little bit, patient assistance programs. We want to make sure we're very well positioned and establish ourselves in a strong way in that space, as you say, as the competition begins to come in.

We're fully expecting, although it's hard to know what the label will be on the competition, but we just assume it's going to be a good label. And we've always planned with Otezla to be going up against a good label on that. We think we've got a great systemic product, no lab monitoring, very safe. I think we're up around 700,000 patients or so now that have been through Otezla. So we're very optimistic and looking forward to continuing to push really hard on it. So it's right up there in terms of our priorities and our growth brands with Repatha and Prolia and EVENITY. And so we're excited about it, and we're optimistic for the rest of the year.

Subject to surges of the -- of COVID and variants of concern, we'll just see what happens, but we're certainly working very hard. And we're expecting the competition to be stiff, but we've always expected that since -- when we announced this opportunity and this transaction in August of 2019.

**Rob Lenz**
*Senior Vice President of Global Development*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

AMGEN INC. COMPANY CONFERENCE PRESENTATION | MAY 11, 2022

I'd just add, Peter. Late last year, we expanded the label into the mild to moderate patient population, which will, of course, be unique across the systemic therapies. And Peter mentioned safety and physicians' sort of comfort level with safety. Physicians are always thoughtful around safety across all diseases, but I think it's particularly true when you think about some of the dermatologic diseases like psoriasis. And when you start to move into a more mild patient population or mild even to moderate, one could argue that will become even more important. So that's where we think Otezla is well established and well positioned in terms of the overall risk benefit in the broad patient population.

**Geoffrey Christopher Meacham**
*BofA Securities, Research Division*

Makes sense. Okay. That's helpful. So biosimilars, you guys have had a growth franchise for several years. And coming up, you have biosimilar HUMIRA for next year, and that could be a pretty high-impact product, but there are a number of biosimilars launching. So maybe help us with how your -- you want to maximize that initial period looking to next year. And do you agree that, that could be one of the bigger assets over time in your biosimilar portfolio?

**Peter H. Griffith**
*Executive VP & CFO*

Well, thank you for that question. As we indicated at Business Review Day, we think AMJEVITA, our biosimilar at HUMIRA is going to be a really important part of an inflection on growth for us beginning on January 31, 2023. So the company is pulling all the stops, and we'll be fully prepared to be ready to go on January 31, 2023.

First and foremost, at Amgen, it's always for the patients but also we think it's a great opportunity for a thoughtful deployment of capital. We are very excited in commercial. We're going to be ready to go. It's -- look, it's an opportunity for us. We have a 5-month head start, just to be clear. The next competitor will be in July of 2023.

Our history with patient experience, our history with devices, our history with supply chain stability and strength, Amgen is every patient, every time for 40 years, and we just haven't missed on delivering medicine to patients, our reputation in biologicals for all those years. So we feel really confident that we're going to be able to establish ourselves in a very strong position there. And so we intend on, as we do at Amgen, competing intensely and winning, and we're looking forward to that.

**Geoffrey Christopher Meacham**
*BofA Securities, Research Division*

To some degree, though, you have to tread lightly with respect to the pricing equation, the indirect effect right on ENBREL.

**Peter H. Griffith**
*Executive VP & CFO*

We do -- what I would like to point out on ENBREL is we now have a nice portfolio, a very, we think, constructive portfolio of inflam between ENBREL and Otezla and TEZSPIRE that Rob was just articulating, the great strengths of and then now down in AMJEVITA. And that actually, Geoff, thank you. You bring up a point that I meant to make as I was articulating that. We go to market with our biosimilars in the commercial therapeutic area, which I think is different than with a lot of companies. We find that to be efficient. We find it to be effective. And we think that's a key to our success with biosimilars. We think it will be a key to our success with AMJEVITA, having it tucked in there with the other inflam drugs.

**Geoffrey Christopher Meacham**
*BofA Securities, Research Division*

Right. Perfect. Let's talk a little bit about external BD. It's a question that comes up a time especially given the current environment. So Amgen, when you did the Micromet deal, it brought you a platform of bispecifics that allowed multiple assets, multiple drugs for a lot of different indications. Is there -- as you look across the landscape, is there a technology that you feel could also serve that role, for example, gene

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

therapy, cell therapy, editing, things of that nature that could scale into multiple indications? Or is Amgen thinking about BD more just at a higher level of what sort of P&L impact it could have in several years? So is it sort of technology-based? Or is it sort of high level? You're probably going to say both.

**Peter H. Griffith**
*Executive VP & CFO*

I'm going to say E, all of the above. So at Amgen, we've got a long history using strategic business development, all types of transactions, all stages of development, different modalities. So let's go back. I think history is always a great indicator of the future.

Go back to last year, 7 strategic transactions. We start with an acquisition of Rodeo early in the year, a preclinical inflammation asset, delighted with that. We go to Five Prime, which is an acquisition of a derisked wonderful drug, Bema, addressing gastric cancer now in Phase III. Then we go to Kyowa Kirin, a licensing transaction. Derisked asset, very excited about AMG 451. If you want the new name of it, Rob is going to pronounce that. I am not going to do it.

**Rob Lenz**
*Senior Vice President of Global Development*

Rocatinlimab.

**Peter H. Griffith**
*Executive VP & CFO*

Rocatinlimab.

**Rob Lenz**
*Senior Vice President of Global Development*

Just flows right out.

**Peter H. Griffith**
*Executive VP & CFO*

This flows right out. I call it roca. And so -- and then we went to Teneobio. And Teneobio, interestingly enough, you talked about Micromet. Well, Teneobio gave us a multispecific kind of new platform that we like that tucks right into the bispecific platform, and we thought it was a nice advance there. In addition to the SMA molecule, it's AMG 340.

And then we go to 2 early-stage collaborations, computational biology and targeted protein degradation with Generate Bio and with Arrakis. And then we had kind of the out-licensing and the investment in Neumora with some of our neuro assets. So Geoff, we are all stages, all time lines. We have Amgen Ventures, so we could certainly keep in touch with and in contact with different modalities, and we'll continue to do that. We'll be thoughtful.

Last year, we spent over $3 billion on upfront payments in addition to thoughtfully executing about $5 billion of opportunistic share repurchases. So we're thoughtful about capital allocation. Strategic business development is important. Acquiring the best innovation, whether internal and external, is #1 in our capital allocation hierarchy, and it will continue to be there.

So a long answer to your question, but a really important question for us. All hands on deck. Rob in Research and Development, Dave Reese worked closely with Murdo Gordon in commercial with Rachna Khosla who took over business development from Dave Piacquad on January 1. He's doing a great job, and we're a company fully committed to finding that best innovation internal or external.

**Geoffrey Christopher Meacham**
*BofA Securities, Research Division*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

And Rob, along those same lines, are there technologies that you feel like Amgen still needs to have access to or could be more impactful going forward? Or is there enough sort of tools that you have at your disposal per Peter's talk about all the deals that you've done.

**Rob Lenz**
*Senior Vice President of Global Development*

Well, it's been a great strategic set of investments to build out our platform capabilities, particularly in the research side over the last year. I mean, it's really -- I think just a really nice cohesive strategy there. That being said, we're always looking, right, to the outside to bring in external innovation, be it on a molecule -- particular molecule that we think is going to address a meaningful unmet need or in a platform that will be a capability build.

And so the ones that come up a lot, and I'm not surprised, I think you mentioned, Geoff, gene therapy, RNA therapy. The one you didn't mention is antibody drug conjugate in the oncology space. These are areas that there's a lot of investment. We're starting to see those move in a meaningful way. I'd say we're constantly surveilling that landscape. And when we think the time is right from a scientific perspective to jump in, we have that freedom -- the financial freedom that Peter gives us to be able to act on those. But I'd say nothing immediate, but those are some areas that we're keeping a close eye on.

**Geoffrey Christopher Meacham**
*BofA Securities, Research Division*

Perfect. In addition to looking at sort of external opportunities, one of the things to -- that investors talk about with respect to just overall growth is the whole BeiGene relationship and the Asian opportunity. Where -- you think about the -- what are the challenges in some of those regions? And just give us sort of a 30,000-foot view, Peter, about how you would sort of grade the access on the BeiGene collaboration thus far. And looking forward, how much do you think you could really impact the P&L looking out 5-plus years?

**Peter H. Griffith**
*Executive VP & CFO*

Well, look, we're pleased with the collaboration. Let me start with what's in market right now. So they're in market with BLINCYTO, XGEVA and KYPROLIS. And we're very pleased with the results on those 3. So they're handling that on -- those in-market oncology products for us. At the same time, kind of thinking about China broadly, we've still got our general medicine portfolio there. Repatha just got on the NRDL.

So we're excited about that. So that's going well. And so we're pleased in the relationship in that. We continue to work on a collaboration on the oncology products with them as we articulate on a regular basis, and so we're pleased with what's going forward. China is the second largest pharmaceutical market in the world. We intend on continuing to be focused on it, but it's always helpful and constructive to have a relationship with -- like that with somebody on the ground there with BeiGene and work our way through it with them. So we're pleased where we sit with that.

We'll continue not just in China with BeiGene, but also things are going very well for us in Japan. We're excited about that. So Asia Pacific will be, as we've indicated, a strong area of growth for us overall through 2030 and really help lead us towards the company that, as we indicated at Business Review Day, we increase outside the United States to 35% or more where we are today and continue to globalize. We've got great medicines that treat large effect sizes and people with serious illnesses. So we want to make sure we're getting them out across the world.

**Geoffrey Christopher Meacham**
*BofA Securities, Research Division*

Perfect. Okay. Well, with that, we're out of time. So guys, thank you very much to you.

**Peter H. Griffith**
*Executive VP & CFO*
Geoff, thank you and thank BofA Securities.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2022 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2022 S&P Global Market Intelligence.

# EXHIBIT I

**S&P Global**
Market Intelligence

# Amgen Inc. NasdaqGS:AMGN

# Company Conference Presentation

**Wednesday, June 15, 2022 6:40 PM GMT**

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

# Table of Contents

Call Participants ....................................................................................... 3

Presentation ........................................................................................... 4

Question and Answer ............................................................................... 7

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

**AMGEN INC. COMPANY CONFERENCE PRESENTATION |  JUN 15, 2022**

# Call Participants

**EXECUTIVES**

**David M. Reese**
*Executive Vice President of
Research & Development*

**Peter H. Griffith**
*Executive VP & CFO*

**ANALYSTS**

**Salveen Jaswal Richter**
*Goldman Sachs Group, Inc.,
Research Division*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Salveen Jaswal Richter**
*Goldman Sachs Group, Inc., Research Division*

Good morning. Thanks, everyone, for joining us. Really pleased to have the Amgen team with us. We have Peter Griffith, CFO; and Dave Reese, Head of R&D. With that, earlier this year -- actually, I'm going to turn it over to you, Peter, first to start with any opening comments.

**Peter H. Griffith**
*Executive VP & CFO*

Great. Thank you, Salveen. Good morning, everyone. And thank you, Goldman, for the 43rd Healthcare Conference. That means I did my math. That means it must have started about when Gene Sykes graduated from college. So I know he's not here, so I can get away with that.

So listen, at Amgen, we always begin with patience. Our mission at Amgen, we're a mission-driven company, is to discover, develop, manufacture and distribute and deliver first-in-class and best-in-class medicines to patients all over the world. And the first quarter was a great indicator that we're on track to deliver against our long-term objectives and, more importantly, against that mission that we communicated at the February business review meeting. We executed efficiently and delivered in the first quarter. We delivered 6% revenue growth year-over-year, and 15% non-GAAP earnings per share growth year-over-year.

Now let me give you a couple of factors underlying our long-term growth objectives. Before I do that, let me remind you, at Amgen, we think about the current year and executing in 2022. We think about the forward 12 quarters and how we're going to dynamically reallocate capital and meet our objectives for our patient shareholders in that time period, and then we think about through 2030 and beyond, creating value over the long term.

We've reaffirmed going to 2022 our revenue and non-GAAP EPS guidance ranges despite by headwinds. We noted on the first quarter call that our guidance ranges included unfavorable foreign exchange impacts of $400 million to revenue and about $0.35 to non-GAAP earnings per share. We also increased our full year OI&E guidance to $1.6 billion to $1.8 billion of net expense from the previous $1.4 billion to $1.6 billion range. This reflects our share of the BeiGene result and also reflects rising interest rates, which we may hear about more today from Chairman Powell, I think. We expect OI&E net expense of approximately $400 million in the second quarter.

The second very important aspect of our journey towards meeting our objectives in 2030 is our strong volume growth from our innovative brands, which will be the key. Repatha was up 49% in volume in the first quarter. Prolia was up 10%. EVENITY, up 59% in volume. Otezla was up 7% in volume as well as we had 11% volume growth across our 6 innovative oncology drugs.

We're pleased with the launches of LUMAKRAS in the second-line non-small cell lung cancer setting, and with TEZSPIRE for severe asthma. Our 5 commercialized biosimilars are performing in line with our expectations. As we've previously said, our biosimilars portfolio really will perform better and better when we're the new -- first product in or we're into a new market. We're continuing to make progress on our international growth strategy.

Let me remind you that in 2021, we exceeded $1 billion in revenue from the Asia Pacific region. We had 15% ex U.S. volume growth in the first quarter and nearly 30% in the Asia Pacific region. As we always do, we like to remind ourselves and all of you that we have a strong balance sheet. We generate significant cash flow and retain significant financial flexibility when we evaluate strategic business developments. And we're committed to pursuing the best innovation available, whether it's internal or whether it's externally generated.

And speaking of innovation, it's a good time to turn it over to my colleague, Dave Reese.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**AMGEN INC. COMPANY CONFERENCE PRESENTATION |  JUN 15, 2022**

**David M. Reese**
*Executive Vice President of Research & Development*

Thanks, Peter. Thanks, Salveen. It's great to see you and everyone in person this year back at the beautiful setting.

A lot going on in the pipeline. Let me recount a few of the highlights here, and then I'm sure we'll return to a lot of these themes in the course of the conversation. First, in our inflammation portfolio, TEZSPIRE launch is going well. We've initiated 2 new studies in asthma, and we are exploring or about to initiate trials in 4 additional indications, very nice progress there. We have made progress in the rocatinlimab, or AMG 451 program. This targets OX40 for atopic dermatitis. I'm pleased to announce that we have initiated enrollment in the first Phase III trial, what will be a suite of trials. That program is now up and running.

In General Medicine, some nice announcements recently. You have seen top line results from the Repatha open-label extension study, several thousand patients studied for 5 years or more, up to 8.5 years, demonstrating long-term safety, tolerability and efficacy for Repatha. We hope to share those results at one of the major cardiology congresses later in the year. Likewise, we're looking forward to sharing results from the Olpasiran program. This is a small interfering RNA that lowers LP(a) levels. We had top line results from the Phase IIb study. I think exceptionally good results. I really like this molecule. It lowered. Most doses studied levels of LP(a) by greater than 90% with what appears to be a clean safety profile. So that program is moving along.

In oncology, also progress. At the AACR meeting, we presented a combined analysis from our Phase I and Phase II data of LUMAKRAS monotherapy on lung cancer showing that roughly 1/3 of patients were alive at 2 years. I think a very compelling result. We are on track for the confirmatory trial against docetaxel to read out in the third quarter and remain on track to generate data from the dose comparison study in the fourth quarter of this year.

I did want to take a minute and pause here because there's been an enormous amount of speculation in the last few years about how potential putative differences in pharmacokinetics, physicochemical properties, tissue penetration and the like would lead to clinical differentiation. We didn't think that would be the case. And in the event the data that we're seeing emerge, I think, justifies our belief in LUMAKRAS, both in terms of efficacy, particularly duration of response, where we look very strong, and a safety profile, 21% Grade 3 or 4 treatment-related adverse events, less than half the rate recently reported in the field. So I'm very, very confident in the clinical profile of this molecule.

Now there's a lot of interest in combination therapy. We'll come back to that as we've announced both checkpoint inhibitor, PD-1 and SHIP2 combination data will be shared a little later this year. They've been submitted to one of the major congresses. Beyond LUMAKRAS in the oncology portfolio, the bemarituzumab program in gastric cancer is enrolling 2 Phase III trials now. We have a Phase Ib signal-seeking study in squamous non-cell -- small cell lung cancer that is also up and running.

And then finally, in oncology in the bispecific portfolio, also forward momentum. Tarlatamab, or AMG 757, targeting DLL3 in small cell lung cancer, we continue to enroll, potentially registrational. Phase II trial enrollment is actually quite brisk in that study. We are investigating now tarlatamab in the first-line setting, and we are investigating it in neuroendocrine prostate cancer.

I had a chance to talk to a number of investigators at ASCO recently within the last couple of weeks. I think a real wave of enthusiasm building behind that molecule, folks wanting more treatment slots for their patients, proposing investigator-sponsored studies, the sorts of things you see when people really get interested in the clinical profile.

In the prostate cancer portfolio, AMG 509 that targets STEAP1 continues to move along nicely. We continue to see what I think are very nice clinical data there. That's a program to watch. And then as we have discussed previously, we have 2 molecules targeting PSMA, AMG 160, AMG 340. Based on the data we've seen across both of those programs, we have elected to prioritize AMG 340 and deprioritize AMG 160, and the AMG 340 program continues to move along briskly as well.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

And then finally, as Peter mentioned, the biosimilars portfolio is doing well. We had recent Phase III top line results of ABP 654, biosimilar to STELARA. Looked quite nice, and we're on track for the Phase III programs for biosimilars to EYLEA and SOLIRIS, and we're on track to launch AMGEVITA in January of next year. So a lot of, I think, very sort of crisp, top-notch execution across the portfolio right now.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Salveen Jaswal Richter**
*Goldman Sachs Group, Inc., Research Division*

Perfect. Peter, maybe we'll start with you. You hosted a business review meeting earlier this year and provided long-term guidance. When you looked at 2030 guidance, we got to about $38 billion in revenue at the midpoint of our math. What gives you confidence in achieving that number? And with Repatha, there were some questions as to what's embedded in your assumptions to get to that run rate that you provided?

**Peter H. Griffith**
*Executive VP & CFO*

Salveen, it's a great question. We are -- we indicated we anticipate mid-single-digit growth through 2030. And so with that, let's start with Repatha. Repatha we indicated will be a multibillion-dollar franchise. We've seen actually strong volume growth this year, as I mentioned just a few moments ago. We see in, for example, in the United States, by the end of the decade, about 50 million people with serious cardiovascular disease, maybe about half of those would be pretty good candidates for Repatha. So a large market there.

Think about China and think about the same opportunity there, by way of example. And we did just go on NRDL over in China earlier this year. So we focus on that as a large part of the market. There's low PCSK9 penetration. We think that's really important to keep in mind. Third, we anticipate now moving from really a continuing focus on cardiologists down into the focus on the PCPs. And we think there's a great opportunity there to do a great job and bring them over and more importantly, their patients. We think that's really important.

We've got access at a point we think that's been unlocked. So we've got the fixed copay we've talked about before, $50 or so under Medicare. We've got broad access, greater than 80% of the covered lives in the United States at this point. And then in 2025, we expect data on our outcomes trial on VESALIUS. And Dave could certainly give you some more details on that. But at least in my notes, I think that unlocks up to even more than 750,000 potential new patients.

So Repatha is a key component. And 1 out of 3 people on the globe die because of a cardiovascular problem. So we're going to continue to move very forward aggressively in that and allocate capital to Repatha. It's on the top of our prioritized agenda. Biosimilars, we talked about that in 2021. You'll recall, we had about $2.2 billion or so in biosimilar revenue. And we've indicated that we expect that to more than double by 2030.

We're excited about the launch of AMGEVITA in the United States next January, January 31. We have a 5-month head start on our competition, and we think that's going to be an important opportunity for us in our biosimilar portfolio. We have 3 more coming after that through 2025. We've got biosimilars to STELARA, to EYLEA and I think the other one is Rituxan, isn't it? And so -- and then we've got 3 more after that. So we have 5 in the market, and we'll have 6 between now and 2030. And so we're really looking forward to continuing to move that forward. We think that's really important.

We'll continue to have new launches. Dave will talk about that. I'm sure you're going to ask him some questions about the great potential in our pipeline and what's coming along there. He just mentioned a number of those, which make up new launches. We include those with TEZSPIRE and with LUMAKRAS and so forth. And then finally, we wanted, during business review day, Salveen, to remind people that the erosion curves on our biologics tend to be quite a bit slower than those, of course, on small molecules.

So when we look at those -- the larger molecules in the portfolio and the LOEs that come through the end of the decade, we feel strongly that the erosion curves are just different and they take longer. And we actually gave some examples going back to 2014 when we looked at our portfolio, about 40% of which at the time came from large molecules that were going to be under LOE expiration in the coming years. And

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

out of that 40% that we looked at in 2014, 10% of that -- 10 percentage points, so 25% of those are still with us today generating significant important cash flow.

I think in the first quarter, cash flow from our established products was over $1 billion, generates great cash flow for us to fund innovation, both internal and external. So as we make our way through to 2030, that's the journey we see. We're executing hard on it, as I said, and we're excited to be able to deliver for patients and for shareholders long-term growth.

### Salveen Jaswal Richter
*Goldman Sachs Group, Inc., Research Division*

Could we -- or could you also speak to business development? You talked about external growth. Maybe 2 questions here. One, you're already 2.5x levered, would you go higher than that? And then two, what is the urgency? If you look at your LOEs, they're more towards the back end of the second half of the decade, so what is the urgency to do something today?

### Peter H. Griffith
*Executive VP & CFO*

I'm glad you asked the question about business development because I forgot to remind all of us that our plan is organic only that -- so we gave guidance on what we call our cards in hand. And so we feel like we've got the assets. And if we execute on it, we execute on the pipeline, which we're feeling very confident about, we get to 2030.

Now let's get to business development. So when you think about our capital structure, we like our efficient capital structure. It's been fairly consistent the past number of years. I've indicated that I think it works for us. It might go up a little bit, it might go down a little bit. But it provides us an efficient capital structure. We want to yield kind of an optimal WACC, weighted average cost of capital. We don't want to minimize WACC. We like our ratings. We have strong investment-grade ratings. We think that's important for us.

We accessed the market -- in the last 2 years and 3 months, we accessed the market 4x for a total of $18 billion at very favorable rates. We were fortunate to get into the market at the right time. We think that's important. So when we look at opportunities, Salveen, and how we would finance them, we'll continue to go with an efficient capital structure. There have been times when Amgen levered up a little bit more. And I think historically, if somebody wanted to look at that and kind of consider how that feels, that's about what we -- those are probably a decent guide.

But on the other hand, in that instance, when we did lever up, there was a clear plan within 24 months or so to get back down to where we were. We like that. We like to use our cash flow to kind of stay where we're at, if in the event we did something like that. But then kind of more broadly on business development and thinking about where we go on it. We haven't changed our methodology, our process. We've got a very strong way we interrogate this with Dave in research and development, with Murdo in Commercial, and with Rachna Khosla, who's taken over business development from Dave Piacquad on January 1, strong team. We want to have a view on just about everything out there.

I'm sure we'll get a lot of questions on small and mid-caps and so forth. We work to interrogate everything and look at it. That team looks at it. And we want to make sure we're the best buyer. We want to make sure, number two, we always say we're prudent. We look at cash-on-cash returns, make sure they're above our hurdle rate. Three, we feel really strongly about being in one of kind of our 3 discovery areas, where we have research and where that kind of supplements what we acquire. And fourth, we think it's important to acquire opportunities that we can, on a very timely basis, integrate into what we do.

We're agnostic on structure. Last year, we did any number of structures. Acquisitions, we did a licensing with Kyowa Kirin. We did an out-licensing with [ Novero ] where we put some money into it. And then we did some early stage investing in collaboration work with Generate Biosciences and Arrakis. So kind of a -- I figured I'd give you a little longer drive, which in Los Angeles and traffic happens, through kind of how we think about our capital structure and our business development opportunities.

Copyright © 2022 by S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**AMGEN INC. COMPANY CONFERENCE PRESENTATION | JUN 15, 2022**

**Salveen Jaswal Richter**
*Goldman Sachs Group, Inc., Research Division*

Great. So Dave, you talked about LUMAKRAS and the data sets that have come out recently, and we're going to see combo data in the second half of the year. How do you think about, I guess, when you look at the profile of your drug, it seems like, and correct me if I'm wrong, but tolerability seems to be the focus for doctors. So when you think about the combination approach here and you're doing combination and sequencing, how do you think about getting that optimal profile? And what's your conviction that you can get that over the goal line here?

**David M. Reese**
*Executive Vice President of Research & Development*

Yes. No, it's a great question and obviously, intense interest in the field in combinations. I'd start by reminding everyone, we've got more than 10 combinations under investigation, all of which have biologic and clinical rationale. I think those questions have to be answered empirically now in the clinic, and we're moving along quite quickly to do that. The -- when we think about lung cancer, in particular, where there's a lot of focus right now and how you might move into earlier lines of therapy. Historically, it's been hard to combine small molecules with checkpoint inhibitors. In fact, most have washed out for one reason or another.

As we mentioned, we'll present what we think is a comprehensive look at that question a little later in the year. It's also important to think about that patient population, which is divided roughly 1/3, 1/3, 1/3 into tumors that are negative for PD-L1 expression, low to intermediate for PD-L1 expression and then high expressers. Because the clinical approach, I think, over time, and those that also have the G12C mutation, may vary.

In the PD-L1 negative population, for example, we have interesting early data on chemotherapy-LUMAKRAS combinations, and in fact, have had very good discussions with regulatory agencies, and we'll be launching a Phase III trial in that population in combination with chemotherapy. We are defining the checkpoint inhibitor approach. And like I said, we will present that a little later in the year. There are multiple other combinations shipped to other small molecules, cytotoxic chemotherapy, not restricted to lung cancer, but targeting, in particular, some of the GI malignancies. Colorectal cancer at the top of the list, but pancreatic cancer and others where there is some frequency of G12C mutations.

**Salveen Jaswal Richter**
*Goldman Sachs Group, Inc., Research Division*

And there was -- I think, coming out of ASCO, there was a presentation looking at chemo in G12C patients, KRAS patients. And so there's been some question as to how to think about the risk to the confirmatory study. I guess, just posing that to you, how confident are you that, that confirmatory study...

**David M. Reese**
*Executive Vice President of Research & Development*

Yes. I mean the confirmatory study, to remind everyone, is a head-to-head trial against docetaxel in the second-line setting. We're confident in that trial. It is powered on progression-free survival. That was after extensive discussions with the FDA and regulatory authorities. So a 90% power to detect a meaningful difference in progression-free survival. I think if we see something like the results we saw in the pivotal trial, I'm quite confident there. I think the adverse event profile should be, if anything, better based on everything we've seen.

We now have 6,500 patients treated with LUMAKRAS across the clinical development program, expanded access programs around the world now and with commercial product. There are 3,000 patients in the expanded access programs. We hope to share those data as well later in the year. But we're really seeing an adverse event profile in the real world that mimics what we saw in the CodeBreaK 100 trial.

**Salveen Jaswal Richter**
*Goldman Sachs Group, Inc., Research Division*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Is the impact on active brain metastases a key differentiating factor? I'm just curious. We've never seen that data from your side.

**David M. Reese**
*Executive Vice President of Research & Development*

Sure. As I mentioned, a lot of putative differentiated factors have come and gone. I'm quite comfortable with our profile. We're actively enrolling a trial with a decent sample size in patients with active brain metastases. I fully expect that we will be very competitive in that domain as well. Everything we understand about the biochemistry suggests that will be the case. We've got lots of anecdotal reports of responses in the brain.

So I think one of the keys here is to be wary when you look at a handful of patients followed for a very short period of time. And in general, our approach is to give you a more robust look at the data.

**Salveen Jaswal Richter**
*Goldman Sachs Group, Inc., Research Division*

Peter, can we talk about the biosimilar business here and your assumptions on durability and new entrants from your portfolio? What is your strategy when you take into account? Or where is the upside when you talk about doubling the revenue by the end of the decade, but why couldn't it be more?

**Peter H. Griffith**
*Executive VP & CFO*

Well, I like the premise of your question. But what I would say, Salveen, is the way we think about it is where I started, which is you want to be first in the market if you can be and you want to enter new markets. If you can do both at the same time, that's great.

So by way of example, when we think about the biosimilar market, take adalimumab with the largest selling biosimilar in Europe on that. We have good experience there. We were first to market. We're going to be first to market in the United States with that January 31 of next year. We think that's really important as we think about it. So we are fully prepared as a company and very prioritized on achieving that objective and making sure that it gets to as many patients as we can.

In response to your question on kind of a more overall basis, we think about the biosimilar portfolio, as I said earlier, 5 in market, 6 coming, 3 we've talked about, 3 we haven't. And I think we've talked about the 3 that haven't come here that they're on innovative molecules of tens of millions of -- tens of billions of dollars. And so we think there's a very robust market for us to go at. We intend to go at it very thoughtfully.

But we think the 11 create an analog to a super blockbuster. So some will stay with us longer. So the erosion curve may be a little bit less steep and some may have a steeper erosion curve. But overall, we expect those 11 to aggregate into a kind of a super blockbuster look. The margins we've indicated are not dilutive to our overall corporate margins. And so we think there's really an opportunity to kind of shape that together.

And so that's what excites us about the biosimilar market. And certainly, it addresses a need in the health care system. And so we like to be there. Amgen has been working on biologics for decades. Probably we'd like to think of ourselves as the leader in the world. We've got great patient experience. We've got a supply chain that matches everyone in that, if not exceeds it. So there's certainly suppliers certainly. So we've got all the key ingredients to build this great portfolio of biosimilars.

We've indicated we think it will be more than double what it was in 2021. And probably the one last point I would make that we think has been a differentiating point and helps in our efficiency is we commercialize these in the therapeutic area into which they fall. And so for us, that's worked out to be really helpful, not just in terms of kind of addressing formulary desires and kind of demand there, but also in terms of just efficiency and being able to get them out. And that's worked well. And so we look forward to having biosimilars as a key component of this mid-single-digit growth on the way to 2030.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

AMGEN INC. COMPANY CONFERENCE PRESENTATION | JUN 15, 2022

**Salveen Jaswal Richter**
*Goldman Sachs Group, Inc., Research Division*

When we look at your portfolio of Otezla and TEZSPIRE and OX40 and other programs in the clinic, maybe a twofold question here. One, how comfortable are you with the growth outlook for the commercial assets? And then two, the science in terms of the competitive aspect and versus what's out there?

**Peter H. Griffith**
*Executive VP & CFO*

You want to start with the science?

**David M. Reese**
*Executive Vice President of Research & Development*

Sure. So TEZSPIRE, as I've said, I think is a great molecule. It's one I've been involved with since it went into the clinic. We're seeing, I think, a very pleasing launch. We are seeing use by both allergists and pulmonologists. And we're seeing use in both patients with low eosinophil counts where we thought might be the initial headway, but actually in those with high eosinophils as well. There are 2.5 million people around the world with severe asthma currently underserved, more than 1 million in the United States. So we're very pleased with our partners, AstraZeneca, where we sit there.

And as I said, we've got a very robust life cycle plan in place in other indications where there is evidenced biology behind the TSLP pathway being a potential initiating event. When we turn to the OX40 program. Again, this is one I like quite a bit. Rocatinlimab, as I mentioned, the Phase III program is now launched, enrolling patients. There will be roughly half a dozen studies as part of that program, which we're calling ROCKET.

It will address a wide swath of patients with atopic dermatitis. Those who are biologics-naive or experienced, those who are JAK inhibitors-naive or experienced, range of ages, range of ethnic populations. If we step back, I sort of think about atopic dermatitis is taking an evolution. As we saw with psoriasis, 25 years ago, there were no biologics for psoriasis. The TNF inhibitors are introduced. Now there are multiple mechanisms of action, pathways in a very robust market. I think you're going to see the same thing play out in atopic dermatitis, which is a more, in my view, more prevalent disease, and we currently appreciate.

And as additional effective therapies become available, that patient pool will grow. And many of these patients will cycle on therapy. So we like rocatinlimab. It both inhibits signaling through the OX40 pathway and reduces the number of pathogenically activated OX40-bearing T cells, which is a fundamental driver of the pathogenesis of the disease. And we're looking forward to pushing that Phase III program along.

**Peter H. Griffith**
*Executive VP & CFO*

Maybe just a quick add on Otezla. Otezla is a really important medicine. We received that mild to moderate indication, very important label for patients, in December. And so we see that as a really important component of our inflammation growth through most of the decade. We've indicated, kind of on average, low double digit growth through its expiry in 2028. And so we think it's a great medicine. It's -- as we way, it's kind of a post-topical, prebiologic medicine. Dermatologists find it very attractive to prescribe. The awareness is very high of it.

And we're working very hard, very focused on Otezla to keep the volume up and continue to make sure it's getting out to as many patients as possible. And we've conceded some price on that to move it in the first quarter, just to make sure it's getting out there and the new indication is taking hold, and we'll continue to work on that. But we feel strongly that it's going to be a very, very attractive component of our inflammation immunology portfolio through its expiry in '28.

**Salveen Jaswal Richter**
*Goldman Sachs Group, Inc., Research Division*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**AMGEN INC. COMPANY CONFERENCE PRESENTATION |  JUN 15, 2022**

Dave, lastly, what are you most excited about in the pipeline?

**David M. Reese**
*Executive Vice President of Research & Development*

I've mentioned a lot of the molecules, I would probably come back to tarlatamab as well, one that gets maybe a little less attention than it ought to. This is again the program targeting DLL3 in small cell lung cancer. We should be presenting updated data from the Phase Ib dose escalation and dose expansion study at a medical meeting in the coming months. That's worth paying attention to. I think additional programs in the inflammation portfolio, AMG 570, which targets both T and B cell pathways in lupus as well as AMG 592, an IL-2 mutein, also being investigated on lupus and ulcerative colitis are worth watching. And then AMG 133 in obesity, dual mechanism of action. Very interesting early clinical data, some of which I shared at our business review in February, that one's worth keeping an eye on as well.

**Salveen Jaswal Richter**
*Goldman Sachs Group, Inc., Research Division*

Great. Well, with that, thank you so much, Peter. Thank you, Dave.

**Peter H. Griffith**
*Executive VP & CFO*

Thank you, Salveen.

**David M. Reese**
*Executive Vice President of Research & Development*

Thank you.

**Salveen Jaswal Richter**
*Goldman Sachs Group, Inc., Research Division*

Thank you.

**Peter H. Griffith**
*Executive VP & CFO*
Nice to see you. Thank you.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2022 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2022 S&P Global Market Intelligence.

# EXHIBIT J



# Q3 '22 EARNINGS CALL

**November 3, 2022**



# SAFE HARBOR STATEMENT

This presentation contains forward-looking statements that are based on management's current expectations and beliefs and are subject to a number of risks, uncertainties and assumptions that could cause actual results to differ materially from those described.  All statements, other than statements of historical fact, are statements that could be deemed forward-looking statements, including any statements on the outcome, benefits and synergies of collaborations, or potential collaborations, with any other company, (including BeiGene, Ltd., Kyowa-Kirin Co., Ltd., or any collaboration to manufacture therapeutic antibodies against COVID-19), the performance of Otezla® (apremilast) (including anticipated Otezla sales growth and the timing of non-GAAP EPS accretion), the Five Prime Therapeutics, Inc. acquisition, the Teneobio, Inc. acquisition, or the ChemoCentryx, Inc. acquisition, as well as estimates of revenues, operating margins, capital expenditures, cash, other financial metrics, expected legal, arbitration, political, regulatory or clinical results or practices, customer and prescriber patterns or practices, reimbursement activities and outcomes, effects of pandemics or other widespread health problems such as the ongoing COVID-19 pandemic on our business, outcomes progress, and other such estimates and results.  Forward-looking statements involve significant risks and uncertainties, including those discussed below and more fully described in the Securities and Exchange Commission (SEC) reports filed by Amgen, including Amgen's most recent annual report on Form 10-K and any subsequent periodic reports on Form 10-Q and current reports on Form 8-K.  Please refer to Amgen's most recent Forms 10-K, 10-Q and 8-K for additional information on the uncertainties and risk factors related to our business.  Unless otherwise noted, Amgen is providing this information as of  November 3, 2022 and expressly disclaims any duty to update information contained in this presentation.

No forward-looking statement can be guaranteed and actual results may differ materially from those we project. Our results may be affected by our ability to successfully market both new and existing products domestically and internationally, clinical and regulatory developments involving current and future products, sales growth of recently launched products, competition from other products including biosimilars, difficulties or delays in manufacturing our products and global economic conditions. In addition, sales of our products are affected by pricing pressure, political and public scrutiny and reimbursement policies imposed by third-party payers, including governments, private insurance plans and managed care providers and may be affected by regulatory, clinical and guideline developments and domestic and international trends toward managed care and healthcare cost containment. Furthermore, our research, testing, pricing, marketing and other operations are subject to extensive regulation by domestic and foreign government regulatory authorities. We or others could identify safety, side effects or manufacturing problems with our products, including our devices, after they are on the market. Our business may be impacted by government investigations, litigation and product liability claims. In addition, our business may be impacted by the adoption of new tax legislation or exposure to additional tax liabilities. If we fail to meet the compliance obligations in the corporate integrity agreement between us and the U.S. government, we could become subject to significant sanctions. Further, while we routinely obtain patents for our products and technology, the protection offered by our patents and patent applications may be challenged, invalidated or circumvented by our competitors, or we may fail to prevail in present and future intellectual property litigation. We perform a substantial amount of our commercial manufacturing activities at a few key facilities, including in Puerto Rico, and also depend on third parties for a portion of our manufacturing activities, and limits on supply may constrain sales of certain of our current products and product candidate development. An outbreak of disease or similar public health threat, such as COVID-19, and the public and governmental effort to mitigate against the spread of such disease, could have a significant adverse effect on the supply of materials for our manufacturing activities, the distribution of our products, the commercialization of our product candidates, and our clinical trial operations, and any such events may have a material adverse effect on our product development, product sales, business and results of operations. We rely on collaborations with third parties for the development of some of our product candidates and for the commercialization and sales of some of our commercial products. In addition, we compete with other companies with respect to many of our marketed products as well as for the discovery and development of new products. Discovery or identification of new product candidates or development of new indications for existing products cannot be guaranteed and movement from concept to product is uncertain; consequently, there can be no guarantee that any particular product candidate or development of a new indication for an existing product will be successful and become a commercial product. Further, some raw materials, medical devices and component parts for our products are supplied by sole third-party suppliers. Certain of our distributors, customers and payers have substantial purchasing leverage in their dealings with us. The discovery of significant problems with a product similar to one of our products that implicate an entire class of products could have a material adverse effect on sales of the affected products and on our business and results of operations. Our efforts to collaborate with or acquire other companies, products or technology, and to integrate the operations of companies or to support the products or technology we have acquired, may not be successful. A breakdown, cyberattack or information security breach of our information technology systems could compromise the confidentiality, integrity and availability of our systems and our data. Our stock price is volatile and may be affected by a number of events. Our business and operations may be negatively affected by the failure, or perceived failure, of achieving our environmental, social and governance objectives. The effects of global climate change and related natural disasters could negatively affect our business and operations. Global economic conditions may magnify certain risks that affect our business. Our business performance could affect or limit the ability of our Board of Directors to declare a dividend or our ability to pay a dividend or repurchase our common stock. We may not be able to access the capital and credit markets on terms that are favorable to us, or at all.

The information relating to our Q3 results is expressly limited to information through September 30, 2022, and future results are subject to the effects of the ongoing COVID-19 pandemic on our business, including disruptions and effects on our product sales, and extrapolation on such results should include the timing and effects of the COVID-19 pandemic discussed in our oral presentation and our Form 10-Q for the period ended September 30, 2022.

This presentation includes GAAP and non-GAAP financial measures.  In accordance with the requirements of SEC Regulation G, reconciliations between these two measures, if these slides are in hard copy, accompany the hard copy presentation or, if these slides are delivered electronically, are available on the Company's website at www.amgen.com within the Investors section.

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

2



# AGENDA

| | |
|---|---|
| **Introduction** | **Arvind Sood** |
| **Opening Remarks** | **Bob Bradway** |
| **Q3 '22 Business Results and Outlook** | **Peter Griffith** |
| **Global Commercial Update** | **Murdo Gordon** |
| **Research & Development Update** | **David Reese** |
| **Q&A** | **All** |

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

3



# WE DELIVERED ANOTHER STRONG QUARTER IN Q3

- **Key products grew through volume**

- **Launch brands LUMAKRAS® and TEZSPIRE® are reaching more patients**

- **Invested in first-in-class pipeline opportunities and product launches, while delivering robust operating margins**

- **Completed acquisition of ChemoCentryx, adding recently launched TAVNEOS®  to our innovative product portfolio**

- **Strong balance sheet and significant cash flow generation provides flexibility for investment in external innovation**

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

4





# Q3 '22 BUSINESS RESULTS AND OUTLOOK



# Q3 2022 FINANCIAL RESULTS

## $ Millions, Except Non-GAAP EPS

| Item | Q3 '22 | | Q3 '21 | | B/(W) % |
|------|--------|---|--------|---|---------|
| Revenue | $6,652 | | $6,706 | | (1%) |
| Product Sales | 6,237 | | 6,320 | | (1%) |
| Other Revenues | 415 | | 386 | | 8% |
| Non-GAAP Operating Expenses | 3,375 | | 3,654 | | 8% |
| Cost of Sales % of product sales | 1,003 | 16.1% | 997 | 15.8% | (1%) |
| R&D % of product sales | 1,096 | 17.6% | 1,397 | 22.1% | 22% |
| SG&A % of product sales | 1,276 | 20.5% | 1,260 | 19.9% | (1%) |
| IPR&D % of product sales | — | —% | — | —% | NM |
| Non-GAAP Operating Income % of product sales | 3,277 | 52.5% | 3,052 | 48.3% | 7% |
| Other Income/(Expense) | (371) | | (370) | | —% |
| Non-GAAP Net Income | $2,530 | | $2,324 | | 9% |
| Non-GAAP EPS | $4.70 | | $4.08 | | 15% |
| Average Shares (millions) | 538 | | 570 | | 6% |
| Non-GAAP Tax Rate | 12.9% | | 13.3% | | 0.4 pts. |

NM – Not meaningful

All income statement items for Q3 '22 and/or Q3 '21, except revenue and average shares, are non-GAAP financial measures—if this slide is in hard copy, see reconciliations accompanying the presentation, or if this slide is delivered electronically, see reconciliations available at: www.amgen.com within the Investors section. Beginning January 1, 2022, the Company's non-GAAP financial measures no longer exclude adjustments for upfront license fees, development milestones and IPR&D expenses of pre-approval programs related to licensing, collaboration and asset acquisition transactions. For purposes of comparability, the non-GAAP financial results for the third quarter of 2021 have been updated to reflect this change.

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

6



# STRONG BALANCE SHEET WITH FREE CASH FLOW OF $2.8B IN Q3 2022

## $ Billions, Except Dividends Paid Per Share

| Cash Flow Data | Q3 '22 | Q3 '21 |
|---|---|---|
| Capital Expenditures | $0.2 | $0.2 |
| Free Cash Flow* | 2.8 | 2.2 |
| Share Repurchases | — | 1.1 |
| YoY Dividend Increase | 10% | 10% |
| Dividends Paid Per Share | $1.94 | $1.76 |
| **Balance Sheet Data** | **9/30/22** | **12/31/21** |
| Cash and Investments | $11.5 | $8.0 |
| Debt Outstanding | 38.7 | 33.3 |

*Non-GAAP financial measure—if this slide is in hard copy, see reconciliations accompanying the presentation, or if this slide is delivered electronically, see reconciliations available at: www.amgen.com within the Investors section.

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

7



# 2022 GUIDANCE

| | Guidance | Comments |
|---|---|---|
| **Revenue** | **$26.0B–$26.3B** | **Revised from $25.5B–$26.4B** |
| **Non-GAAP EPS\*** | **$17.25–$17.85** | **Revised from $17.00–$18.00** |
| **Non-GAAP Tax Rate\*** | **13.5%–14.5%** | **Revised from 14.0%–15.0%** |
| **Capital Expenditures** | **~$950M** | **Unchanged** |

**\*Non-GAAP financial measure—if this slide is in hard copy, see reconciliations accompanying the presentation, or if this slide is delivered electronically, or amounts pertain to previously issued financial guidance, see reconciliations available at: www.amgen.com within the Investors section.**

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

8





# GLOBAL COMMERCIAL UPDATE



# Q3 '22 GLOBAL COMMERCIAL UPDATE

| $ Millions, Net Sales | Q3 '22 | | | Q3 '21 | YoY |
|---|---|---|---|---|---|
| | U.S. | ROW | Total | Total | Total |
| Prolia® | 590 | 272 | 862 | 803 | 7% |
| EVENITY® | 136 | 65 | 201 | 149 | 35% |
| Repatha® | 142 | 167 | 309 | 272 | 14% |
| Aimovig® | 103 | 4 | 107 | 79 | 35% |
| TEZSPIRE® | 55 | — | 55 | — | NM |
| Otezla® | 529 | 98 | 627 | 609 | 3% |
| Enbrel® | 1,086 | 20 | 1,106 | 1,289 | (14%) |
| AMGEVITA™ | — | 117 | 117 | 111 | 5% |
| LUMAKRAS®/LUMYKRAS™ | 61 | 14 | 75 | 36 | * |
| KYPROLIS® | 217 | 101 | 318 | 293 | 9% |
| XGEVA® | 363 | 132 | 495 | 517 | (4%) |
| Vectibix® | 106 | 141 | 247 | 200 | 24% |
| Nplate® | 162 | 126 | 288 | 273 | 5% |
| BLINCYTO® | 84 | 58 | 142 | 125 | 14% |
| MVASI® | 139 | 70 | 209 | 274 | (24%) |
| KANJINTI® | 58 | 14 | 72 | 116 | (38%) |
| Neulasta® | 205 | 42 | 247 | 415 | (40%) |
| NEUPOGEN® | 21 | 14 | 35 | 52 | (33%) |
| EPOGEN® | 136 | — | 136 | 138 | (1%) |
| Aranesp® | 128 | 230 | 358 | 396 | (10%) |
| Parsabiv® | 61 | 39 | 100 | 61 | 64% |
| Sensipar®/Mimpara™ | 4 | 13 | 17 | 19 | (11%) |
| Other products** | 80 | 34 | 114 | 93 | 23% |
| Total Product Sales | $4,466 | $1,771 | $6,237 | $6,320 | (1%) |
| Total Revenue | | | $6,652 | $6,706 | (1%) |

*Change in excess of 100%
**Other products include Corlanor®, AVSOLA®, RIABNI® and IMLYGIC®, as well as sales by GENSENTA and Bergamo subsidiaries.
NM – Not meaningful

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

10



# Q3 '22 PRODUCT SALES DECREASED 1%, WITH VOLUME GROWTH OF 8%

## $ Millions, Net Sales



| | Q3 '22 | YoY | QoQ |
|---|---|---|---|
| Total Change | | (1%) | (1%) |
| Units | | 8% | 1% |
| Inventory | | (1%) | (1%) |

ROW
U.S.

| Q3 '21 | Q4 '21 | Q1 '22 | Q2 '22 | Q3 '22 |
|---|---|---|---|---|
| 6,320 | 6,271 | 5,731 | 6,281 | 6,237 |
| 1,762 | 1,820 | 1,694 | 1,835 | 1,771 |
| 4,558 | 4,451 | 4,037 | 4,446 | 4,466 |

## Q3 '22 Highlights

- **8% volume growth was offset primarily by 5% lower net selling price and 2% negative impact from foreign exchange**

- **Record quarterly sales of 11 products**

- **Delivered double-digit volume growth for a number of products, including LUMAKRAS®/LUMYKRAS™, Repatha®, EVENITY®, Parsabiv®, and Vectibix®**

**Note: Inventory represents wholesaler and, based on prescription data for Otezla® and Enbrel®, end-user inventories**

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

11





# PROLIA® VOLUME GREW 8% YOY

## $ Millions, Net Sales

| Q3 '22 | YoY | QoQ |
|---|---|---|
| Total Change | 7% | (7%) |
| Units | 8% | (5%) |
| Inventory | (1%) | (1%) |

ROW
U.S.



## Q3 '22 Highlights

- **YoY sales increased 7%, driven by 8% volume growth**

**Note: Inventory represents wholesaler inventories**

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

12





# EVENITY® HAD RECORD QUARTERLY SALES IN Q3

## $ Millions, Net Sales



| | Q3 '22 | YoY | QoQ |
|---|---|---|---|
| Total Change | | 35% | 5% |
| Units | | 39% | 3% |
| Inventory | | (1%) | 0% |

- ROW
- U.S.



| | Q3 '21 | Q4 '21 | Q1 '22 | Q2 '22 | Q3 '22 |
|---|---|---|---|---|---|
| Total | 149 | 143 | 170 | 191 | 201 |
| ROW | 55 | 42 | 60 | 61 | 65 |
| U.S. | 94 | 101 | 110 | 130 | 136 |

## Q3 '22 Highlights

- **YoY sales increased 35%, driven by volume growth**
- **U.S. volumes grew 45% and ex-U.S. volumes grew 30%**

**Note: Inventory represents wholesaler inventories**
**EVENITY® is developed and commercialized in collaboration with UCB globally, as well as our collaboration partner Astellas in Japan**

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

13





# REPATHA® VOLUME GREW 52% YOY

## $ Millions, Net Sales



| Q3 '22 | YoY | QoQ |
|---|---|---|
| Total Change | 14% | (5%) |
| Units | 52% | 5% |
| Inventory | (2%) | (1%) |

Legend:
- ROW (green)
- U.S. (blue)

| | Q3 '21 | Q4 '21 | Q1 '22 | Q2 '22 | Q3 '22 |
|---|---|---|---|---|---|
| Total | 272 | 273 | 329 | 325 | 309 |
| ROW | 133 | 137 | 164 | 171 | 167 |
| U.S. | 139 | 136 | 165 | 154 | 142 |

## Q3 '22 Highlights

- YoY sales increased 14%, driven by 52% volume growth, partially offset by lower net selling price*

- U.S. sales grew 2%, driven by 32% volume growth, partially offset by lower net selling price* resulting from higher rebates to support and expand access for patients

- Ex-U.S. sales grew 26%

*Net selling price represents the impact of list price changes as well as contracting and access changes
Note: Inventory represents wholesaler inventories

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

14





# AIMOVIG® DELIVERED 35% YOY SALES GROWTH

## $ Millions, Net Sales



| | Q3 '22 | YoY | QoQ |
|---|---|---|---|
| Total Change | | 35% | 16% |
| Units | | (7%) | 6% |
| Inventory | | 1% | 2% |

- ROW
- U.S.



## Q3 '22 Highlights

- **YoY sales increased 35%, driven by favorable changes to estimated sales deductions and higher net selling price,\* partially offset by a 7% decline in volume**

*Net selling price represents the impact of list price changes as well as contracting and access changes
Note: Inventory represents wholesaler inventories

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.



**TEZSPIRE®**
(tezepelumab-ekko) Subcutaneous Injection 210 mg

# STRONG LAUNCH OF TEZSPIRE® CONTINUED IN Q3



| | Q3 '22 | QoQ |
|---|---|---|
| Total Change | | 90% |
| Units | | 75% |
| Inventory | | 5% |

■ U.S.

| | Q1 '22 | Q2 '22 | Q3 '22 |
|---|---|---|---|
| | 7 | 29 | 55 |

## Q3 '22 Highlights

- **Continued strong adoption in the U.S. by both allergists and pulmonologists**

- **Healthcare providers acknowledge the unique, differentiated profile of TEZSPIRE® and its broad potential to treat 2.5 million patients worldwide with severe asthma who are uncontrolled, without any phenotypic and biomarker limitation**

**Note: Inventory represents wholesaler inventories**
**TEZSPIRE® is developed in collaboration with AstraZeneca**

Provided November 3, 2022, as part of an oral presentation and is qualified
by such, contains forward-looking statements, actual results may vary
materially; Amgen disclaims any duty to update.

16



# OTEZLA® VOLUME GREW 9% YOY



## $ Millions, Net Sales

| | Q3 '22 | YoY | QoQ |
|---|---|---|---|
| Total Change | | 3% | 6% |
| Units | | 9% | 0% |
| Inventory | | (3%) | 1% |



ROW
U.S.

## Q3 '22 Highlights

- **YoY sales increased 3%, driven by 9% volume growth, partially offset by lower inventory levels and unfavorable foreign exchange impact**

**Note: Inventory represents wholesaler inventories**

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.





# ENBREL'S RECORD OF SAFETY AND EFFICACY CONTINUED TO SUPPORT DEMAND

## $ Millions, Net Sales



| | Q3 '22 | YoY | QoQ |
|---|---|---|---|
| Total Change | | (14%) | 5% |
| Units | | (3%) | (2%) |
| Inventory | | (2%) | (1%) |

ROW
U.S.

| | 1,289 | 1,108 | 862 | 1,051 | 1,106 |
|---|---|---|---|---|---|
| ROW | 26 | 26 | 19 | 15 | 20 |
| U.S. | 1,263 | 1,082 | 843 | 1,036 | 1,086 |
| | Q3 '21 | Q4 '21 | Q1 '22 | Q2 '22 | Q3 '22 |

## Q3 '22 Highlights

- **YoY sales decreased 14%, driven by lower net selling price\*, 5% unfavorable changes to estimated sales deductions, and 3% volume decline**

- **5% unfavorable impact of changes to estimated sales deductions results from $114 million favorable adjustment in Q3 '21, more than offsetting $47 million favorable adjustment in Q3 '22**

- **Continued YoY net selling price\* decline is expected, driven by increased competition**

\*Net selling price represents the impact of list price changes as well as contracting and access changes
Note: Inventory represents wholesaler inventories

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

18



# AMGEVITA™ REMAINED THE MOST PRESCRIBED ADALIMUMAB BIOSIMILAR IN EUROPE

## $ Millions, Net Sales



■ ROW (ex U.S.)

| Q3 '22 | YoY | QoQ |
|---|---|---|
| Total Change | 5% | 1% |
| Units | 27% | 9% |
| Inventory | 0% | 0% |

| Q3 '21 | Q4 '21 | Q1 '22 | Q2 '22 | Q3 '22 |
|---|---|---|---|---|
| 111 | 115 | 108 | 116 | 117 |

## Q3 '22 Highlights

- **YoY sales increased 5%, driven by 27% volume growth, partially offset by foreign exchange impact and lower net selling price\* resulting from increased competition**

**\*Net selling price represents the impact of list price changes as well as contracting and access changes**
**Note: Inventory represents wholesaler inventories**

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

19



# LUMAKRAS®/LUMYKRAS™ NOW APPROVED IN OVER 45 COUNTRIES





| | Q3 '22 | QoQ |
|---|---|---|
| Total Change | | (3%) |
| Units | | 15% |
| Inventory | | 1% |

ROW
U.S.

## Q3 '22 Highlights

- **QoQ sales declined 3%, driven by lower net selling price due to an unfavorable price adjustment resulting from a reimbursement approval in Germany, partially offset by 15% volume growth**

- **In the U.S., LUMAKRAS® has been prescribed to over 3,700 patients by over 2,200 physicians**

- **Ex-U.S., LUMYKRAS™ has been approved in over 45 countries; we are actively launching in 30 markets and pursuing reimbursement in the remaining countries**

**Note: Inventory represents wholesaler inventories**

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.



# KYPROLIS® HAD RECORD QUARTERLY SALES IN Q3



## $ Millions, Net Sales



| | Q3 '22 | YoY | QoQ |
|---|---|---|---|
| Total Change | 9% | 0% |
| Units | 11% | 0% |
| Inventory | (1%) | (2%) |

ROW
U.S.

| | Q3 '21 | Q4 '21 | Q1 '22 | Q2 '22 | Q3 '22 |
|---|---|---|---|---|---|
| Total | 293 | 284 | 287 | 317 | 318 |
| ROW | 95 | 95 | 91 | 104 | 101 |
| U.S. | 198 | 189 | 196 | 213 | 217 |

## Q3 '22 Highlights

- **YoY sales increased 9%, driven by 11% volume growth**

**Note: Inventory represents wholesaler inventories**

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

21





# XGEVA® SALES DECREASED 4% IN Q3

## $ Millions, Net Sales



| | Q3 '22 | YoY | QoQ |
|---|---|---|---|
| Total Change | | (4%) | (7%) |
| Units | | (3%) | (2%) |
| Inventory | | (2%) | (3%) |

Legend:
- ROW
- U.S.

| | Q3 '21 | Q4 '21 | Q1 '22 | Q2 '22 | Q3 '22 |
|---|---|---|---|---|---|
| Total | 517 | 545 | 502 | 533 | 495 |
| ROW | 145 | 172 | 134 | 142 | 132 |
| U.S. | 372 | 373 | 368 | 391 | 363 |

## Q3 '22 Highlights

- **YoY sales decreased 4%, driven by a 3% decline in volume, lower inventory levels, and unfavorable foreign exchange impact, partially offset by higher net selling price***

**\*Net selling price represents the impact of list price changes as well as contracting and access changes**
**Note: Inventory represents wholesaler inventories**

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

22





# VECTIBIX® HAD RECORD QUARTERLY SALES IN Q3

## $ Millions, Net Sales



| Q3 '22 | YoY | QoQ |
|---|---|---|
| Total Change | 24% | 19% |
| Units | 21% | 17% |
| Inventory | 1% | 1% |

- ROW
- U.S.

| 200 | 243 | 201 | 207 | 247 |

| 116 | 151 | 116 | 111 | 141 |

| 84 | 92 | 85 | 96 | 106 |

| Q3 '21 | Q4 '21 | Q1 '22 | Q2 '22 | Q3 '22 |

## Q3 '22 Highlights

- **YoY sales increased 24%, driven by volume growth that benefited from the timing of shipments to Takeda, our partner in Japan**

**Note: Inventory represents wholesaler inventories**

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

23





# NPLATE® HAD RECORD QUARTERLY SALES IN Q3

## $ Millions, Net Sales



| | Q3 '22 | YoY | QoQ |
|---|---|---|---|
| Total Change | 5% | | 1% |
| Units | 12% | | 6% |
| Inventory | (1%) | | (1%) |

Legend:
- ROW (green)
- U.S. (blue)

| | Q3 '21 | Q4 '21 | Q1 '22 | Q2 '22 | Q3 '22 |
|---|---|---|---|---|---|
| Total | 273 | 282 | 266 | 284 | 288 |
| ROW | 117 | 120 | 110 | 128 | 126 |
| U.S. | 156 | 162 | 156 | 156 | 162 |

## Q3 '22 Highlights

- **YoY sales increased 5%, primarily driven by 12% volume growth, partially offset by unfavorable changes to estimated sales deductions**

- **Volume growth benefited from increased shipments to Kyowa Kirin Co., Ltd., our partner in Japan**

**Note: Inventory represents wholesaler inventories**

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

24





# BLINCYTO® HAD RECORD QUARTERLY SALES IN Q3

## $ Millions, Net Sales



| | Q3 '22 | YoY | QoQ |
|---|---|---|---|
| Total Change | | 14% | 2% |
| Units | | 18% | 1% |
| Inventory | | (1%) | 0% |

**ROW**
**U.S.**

| | Q3 '21 | Q4 '21 | Q1 '22 | Q2 '22 | Q3 '22 |
|---|---|---|---|---|---|
| Total | 125 | 132 | 138 | 139 | 142 |
| ROW | 51 | 55 | 59 | 62 | 58 |
| U.S. | 74 | 77 | 79 | 77 | 84 |

## Q3 '22 Highlights

- **YoY sales increased 14%, driven by volume growth**
- **Only approved bispecific T-cell engager (BiTE®) immunotherapy**

**Note: Inventory represents wholesaler inventories**

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

25





# MVASI® SALES DECREASED 24% YOY

## $ Millions, Net Sales



| Q3 '22 | YoY | QoQ |
|---|---|---|
| Total Change | (24%) | (14%) |
| Units | 3% | (4%) |
| Inventory | (2%) | (1%) |

Legend: ROW (green), U.S. (blue)

Chart data ($ Millions):

| | Q3 '21 | Q4 '21 | Q1 '22 | Q2 '22 | Q3 '22 |
|---|---|---|---|---|---|
| Total | 274 | 304 | 244 | 243 | 209 |
| ROW | 87 | 95 | 76 | 82 | 70 |
| U.S. | 187 | 209 | 168 | 161 | 139 |

## Q3 '22 Highlights

- **YoY sales decreased 24%, primarily driven by lower net selling price***

- **Continued net selling price* erosion and declining volume expected from increased competition and continued Average Selling Price (ASP) erosion**

*Net selling price represents the impact of list price changes as well as contracting and access changes
Note: Inventory represents wholesaler inventories

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

26





# KANJINTI® SALES DECREASED 38% YOY

## $ Millions, Net Sales



| Q3 '22 | YoY | QoQ |
|---|---|---|
| Total Change | (38%) | (15%) |
| Units | (11%) | (3%) |
| Inventory | (1%) | 0% |

Legend:
- ROW (green)
- U.S. (blue)

Chart (Net Sales, $ Millions):
- Q3 '21: 116 total (U.S. 92, ROW 24)
- Q4 '21: 139 total (U.S. 125, ROW 14)
- Q1 '22: 96 total (U.S. 80, ROW 16)
- Q2 '22: 85 total (U.S. 69, ROW 16)
- Q3 '22: 72 total (U.S. 58, ROW 14)

## Q3 '22 Highlights

- **YoY sales decreased 38%, primarily driven by declines in net selling price* and volume, partially offset by favorable changes to estimated sales deductions**

- **Continued net selling price* erosion and volume declines expected from increased competition and continued Average Selling Price (ASP) erosion**

*Net selling price represents the impact of list price changes as well as contracting and access changes
Note: Inventory represents wholesaler inventories

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

27



# ESTABLISHED PRODUCTS GENERATED $893M OF Q3 SALES AND CONTINUED TO DELIVER STRONG CASH FLOWS

## $ Millions, Net Sales



|  | Q3 '22 | YoY | QoQ |
|---|---|---|---|
| Total Change | | (17%) | (7%) |
| Units | | (2%) | (1%) |
| Inventory | | (2%) | (2%) |

Legend:
- ROW (green)
- U.S. (blue)

| | Q3 '21 | Q4 '21 | Q1 '22 | Q2 '22 | Q3 '22 |
|---|---|---|---|---|---|
| Total | 1,081 | 959 | 970 | 963 | 893 |
| ROW | 378 | 344 | 325 | 335 | 338 |
| U.S. | 703 | 615 | 645 | 628 | 555 |

## Q3 '22 Highlights

- **Includes Neulasta®, NEUPOGEN®, EPOGEN®, Aranesp®, Parsabiv®, and Sensipar®/Mimpara™**

- **YoY sales decreased 17%, primarily driven by lower net selling price\* and inventory levels**

- **In the aggregate, expect the YoY net selling price\* and volume erosion for this portfolio of products to continue**

\*Net selling price represents the impact of list price changes as well as contracting and access changes
Note: Inventory represents wholesaler inventories

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.





# RESEARCH & DEVELOPMENT UPDATE



# Q3 '22 EARNINGS CALL—R&D UPDATE

## General Medicine

- **Repatha® – monoclonal antibody targeting PCSK9**
  - An abstract based on data from the Repatha® FOURIER and FOURIER-OLE studies highlighting the association between the significant and sustained achievement of low and very low LDL-C levels and lower rates of major cardiovascular events has been accepted as a late-breaking abstract at AHA in November.

- **Olpasiran (AMG 890) – Lipoprotein(a) siRNA molecule**
  - An abstract based on the end-of-treatment analysis data from a Phase 2 study of olpasiran, a small interfering RNA molecule that reduces Lp(a) synthesis in the liver in subjects with elevated Lp(a) has been accepted as a late-breaking clinical trial presentation at AHA in November.

- **AMG 133 – multispecific GIPR inhibitor and GLP-1 receptor agonist**
  - A Phase 1 study of AMG 133 has completed enrollment.
  - Data from the single and multiple-dose cohorts of this Phase 1 study will be presented at the 20th World Congress on Insulin Resistance, Diabetes, and Cardiovascular Disease (WCIRDC) Hybrid Conference in December.

- **Webcast call Monday, November. 7, 2022**
  - The Company will host a call where David M. Reese, members of Amgen's R&D team, and a clinical investigator, will discuss Olpasiran Phase 2 data, Repatha FOURIER and FOURIER-open label extension studies, and will provide an update on AMG 133.

PCSK9 = proprotein convertase subtilisin/kexin type 9; OLE = open-label extension; LDL-C = low-density lipoprotein cholesterol; AHA = American Heart Association Scientific Sessions; siRNA = small interfering ribonucleic acid; Lp(a)= Lipoprotein(a); GIPR= Gastric Inhibitory Polypeptide Receptor; GLP-1= Glucagon-like peptide-1.

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

30



# Q3 '22 EARNINGS CALL—R&D UPDATE

## Inflammation

- **Otezla® (apremilast)**
  - **In September, results were presented from:**
    - **The Phase 3 SPROUT study, evaluating Otezla® in pediatric patients (ages 6 through 17) with moderate to severe plaque psoriasis. Otezla® treatment resulted in significant improvements in measures of disease severity at week 16 compared with placebo.**
    - **The Phase 3 DISCREET study, evaluating Otezla® in adult patients with moderate to severe genital psoriasis. Otezla® treatment showed a clinically meaningful and statistically significant improvement in genital psoriasis, including improvements in skin clearance, itch, and quality of life at week 16 compared with placebo.**
    - **In both studies, safety findings were consistent with the known profile of Otezla®; no new signals were identified.**
  - **Based on these results, discussions with the FDA are ongoing for DISCREET to add clinical data to Otezla® U.S. prescribing information. Discussions with regulatory authorities globally for SPROUT are forthcoming.**

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

31



# Q3 '22 EARNINGS CALL—R&D UPDATE

## Inflammation (continued)

- **TEZSPIRE® (Tezepelumab-ekko) – monoclonal antibody targeting TSLP**
  - **In September, TEZSPIRE® was approved**
    - **in the European Union as an add-on maintenance treatment in adults and adolescents 12 years and older with severe asthma who are inadequately controlled despite high-dose inhaled corticosteroids plus another medicinal product for maintenance treatment.**
    - **by the Japanese Ministry of Health, Labour, and Welfare for the treatment of bronchial asthma in patients with severe or refractory disease in whom asthma symptoms cannot be controlled with mid- or high-dose inhaled corticosteroids and other long-term maintenance therapies.**
  - **Regulatory reviews continue in other jurisdictions.**

**TSLP = thymic stromal lymphopoietin.**
**TEZSPIRE® is being developed in collaboration with AstraZeneca.**

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.



# Q3 '22 EARNINGS CALL—R&D UPDATE

## Inflammation (continued)

- **TEZSPIRE® (tezepelumab-ekko) – monoclonal antibody targeting TSLP**
  - In severe asthma, the PASSAGE Phase 4 real-world effectiveness study, the WAYFINDER Phase 3b study, and the SUNRISE Phase 3 study are enrolling patients.
  - A Phase 3 study continues to enroll patients with chronic rhinosinusitis with nasal polyps.
  - Planning is underway for a Phase 3 study in patients with eosinophilic esophagitis.
  - A Phase 2b study in patients with chronic spontaneous urticaria is fully enrolled, with data readout anticipated in H1-2023.
  - A Phase 2 study continues to enroll patients with chronic obstructive pulmonary disease.

TSLP = thymic stromal lymphopoietin.
TEZSPIRE® is being developed in collaboration with AstraZeneca.

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

33



# Q3 '22 EARNINGS CALL—R&D UPDATE

## Inflammation (continued)

- **Rocatinlimab (AMG 451 / KHK4083) – monoclonal antibody targeting OX40**
  - **In September, data were presented**
    - **from a Phase 2 study of rocatinlimab, which demonstrated improvement in head and neck atopic dermatitis in patients with moderate to severe disease.**
    - **demonstrating that rocatinlimab provides durable normalization of atopic dermatitis inflammation-related gene expression in skin biopsies from atopic dermatitis patients.**
  - **The ROCKET Phase 3 program evaluating rocatinlimab in patients with moderate to severe atopic dermatitis was initiated in June. Following additional discussions with regulators and our partner, we are amending the studies to further improve patient convenience and investigate a range of doses. Amendments are not related to safety or efficacy issues.**

**Rocatinlimab is being developed in collaboration with Kyowa Kirin.**

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.



# Q3 '22 EARNINGS CALL—R&D UPDATE

## Inflammation (continued)

- **Rozibafusp alfa (AMG 570) – antibody-peptide conjugate that blocks ICOSL and BAFF**
  - A Phase 2b study continues to enroll patients with SLE.

- **Efavaleukin alfa (AMG 592) – IL-2 mutein Fc fusion protein**
  - A Phase 2b study continues to enroll patients with SLE.
  - A Phase 2b study continues to enroll patients with ulcerative colitis.

- **Ordesekimab (AMG 714 / PRV-015) – monoclonal antibody targeting IL-15**
  - A Phase 2b study continues to enroll patients with nonresponsive celiac disease.

ICOSL = inducible T-cell costimulatory ligand; BAFF = B-cell activating factor; SLE = systemic lupus erythematosus; IL-2 = interleukin-2; IL-15 = interleukin-15.
Ordesekimab is being developed in collaboration with Provention Bio.

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.



# Q3 '22 EARNINGS CALL—R&D UPDATE

## Oncology/Hematology

- **LUMAKRAS®/LUMYKRAS™ (sotorasib)**
  - **In August, data were presented demonstrating that:**
    - **in a mostly pretreated advanced NSCLC population, lead-in cohorts treated with LUMAKRAS® followed by a combination of LUMAKRAS® and immunotherapy demonstrated durable clinical activity with lower rates of grade 3-4 TRAEs compared to concurrently treated cohorts. Dose expansion is ongoing in treatment-naïve patients using lower-dose LUMAKRAS® lead-in followed by combination of LUMAKRAS® with pembrolizumab.**
    - **LUMAKRAS® given in combination with SHP2 inhibitor RMC-4630 demonstrated promising clinical activity in patients with KRAS G12C-mutated NSCLC, most notably in KRAS G12C inhibitor-naïve patients.**

**NSCLC = non-small cell lung cancer; TRAE = treatment-related adverse event; SHP2 = Src homology region 2-containing protein tyrosine phosphatase 2; KRAS = Kirsten Rat Sarcoma.**

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.



# Q3 '22 EARNINGS CALL—R&D UPDATE

## Oncology/Hematology (continued)

- **LUMAKRAS®/LUMYKRAS™ (sotorasib)**
  - **In September, data were presented demonstrating that**
    - in the global Phase 3 CodeBreaK 200 trial, LUMAKRAS® treatment led to increased PFS (primary endpoint) and a significantly higher ORR (key secondary endpoint) in patients with KRAS G12C-mutated NSCLC compared with intravenous chemotherapy docetaxel. Patient-reported outcomes (a key secondary endpoint) also favored LUMAKRAS® versus docetaxel.
    - in the Phase 1b CodeBreaK 101 study, LUMAKRAS® combined with Vectibix® demonstrated encouraging efficacy and safety in patients with chemo-refractory metastatic CRC. This combination delivered a 30% ORR with a median PFS of 5.7 months. With a median follow up of 8.8 months, median OS was not yet reached. A Phase 3 trial continues to enroll using this combination.
  - **The Company is planning to initiate a Phase 3 study of LUMAKRAS® plus chemotherapy in first-line KRAS G12C mutant and PD-L1 negative advanced/metastatic NSCLC.**

---

PFS = progression-free survival; ORR = Objective response rate; KRAS = Kirsten Rat Sarcoma; NSCLC = non-small cell lung cancer; CRC = colorectal cancer; OS = overall survival; PD-L1 = programmed death-ligand 1.

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.



# Q3 '22 EARNINGS CALL—R&D UPDATE

## Oncology/Hematology (continued)

- **BLINCYTO® – BiTE® molecule targeting CD19**
  - ECOG-ACRIN Cancer Research Group announced that an NCI-sponsored, registration enabling BLINCYTO® randomized controlled trial (E1910) in adults with newly diagnosed Philadelphia chromosome negative B-ALL, met the primary endpoint of statistically significant improvement in OS at a predefined interim analysis. This study investigated the addition of BLINCYTO® to SOC chemotherapy. Data were submitted to a medical congress taking place later this year and will be submitted to regulatory authorities in due course.

- **Vectibix® – monoclonal antibody targeting EGFR**
  - ASCO guidelines in the U.S. and ESMO guidelines in Europe were updated to indicate anti-EGFR monoclonal antibodies are preferred treatment over bevacizumab in patients with RAS wild type (RAS/BRAF wild type by ESMO) metastatic CRC and left-sided tumors. These updates were based on the Vectibix® PARADIGM study that was presented at ASCO, where data demonstrated that the mFOLFOX6 + Vectibix® combination provides a statistically significant improvement in OS over the mFOLFOX6 + bevacizumab combination as first-line treatment for metastatic CRC patients with a left-sided primary tumor and in the overall population.

CD19 = cluster of differentiation 19; ECOG = Eastern Cooperative Oncology Group; ACRIN = American College of Radiology Imaging Network; NCI = National Cancer Institute; OS = overall survival; SOC = standard of care; B-ALL= B-cell acute lymphoblastic leukemia; EGFR = epidermal growth factor receptor; ASCO = American Society of Clinical Oncology; ESMO = European Society for Medical Oncology; CRC = colorectal cancer; mFOLFOX6 = Levofolinic acid, 5-Fluorouracil [5-FU] and oxaliplatin.

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

38



# Q3 '22 EARNINGS CALL—R&D UPDATE

## Oncology/Hematology (continued)

- **Bemarituzumab – monoclonal antibody targeting FGFR2b**

    - FORTITUDE-101, a Phase 3 study of bemarituzumab plus chemotherapy, versus placebo plus chemotherapy in first-line gastric cancer with FGFR2b overexpression continues to enroll patients.

    - FORTITUDE-102, a Phase 1b/3 study of bemarituzumab plus chemotherapy and nivolumab versus chemotherapy and nivolumab in first-line gastric cancer with FGFR2b overexpression is enrolling patients in the Phase 3 portion of the study.

    - FORTITUDE-103, a Phase 1b study of bemarituzumab plus oral chemotherapy regimens in first-line gastric cancer is enrolling patients.

    - FORTITUDE-201, a Phase 1b study of bemarituzumab monotherapy and in combination with SOC therapy continues to enroll patients with squamous NSCLC with FGFR2b overexpression.

    - FORTITUDE-301, a Phase 1b/2 basket study evaluating the safety and efficacy of bemarituzumab monotherapy in solid tumors with FGFR2b overexpression is enrolling patients.

FGFR2b = fibroblast growth factor receptor 2b; SOC = standard of care; NSCLC = non-small cell lung cancer.

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.



# Q3 '22 EARNINGS CALL—R&D UPDATE

## Oncology/Hematology (continued)

- **Tarlatamab (AMG 757) – HLE BiTE® molecule targeting DLL3**
  - **In August, Phase 1 data from DeLLphi-300 were presented demonstrating that in heavily pretreated patients with SCLC, tarlatamab delivered a confirmed ORR of 23%, a median duration of response of 13.0 months and a median OS of 13.2 months. DeLLphi-301, a potentially registrational Phase 2 study of tarlatamab, continues to enroll patients in this setting.**
  - **DeLLphi-300, a Phase 1 study of tarlatamab, continues to enroll patients with relapsed/refractory SCLC.**
  - **DeLLphi-302, a Phase 1b study of tarlatamab in combination with AMG 404, an anti-PD1 monoclonal antibody, continues to enroll patients with second-line or later SCLC.**
  - **DeLLphi-303, a Phase 1b study of tarlatamab in combination with SOC in first-line SCLC, is enrolling patients.**
  - **DeLLpro-300, a Phase 1b study of tarlatamab, continues to enroll patients with de novo or treatment-emergent neuroendocrine prostate cancer.**

---

HLE = half-life extended; BiTE® = bispecific T-cell engager; DLL3 = delta-like ligand 3; SCLC = small cell lung cancer; ORR = objective response rate; OS = overall survival; PD-1 = programmed cell death protein 1; SOC = standard of care.

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.



# Q3 '22 EARNINGS CALL—R&D UPDATE

## Oncology/Hematology (continued)

- **AMG 509 – bispecific molecule targeting STEAP1**
  - A Phase 1 dose-escalation study continues to enroll patients with mCRPC.

- **AMG 340  – lower T-cell affinity BiTE® molecule targeting PSMA**
  - A Phase 1 dose-escalation study continues to enroll patients with mCRPC.

- **AMG 193 – small molecule MTA cooperative PRMT5 molecular glue**
  - A Phase 1/1b/2 study continues to enroll patients with advanced MTAP-null solid tumors.

STEAP1 = Six-transmembrane epithelial antigen of prostate 1; mCRPC = metastatic castrate-resistant prostate cancer; BiTE® = bispecific T-cell engager; PSMA = prostate-specific membrane antigen; MTA = methylthioadenosine; PRMT5= protein arginine methyltransferase 5; MTAP = methylthioadenosine phosphorylase.
AMG 509 is being developed in collaboration with Xencor.

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.



# Q3 '22 EARNINGS CALL—R&D UPDATE

## Biosimilars

- In August, the Company announced positive top-line results from the DAHLIA study, a randomized, double-blind, active-controlled, two-period crossover Phase 3 study evaluating the efficacy and safety of ABP 959, a biosimilar candidate to SOLIRIS® (eculizumab), compared with SOLIRIS® in adult patients with PNH.

- The primary analysis of a randomized, double-blind, active controlled, Phase 3 study evaluating the efficacy and safety of ABP 938, an investigational biosimilar to EYLEA® (aflibercept) compared with EYLEA® met its primary endpoint in subjects with neovascular age-related macular degeneration; final analysis is expected in 2023.

- A Phase 3 study evaluating the efficacy and safety of ABP 654 compared to STELARA® (ustekinumab) in adult patients with moderate to severe plaque psoriasis has completed, and these data were submitted to the FDA to support U.S. approval.

- A Phase 3 study to support an interchangeability designation in the U.S. for ABP 654 is ongoing.

- A Phase 3 study to support an interchangeability designation in the U.S. for AMJEVITA™ (adalimumab-atto) is ongoing.

PNH = paroxysmal nocturnal hemoglobinuria; STELARA® is a registered trademark of Janssen Pharmaceutica NV; EYLEA® is a registered trademark of Regeneron Pharmaceuticals, Inc.; SOLIRIS® is a registered trademark of Alexion Pharmaceuticals, Inc.

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

42





# Q3 '22 EARNINGS CALL

**November 3, 2022**





# RECONCILIATIONS



**Amgen Inc.**
**Consolidated Statements of Income - GAAP**
**(In millions, except per - share data)**
**(Unaudited)**

| | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| **Revenues:** | | | | |
| Product sales | $ 6,237 | $ 6,320 | $ 18,249 | $ 18,026 |
| Other revenues | 415 | 386 | 1,235 | 1,107 |
| Total revenues | 6,652 | 6,706 | 19,484 | 19,133 |
| **Operating expenses:** | | | | |
| Cost of sales | 1,588 | 1,609 | 4,659 | 4,736 |
| Research and development | 1,112 | 1,422 | 3,110 | 3,471 |
| Acquired in-process research and development | — | — | — | 1,505 |
| Selling, general and administrative | 1,287 | 1,305 | 3,842 | 3,943 |
| Other | 5 | (8) | 537 | 143 |
| Total operating expenses | 3,992 | 4,328 | 12,148 | 13,798 |
| **Operating income** | 2,660 | 2,378 | 7,336 | 5,335 |
| **Other income (expense):** | | | | |
| Interest expense, net | (368) | (296) | (991) | (862) |
| Other income (expense), net | 100 | 73 | (747) | 97 |
| **Income before income taxes** | 2,392 | 2,155 | 5,598 | 4,570 |
| Provision for income taxes | 249 | 271 | 662 | 576 |
| **Net income** | $ 2,143 | $ 1,884 | $ 4,936 | $ 3,994 |
| **Earnings per share:** | | | | |
| Basic | $ 4.01 | $ 3.32 | $ 9.16 | $ 6.98 |
| Diluted | $ 3.98 | $ 3.31 | $ 9.11 | $ 6.93 |
| **Shares used in calculation of earnings per share:** | | | | |
| Basic | 535 | 567 | 539 | 572 |
| Diluted | 538 | 570 | 542 | 576 |

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

45



**Amgen Inc.**
**Consolidated Balance Sheets - GAAP**
**(In millions)**

| | September 30, 2022 | December 31, 2021 |
|---|---|---|
| | (Unaudited) | |
| **Assets** | | |
| Current assets: | | |
| Cash, cash equivalents and marketable securities | $ 11,478 | $ 8,037 |
| Trade receivables, net | 5,326 | 4,895 |
| Inventories | 4,757 | 4,086 |
| Other current assets | 2,501 | 2,367 |
| Total current assets | 24,062 | 19,385 |
| | | |
| Property, plant and equipment, net | 5,188 | 5,184 |
| Intangible assets, net | 13,266 | 15,182 |
| Goodwill | 14,845 | 14,890 |
| Other noncurrent assets | 6,339 | 6,524 |
| Total assets | $ 63,700 | $ 61,165 |
| | | |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable and accrued liabilities | $ 12,788 | $ 12,097 |
| Current portion of long-term debt | 1,543 | 87 |
| Total current liabilities | 14,331 | 12,184 |
| | | |
| Long-term debt | 37,161 | 33,222 |
| Long-term tax liabilities | 5,680 | 6,594 |
| Other noncurrent liabilities | 2,875 | 2,465 |
| Total stockholders' equity | 3,653 | 6,700 |
| Total liabilities and stockholders' equity | $ 63,700 | $ 61,165 |
| | | |
| Shares outstanding | 534 | 558 |

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.



**Amgen Inc.**
**GAAP to Non-GAAP Reconciliations**
(Dollars In millions)
(Unaudited)

| | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| GAAP cost of sales | $ 1,588 | $ 1,609 | $ 4,659 | $ 4,736 |
| Adjustments to cost of sales: | | | | |
| Acquisition-related expenses (a) | (585) | (606) | (1,779) | (1,827) |
| Other | — | (6) | — | (11) |
| Total adjustments to cost of sales | (585) | (612) | (1,779) | (1,838) |
| Non-GAAP cost of sales | $ 1,003 | $ 997 | $ 2,880 | $ 2,898 |
| GAAP cost of sales as a percentage of product sales | 25.5 % | 25.5 % | 25.5 % | 26.3 % |
| Acquisition-related expenses (a) | (9.4) | (9.6) | (9.7) | (10.1) |
| Other | 0.0 | (0.1) | 0.0 | (0.1) |
| Non-GAAP cost of sales as a percentage of product sales | 16.1 % | 15.8 % | 15.8 % | 16.1 % |
| GAAP research and development expenses | $ 1,112 | $ 1,422 | $ 3,110 | $ 3,471 |
| Adjustments to research and development expenses: | | | | |
| Acquisition-related expenses (a) | (16) | (25) | (60) | (94) |
| Non-GAAP research and development expenses | $ 1,096 | $ 1,397 | $ 3,050 | $ 3,377 |
| GAAP research and development expenses as a percentage of product sales | 17.8 % | 22.5 % | 17.0 % | 19.3 % |
| Acquisition-related expenses (a) | (0.2) | (0.4) | (0.3) | (0.6) |
| Non-GAAP research and development expenses as a percentage of product sales | 17.6 % | 22.1 % | 16.7 % | 18.7 % |
| GAAP selling, general and administrative expenses | $ 1,287 | $ 1,305 | $ 3,842 | $ 3,943 |
| Adjustments to selling, general and administrative expenses: | | | | |
| Acquisition-related expenses (a) | (11) | (16) | (40) | (67) |
| Other | — | (29) | — | (45) |
| Total adjustments to selling, general and administrative expenses | (11) | (45) | (40) | (112) |
| Non-GAAP selling, general and administrative expenses | $ 1,276 | $ 1,260 | $ 3,802 | $ 3,831 |
| GAAP selling, general and administrative expenses as a percentage of product sales | 20.6 % | 20.6 % | 21.1 % | 21.9 % |
| Acquisition-related expenses (a) | (0.1) | (0.2) | (0.3) | (0.4) |
| Other | 0.0 | (0.5) | 0.0 | (0.2) |
| Non-GAAP selling, general and administrative expenses as a percentage of product sales | 20.5 % | 19.9 % | 20.8 % | 21.3 % |
| GAAP operating expenses | $ 3,992 | $ 4,328 | $ 12,148 | $ 13,798 |
| Adjustments to operating expenses: | | | | |
| Adjustments to cost of sales | (585) | (612) | (1,779) | (1,838) |
| Adjustments to research and development expenses | (16) | (25) | (60) | (94) |
| Adjustments to selling, general and administrative expenses | (11) | (45) | (40) | (112) |
| Certain charges pursuant to our cost savings initiatives | 8 | (1) | 7 | (129) |
| Certain other expenses (b) | (13) | 9 | (544) | (14) |
| Total adjustments to operating expenses | (617) | (674) | (2,416) | (2,187) |
| Non-GAAP operating expenses | $ 3,375 | $ 3,654 | $ 9,732 | $ 11,611 |

| | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| GAAP operating income | $ 2,660 | $ 2,378 | $ 7,336 | $ 5,335 |
| Adjustments to operating expenses | 617 | 674 | 2,416 | 2,187 |
| Non-GAAP operating income | $ 3,277 | $ 3,052 | $ 9,752 | $ 7,522 |
| GAAP operating income as a percentage of product sales | 42.6 % | 37.6 % | 40.2 % | 29.6 % |
| Adjustments to cost of sales | 9.4 | 9.7 | 9.7 | 10.2 |
| Adjustments to research and development expenses | 0.2 | 0.4 | 0.3 | 0.6 |
| Adjustments to selling, general and administrative expenses | 0.1 | 0.7 | 0.3 | 0.6 |
| Certain charges pursuant to our cost savings initiatives | 0.0 | 0.0 | 0.0 | 0.7 |
| Certain other expenses (b) | 0.2 | (0.1) | 2.9 | 0.0 |
| Non-GAAP operating income as a percentage of product sales | 52.5 % | 48.3 % | 53.4 % | 41.7 % |
| GAAP other income (expense), net | $ 100 | $ 73 | $ (747) | $ 97 |
| Adjustments to other income (expense), net: | | | | |
| Equity method investment basis difference amortization | 47 | 44 | 143 | 128 |
| Net (gains)/losses from equity investments | (150) | (191) | 401 | (335) |
| Total adjustments to other income (expense), net | (103) | (147) | 544 | (207) |
| Non-GAAP other income (expense), net | $ (3) | $ (74) | $ (203) | $ (110) |
| GAAP income before income taxes | $ 2,392 | $ 2,155 | $ 5,598 | $ 4,570 |
| Adjustments to income before income taxes: | | | | |
| Adjustments to operating expenses | 617 | 674 | 2,416 | 2,187 |
| Adjustments to other income (expense), net | (103) | (147) | 544 | (207) |
| Total adjustments to income before income taxes | 514 | 527 | 2,960 | 1,980 |
| Non-GAAP income before income taxes | $ 2,906 | $ 2,682 | $ 8,558 | $ 6,550 |
| GAAP provision for income taxes | $ 249 | $ 271 | $ 662 | $ 576 |
| Adjustments to provision for income taxes: | | | | |
| Income tax effect of the above adjustments (c) | 122 | 58 | 527 | 466 |
| Other income tax adjustments (d) | 5 | 29 | 1 | 17 |
| Total adjustments to provision for income taxes | 127 | 87 | 528 | 483 |
| Non-GAAP provision for income taxes | $ 376 | $ 358 | $ 1,190 | $ 1,059 |
| GAAP tax as a percentage of income before income taxes | 10.4 % | 12.6 % | 11.8 % | 12.6 % |
| Adjustments to provision for income taxes: | | | | |
| Income tax effect of the above adjustments (c) | 2.3 | (0.3) | 2.1 | 3.3 |
| Other income tax adjustments (d) | 0.2 | 1.0 | 0.0 | 0.3 |
| Total adjustments to provision for income taxes | 2.5 | 0.7 | 2.1 | 3.6 |
| Non-GAAP tax as a percentage of income before taxes | 12.9 % | 13.3 % | 13.9 % | 16.2 % |
| GAAP net income | $ 2,143 | $ 1,884 | $ 4,936 | $ 3,994 |
| Adjustments to net income: | | | | |
| Adjustments to income before income taxes, net of the income tax effect | 392 | 469 | 2,433 | 1,514 |
| Other income tax adjustments (d) | (5) | (29) | (1) | (17) |
| Total adjustments to net income | 387 | 440 | 2,432 | 1,497 |
| Non-GAAP net income | $ 2,530 | $ 2,324 | $ 7,368 | $ 5,491 |

Note: Numbers may not add due to rounding

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.



**Amgen Inc.**
**GAAP to Non-GAAP Reconciliations**
**(In millions, except per-share data)**
**(Unaudited)**
**(Continued from previous slide)**

The following table presents the computations for GAAP and non-GAAP diluted earnings per share:

|  | Three months ended September 30, 2022 | | Three months ended September 30, 2021 | |
|  | GAAP | Non-GAAP | GAAP | Non-GAAP |
|---|---|---|---|---|
| Net income | $ 2,143 | $ 2,530 | $ 1,884 | $ 2,324 |
| Weighted-average shares for diluted EPS | 538 | 538 | 570 | 570 |
| Diluted EPS | $ 3.98 | $ 4.70 | $ 3.31 | $ 4.08 |

|  | Nine months ended September 30, 2022 | | Nine months ended September 30, 2021 | |
|  | GAAP | Non-GAAP | GAAP | Non-GAAP |
|---|---|---|---|---|
| Net income | $ 4,936 | $ 7,368 | $ 3,994 | $ 5,491 |
| Weighted-average shares for diluted EPS | 542 | 542 | 576 | 576 |
| Diluted EPS | $ 9.11 | $ 13.59 | $ 6.93 | $ 9.53 |

a.   The adjustments related primarily to noncash amortization of intangible assets from business acquisitions.
b.   For the three months ended September 30, 2022, the adjustments related primarily to an impairment-related charge associated with an intangible asset acquired in a business combination. For the nine months ended September 30, 2022, the adjustments related primarily to cumulative foreign currency translation adjustments from a nonstrategic divestiture. For the three and nine months ended September 30, 2021, the adjustments related primarily to the change in fair values of contingent consideration liabilities.
c.   The tax effect of the adjustments between our GAAP and non-GAAP results takes into account the tax treatment and related tax rate(s) that apply to each adjustment in the applicable tax jurisdiction(s). Generally, this results in a tax impact at the U.S. marginal tax rate for certain adjustments, including the majority of amortization of intangible assets, whereas the tax impact of other adjustments, including restructuring initiatives, depends on whether the amounts are deductible in the respective tax jurisdictions and the applicable tax rate(s) in those jurisdictions. Due to these factors, the effective tax rate for the adjustments to our GAAP income before income taxes, for the three and nine months ended September 30, 2022, were 23.7% and 17.8%, respectively, compared to 11.0% and 23.5% for the corresponding period of the prior year.
d.   The adjustments related to certain acquisition items, prior period and other items excluded from GAAP earnings.

**Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.**



**Amgen Inc.**
**Reconciliations of Cash Flows**
**(In millions)**
**(Unaudited)**

| | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| Net cash provided by operating activities | $ 2,978 | $ 2,418 | $ 7,072 | $ 6,453 |
| Net cash (used in) provided by investing activities | (267) | 73 | (2,571) | 963 |
| Net cash used in financing activities | 1,588 | 2,848 | (2,988) | (1,713) |
| (Decrease) increase in cash and cash equivalents | 4,299 | 5,339 | 1,513 | 5,703 |
| Cash and cash equivalents at beginning of period | 5,203 | 6,630 | 7,989 | 6,266 |
| Cash and cash equivalents at end of period | $ 9,502 | $ 11,969 | $ 9,502 | $ 11,969 |

| | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| Net cash provided by operating activities | $ 2,978 | $ 2,418 | $ 7,072 | $ 6,453 |
| Capital expenditures | (160) | (242) | (596) | (593) |
| Free cash flow | $ 2,818 | $ 2,176 | $ 6,476 | $ 5,860 |

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

49



**Amgen Inc.**
**Reconciliations of Total Revenues Adjusted for Foreign Currency Impact**
**(In millions)**
**(Unaudited)**

| | Three months ended September 30, | | Change | FX impact $ (a) | Three months ended September 30, 2022 excluding FX | FX impact % (a) | Change excluding FX |
|---|---|---|---|---|---|---|---|
| | **2022** | **2021** | | | | | |
| Total Revenues | $ 6,652 | $ 6,706 | (1%) | $ (160) | $ 6,812 | (2%) | 2% |

(a)     Foreign currency impact was calculated by converting our current period local currency Product sales using the prior period foreign currency exchange rates and comparing that to our current period Product sales.

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.

50



**Amgen Inc.**
**Reconciliation of GAAP EPS Guidance to Non-GAAP**
**EPS Guidance for the Year Ending December 31, 2022**
**(Unaudited)**

| | | | | |
|---|---|---|---|---|
| **GAAP diluted EPS guidance** | $ | 11.46 | — | $ 12.17 |
| **Known adjustments to arrive at non-GAAP*:** | | | | |
| Acquisition-related expenses (a) | | 4.08 | — | 4.19 |
| Loss on divestiture (b) | | | 1.04 | |
| Net losses from equity investments | | | 0.58 | |
| Other | | | (0.02) | |
| **Non-GAAP diluted EPS guidance** | $ | 17.25 | — | $ 17.85 |

* The known adjustments are presented net of their related tax impact, which amount to approximately $1.29 - $1.30 per share.

(a) The adjustments relate primarily to noncash amortization of intangible assets acquired in business acquisitions.
(b) The adjustment primarily relates to a cumulative foreign currency translation adjustment from a nonstrategic divestiture.

Our GAAP diluted EPS guidance does not include the effect of GAAP adjustments triggered by events that may occur subsequent to this press release such as acquisitions, divestitures, asset impairments, litigation, changes in fair value of our contingent consideration obligations and changes in fair value of our equity investments. The GAAP adjustments from the acquisition of ChemoCentryx, Inc. are included in the GAAP diluted EPS guidance.

**Reconciliation of GAAP Tax Rate Guidance to Non-GAAP**
**Tax Rate Guidance for the Year Ending December 31, 2022**
**(Unaudited)**

| | | | |
|---|---|---|---|
| GAAP tax rate guidance | 11.0 % | — | 12.5 % |
| Tax rate of known adjustments discussed above | 2.0% | — | 2.5% |
| Non-GAAP tax rate guidance | 13.5 % | — | 14.5 % |

Provided November 3, 2022, as part of an oral presentation and is qualified by such, contains forward-looking statements, actual results may vary materially; Amgen disclaims any duty to update.





# Q3 '22 EARNINGS CALL

November 3, 2022



# EXHIBIT K

**From:** Morin, Mike (DC) <Michael.Morin@lw.com>
**Sent:** Friday, November 11, 2022 3:19 PM
**To:** Gutman, Siegmund Y. <sgutman@proskauer.com>
**Subject:** RE: Stelara Biosimilar Matter

Dear Sige,

Thanks for participating in the call yesterday.  As we discussed, we're requesting certain information from Amgen in order to make sure that the proceedings going forward are as streamlined, focused, and efficient as possible, and so that we do not end up wasting the parties' or the court's time with unnecessary motions practice.  We'd be amenable to entering into an NDA if it would be helpful, provided that we can share at least the basic information (confidentially) with our client.

Here is the information we are initially most interested in:

- When did Amgen file its aBLA?  Has the FDA accepted its application and, if so, when?
- Does Amgen intend to participate in the patent dance?
- Will Amgen provide its aBLA?
- Will Amgen provide other information about its manufacturing processes or injection device(s)?
- Will Amgen voluntarily agree to stay off the market until expiration of U.S. Patent No. 6,902,734 on September 25, 2023?
- Will Amgen agree to skinny label removing UC from the label until there is a judicial decision on U.S. Patent No. 10,961,307?

Given that Amgen has already given its 180 day notice, we'd ask that you respond to these requests asap, and no later than next Tuesday, November 15.  We look forward to your response, and in working with you cooperatively to make this matter proceed as efficiently and cooperatively as reasonably possible.

Mike

**From:** Gutman, Siegmund Y. <sgutman@proskauer.com>
**Date:** Wednesday, Nov 09, 2022 at 1:32 PM
**To:** Morin, Mike (DC) <Michael.Morin@lw.com>
**Subject:** RE: Stelara Biosimilar Matter

Hi Mike:

I'm happy to talk.  Let me know if you  have availability for a call tomorrow between 9:30am-11am PT or between 2-3pm PT.

Thanks,
Sige

**Siegmund Gutman**
Partner
Chair, Life Sciences Litigation

Proskauer
2029 Century Park East
Suite 2400
Los Angeles, CA 90067-3010
d 310.284.4533
f  310.557.2193

1

sgutman@proskauer.com

greenspaces
Please consider the environment before printing this email.

---

**From:** Michael.Morin@lw.com <Michael.Morin@lw.com>
**Sent:** Tuesday, November 8, 2022 1:20 PM
**To:** Gutman, Siegmund Y. <sgutman@proskauer.com>
**Subject:** Stelara Biosimilar Matter

*This email originated from outside the Firm.*

---

Hi Sige,

Following up on the voicemail I left yesterday.  As mentioned, we represent J&J on Stelara matters, and I wanted to discuss your letter of yesterday regarding Amgen's Notice of Commercial Marketing and next steps.  Please let me know when you might be available to talk.

Best,

Mike

**Michael A. Morin**

**LATHAM & WATKINS LLP**
555 Eleventh Street, NW | Suite 1000 | Washington, D.C. 20004-1304
D: +1.202.637.2298 | M: +1.202.253.8351

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.

*****************************************************************************************************************************
This message and its attachments are sent from a law firm and may contain information that is confidential and protected by privilege from disclosure.
If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them.
Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.
*****************************************************************************************************************************

# EXHIBIT L

# BIOSIMILAR BIOLOGICAL PRODUCT REAUTHORIZATION PERFORMANCE GOALS AND PROCEDURES FISCAL YEARS 2023 THROUGH 2027

I.    ENSURING THE EFFECTIVENESS OF THE BIOSIMILAR BIOLOGICAL PRODUCT REVIEW PROGRAM

    **A.** Review Performance Goals

    **B.** Program for Enhanced Review Transparency and Communication for Original 351(k) BLAs

    **C.** Guidance

    **D.** Review of Proprietary Names to Reduce Medication Errors

    **E.** Major Dispute Resolution

    **F.** Clinical Holds

    **G.** Special Protocol Question Assessment and Agreement

    **H.** Meeting Management Goals

II.  ENHANCING BIOSIMILAR AND INTERCHANGEABLE BIOLOGICAL PRODUCT DEVELOPMENT AND REGULATORY SCIENCE

    **A.** Promoting Best Practices in Communication between FDA and Sponsors During Application Review

    **B.** Inspections and Alternate Tools to Evaluate Facilities

    **C.** Advancing Development of Biosimilar Biological-Device Combination Products Regulated by CDER and CBER

    **D.** Advancing Development of Interchangeable Biosimilar Biological Products

    **E.** Regulatory Science to Enhance the Development of Biosimilar and Interchangeable Biological Products

III.  CONTINUED ENHANCEMENT OF USER FEE RESOURCE MANAGEMENT

    **A.** Resource Capacity Planning

28      **B.** Financial Transparency

29      **C.** Management of Carryover Balance

30    **IV.**    **IMPROVING FDA HIRING AND RETENTION OF REVIEW STAFF**

31      **A.** Set Clear Goals for Biosimilar Biological Product Review Program Hiring

32      **B.** Comprehensive and Continuous Assessment of Hiring and Retention

33    **V.**    **INFORMATION TECHNOLOGY GOALS**

34      **A.** Develop Data and Technology Modernization Strategy

35      **B.** Monitor and Modernize Electronic Submission Gateway (ESG)

36    **VI.**    **DEFINITIONS AND EXPLANATION OF TERMS**

# BIOSIMILAR BIOLOGICAL PRODUCT AUTHORIZATION PERFORMANCE GOALS AND PROCEDURES FOR FISCAL YEARS 2023 THROUGH 2027

This document contains the performance goals and procedures for the Biosimilar User Fee Act (BsUFA) reauthorization for fiscal years (FYs) 2023-2027, known as BsUFA III.  It is commonly referred to as the "goals letter" or "commitment letter."  The goals letter represents the product of FDA's discussions with the regulated industry and public stakeholders, as mandated by Congress. The performance and procedural goals and other commitments specified in this letter apply to aspects of the biosimilar biological product review program that are important for facilitating timely access to safe and effective biosimilar medicines for patients.  FDA is committed to meeting the performance goals specified in this letter, enhancing management of BsUFA resources, and ensuring BsUFA user fee resources are administered, allocated, and reported in an efficient and transparent manner.

Under BsUFA III, FDA is committed to ensuring effective scientific coordination and review consistency, as well as efficient governance and operations across the biosimilar biological product review program.

FDA and the regulated industry will periodically and regularly assess the progress of the biosimilar biological product review program throughout BsUFA III. This will allow FDA and the regulated industry to identify emerging challenges and develop strategies to address these challenges to ensure the efficiency and effectiveness of the biosimilar biological product review program.

I.   **ENSURING THE EFFECTIVENESS OF THE BIOSIMILAR BIOLOGICAL PRODUCT REVIEW PROGRAM**

    **A.  REVIEW PERFORMANCE GOALS**

        **1.  <u>Original and Resubmitted Biosimilar Biological Product Applications</u>**

           a.  Review and act on 90 percent of original biosimilar biological product application submissions within 10 months of the 60 day filing date.

           b.  Review and act on 90 percent of resubmitted original biosimilar biological product applications within 6 months of receipt.

        **2.  <u>Original and Resubmitted Supplemental Biosimilar Biological Product Applications</u>**

           a.  Review and act on the following supplements within 3 months of receipt:

               i.  **Category A:** Supplements seeking to update the labeling for a licensed biosimilar or interchangeable product with regards to safety information that has been updated in the reference product labeling and is applicable to one or more indications for which the biosimilar or interchangeable product is licensed.

           b.  Review and act on the following supplements within 4 months of receipt:

               i.  **Category B:** Supplements seeking licensure for an additional indication for a licensed biosimilar or interchangeable product when the submission does not include new data sets (other than analytical in vitro data obtained by use of physical, chemical and/or biological function assays, if needed to support the scientific justification for extrapolation), provided that:

                   1)  The supplement does not seek a new route of administration, dosage form, dosage strength, formulation or presentation; and

                   2)  If the supplement is subject to section 505B(a) of the Federal Food, Drug, and Cosmetic Act (FD&C Act), the supplement contains an up-to-date agreed initial pediatric study plan (iPSP).

              ii.  **Category C:** Supplements seeking to remove an approved indication for a licensed biosimilar or interchangeable product.

           c.  Review and act on the following supplements within 6 months of receipt:

               i.  **Category D:** Supplements seeking licensure for an additional indication for a licensed biosimilar or interchangeable product when the submission:

1) Contains new data sets (other than efficacy data, data to support a supplement seeking an initial determination of interchangeability, or only analytical in vitro data obtained by use of physical, chemical and/or biological function assays); or

2) Does not contain new data sets (other than analytical in vitro data obtained by use of physical, chemical and/or biological function assays) but is subject to section 505B(a) of the FD&C Act, and the supplement does not contain an up-to-date agreed iPSP.

d. Review and act on the following supplements within 10 months of receipt for the original submissions, and within 6 months of receipt for resubmissions:

i. **Category E:** Supplements seeking licensure for an additional indication for a licensed biosimilar or interchangeable product and containing efficacy data sets.

ii. **Category F:** Supplements seeking an initial determination of interchangeability.

e. FDA will issue a letter to the applicant for 90% of original Category A through D supplements within 60 calendar days of receipt. The letter will acknowledge receipt of the submission and provide the date for FDA to take action on the supplement.

i. Applicants may include in their cover letter a request that FDA not approve the supplement before a certain date, as long as that date is not later than the BsUFA goal date.

f. A filing letter will be issued to the applicant for 90% of original Category E and F supplements within 74 calendar days of receipt. Consistent with the underlying principles articulated in the Good Review Management Principles and Practices (GRMP) guidance, the letter will acknowledge receipt of the submission and inform the applicant of the planned review timeline and whether substantive review issues were identified.  If no substantive review issues were identified during the filing review, FDA will so notify the applicant.

3. **Original Manufacturing Supplements**

a. Review and act on 90 percent of manufacturing supplements requiring prior approval within 4 months of receipt.

b. Review and act on 90 percent of all other manufacturing supplements within 6 months of receipt.

4. **Goals Summary Tables**

**Table 1: Original and Resubmitted Applications and Category A- F Supplements**

| | |
|---|---|
| **Original Biosimilar Biological Product Application Submissions** | 90% in 10 months of the 60 day filing date |
| **Resubmitted Original Biosimilar Biological Product Applications** | 90% in 6 months of the receipt date |
| **Category A Supplements**<br><br>• **(original and resubmitted)** | • FY 2023: 70% in 3 months of the receipt date<br>• FY 2024: 80% in 3 months of the receipt date<br>• FY 2025: 90% in 3 months of the receipt date<br>• FY 2026: 90% in 3 months of the receipt date<br>• FY 2027: 90% in 3 months of the receipt date |
| **Category B and C Supplements**<br><br>• **(original and resubmitted)** | • FY 2023: 70% in 4 months of the receipt date<br>• FY 2024: 80% in 4 months of the receipt date<br>• FY 2025: 90% in 4 months of the receipt date<br>• FY 2026: 90% in 4 months of the receipt date<br>• FY 2027: 90% in 4 months of the receipt date |
| **Category D Supplements**<br><br>• **(original and resubmitted)** | • FY 2023: 70% in 6 months of the receipt date<br>• FY 2024: 80% in 6 months of the receipt date<br>• FY 2025: 90% in 6 months of the receipt date<br>• FY 2026: 90% in 6 months of the receipt date<br>• FY 2027: 90% in 6 months of the receipt date |
| **Original Category E and F Supplements** | 90% in 10 months of the receipt date |

| Resubmitted Category E and F Supplements | 90% in 6 months of the receipt date |
|---|---|

**Table 2: Manufacturing Supplements**

| | PRIOR APPROVAL | ALL OTHER |
|---|---|---|
| **Manufacturing Supplements** | 90% in 4 months of the receipt date | 90% in 6 months of the receipt date |

**5.   Review Performance Goal Extensions**

  a.   Major Amendments

    i.   A major amendment to an original application, supplement with clinical data, or resubmission of any of these applications, submitted at any time during the review cycle, may extend the goal date by three months.

    ii.   A major amendment may include, for example, a major new clinical study report; major re-analysis of previously submitted study(ies); submission of a risk evaluation and mitigation strategy (REMS) with elements to assure safe use (ETASU) not included in the original application; or significant amendment to a previously submitted REMS with ETASU.  Generally, changes to REMS that do not include ETASU and minor changes to REMS with ETASU will not be considered major amendments.

    iii.   A major amendment to a manufacturing supplement submitted at any time during the review cycle may extend the goal date by two months.

    iv.   Only one extension can be given per review cycle.

    v.   Consistent with the underlying principles articulated in the Good Review Management Principles and Practices (GRMP) guidance, FDA's decision to extend the review clock should, except in rare circumstances, be limited to occasions where review of the new information could address outstanding deficiencies in the application and lead to approval in the current review cycle.

  b.   Inspection of Facilities Not Adequately Identified in an Original Application or Supplement

i.  All original applications and supplements are expected to include a comprehensive and readily located list of all manufacturing facilities included or referenced in the application or supplement.  This list provides FDA with information needed to schedule inspections of manufacturing facilities that may be necessary before approval of the original application or supplement.

ii.  If, during FDA's review of an original application or supplement, the Agency identifies a manufacturing facility that was not included in the comprehensive and readily located list, the goal date may be extended.

1)  If FDA identifies the need to inspect a manufacturing facility that is not included as part of the comprehensive and readily located list in an original application or supplement with clinical data, the goal date may be extended by three months.

2)  If FDA identifies the need to inspect a manufacturing facility that is not included as part of the comprehensive and readily located list in a manufacturing supplement, the goal date may be extended by two months.

## B. PROGRAM FOR ENHANCED REVIEW TRANSPARENCY AND COMMUNICATION FOR ORIGINAL 351(k) BLAs

To promote transparency and communication between the FDA review team and the applicant, FDA will apply the following model ("the Program") to the review of all original Biologics License Applications (BLAs) submitted under section 351(k) of the Public Health Service Act ("351(k) BLAs"), including applications that are resubmitted following a Refuse-to-File decision, received from October 1, 2022, through September 30, 2027.[1] The goal of the Program is to promote the efficiency and effectiveness of the first cycle review process and minimize the number of review cycles necessary for approval, ensuring that patients have timely access to safe, effective, and high quality biosimilar and interchangeable biological products.

The standard approach for the review of original 351(k) BLAs is described in this section.  However, the FDA review team and the applicant may discuss and reach mutual agreement on an alternative approach to the timing and nature of interactions and information exchange between the applicant and FDA, i.e., a Formal Communication Plan for the review of the original 351(k) BLA.  The Formal Communication Plan may include elements of the standard approach (e.g., a mid-cycle communication or a late-cycle meeting) as well as other interactions that

---

[1] The "Program for Enhanced Review Transparency and Communication for Original 351(k) BLAs" (referred to as "the Program" and described in this goals letter) is distinct from the statutory term, "biosimilar biological product development program," which is defined in section 744G of the Federal Food, Drug, and Cosmetic (FD&C Act) as "the program under [the statutory BsUFA fee provisions] for expediting the process for the review of submissions in connection with biosimilar biological product development." Section 744G(6) of the FD&C Act.

sometimes occur during the review process (e.g., a meeting during the filing period to discuss the application, i.e., an "application orientation meeting").  If appropriate, the Formal Communication Plan should specify those elements of the Program that FDA and the sponsor agree are unnecessary for the application under review.  If the review team and the applicant anticipate developing a Formal Communication Plan, the elements of the plan should be discussed and agreed to at the pre-submission meeting (see Section I.B.1) and reflected in the meeting minutes.  The Formal Communication Plan may be reviewed and amended at any time based on the progress of the review and the mutual agreement of the review team and the applicant.  For example, the review team and the applicant may mutually agree at any time to cancel future specified interactions in the Program (e.g., the late-cycle meeting) that become unnecessary (e.g., because previous communications between the review team and the applicant are sufficient).  Any amendments made to the Formal Communication Plan should be consistent with the goal of an efficient and timely first cycle review process and not impede the review team's ability to conduct its review.

The remainder of this Section I.B. describes the parameters that will apply to FDA's review of applications in the Program.

1. **Pre-submission meeting:**  The applicant is strongly encouraged to discuss the planned content of the application with the appropriate FDA review division at a BPD Type 4 (pre-351(k) BLA) meeting.  This meeting will be attended by the FDA review team, including appropriate senior FDA staff.

    a. The BPD Type 4 (pre-351(k) BLA) meeting should be held sufficiently in advance of the planned submission of the application to allow for meaningful response to FDA feedback and should generally occur not less than 2 months prior to the planned submission of the application.

    b. In addition to FDA's preliminary responses to the applicant's questions, other potential discussion topics include preliminary discussions regarding the approach to developing the content for REMS, where applicable, patient labeling (e.g., Medication Guide and Instructions For Use) and, where applicable, the development of a Formal Communication Plan.  These discussions will be summarized at the conclusion of the meeting and reflected in the FDA meeting minutes.

        The FDA and the applicant will agree on the content of a complete application for the proposed indication(s) at the pre-submission meeting.  The FDA and the applicant may also reach agreement on submission of a limited number of application components not later than 30 calendar days after the submission of the original application.  These submissions must be of a type that would not be expected to materially impact the ability of the review team to begin its review.  These agreements will be summarized at the conclusion of the meeting and reflected in the FDA meeting minutes.

9

      i.    Examples of application components that may be appropriate for delayed submission include; stability updates, the final audited report of a preclinical study (e.g., toxicology) where the final draft report is submitted with the original application, or a limited amount of the data from an assessment of a single transition from the reference product to the proposed biosimilar biological product, where applicable.

      ii.    Major components of the application (e.g., the complete analytical similarity assessment, the complete study report of a comparative clinical study or the full study report of necessary immunogenicity data) are expected to be submitted with the original application and are not subject to agreement for late submission.

**2.** **<u>Original application submission:</u>** Applications are expected to be complete, as agreed between the FDA review team and the applicant at the BPD Type 4 (pre-351(k) BLA) meeting, at the time of original submission of the application.  If the applicant does not have a BPD Type 4 (pre-351(k) BLA) meeting with FDA, and no agreement exists between FDA and the applicant on the contents of a complete application or delayed submission of certain components of the application, the applicant's submission is expected to be complete at the time of original submission.

    a.    All applications are expected to include a comprehensive and readily located list of all clinical sites and manufacturing facilities included or referenced in the application.

    b.    Any components of the application that FDA agreed at the pre-submission meeting could be submitted after the original application are expected to be received not later than 30 calendar days after receipt of the original application.

    c.    Incomplete applications, including applications with components that are not received within 30 calendar days after receipt of the original submission, will be subject to a Refuse-to-File decision.

    d.    The following parameters will apply to applications that are subject to a Refuse-to-File decision and are subsequently filed over protest:

      i.    The original submission of the application will be subject to the review performance goal as described in Section I.A.1.a.

      ii.    The application will not be eligible for the other parameters of the Program (e.g., mid-cycle communication, late-cycle meeting).

      iii.    FDA generally will not review amendments to the application during any review cycle.  FDA also generally will not issue information requests to the applicant during the agency's review.

      iv.   The resubmission goal described in Section I.A.1.b will not apply to any resubmission of the application following an FDA complete response action.  Any such resubmission will be reviewed as available resources permit.

e.   Since applications are expected to be complete at the time of submission, unsolicited amendments are expected to be rare and not to contain major new information or analyses.  Review of unsolicited amendments, including those submitted in response to an FDA communication of deficiencies, will be handled in accordance with the GRMP guidance.  This guidance includes the underlying principle that FDA will consider the most efficient path toward completion of a comprehensive review that addresses application deficiencies and leads toward a first cycle approval when possible.

3.  **Day 74 Letter:**  FDA will follow existing procedures regarding identification and communication of substantive review issues identified during the initial filing review to the applicant in the "Day 74 letter."  If no substantive review issues were identified during the filing review, FDA will so notify the applicant.  FDA's filing review represents a preliminary review of the application and is not indicative of deficiencies that may be identified later in the review cycle.

For applications subject to the Program, the timeline for this communication will be within 74 calendar days from the date of FDA receipt of the original submission.   The planned timeline for review of the application included in the Day 74 letter for applications in the Program will include:

a.  the planned date for the internal mid-cycle review meeting,

b.  preliminary plans on whether to hold an Advisory Committee (AC) meeting to discuss the application,

c.  a target date for communication of feedback from the review division to the applicant regarding proposed labeling and any postmarket requirements or postmarket commitments the Agency will be requesting.

4.  **Review performance goals:**  For original 351(k) BLA submissions that are filed by FDA under the Program, the BsUFA review clock will begin at the conclusion of the 60 calendar day filing review period that begins on the date of FDA receipt of the original submission.  The review performance goals for these applications are as follows:

a.  Review and act on 90 percent of original 351(k) BLA submissions within 10 months of the 60 day filing date.

5.  **Mid-Cycle Communication:**  The FDA Regulatory Project Manager (RPM), and other appropriate members of the FDA review team (e.g., Cross Discipline Team Leader (CDTL)), will call the applicant, generally within 2 weeks following the Agency's internal mid-cycle review meeting, to provide the applicant with an

update on the status of the review of their application.  An agenda will be sent to the applicant prior to the mid-cycle communication.  Scheduling of the internal mid-cycle review meeting will be handled in accordance with the GRMP guidance.  The RPM will coordinate the specific date and time of the telephone call with the applicant.

The update should include any significant issues identified by the review team to date, any information requests, and information regarding major concerns with the following:

a.  The analytical similarity data, including the potential relevance of any issues (e.g. data analysis issues or potential clinical impact of observed analytical differences), intended to support a demonstration that the proposed biosimilar biological product is highly similar to the reference product.

b.  The data intended to support a demonstration of no clinically meaningful differences, including discussion of any immunogenicity issues.

c.  The data intended to support a demonstration of interchangeability.

d.  CMC issues.

In addition, the update should include preliminary review team thinking regarding the content of the proposed REMS, where applicable, proposed date(s) for the late-cycle meeting, updates regarding plans for the AC meeting (if an AC meeting is anticipated), and other projected milestone dates for the remainder of the review cycle.

6.  **Late-Cycle and Advisory Committee Meetings:**  A meeting will be held between the FDA review team and the applicant to discuss the status of the review of the application late in the review cycle. Late-cycle meetings will generally be face-to-face meetings; however, the meeting may be held by teleconference if FDA and the applicant agree.  Since the application is expected to be complete at the time of submission, FDA intends to complete primary and secondary reviews of the application in advance of the planned late-cycle meeting.

a.  FDA representatives at the late-cycle meeting are expected to include the signatory authority for the application, review team members from appropriate disciplines, and appropriate team leaders and/or supervisors from disciplines for which substantive issues have been identified in the review to date.

b.  For applications that will be discussed at an Advisory Committee (AC) meeting, the following parameters apply:

i.  FDA intends to convene AC meetings no later than 2 months prior to the BsUFA goal date. The late-cycle meeting will occur not less than 12 calendar days before the date of the AC meeting.

      ii.     FDA intends to provide final questions for the AC to the sponsor and the AC not less than 2 calendar days before the AC meeting.

      iii.    Following an AC meeting, FDA and the applicant may agree on the need to discuss feedback from the committee for the purpose of facilitating the remainder of the review.  Such a meeting will generally be held by teleconference without a commitment for formal meeting minutes issued by the agency.

c.    For applications that will not be discussed at an AC meeting, the late-cycle meeting will generally occur not later than 3 months prior to the BsUFA goal date.

d.    <u>Late-Cycle Meeting Background Packages</u>:  The Agency background package for the late-cycle meeting will be sent to the applicant not less than 10 calendar days before the late-cycle meeting.  The package will consist of any discipline review (DR) letters issues to date, a brief memorandum from the review team outlining substantive application issues (e.g., deficiencies identified by primary and secondary reviews), the Agency's background package for the AC meeting (incorporated by reference if previously sent to the applicant), potential questions and/or points for discussion for the AC meeting (if planned) and the current assessment of the content of proposed REMS or other risk management actions, where applicable.

e.    <u>Late-Cycle Meeting Discussion Topics</u>:  Potential topics for discussion at the late-cycle meeting include:

      i.      major deficiencies identified to date;

      ii.     analytical similarity data, including the potential relevance of any issues (e.g. data analysis issues or potential clinical impact of observed analytical differences), intended to support a demonstration that the proposed biosimilar biological product is highly similar to the reference product;

      iii.    data intended to support a demonstration of no clinically meaningful differences, including discussion of any immunogenicity issues;

      iv.    data intended to support a demonstration of interchangeability;

      v.     CMC issues;

      vi.    inspectional findings identified to date;

      vii.   issues to be discussed at the AC meeting (if planned);

      viii.  current assessment of the content of proposed REMS or other risk management actions, where applicable;

ix.     information requests from the review team to the applicant; and additional data or analyses the applicant may wish to submit.

With regard to submission of additional data or analyses, the FDA review team and the applicant will discuss whether such data will be reviewed by the Agency in the current review cycle and, if so, whether the submission will be considered a major amendment and trigger an extension of the BsUFA goal date.

7.  **Inspections:**  FDA's goal is to complete all GCP, GLP, and GMP inspections for applications in the Program within 10 months of the date of original receipt of the application.  This will allow 2 months at the end of the review cycle to attempt to address any deficiencies identified by the inspections.

## C.  GUIDANCE

FDA and industry share a commitment to ensuring an efficient and effective review process for all applications subject to the BsUFA program.

In light of the new, expedited timelines for supplements, FDA will issue guidance and/or a MAPP on classifying supplements to a licensed 351(k) BLA for purposes of determining review timelines.  FDA will publish a draft guidance for public comment and/or a MAPP no later than the end of FY 2023.  FDA will work toward the goal of publishing a revised draft or final guidance within 18 months after the close of the public comment period.

## D.  REVIEW OF PROPRIETARY NAMES TO REDUCE MEDICATION ERRORS

To enhance patient safety, FDA is committed to various measures to reduce medication errors related to look-alike and sound-alike proprietary names and such factors as unclear label abbreviations, acronyms, dose designations, and error prone label and packaging design.  The following performance goals apply to FDA's review of biosimilar biological product proprietary names during the biosimilar biological product development (BPD) phase and during FDA's review of a marketing application:

1.  **Proprietary Name Review Performance Goals During The BPD Phase**

a.  Review 90% of proprietary name submissions filed within 180 days of receipt. Notify sponsor of tentative acceptance or non-acceptance.

b.  If the proprietary name is found to be unacceptable, the sponsor can request reconsideration by submitting a written rebuttal with supporting data or request a meeting within 60 days to discuss the initial decision (meeting package required).

    c.  If the proprietary name is found to be unacceptable, the above review performance goals also would apply to the written request for reconsideration with supporting data or the submission of a new proprietary name.

    d.   A complete submission is required to begin the review clock.

**2.  Proprietary Name Review Performance Goals During Application Review**

    a.  Review 90% of biosimilar biological product proprietary name submissions filed within 90 days of receipt.  Notify sponsor of tentative acceptance/non-acceptance.

    b.  A supplemental review will be done meeting the above review performance goals if the proprietary name has been submitted previously (during the BPD phase) and has received tentative acceptance.

    c.  If the proprietary name is found to be unacceptable, the sponsor can request reconsideration by submitting a written rebuttal with supporting data or request a meeting within 60 days to discuss the initial decision (meeting package required).

    d.  If the proprietary name is found to be unacceptable, the above review performance goals apply to the written request for reconsideration with supporting data or the submission of a new proprietary name.

    e.  A complete submission is required to begin the review clock.

## E.  MAJOR DISPUTE RESOLUTION

**1.  Procedure:** For procedural or scientific matters involving the review of biosimilar biological product applications and supplements (as defined in BsUFA) that cannot be resolved at the signatory authority level (including a request for reconsideration by the signatory authority after reviewing any materials that are planned to be forwarded with an appeal to the next level), the response to appeals of decisions will occur within 30 calendar days of the Center's receipt of the written appeal.

**2.  Performance goal:** 90% of such responses are provided within 30 calendar days of the Center's receipt of the written appeal.

**3.  Conditions:**

    a.  Sponsors should first try to resolve the procedural or scientific issue at the signatory authority level.  If it cannot be resolved at that level, it should be appealed to the next higher organizational level (with a copy to the signatory authority) and then, if necessary, to the next higher organizational level.

b. Responses should be either verbal (followed by a written confirmation within 14 calendar days of the verbal notification) or written and should ordinarily be to either grant or deny the appeal.

c. If the decision is to deny the appeal, the response should include reasons for the denial and any actions the sponsor might take to persuade the Agency to reverse its decision.

d. In some cases, further data or further input from others might be needed to reach a decision on the appeal.  In these cases, the "response" should be the plan for obtaining that information (e.g., requesting further information from the sponsor, scheduling a meeting with the sponsor, scheduling the issue for discussion at the next scheduled available advisory committee).

e. In these cases, once the required information is received by the Agency (including any advice from an advisory committee), the person to whom the appeal was made, again has 30 calendar days from the receipt of the required information in which to either deny or grant the appeal.

f. Again, if the decision is to deny the appeal, the response should include the reasons for the denial and any actions the sponsor might take to persuade the Agency to reverse its decision.

g. Note: If the Agency decides to present the issue to an advisory committee and there are not 30 days before the next scheduled advisory committee, the issue will be presented at the following scheduled committee meeting to allow conformance with advisory committee administrative procedures.

## F.  CLINICAL HOLDS

1. **Procedure:** The Center should respond to a sponsor's complete response to a clinical hold within 30 days of the Agency's receipt of the submission of such sponsor response.

2. **Performance goal:** 90% of such responses are provided within 30 calendar days of the Agency's receipt of the sponsor's response.

## G.  SPECIAL PROTOCOL QUESTION ASSESSMENT AND AGREEMENT

1. **Procedure:** Upon specific request by a sponsor (including specific questions that the sponsor desires to be answered), the Agency will evaluate certain protocols and related issues to assess whether the design is adequate to meet scientific and regulatory requirements identified by the sponsor.

a. The sponsor should submit a limited number of specific questions about the protocol design and scientific and regulatory requirements for which the sponsor seeks agreement (e.g., are the clinical endpoints adequate to assess

16

whether there are clinically meaningful differences between the proposed biosimilar biological product and the reference product).

b. Within 45 days of Agency receipt of the protocol and specific questions, the Agency will provide a written response to the sponsor that includes a succinct assessment of the protocol and answers to the questions posed by the sponsor. If the Agency does not agree that the protocol design, execution plans, and data analyses are adequate to achieve the goals of the sponsor, the reasons for the disagreement will be explained in the response.

c. Protocols that qualify for this program include any necessary clinical study or studies to prove biosimilarity and/or interchangeability (e.g., protocols for pharmacokinetics and pharmacodynamics studies, protocols for comparative clinical studies that will form the primary basis for demonstrating that there are no clinically meaningful differences between the proposed biosimilar biological product and the reference product, and protocols for clinical studies intended to support a demonstration of interchangeability). For such protocols to qualify for this comprehensive protocol assessment, the sponsor must have had a BPD Type 2b or 3 Meeting, as defined in section I.I, below, with the review division so that the division is aware of the developmental context in which the protocol is being reviewed and the questions being answered.

d. If a protocol is reviewed under the process outlined above, and agreement with the Agency is reached on design, execution, and analyses, and if the results of the trial conducted under the protocol substantiate the hypothesis of the protocol, the Agency agrees that the data from the protocol can be used as part of the primary basis for approval of the product. The fundamental agreement here is that having agreed to the design, execution, and analyses proposed in protocols reviewed under this process, the Agency will not later alter its perspective on the issues of design, execution, or analyses unless public health concerns unrecognized at the time of protocol assessment under this process are evident.

2. **Performance goal:** 90% of special protocols assessments and agreement requests completed and returned to sponsor within 45 days.

3. **Reporting:** The Agency will track and report the number of original special protocol assessments and resubmissions per original special protocol assessment.

## H. MEETING MANAGEMENT GOALS

Formal BsUFA meetings between sponsors and FDA consist of Biosimilar Initial Advisory and BPD Type 1-4 meetings. These meetings are further described below.

• A Biosimilar Initial Advisory Meeting is an initial assessment limited to a general discussion regarding whether licensure under section 351(k) of the Public Health Service Act may be feasible for a particular product, and, if so, general advice on

the expected content of the development program.  Such term does not include any meeting that involves substantive review of summary data or full study reports.  Only one BIA meeting may be granted per program. While preliminary comparative analytical data from at least one lot of the proposed biosimilar or interchangeable product compared to the U.S.-licensed reference product is not required for the meeting request, sufficient information should be provided with the meeting request to enable FDA to make such a preliminary determination related to potential licensure under section 351(k) and to provide meaningful advice.  This should include, as appropriate:

- Identification of reference product.

- The indications intended to be sought for licensure.

- A comparative analytical similarity plan, including preliminary identification of the Critical Quality Attributes and planned characterization methods.

- If a sponsor seeks to utilize a non-US-licensed comparator during development, the proposed bridging strategy for US-licensed reference product and that comparator should be provided.

- A conceptual plan for non-clinical studies or rationale and justification of why such studies may not needed.

- A conceptual description of the planned clinical pharmacokinetics and/or pharmacodynamic study(ies), including proposed endpoints.

- If the sponsor plans to conduct a comparative clinical safety and efficacy study, a conceptual plan should be provided. This would include the patient population and proposed endpoints.

- Any guidance already received from other health authorities on product development.

- Identification to the FDA of the regulatory status in other jurisdictions.

- A BPD Type 1 Meeting is a meeting which is necessary for an otherwise stalled drug development program to proceed (e.g. meeting to discuss clinical holds, dispute resolution meeting), a special protocol assessment meeting, or a meeting to address an important safety issue.

- A BPD Type 2a Meeting is a meeting focused on a narrow set of issues (e.g., often one, but not more than two issues and associated questions), requiring input from no more than 3 disciplines or review divisions. In order to request a Type 2a meeting, sponsors must first have had a BIA or other BPD meeting with the Agency. Requests could include:

- Defined CMC post-approval commitments (e.g., related to analytical methods) discussing the approach in advance of conducting the study to ensure the approach is in line with the Agency's expectations.

- Immunogenicity testing strategy following prior FDA recommendations/feedback.

- Feedback on revised study design when revisions are based on prior FDA feedback.

- A BPD Type 2b Meeting is a meeting to discuss a specific issue (e.g., proposed study design or endpoints) or questions where FDA will provide advice regarding an ongoing biosimilar biological product development program.  This meeting may include substantive review of summary data, but does not include review of full study reports.

- A BPD Type 3 Meeting is an in depth data review and advice meeting regarding an ongoing biosimilar biological product development program.  This meeting includes substantive review of full study reports, FDA advice regarding the similarity between the proposed biosimilar biological product and the reference product, and FDA advice regarding additional studies, including design and analysis.

- A BPD Type 4 Meeting is a pre-submission meeting to discuss the format and content of a complete application for an original biosimilar biological product application under the Program or supplement submitted under 351(k) of the PHS Act.  The purpose of this meeting is to discuss the format and content of the planned submission and other items, including identification of those studies that the sponsor is relying on to support a demonstration of biosimilarity or interchangeability, discussion of any potential review issues identified based on the information provided, identification of the status of ongoing or needed studies to adequately to address the Pediatric Research Equity Act (PREA), acquainting FDA reviewers with the general information to be submitted in the marketing application (including technical information), and discussion of the best approach to the presentation and formatting of data in the marketing application.

1. **Response to Meeting Requests**

   a. Procedure: FDA will notify the sponsor in writing of the date, time, and place for the meeting, as well as expected Center participants following receipt of a formal meeting request and background package.  Table 1 below indicates the timeframes for FDA's response to a meeting request.

Table 1:

| Meeting Type | Response Time (calendar days) |
|---|---|
| Biosimilar Initial Advisory | 21 |
| BPD Type 1 | 14 |
| BPD Type 2a, 2b, 3 and 4 | 21 |

    i.    For Biosimilar Initial Advisory and BPD Type 2a or 2b meetings, the sponsor may request a written response to its questions, rather than a face-to-face meeting[2] or teleconference.  If a written response is deemed appropriate, FDA will notify the sponsor of the date it intends to send the written response. This date will be consistent with the timeframes specified in Table 2 below for the specific meeting type.

    ii.    For the BPD Type 2a meeting, while the sponsor may request a face-to-face meeting, the Agency may determine that a written response to the sponsor's questions would be the most appropriate means for providing feedback and advice to the sponsor.  When it is determined that the meeting request can be appropriately addressed through a written response, FDA will notify the sponsor of the date it intends to send the written response in the Agency's response to the meeting request.  This date will be consistent with the timeframe for a Type 2a meeting.  If the sponsor believes a face-to-face Type 2a meeting is valuable and warranted, then the sponsor may provide a rationale in a follow-up correspondence explaining why a face-to-face meeting is valuable and warranted, and FDA will reconsider this request.  If FDA agrees to grant the face-to-face format, the Agency will strive to schedule the meeting to occur within 60 days of FDA's receipt of the meeting request.

b.  <u>Performance Goal</u>: FDA will respond to meeting requests and provide notification within the response times noted in Table 1 for 90 percent of each meeting type.

---

[2] A "face-to-face" meeting includes both in-person meetings and virtual meetings on IT platforms that allow for both audio and visual communication.

2. **Scheduling Meetings**

    a. <u>Procedure</u>**:** FDA will schedule the meeting on the next available date at which all applicable Center personnel are available to attend, consistent with the component's other business; however, the meeting should be scheduled consistent with the type of meeting requested in Table 2.  Table 2 below indicates the timeframes for FDA to schedule the meeting following receipt of a formal meeting request and background package, or in the case of a written response for Biosimilar Initial Advisory and BPD Type 2a and 2b meetings, the timeframes for the Agency to send the written response.  If the requested date for any meeting type is greater than the specified timeframe, the meeting date should be within 14 calendar days of the requested date.

**Table 2:**

| Meeting Type | Meeting Scheduling or Written Response Time |
|---|---|
| Biosimilar Initial Advisory | 75 calendar days from receipt of meeting request and background package |
| BPD Type 2a | 60 calendar days from receipt of meeting request and background package |
| BPD Type 2b | 90 calendar days from receipt of meeting request and background package |
|  | **Meeting Scheduling Time** |
| BPD Type 1 | 30 calendar days from receipt of meeting request and background package |
| BPD Type 3 | 120 calendar days from receipt of meeting request and background package |
| BPD Type 4 | 60 calendar days from receipt of meeting request* |

    *Note the background package for BPD Type 4 meetings must be received no later than 14 calendar days after FDA receipt of the meeting request.

b. <u>Performance goal:</u>

**Table 3:**

| Meeting Type | Goal |
|---|---|
| BPD Type 2a | FY 2023: 50% of meetings are held or written responses are sent within the timeframe<br><br>FY 2024: 60% of meetings are held or written responses are sent within the timeframe<br><br>FY 2025:  70% of meetings are held or written responses are sent within the timeframe<br><br>FY 2026: 80% of meetings are held or written responses are sent within the timeframe<br><br>FY 2027:  90% of meetings are held or written responses are sent within the timeframe |
| Biosimilar Initial Advisory and BPD Type 2b | 90% of meetings are held or written responses are sent within the timeframe |
| BPD Type 1, 3, and 4 | 90% of meetings are held within the timeframe for each meeting type |

3. **Preliminary Responses**

a. <u>Procedure</u>**:** The Agency will send preliminary responses to the sponsor's questions contained in the background package no later than five calendar days before the face-to-face or teleconference meeting date for BPD Type 2b and Type 3 meetings.

b. Performance goal:

**Table 4:**

| Meeting Type | |
|---|---|
| BPD Types 2b and 3 | 90% of preliminary responses to questions are issued by FDA no later than five calendar days before the meeting date |

**4. Meeting Minutes**

a. Procedure**:** The Agency will prepare minutes which will be available to the sponsor 30 calendar days after the meeting. The minutes will clearly outline the important agreements, disagreements, issues for further discussion, and action items from the meeting in bulleted form and need not be in great detail. Meeting minutes are not necessary if the Agency transmits a written response for Biosimilar Initial Advisory, BPD Type 2a, or 2b meetings.

b. Performance Goal**:** 90% of minutes are issued within 30 calendar days of the date of the meeting.

**5. Conditions:** For a meeting to qualify for these performance goals:

a. A written request and supporting documentation (i.e., the background package) must be submitted to the appropriate review division or office. The background package must be submitted at the same time as the written request for Biosimilar Initial Advisory, BPD Type 1, 2a, 2b and 3 meetings. For BPD Type 4 meetings, the background package must be received no later than 14 calendar days after FDA receipt of the written request.

b. The request must provide:

    i. A brief statement of the purpose of the meeting, the sponsor's proposal for the type of meeting, and the sponsor's proposal for a face-to-face meeting, teleconference, or for a written response (Biosimilar Initial Advisory and BPD Type 2a and 2b meetings only);

    ii. A listing of the specific objectives/outcomes the sponsor expects from the meeting;

    iii. A proposed agenda, including estimated times needed for each agenda item;

    iv.    A list of questions, grouped by discipline (For each question there should be a brief explanation of the context and purpose of the question);

    v.    A listing of planned external attendees; and

    vi.    A listing of requested participants/disciplines representative(s) from the Center with an explanation for the request as appropriate.

    vii.    Suggested dates and times (e.g., morning or afternoon) for the meeting that are within or beyond the appropriate time frame of the meeting type being requested.

c.    The Agency concurs that the meeting will serve a useful purpose (i.e., it is not premature or clearly unnecessary).  However, requests for BPD Type 2b, 3, and 4 Meetings will be honored except in the most unusual circumstances.

The Center may determine that a different type of meeting (i.e., Biosimilar Initial Advisory, or BPD Type 1-4) is more appropriate and it may grant a meeting of a different type than requested, which may require the payment of a biosimilar biological product development fee as described in section 744H of the Federal Food, Drug, and Cosmetic Act before the meeting will be provided. If a biosimilar biological product development fee is required under section 744H, and the sponsor does not pay the fee within the time frame required under section 744H, the meeting will be cancelled.  If the sponsor pays the biosimilar biological product development fee after the meeting has been cancelled due to non-payment, the time frame described in section I.I.1.a will be calculated from the date on which FDA received the payment, not the date on which the sponsor originally submitted the meeting request.

Sponsors are encouraged to consult available FDA guidance to obtain further information on recommended meeting procedures.

## 6.  Guidance, Clarity, and Transparency

a.    Guidance: By September 30, 2023, FDA will issue a revised draft of the existing draft guidance on "Formal Meetings Between the FDA and Sponsors or Applicants of BsUFA Products" with information pertaining to BIA, Type 2a, and Type 4 meetings, as well as the follow-up opportunity described below.  In addition, FDA will update relevant MAPPs and SOPPs.

b.    Follow-up opportunity: For all meeting types, to ensure the sponsor's understanding of FDA feedback from meeting discussions or a WRO, sponsors may submit clarifying questions to the agency. Only questions of a clarifying nature will be permitted, i.e., to confirm something in minutes or a WRO issued by FDA, rather than raising new issues or new proposals. FDA will develop criteria and parameters for permissible requests, and FDA may exercise discretion about whether requests are in-scope. The clarifying

questions should be sent in writing as a "Request for Clarification" to the FDA within 20 calendar days following receipt of meeting minutes or a WRO. For questions that meet the criteria, FDA will issue a response in writing within 20 calendar days of receipt of the clarifying questions. FDA's response will reference the original meeting minutes or WRO.

c. <u>Transparency</u>: On or before March 31st, 2025, FDA will publish on its public webpage certain metrics regarding the new Type 2a meeting and sponsor requests for face-to-face meetings for year 1 and year 2 of BsUFA III.

## II. ENHANCING BIOSIMILAR AND INTERCHANGEABLE BIOLOGICAL PRODUCT DEVELOPMENT AND REGULATORY SCIENCE

To facilitate the timely development of biosimilar and interchangeable biological products and their availability to patients, FDA will focus on enhancing communications during application review, including inspection communications, and advancing the development of combination and interchangeable products. FDA will also pilot a regulatory science program focused on enhancing regulatory decision-making and facilitating science-based recommendations in areas foundational to biosimilar and interchangeable biological development.

### A. PROMOTING BEST PRACTICES IN COMMUNICATION BETWEEN FDA AND SPONSORS DURING APPLICATION REVIEW

The utilization of best practices in communication during application review are the responsibility of both industry and FDA. Efforts from both industry and FDA are needed in order to continue advancement, improvement, and updating of best practices.

To continue to enhance communication with sponsors during biosimilar application review in BsUFA III, FDA will update relevant guidances, MAPPs and SOPPs, as appropriate, on or before December 31st, 2023 regarding best practices in communication.  FDA will utilize input from the BsUFA II final assessment of the Program, FDA experiences, and discussion from a meeting with industry on best practices in FY 2022 to update the above documents, as appropriate.

### B. INSPECTIONS AND ALTERNATIVE TOOLS TO EVALUATE FACILITIES

1. <u>Enhancing Inspection Communication for Applications, not Including Supplements</u>

FDA and industry believe enhanced communication between review teams and industry on certain pre-license inspections can facilitate an efficient application review process.

25

When FDA determines for an application, not including supplements, that it is necessary to conduct a pre-license inspection at a time when the product identified in the application is being manufactured, FDA's goal is to communicate its intent to inspect a manufacturing facility at least 60 days in advance of the pre-license inspection and no later than mid-cycle. FDA reserves the right to conduct manufacturing facility inspections at any time during the review cycle, whether or not FDA has communicated to the facility the intent to inspect.

### 2. Alternative Tools to Assess Manufacturing Facilities Named in Pending Applications

During the COVID-19 public health emergency, the FDA expanded its use of alternate tools for assessing facilities named in applications, including exercising its authority to request records and other information in advance of or in lieu of an inspection, granted per section 704(a)(4) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) (21 U.S.C. 374(a)). Where appropriate, the Agency also increased the use of information, including inspection reports, shared by trusted foreign regulatory partners through mutual recognition agreements and other confidentiality agreements. As FDA continues to gain experience and lessons learned from the use of these tools, FDA will communicate its thinking on the use of such methods beyond the pandemic.

On or before September 30, 2023, FDA will issue draft guidance on the use of alternative tools to assess manufacturing facilities named in pending applications (e.g., requesting existing inspection reports from other trusted foreign regulatory partners through mutual recognition and confidentiality agreements, requesting information from applicants, requesting records and other information directly from facilities and other inspected entities, and, as appropriate, utilizing new or existing technology platforms to assess manufacturing facilities). The guidance will incorporate best practices, including those in existing published documents, from the use of such tools during the COVID-19 pandemic. FDA will work towards the goal of publishing final guidance within 18 months after the close of the public comment period on the draft guidance. If, after receiving comments on the draft guidance, FDA determines that the guidance requires substantive changes on which further public comments are warranted, FDA will issue a revised draft guidance within those 18 months instead. It then will work towards publishing a final guidance within 18 months after the close of the public comment period on the revised draft guidance.

### C. ADVANCING THE DEVELOPMENT OF BIOSIMILAR BIOLOGICAL-DEVICE COMBINATION PRODUCTS REGULATED BY CDER AND CBER

### 1. Use-Related Risk Analysis (URRA)

Sponsors employ URRA to identify the need for risk mitigation strategies and to design a human factors (HF) validation study. Based on a URRA, a sponsor may propose that a HF validation study is not needed to be submitted to support the

safe and effective use of a biosimilar biologic-device combination product. FDA will establish the following procedures for review of URRAs for combination products:

a. The sponsor should submit a request for review of their URRA to their IND. The submission should include specific questions, justification that a HF validation study is not needed to be submitted including any supporting information, and scientific and regulatory requirements for which the sponsor seeks agreement.

b. Within 60 days of Agency receipt of the URRA and specific questions, the Agency will provide a written response to the sponsor that includes a succinct assessment of the URRA and answers to the questions posed by the sponsor. If the Agency does not agree that either the URRA or the sponsor's justification are adequate to support the absence of a HF validation study, the reasons for the disagreement will be explained in the response.

c. URRA submission: performance goals for FDA will be phased in, starting FY 2024 as follows:

    i. By FY 2024, review and notify sponsor of agreement or non-agreement with comments for 50% of filed submissions, within 60 days of receipt of submission.

    ii. By FY 2025, review and notify sponsor of agreement or non-agreement with comments for 70% of filed submissions, within 60 days of receipt of submission.

    iii. By FY 2026, review and notify sponsor of agreement or non-agreement with comments for 90% of filed submissions, within 60 days of receipt of submission.

    iv. By FY 2027, review and notify sponsor of agreement or non-agreement with comments for 90% of filed submissions, within 60 days of receipt of submission.

d. On or before the end of FY 2024, FDA will publish new draft or revised guidance for review staff and industry describing considerations related to biosimilar biologic-device combination products on the topics noted below.

    Guidance will convey FDA's current thinking regarding how a URRA along with other information can be used to inform when the results from an HF validation study may need to be submitted to a marketing application. The guidance will provide a comprehensive, systematic and stepwise approach with examples, when applicable, to illustrate how to make this determination.

    e.   Sponsors may still elect to submit a URRA with a HF validation protocol and will only be subject to timelines in Section II.C.2., For Human Factor Validation Study Protocols.

**2.**   **Human Factor Validation Study Protocols**

Human factors studies are conducted to evaluate the user interface of a biosimilar biologic-device combination product to eliminate or mitigate use-related hazards that may affect the safe and effective use of the combination product. Over the past decade, more combination products have been developed to deliver therapeutics via different routes of administration (e.g., parenteral, inhalation) with complex engineering designs. HF validation protocols are reviewed during the IND stage with the goal towards developing a final finished combination product that supports the marketing application. To achieve this objective, FDA will establish the following procedures for review of HF validation study protocols:

    a.   The sponsor should submit a human factors protocol to the IND with specific questions, including scientific and regulatory requirements for which the sponsor seeks agreement (e.g., are the study participant groups appropriate to represent intended users, is the study endpoint adequate, are the critical tasks that should be evaluated appropriately identified).

    b.   Within 60 days of Agency receipt of the protocol and specific questions, the Agency will provide a written response to the sponsor that includes a succinct assessment of the protocol and answers to the questions posed by the sponsor. If the Agency does not agree that the protocol design, execution plans, and data analyses are adequate to achieve the goals of the sponsor, the reasons for the disagreement will be explained in the response.

Performance goals for FDA will be as follows:

    c.   Beginning in FY 2023, review and provide sponsor with written comments for 90% of human factors validation protocol submissions within 60 days of receipt of protocol submission.

**D.**  **ADVANCING DEVELOPMENT OF INTERCHANGEABLE BIOSIMILAR BIOLOGICAL PRODUCTS**

FDA is committed to a focused effort to further advance the development of safe and effective interchangeable biosimilar biological products. The effort will address current needs, prospectively identify future needs and incorporate the following components:

**1.**   **Research:** FDA will leverage the BsUFA III Regulatory Science Program to advance product development, assist regulatory decision-making, and support guidance development for interchangeable biosimilar products.

28

2. **Foundational guidance development:** FDA will develop foundational guidances for the development of interchangeable biosimilar biological products:

   a. On or before September 30, 2025, FDA will publish a draft guidance describing considerations for developing presentations, container closure systems and device constituent parts for proposed interchangeable biosimilar biological products. FDA will work towards the goal of publishing final guidance within 18 months after the close of the public comment period on the draft guidance. If, after receiving comments on the draft guidance, FDA determines that the guidance requires substantive changes on which further public comments are warranted, FDA will issue a revised draft guidance within those 18 months instead. It will then work towards publishing a final guidance within 18 months after the close of the public comment period on the revised draft guidance.

   b. On or before September 30, 2023, FDA will publish draft guidance on labeling for interchangeable biosimilar biological products. FDA will work towards the goal of publishing final guidance within 18 months after the close of the public comment period on the draft guidance. If, after receiving comments on the draft guidance, FDA determines that the guidance requires substantive changes on which further public comments are warranted, FDA will issue a revised draft guidance within those 18 months instead. It will then work towards publishing a final guidance within 18 months after the close of the public comment period on the revised draft guidance.

   c. On or before September 30, 2024, FDA will publish a draft guidance on promotional labeling and advertising considerations for interchangeable biosimilar biological products. FDA will work towards the goal of publishing final guidance within 18 months after the close of the public comment period on the draft guidance. If, after receiving comments on the draft guidance, FDA determines that the guidance requires substantive changes on which further public comments are warranted, FDA will issue a revised draft guidance within those 18 months instead. It will then work towards publishing a final guidance within 18 months after the close of the public comment period on the revised draft guidance.

   d. On or before September 30, 2024, FDA will publish a draft guidance on the nature and type of information, for different reporting categories, a sponsor should provide to support post-approval manufacturing changes to approved biosimilar and interchangeable biosimilar biological products. FDA will work towards the goal of publishing final guidance within 18 months after the close of the public comment period on the draft guidance. If, after receiving comments on the draft guidance, FDA determines that the guidance requires substantive changes on which further public comments are warranted, FDA will issue a revised draft guidance within those 18 months instead. It then will work towards publishing a final guidance within 18 months after the close of the public comment period on the revised draft guidance.

   3. **Stakeholder Engagement:** FDA will hold a scientific workshop on the development of interchangeable products to help identify future needs (e.g., guidance, research) on or before October 31, 2025. Within 12 months following the public workshop, FDA will issue a draft strategy document for public comment that outlines the specific actions the agency will take to facilitate the development of interchangeable biosimilar biological products. The strategy document may identify activities and deliverables including updating or creating new procedures, MAPPs, SOPPs, guidances, and other changes to FDA's scientific and other programs related to the topics discussed in the workshop. The strategy document will also include proposed timeframes for the specific actions outlined in the document. FDA will consider public input and will publish a final strategy document within 9 months after the close of the public comment period on the draft strategy document.

E. **REGULATORY SCIENCE TO ENHANCE THE DEVELOPMENT OF BIOSIMILAR AND INTERCHANGEABLE BIOLOGICAL PRODUCTS**

   FDA is committed to enhancing regulatory decision-making and facilitating science-based recommendations in areas foundational to biosimilar development. Starting in FY 2023, FDA will pilot a regulatory science program broadly applicable to facilitating biosimilar and interchangeable biological product development. Project goals should not be specific to a product or product class[3]. The pilot program will focus on two demonstration projects: (1) advancing the development of interchangeable products, and (2) improving the efficiency of biosimilar product development.

   1. **Advancing Development of Interchangeable Products**

      This demonstration project will be focused on progressing research to advance the development of interchangeable products. Specifically, this demonstration project will:

      a. Investigate and evaluate the data and information (including Real World Evidence) needed to meet the safety standards for determining interchangeability under section 351(k)(4) of the PHS Act, including:

         i. Investigate and evaluate informative, scientifically appropriate methodologies to assess the potential impact of differences between proposed interchangeable biosimilar and reference product presentations and container closure systems.

         ii. Investigate and evaluate informative, scientifically appropriate methodologies to predict immunogenicity by advancing the knowledge of analytical (including physical, chemical and biological function

---

[3] See Guidance for Industry: Questions and Answers on Biosimilar Development and the BPCI Act, December 2018 Biosimilars, Revision 1, Q&A II.2.

assays), pharmacological and clinical correlations as relates to interchangeability.

2. **Improving the Efficiency of Biosimilar Product Development**

This demonstration project will be focused on progressing research to advance the efficiency of biosimilar product development, enhance regulatory decision-making based on the latest scientific knowledge, and advance the use of innovative scientific methodologies and experience with biosimilars. Specifically, this demonstration project will:

a. Review and evaluate opportunities for streamlining and targeting biosimilar product development in consideration of scientific advancements in analytical (including physical, chemical and biological function assays), and pharmacological assessments and experience with prior biosimilar product development and marketed biosimilar products.

b. Investigate and evaluate informative, scientifically appropriate methodologies to predict immunogenicity by advancing the knowledge of analytical (including physical, chemical and biological function assays), pharmacological and clinical correlations as it relates to biosimilarity.

3. **Stakeholder Engagement:** On or before October 31, 2025, FDA will hold a public meeting to review the progress of the demonstration projects and solicit input on future priorities. An interim report will be posted on FDA's website in advance of the public meeting. On or before September 30, 2027, a final summary report of outcomes from the pilot program will be posted on FDA's website.

4. **Deliverables:** Within 12 months of the completion of the demonstration projects, FDA will use the learnings from the demonstration projects to publish a comprehensive strategy document outlining specific actions the agency will take to facilitate the development of biosimilar and interchangeable biological products. The comprehensive strategy document may include updating or creating new procedures, MAPPs, SOPPs, and guidances and will also include proposed timeframes for the specific actions outlined in the document. The comprehensive strategy document will be distinct from the final summary report of the pilot program.


III.  **CONTINUED ENHANCEMENT OF USER FEE RESOURCE MANAGEMENT**

FDA is committed to ensuring the sustainability of BsUFA program resources and to enhancing the operational agility of the BsUFA program. FDA will build on the financial enhancements included in BsUFA II and continue activities in BsUFA III to ensure optimal use of user fee resources and the alignment of staff to workload through the continued maturation and assessment of the Agency's resource capacity planning

capability. FDA will also continue activities to promote transparency of the use of financial resources in support of the BsUFA program.

## A. RESOURCE CAPACITY PLANNING

FDA will continue activities to mature the Agency's resource capacity planning function, including utilization of modernized time reporting, to support enhanced management of BsUFA resources in BsUFA III and help ensure alignment of user fee resources to staff workload.

### 1. Resource Capacity Planning Implementation

a. On or before the end of the 2nd quarter of FY 2023, FDA will publish an implementation plan that will describe how resource capacity planning and time reporting will continue to be implemented during BsUFA III. This implementation plan will address topics relevant to the maturation of resource capacity planning, including, but not limited to, detailing FDA's approach to:

   i. The continued implementation of the Agency's resource capacity planning capability, including:

      1) The continual improvement of the Capacity Planning Adjustment (CPA); and

      2) The continual improvement of time reporting and its utilization in the CPA.

   ii. The integration of resource capacity planning analyses in the Agency's resource and operational decision-making processes.

b. FDA will provide annual updates on the FDA website on the Agency's progress relative to activities detailed in this implementation plan on or before the end of the 2nd quarter of each subsequent fiscal year.

c. FDA will document in the annual BsUFA Financial Report how the CPA fee revenues are being utilized.

### 2. Resource Capacity Planning Assessment

On or before the end of FY 2025, an independent contractor will complete and publish an evaluation of the resource capacity planning capability. This will include an assessment of the following topics:

a. The ability of the CPA to forecast resource needs for the BsUFA program, including an assessment of the scope of the workload drivers in the CPA and their ability to represent the overall workload of the BsUFA program;

    b.   Opportunities for the enhancement of time reporting toward informing resource needs; and

    c.   The integration and utilization of resource capacity planning information within resource and operational decision-making processes of the BsUFA program.

The contractor will provide options and recommendations in the evaluation regarding the continued enhancement of the above topics as warranted. The evaluation findings and any related recommendations will be discussed at the FY 2026 BsUFA 5-year financial plan public meeting. After review of the findings and recommendations of the evaluation, FDA will, as appropriate, continue improving the resource capacity planning capability and the CPA.

## B.  FINANCIAL TRANSPARENCY

**1.**   FDA will publish a BsUFA 5-year financial plan on or before the end of the 2nd quarter of FY 2023. The plan shall recognize that the retention of the strategic hiring and retention adjustment required by section 744H(b)(1)(C) of the FD&C Act is subject to renegotiation under a subsequent reauthorization of BsUFA. FDA will publish updates to the 5-year plan on or before the end of the 2nd quarter of each subsequent fiscal year. The annual updates will include the following topics:

    a.   The changes in the personnel compensation and benefit costs for the process for the review of biosimilar biological product applications that exceed the amounts provided by the personnel compensation and benefit costs portion of the inflation adjustment; and

    b.   FDA's plan for managing costs related to strategic hiring and retention after the adjustment required by section 744H(b)(1)(C) of the FD&C Act expires at the end of fiscal year 2027, given this adjustment is not intended to be reauthorized in a subsequent reauthorization of BsUFA.

**2.**   FDA will convene a public meeting on or before the end of the 3rd quarter of each fiscal year to discuss the BsUFA 5-year financial plan and the Agency's progress in implementing resource capacity planning, including the continual improvement of the CPA and time reporting, and the integration of resource capacity planning in resource and operational decision-making processes.

## C.  MANAGEMENT OF CARRYOVER BALANCE

FDA is committed to reducing the carryover balance to no greater than 21 weeks of the target revenue by the end of FY 2025.

In the annual updates to the BsUFA five-year financial plan, FDA will provide updates on its progress towards implementing its plan to reduce the carryover balance as outlined in the FY 2022 BsUFA financial report and the five-year financial plan.

## IV.   IMPROVING FDA HIRING AND RETENTION OF REVIEW STAFF

Enhancements to the biosimilar biological product review program require that FDA hire and retain sufficient numbers and types of technical and scientific experts to efficiently conduct reviews of 351(k) applications. During BsUFA III, the FDA will commit to do the following:

### A.   SET CLEAR GOALS FOR BIOSIMILAR BIOLOGICAL PRODUCT REVIEW PROGRAM HIRING

**1.**   The BsUFA III agreement provides FDA additional user fee funding to hire additional staff for the biosimilar biological product review program in BsUFA III. FDA will set clear goals to hire the new staff outlined in Table 1.

**Table 1**

|        | FY 2023 | FY 2024 | FY 2025 | FY 2026 | FY 2027 |
|--------|---------|---------|---------|---------|---------|
| CDER   | 14      | 1       | 0       | 0       | 0       |

**2.**   FDA will report on progress against the hiring goal for BsUFA III on a quarterly basis posting updates to the FDA BsUFA Performance webpage.

### B.   COMPREHENSIVE AND CONTINUOUS ASSESSMENT OF HIRING AND RETENTION

The Directors of CDER and CBER will utilize a qualified, independent contractor with expertise in assessing HR operations to conduct a targeted assessment of the hiring and retention of staff for the biosimilar biological product review program. The BsUFA III assessment will be conducted under the same contract and by the same independent contractor that will conduct the assessment related to hiring and retention of staff for the human drug review program in PDUFA VII. The contractor will assess the factors that contribute to HR successes and challenges, including factors outside of FDA's control. The assessment will build upon the findings of previous evaluations conducted under BsUFA II and PDUFA VI with a focus on the changes and adjustments that have improved FDA's hiring and retention outcomes and which challenges remain. In addition to evaluating the outcomes of various hiring changes, the assessment will include metrics related to recruiting and retention in the biosimilar biological product review program, including, but not limited to, specific targeted scientific disciplines, attrition, and utilization of pay authorities. The report will include the contractor's findings and recommendations on further enhancements to hiring and retention of staff for the biosimilar biological product review program, if warranted.

34

The assessment will be published on FDA's website on or before June 30th, 2025 for public comment. FDA will also hold a public meeting on or before September 30th, 2025 to discuss the report, its findings, and the Agency's specific plans to address the report recommendations.

## V.   INFORMATION TECHNOLOGY GOALS

Under BsUFA III, FDA will:

### A.   DEVELOP DATA AND TECHNOLOGY MODERNIZATION STRATEGY

FDA will progress a Data and Technology Modernization Strategy ("Strategy") that provides FDA's strategic direction for current and future state data-driven regulatory initiatives.

1. No later than Q4 FY 2023, FDA will establish a Data and Technology Modernization Strategy that reflects the vision in FDA's Technology and Data Modernization Action Plans, including:

   a. outlining key areas of focus and approach including leveraging cloud technologies to support Applicant-FDA regulatory interaction;

   b. articulating enterprise-wide approaches for both technology and data governance; and

   c. aligning strategic initiatives in support of BsUFA review goals, drawing a line of sight between initiatives and the enterprise strategy (i.e. the agency-wide strategy also supporting components outside BsUFA).

2. The Strategy will be shared and annually updated to reflect progress and any needed adjustments. Milestones and metrics for BsUFA initiatives will be included in the updates.

### B.   MONITOR AND MODERNIZE ELECTRONIC SUBMISSION GATEWAY (ESG)

FDA will continue to ensure the usability and improvement of the ESG.

1. Annually, FDA will provide on the ESG website historic and current metrics on ESG performance in relation to published targets, characterizations and volume of submissions, and standards adoption and conformance.

FDA will advance the ESG cloud-based modernization with an improved architecture that supports greatly expanding data submission bandwidth and storage, while continuing to ensure its stable operation.

**2.** Annually, FDA will provide on the ESG website historic and current metrics on ESG performance in relation to published targets, characterizations and volume of submissions, and standards adoption and conformance.

**3.** By the end of FY 2025, FDA will complete ESG transition to the cloud, including set-up and integration of an enterprise Identity and Access Management solution that will streamline applicant access to FDA resources.

**4.** Annually, FDA will share progress against the implementation project plan.

**5.** FDA will engage industry to provide feedback and/or participate in pilot testing in advance of implementing significant changes that impact industry's interaction with the enterprise-wide systems.

## VI.    DEFINITIONS AND EXPLANATION OF TERMS

**A.** The term "review and act on" means the issuance of a complete action letter after the complete review of a filed complete application. The action letter, if it is not an approval, will set forth in detail the specific deficiencies and, where appropriate, the actions necessary to place the application in condition for approval.

**B.** A resubmitted original application is a complete response to an action letter addressing all identified deficiencies.

36

# EXHIBIT M

US006902734B2

(12) **United States Patent**   (10) **Patent No.:**     **US 6,902,734 B2**
Giles-Komar et al.          (45) **Date of Patent:**         **Jun. 7, 2005**

(54) **ANTI-IL-12 ANTIBODIES AND COMPOSITIONS THEREOF**

(75) Inventors: **Jill Giles-Komar**, Downingtown, PA (US); **David M. Knight**, Berwyn, PA (US); **David Peritt**, Bala Cynwyd, PA (US); **Bernard Scallon**, Collegeville, PA (US); **David Shealy**, Downingtown, PA (US)

(73) Assignee: **Centocor, Inc.**, Malvern, PA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 360 days.

(21) Appl. No.: **09/920,262**

(22) Filed: **Aug. 1, 2001**

(65) **Prior Publication Data**

US 2003/0124123 A1 Jul. 3, 2003

**Related U.S. Application Data**

(60) Provisional application No. 60/236,827, filed on Sep. 29, 2000, and provisional application No. 60/223,358, filed on Aug. 7, 2000.

(51) Int. Cl.[7] ....................... **C07K 16/24**; A61K 39/395
(52) **U.S. Cl.** ................................. **424/145.1**; 424/130.1; 424/139.1; 530/387.1; 530/387.9; 530/388.23; 530/389.2
(58) **Field of Search** ........................... 530/387.1, 387.9, 530/388.23, 389.2; 424/130.1, 139.1, 145.1

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,457,038 A | 10/1995 | Trinchieri et al. |
| 5,547,852 A | 8/1996 | Seller et al. |
| 5,648,467 A | 7/1997 | Trinchieri et al. |
| 5,780,597 A | 7/1998 | Gately et al. |
| 5,811,523 A | 9/1998 | Trinchieri et al. |
| 5,891,680 A | 4/1999 | Lieschke et al. |
| 6,086,876 A | 7/2000 | Karp et al. |
| 6,225,117 B1 | 5/2001 | Gately et al. |
| 6,300,478 B1 | 10/2001 | Trinchieri et al. |
| 6,338,848 B1 | 1/2002 | Leonard et al. |
| 6,495,667 B1 | 12/2002 | Bazan |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 790255 A2 | 8/1997 |
| EP | 433827 B1 | 3/1998 |
| EP | 804581 B1 | 9/2001 |
| WO | WO 90/05147 A1 | 5/1990 |
| WO | WO 92/05256 A1 | 4/1992 |
| WO | WO 96 33735 A | 10/1996 |
| WO | WO 97 15327 A | 5/1997 |
| WO | WO 99/37682 A2 | 4/1999 |
| WO | WO 99 37682 A | 7/1999 |
| WO | WO 00 56772 A | 9/2000 |
| WO | WO 00/56772 A1 | 9/2000 |
| WO | WO 01/19373 A2 | 3/2001 |

OTHER PUBLICATIONS

A. U. Gubler et. al (Coexpression of Two Distinct Genes is Required to Generate Secreted Bioactive Cytotoxic Lymphocyte Maturation Factor) Proc. Natl. acad. Sci. USA. vol. 88. pp 4143–4147– (May 1991) Immunology.

A. U. Gubler et. al (Clonic and Expression of Cytotoxic Lymphocyte Maturation Factor (CLMF) a Heterodimeric Lymphokine That Potentiates NR. LAK NA D T–Cell Responses) Abstracts Journal of cellular Biochemistry Supplement 15 F: 70 (1991).

Alvin S. Stern et.al–(Purification to Homgeneity and Partial Characterization of Cytotoxic Lymphocyte Maturation Factor from Human B–Lymphoblastoid Cells) (Jun. 11, 1990) F. Hoffmann La Roche Inc. Nutley NJ USA. Proc. National Acad. Sci. USA (vol. 87,pp 6808–6812– Sep. 1990– Immunology).

M. Gately et. al. (Regulation of Human Lymphocyte Proliferation by a Heterodimeric Cytokine IL–12 (Cytotoxic Lymphocyte Maturation Factor) vol. 147– 874–882 No. 3. (Aug. 1, 1991).(The Journal of Immunology).

R. Chizzonite et. al. (IL–12 Monoclonal Antibodies Specific for the 40–KdA Subunit Block Receptor Binding and Biologic Activity on Activated Human Lymphoblasts.) vol. 147,1548–1556– No. 5 (Sep1, 1991) The Journal of Immunology.

Susan H. Chan et. al. (Introduction of Interferon Production by Natural Killer Cell Stimulatory Factor Characterization of the Responder Cells and Synergy with Other Inducers) (The Rockefeller University Press)– 0022–1007/91/04/ 0869/–vol. 173 Apr. 1991–pp869–879.

Annalisa D'Andrea et. al. (Production of Natural Killer Cell Stimulatory Factor (Interleukin 12) by Peripheral Blood Mononuclear Cell) J. Exp. Med. The Rockefeller university press– 0022–1007/92/11/1387 vol. 176 Nov. 1992. – pp: 1387–1398.

Markus F. Neurath et. al. (Antibodies to Interleukin 12 Abrogate Established Experimental Colitis in Mice) The Journal of Experimental Medicine–vol. 182– Nov. 1995– pp. 1281–1290.

R.W. Carter. et. al. (Production and Characterization of Monoclonal Antibodies to Human Interleukin–12) Hybriidona 16: 363–369 (1997).

(Continued)

*Primary Examiner*—Prema Mertz
(74) *Attorney, Agent, or Firm*—Eric A. Dichter; Guy Kevin Townsend

(57) **ABSTRACT**

The present invention relates to at least one anti-IL-12 antibody, including isolated nucleic acids that encode at least one anti-IL-12 antibody, IL-12, vectors, host cells, transgenic animals or plants, and methods of making and using thereof, including therapeutic compositions, methods and devices.

**4 Claims, 12 Drawing Sheets**

US 6,902,734 B2

Page 2

OTHER PUBLICATIONS

Nicolas M. Valiante et. al. ( Role of the Production of Natural Killer Cell Stimulatory Factor (NKSF/IL–12) in the Ability of B Cell Lines to Stimulate T and NK Cell Proliferation). Cellunar Immunology 145, 187–198–(1992).

Michiko Kobayashi et. al. I ( Identification and Purification of Natural Killer Cell Stimulatory Factor (NKSF) a Cytokine with Multiple Biologic Efects on Human Lymphocytes) J. Exp. Med. The Rockefeller university Press– vol. 170–(Sep. 1989) pp. 827–845.

Sylvie Trembleau et. al. (The Role of IL–12 in the Induction of Organ–Specific Autoimmune Diseases).

Nikhil, Ywalkar et al.; "Expression of interleukin–12 is increased in psoriatic skin", Journal of Investigative Dermatology, Dec. 1998, pp. 1053–1057; vol. 111, No. 6; XP00800577; ISSN: 0022–202X, abstract.

PCT International Search Report PCT/US01/24720 dated Jul. 30, 2002.

## FIG. 1A



## FIG. 1B





*FIG. 2B*



*FIG. 2A*



FIG. 3



FIG. 4



FIG. 5

# *FIG. 6*





*FIG. 7A*



FIG. 7B

FIG. 8

Case 1:22-cv-01549-UNA   Document 1-2   Filed 11/29/22   Page 134 of 233 PageID #: 364



*FIG. 9A*



FIG. 9B



FIG. 9C

US 6,902,734 B2

**1**

# ANTI-IL-12 ANTIBODIES AND COMPOSITIONS THEREOF

## CROSS-REFERENCE TO RELATED APPLICATION

This application is based in part on, and claims priority to, U.S. Provisional Application Nos. 60/223,358 filed Aug. 7, 2000 and 60/236,827 filed Sep. 29, 2000, each of which is entirely incorporated herein by reference.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to antibodies, including specified portions or variants, specific for at least one Interleukin-12 (IL-12) protein or fragment thereof, as well as nucleic acids encoding such anti-IL-12 antibodies, complementary nucleic acids, vectors, host cells, and methods of making and using thereof, including therapeutic formulations, administration and devices.

### 2. Related Art

Interleukin-12 (IL-12) is a heterodimeric cytokine consisting of glycosylated polypeptide chains of 35 and 40 kD which are disulfide bonded. The cytokine is synthesized and secreted by antigen presenting cells including dendritic cells, monocytes, macrophages, B cells, Langerhans cells and keratinocytes as well as natural killer (NK) cells. IL-12 mediates a variety of biological processes and has been referred to as NK cell stimulatory factor (NKSF), T-cell stimulating factor, cytotoxic T-lymphocyte maturation factor and EBV-transformed B-cell line factor (Curfs, J. H. A. J., et al., Clinical Microbiology Reviews, 10:742–780 (1997)).

Interleukin-12 can bind to the IL-12 receptor expressed on the plasma membrane of cells (e.g., T cells, NK cell), thereby altering (e.g., initiating, preventing) biological processes. For example, the binding of IL-12 to the IL-12 receptor can stimulate the proliferation of pre-activated T cells and NK cells, enhance the cytolytic activity of cytotoxic T cells (CTL), NK cells and LAK (lymphokine activated killer) cells, induce production of gamma interferon (IFN GAMMA) by T cells and NK cells and induce differentiation of naive Th0 cells into Th1 cells that produce IFN GAMMA and IL-2 (Trinchieri, G., Annual Review of Immunology, 13:251–276 (1995)). In particular, IL-12 is vital for the generation of cytolytic cells (e.g., NK, CTL) and for mounting a cellular immune response (e.g., a Th1 cell mediated immune response). Thus, IL-12 is critically important in the generation and regulation of both protective immunity (e.g., eradication of infections) and pathological immune responses (e.g., autoimmunity) (Hendrzak, J. A. and Brunda, M. J., Laboratory Investigation, 72:619–637 (1995)). Accordingly, an immune response (e.g., protective or pathogenic) can be enhanced, suppressed or prevented by manipulation of the biological activity of IL-12 in vivo, for example, by means of an antibody.

Non-human mammalian, chimeric, polyclonal (e.g., antisera) and/or monoclonal antibodies (Mabs) and fragments (e.g., proteolytic digestion or fusion protein products thereof) are potential therapeutic agents that are being investigated in some cases to attempt to treat certain diseases. However, such antibodies or fragments can elicit an immune response when administered to humans. Such an immune response can result in an immune complex-mediated clearance of the antibodies or fragments from the circulation, and make repeated administration unsuitable for therapy, thereby reducing the therapeutic benefit to the

**2**

patient and limiting the readministration of the antibody or fragment. For example, repeated administration of antibodies or fragments comprising non-human portions can lead to serum sickness and/or anaphalaxis. In order to avoid these and other problems, a number of approaches have been taken to reduce the immunogenicity of such antibodies and portions thereof, including chimerization and humanization, as well known in the art. These and other approaches, however, still can result in antibodies or fragments having some immunogenicity, low affinity, low avidity, or with problems in cell culture, scale up, production, and/or low yields. Thus, such antibodies or fragments can be less than ideally suited for manufacture or use as therapeutic proteins.

Accordingly, there is a need to provide anti-IL-12 antibodies or fragments that overcome one more of these problems, as well as improvements over known antibodies or fragments thereof.

## SUMMARY OF THE INVENTION

The present invention provides isolated human, primate, rodent, mammalian, chimeric, humanized and/or CDR-grafted anti-IL-12 antibodies, immunoglobulins, cleavage products and other specified portions and variants thereof, as well as anti-IL-12 antibody compositions, encoding or complementary nucleic acids, vectors, host cells, compositions, formulations, devices, transgenic animals, transgenic plants, and methods of making and using thereof, as described and enabled herein, in combination with what is known in the art.

The present invention also provides at least one isolated anti-IL-12 antibody as described herein. An antibody according to the present invention includes any protein or peptide containing molecule that comprises at least a portion of an immunoglobulin molecule, such as but not limited to at least one complementarity determining region (CDR) of a heavy or light chain or a ligand binding portion thereof, a heavy chain or light chain variable region, a heavy chain or light chain constant region, a framework region, or any portion thereof, that can be incorporated into an antibody of the present invention. An antibody of the invention can include or be derived from any mammal, such as but not limited to a human, a mouse, a rabbit, a rat, a rodent, a primate, or any combination thereof, and the like.

The present invention provides, in one aspect, isolated nucleic acid molecules comprising, complementary, or hybridizing to, a polynucleotide encoding specific anti-IL-12 antibodies, comprising at least one specified sequence, domain, portion or variant thereof. The present invention further provides recombinant vectors comprising said anti-IL-12 antibody nucleic acid molecules, host cells containing such nucleic acids and/or recombinant vectors, as well as methods of making and/or using such antibody nucleic acids, vectors and/or host cells.

At least one antibody of the invention binds at least one specified epitope specific to at least one IL-12 protein, subunit, fragment, portion or any combination thereof. The at least one epitope can comprise at least one antibody binding region that comprises at least one portion of said protein, which epitope is preferably comprised of at least 1–5 amino acids of at least one portion thereof, such as but not limited to, at least one functional, extracellular, soluble, hydrophillic, external or cytoplasmic domain of said protein, or any portion thereof.

The at least one antibody can optionally comprise at least one specified portion of at least one complementarity determining region (CDR) (e.g., CDR1, CDR2 or CDR3 of the

heavy or light chain variable region) and/or at least one constant or variable framework region or any portion thereof. The at least one antibody amino acid sequence can further optionally comprise at least one specified substitution, insertion or deletion as described herein or as known in the art.

The present invention also provides at least one isolated anti-IL-12 antibody as described herein, wherein the antibody has at least one activity, such as, but not limited to: (i) inhibition of IL-12 induced IFN-gamma secretion; (ii) inhibition of LAK cell cytotoxicity; (iii) inhibition of IFN gamma mRNA transription; (iv) inhibition of intracellular IFN gamma CD3+ cells; and/or (v) CD95 expression. See, e.g., Chan, et al., (1992). J. Immunol. 148(1): 92–98; Chan, et al., (1991). J. Exp. Med. 173(4): 869–79; Chehimi, et al., (1992) J. Exp. Med. 175(3): 789–96; Medvedev, et al., (1997) Cytokine 9(6): 394–404. A(n) anti-IL-12 antibody can thus be screened for a corresponding activity according to known methods, such as but not limited to at least one biological activity towards a IL-12 protein.

The present invention further provides at least one IL-12 anti-idiotype antibody to at least one IL-12 antibody of the present invention. The anti-idiotype antibody includes any protein or peptide containing molecule that comprises at least a portion of an immunoglobulin molecule, such as but not limited to at least one complementarity determining region (CDR) of a heavy or light chain or a ligand binding portion thereof, a heavy chain or light chain variable region, a heavy chain or light chain constant region, a framework region, or any portion thereof, that can be incorporated into an antibody of the present invention. An antibody of the invention can include or be derived from any mammal, such as but not limited to a human, a mouse, a rabbit, a rat, a rodent, a primate, and the like.

The present invention provides, in one aspect, isolated nucleic acid molecules comprising, complementary, or hybridizing to, a polynucleotide encoding at least one IL-12 anti-idiotype antibody, comprising at least one specified sequence, domain, portion or variant thereof. The present invention further provides recombinant vectors comprising said IL-12 anti-idiotype antibody encoding nucleic acid molecules, host cells containing such nucleic acids and/or recombinant vectors, as well as methods of making and/or using such anti-idiotype antibody nucleic acids, vectors and/or host cells.

The present invention also provides at least one method for expressing at least one anti-IL-12 antibody, or IL-12 anti-idiotype antibody, in a host cell, comprising culturing a host cell as described herein under conditions wherein at least one anti-IL-12 antibody is expressed in detectable and/or recoverable amounts.

The present invention also provides at least one composition comprising (a) an isolated anti-IL-12 antibody encoding nucleic acid and/or antibody as described herein; and (b) a suitable carrier or diluent. The carrier or diluent can optionally be pharmaceutically acceptable, according to known carriers or diluents. The composition can optionally further comprise at least one further compound, protein or composition.

The present invention further provides at least one anti-IL-12 antibody method or composition, for administering a therapeutically effective amount to modulate or treat at least one IL-12 related condition in a cell, tissue, organ, animal or patient and/or, prior to, subsequent to, or during a related condition, as described herein.

The present invention also provides at least one composition, device and/or method of delivery of a thera-

peutically or prophylactically effective amount of at least one anti-IL-12 antibody, according to the present invention.

The present invention further provides at least one anti-IL-12 antibody method or composition, for diagnosing at least one IL-12 related condition in a cell, tissue, organ, animal or patient and/or, prior to, subsequent to, or during a related condition, as described herein.

The present invention also provides at least one composition, device and/or method of delivery for diagnosing of at least one anti-IL-12 antibody, according to the present invention.

## DESCRIPTION OF THE FIGURES

FIGS. **1A** and **1B** are graphs showing concentration-dependent binding of human anti-IL-12 mAbs to immobilized human IL-12. Anti-IL-12 antibodies were serially diluted in 1% BSA/PBS and incubated on rhIL-12 coated plates for 1 hour at 37° C. Plates were washed twice with 0.02% Tween 20 (polyoxyethylene (20) sorbitan monolaurate), 0.15M saline and then probed with horse radish peroxidase (HRP) labeled goat anti-human IgG kappa specific antibody for 1 hour at room temperature. Plates were again washed, developed with o-phenylenediamine (OPD) substrate and the optical density (OD) of each well was measured at 490 nm.

FIG. **2**: Lanes from left to right in Figures A and B contain human IL-12, human IL-12 p40, murine IL-12, and prestained molecular weight markers. FIG. **2A** shows bands stained from total protein. The primary bands in each lane are human IL-12 (75 kd), p40 human IL-12 (40 kd), and murine IL-12 (75 kd). FIG. **2B** shows a western blot prepared from a gel identical to that shown in FIG. **2A**. Blot was reacted with C340 followed by HRP labeled goat anti-human IgG and specifically detected human IL-12 (monomer and multimers) and human IL-12 p40 only. A control blot (not shown) reacted with HRP labeled goat anti-human IgG did not display any bands.

FIG. **3**: Reverse transcription-PCR analysis of IFNγ gene expression in human PBL's treated with IL-2, IL-12, IL-2+ IL-12 with and without anti-IL-12 antibody C340, 8.6.2, isotype control antibody. Total RNA was reverse transcribed, amplified by PCR using gene-specific primers. The level of β-actin mRNA in each sample was also determined which served as a control for mRNA integrity and content.

FIG. **4** is a histogram showing that human anti-IL-12 mAb (C340) inhibits production of interferon-γ (IFNγ) by monocyte depleted CD3+ peripheral blood mononuclear cells (PBMC) stimulated with IL-2 plus IL-12. PBMC were cultured for five hours in control media (no added cytokines), media supplemented with IL-12 (0.1 ng/ml) plus IL-2 (50 IU/ml) (IL-12/IL-2), control media containing mAb C340 (10 μg/ml) and IL-12/IL-2 media containing mAb C340 (10 μg/ml). Intracellular IFNγ was measured by two color immunostaining with CD3-PE and IFNγ-FITC. Data are shown for one donor.

FIG. **5** is a graph showing dose-dependent inhibition of IFNγ secretion by IL-2 plus IL-12 stimulated peripheral blood lymphocytes with two different lots of a human anti-IL-12 mAb (C340). Human PBL (8×106/ml) were cultured for 24 hours with 10 U/ml IL-2, IL-2 plus 400 pg/ml IL-12, or IL-2 plus IL-12 and mAb C340 as indicated. The culture supernatents were removed and assayed for IFNγ by EIA.

FIG. **6** is a histogram showing dose-dependent inhibition of IL-12 plus IL-2 induced LAK cell cytotoxicity by a

5

human anti-IL-12 mAb (C340). LAK effector cells (human PBL, 8×106/ml) were cultured for 24 hours with IL-12 (400 pg/ml) plus IL-2 (10 U/ml) and mAb C340 (5000 ng/ml or 50 ng/ml as indicated). The LAK effector cells were washed and cultured with 51Cr labeled Raji target cells for four hours at an effector to target (E:T) ration of 80:1, and the quantity of 51Cr released into the media upon Raji cell lysis was measured. Results are expressed as the mean of three normal donors standard error. IL-12 positive control (IL-12) is effector cells incubated with IL-12 and without antibody. Background (BKGD) is effector cells incubated without IL-12 or antibody.

FIGS. 7A and 7B are histograms showing that IL-12 plus IL-2-induced expression of CD95 on CD3+ peripheral blood mononuclear cells is inhibited by human anti-IL-12 mAb (C340). PBMC were cultured for 72 hours in media containing 0.1 ng/ml IL-12 and a suboptimal dose of IL-2 (50 IU/ml) in the presence or absence of mAb C340 (10 μg/ml). CD95 expression was measured flow cytometry of cells stained with anti-CD95-FITC. Gating was performed using two-color analysis (CD3 or CD56-PE vs. CD95-FITC) and forward vs. orthogonal light scatter.

FIG. 8 is a graph showing that recombinant human anti-human IL-12 antibodies (rC340) bind to immobilized IL-12 in a manner that is indistinguishable from purified mAb C340. The concentration of rC340 in the supernatants of three rC340-producing recombinant cell lines was determined, and the supernatants were evaluated for IL-12 binding in an ELISA. Plates were coated with 2 μg/ml human IL-12 and incubated with purified mAb C340 from the original hybridoma (standard) or the supernatants of recombinant cell lines. IL-12-bound antibody was detected using alkaline phosphatase-conjugated goat anti-human IgG (heavy chain+light chain).

FIGS. 9A–9C are graphs showing growth kinetics and the quantity of antibody secreted by three independently-derived rC340-producing recombinant cell subclones (FIG. 9A, subclone C379B; FIG. 9B, subclone C381A; FIG. 9C, subclone C389A). Recombinant cells were seeded into T75 flasks at a starting density of 2×10⁵ cells/ml in standard media. At various times, cells were resuspended and the number of live cells and the quantity (μg/ml) of rC340 in the media were determined.

DESCRIPTION OF THE INVENTION

The present invention provides isolated, recombinant and/or synthetic anti-IL-12 human, primate, rodent, mammalian, chimeric, humanized or CDR-grafted, antibodies and IL-12 anti-idiotype antibodies thereto, as well as compositions and encoding nucleic acid molecules comprising at least one polynucleotide encoding at least one anti-IL-12 antibody or anti-idiotype antibody. The present invention further includes, but is not limited to, methods of making and using such nucleic acids and antibodies and anti-idiotype antibodies, including diagnostic and therapeutic compositions, methods and devices.

As used herein, an "anti-Interleukin-12 antibody," "anti-IL-12 antibody," "anti-IL-12 antibody portion," or "anti-IL-12 antibody fragment" and/or "anti-IL-12 antibody variant" and the like include any protein or peptide containing molecule that comprises at least a portion of an immunoglobulin molecule, such as but not limited to at least one complementarity determining region (CDR) of a heavy or light chain or a ligand binding portion thereof, a heavy chain or light chain variable region, a heavy chain or light chain constant region, a framework region, or any portion thereof,

6

or at least one portion of an IL-12 receptor or binding protein, which can be incorporated into an antibody of the present invention. Such antibody optionally further affects a specific ligand, such as but not limited to where such antibody modulates, decreases, increases, antagonizes, agonizes, mitigates, alleviates, blocks, inhibits, abrogates and/or interferes with at least one IL-12 activity or binding, or with IL-12 receptor activity or binding, in vitro, in situ and/or in vivo. As a non-limiting example, a suitable anti-IL-12 antibody, specified portion or variant of the present invention can bind at least one IL-12, or specified portions, variants or domains thereof. A suitable anti-IIL-12 antibody, specified portion, or variant can also optionally affect at least one of IL-12 activity or function, such as but not limited to, RNA, DNA or protein synthesis, IL-12 release, IL-12 receptor signaling, membrane IL-12 cleavage, IL-12 activity, IL-12 production and/or synthesis. The term "antibody" is further intended to encompass antibodies, digestion fragments, specified portions and variants thereof, including antibody mimetics or comprising portions of antibodies that mimic the structure and/or function of an antibody or specified fragment or portion thereof, including single chain antibodies and fragments thereof. Functional fragments include antigen-binding fragments that bind to a mammalian IL-12. For example, antibody fragments capable of binding to IL-12 or portions thereof, including, but not limited to Fab (e.g., by papain digestion), Fab' (e.g., by pepsin digestion and partial reduction) and F(ab')₂ (e.g., by pepsin digestion), facb (e.g., by plasmin digestion), pFc' (e.g., by pepsin or plasmin digestion), Fd (e.g., by pepsin digestion, partial reduction and reaggregation), Fv or scFv (e.g., by molecular biology techniques) fragments, are encompassed by the invention (see, e.g., Colligan, Immunology, supra).

Such fragments can be produced by enzymatic cleavage, synthetic or recombinant techniques, as known in the art and/or as described herein. Antibodies can also be produced in a variety of truncated forms using antibody genes in which one or more stop codons have been introduced upstream of the natural stop site. For example, a combination gene encoding a F(ab')₂ heavy chain portion can be designed to include DNA sequences encoding the CH₁ domain and/or hinge region of the heavy chain. The various portions of antibodies can be joined together chemically by conventional techniques, or can be prepared as a contiguous protein using genetic engineering techniques.

As used herein, the term "human antibody" refers to an antibody in which substantially every part of the protein (e.g., CDR, framework, $C_L$, $C_H$ domains (e.g., $C_H1$, $C_H2$, $C_H3$), hinge, ($V_L$, $V_H$)) is substantially non-immunogenic in humans, with only minor sequence changes or variations. Similarly, antibodies designated primate (monkey, baboon, chimpanzee, etc.), rodent (mouse, rat, rabbit, guinea pig, hamster, and the like) and other mammals designate such species, sub-genus, genus, sub-family, family specific antibodies. Further, chimeric antibodies include any combination of the above. Such changes or variations optionally and preferably retain or reduce the immunogenicity in humans or other species relative to non-modified antibodies. Thus, a human antibody is distinct from a chimeric or humanized antibody. It is pointed out that a human antibody can be produced by a non-human animal or prokaryotic or eukaryotic cell that is capable of expressing functionally rearranged human immunoglobulin (e.g., heavy chain and/or light chain) genes. Further, when a human antibody is a single chain antibody, it can comprise a linker peptide that is not found in native human antibodies. For example, an Fv can comprise a linker peptide, such as two to about eight glycine

US 6,902,734 B2

7

or other amino acid residues, which connects the variable region of the heavy chain and the variable region of the light chain. Such linker peptides are considered to be of human origin.

Bispecific, heterospecific, heteroconjugate or similar antibodies can also be used that are monoclonal, preferably human or humanized, antibodies that have binding specificities for at least two different antigens. In the present case, one of the binding specificities is for at least one IL-12 protein, the other one is for any other antigen. Methods for making bispecific antibodies are known in the art. Traditionally, the recombinant production of bispecific antibodies is based on the co-expression of two immunoglobulin heavy chain-light chain pairs, where the two heavy chains have different specificities (Milstein and Cuello, Nature 305:537 (1983)). Because of the random assortment of immunoglobulin heavy and light chains, these hybridomas (quadromas) produce a potential mixture of 10 different antibody molecules, of which only one has the correct bispecific structure. The purification of the correct molecule, which is usually done by affinity chromatography steps, is rather cumbersome, and the product yields are low. Similar procedures are disclosed, e.g., in WO 93/08829, U.S. Pat. Nos. 6,210,668, 6,193,967, 6,132,992, 6,106,833, 6,060, 285, 6,037,453, 6,010,902, 5,989,530, 5,959,084, 5,959,083, 5,932,448, 5,833,985, 5,821,333, 5,807,706, 5,643,759, 5,601,819, 5,582,996, 5,496,549, 4,676,980, WO 91/00360, WO 92/00373, EP 03089, Traunecker et al., EMBO J. 10:3655 (1991), Suresh et al., Methods in Enzymology 121:210 (1986), each entirely incorporated herein by reference.

Anti-IL-12 antibodies (also termed IL-12 antibodies) useful in the methods and compositions of the present invention can optionally be characterized by high affinity binding to IL-12 and optionally and preferably having low toxicity. In particular, an antibody, specified fragment or variant of the invention, where the individual components, such as the variable region, constant region and framework, individually and/or collectively, optionally and preferably possess low immunogenicity, is useful in the present invention. The antibodies that can be used in the invention are optionally characterized by their ability to treat patients for extended periods with measurable alleviation of symptoms and low and/or acceptable toxicity. Low or acceptable immunogenicity and/or high affinity, as well as other suitable properties, can contribute to the therapeutic results achieved. "Low immunogenicity" is defined herein as raising significant HAHA, HACA or HAMA responses in less than about 75%, or preferably less than about 50% of the patients treated and/or raising low titres in the patient treated (less than about 300, preferably less than about 100 measured with a double antigen enzyme immunoassay) (see, e.g., Elliott et al., *Lancet* 344:1125–1127 (1994), entirely incorporated herein by reference).

Utility

The isolated nucleic acids of the present invention can be used for production of at least one anti-IL-12 antibody or specified variant thereof, which can be used to measure or effect in an cell, tissue, organ or animal (including mammals and humans), to diagnose, monitor, modulate, treat, alleviate, help prevent the incidence of, or reduce the symptoms of, at least one IL-12 condition, selected from, but not limited to, at least one of an immune disorder or disease, a cardiovascular disorder or disease, an infectious, malignant, and/or neurologic disorder or disease, or other known or specified IL-12 related condition.

Such a method can comprise administering an effective amount of a composition or a pharmaceutical composition

8

comprising at least one anti-IL-12 antibody to a cell, tissue, organ, animal or patient in need of such modulation, treatment, alleviation, prevention, or reduction in symptoms, effects or mechanisms. The effective amount can comprise an amount of about 0.001 to 500 mg/kg per single (e.g., bolus), multiple or continuous administration, or to achieve a serum concentration of 0.01–5000 $\mu$g/ml serum concentration per single, multiple or continuous adminstration, or any effective range or value therein, as done and determined using known methods, as described herein or known in the relevant arts.

Citations

All publications or patents cited herein are entirely incorporated herein by reference as they show the state of the art at the time of the present invention and/or to provide description and enablement of the present invention. Publications refer to any scientific or patent publications, or any other information available in any media format, including all recorded, electronic or printed formats. The following references are entirely incorporated herein by reference: Ausubel, et al., ed., Current Protocols in Molecular Biology, John Wiley & Sons, Inc., NY, N.Y. (1987–2001); Sambrook, et al., Molecular Cloning: A Laboratory Manual, 2nd Edition, Cold Spring Harbor, N.Y. (1989); Harlow and Lane, antibodies, a Laboratory Manual, Cold Spring Harbor, N.Y. (1989); Colligan, et al., eds., Current Protocols in Immunology, John Wiley & Sons, Inc., NY (1994–2001); Colligan et al., Current Protocols in Protein Science, John Wiley & Sons, New York, N.Y., (1997–2001).

Antibodies of the Present Invention

At least one anti-IL-12 antibody of the present invention can be optionally produced by a cell line, a mixed cell line, an immortalized cell or clonal population of immortalized cells, as well known in the art. See, e.g., Ausubel, et al., ed., Current Protocols in Molecular Biology, John Wiley & Sons, Inc., New York, N.Y. (1987–2001); Sambrook, et al., Molecular Cloning: A Laboratory Manual, 2nd Edition, Cold Spring Harbor, N.Y. (1989); Harlow and Lane, antibodies, a Laboratory Manual, Cold Spring Harbor, N.Y. (1989); Colligan, et al., eds., Current Protocols in Immunology, John Wiley & Sons, Inc., NY (1994–2001); Colligan et al., Current Protocols in Protein Science, John Wiley & Sons, New York, N.Y., (1997–2001), each entirely incorporated herein by reference.

Human antibodies that are specific for human IL-12 proteins or fragments thereof can be raised against an appropriate immunogenic antigen, such as isolated and/or IL-12 protein or a portion thereof (including synthetic molecules, such as synthetic peptides). Other specific or general mammalian antibodies can be similarly raised. Preparation of immunogenic antigens, and monoclonal antibody production can be performed using any suitable technique.

In one approach, a hybridoma is produced by fusing a suitable immortal cell line (e.g., a myeloma cell line such as, but not limited to, Sp2/0, Sp2/0-AG14, NSO, NS1, NS2, AE-1, L.5, >243, P3X63Ag8.653, Sp2 SA3, Sp2 MAI, Sp2 SS1, Sp2 SA5, U937, MLA 144, ACT IV, MOLT4, DA-1, JURKAT, WEHI, K-562, COS, RAJI, NIH 3T3, HL-60, MLA 144, NAMAIWA, NEURO 2A, or the like, or heteromylomas, fusion products thereof, or any cell or fusion cell derived therefrom, or any other suitable cell line as known in the art. See, e.g., www.atcc.org, www.lifetech.com., and the like, with antibody producing cells, such as, but not limited to, isolated or cloned spleen, peripheral blood, lymph, tonsil, or other immune or B cell containing cells, or any other cells expressing heavy or light

US 6,902,734 B2

9

chain constant or variable or framework or CDR sequences, either as endogenous or heterologous nucleic acid, as recombinant or endogenous, viral, bacterial, algal, prokaryotic, amphibian, insect, reptilian, fish, mammalian, rodent, equine, ovine, goat, sheep, primate, eukaryotic, genomic DNA, cDNA, rDNA, mitochondrial DNA or RNA, chloroplast DNA or RNA, hnRNA, mRNA, tRNA, single, double or triple stranded, hybridized, and the like or any combination thereof. See, e.g., Ausubel, supra, and Colligan, Immunology, supra, chapter 2, entirely incorporated herein by reference.

Antibody producing cells can also be obtained from the peripheral blood or, preferably the spleen or lymph nodes, of humans or other suitable animals that have been immunized with the antigen of interest. Any other suitable host cell can also be used for expressing heterologous or endogenous nucleic acid encoding an antibody, specified fragment or variant thereof, of the present invention. The fused cells (hybridomas) or recombinant cells can be isolated using selective culture conditions or other suitable known methods, and cloned by limiting dilution or cell sorting, or other known methods. Cells which produce antibodies with the desired specificity can be selected by a suitable assay (e.g., ELISA).

Other suitable methods of producing or isolating antibodies of the requisite specificity can be used, including, but not limited to, methods that select recombinant antibody from a peptide or protein library (e.g., but not limited to, a bacteriophage, ribosome, oligonucleotide, RNA, cDNA, or the like, display library; e.g., as available from Cambridge antibody Technologies, Cambridgeshire, UK; MorphoSys, Martinsreid/Planegg, DE; Biovation, Aberdeen, Scotland, UK; BioInvent, Lund, Sweden; Dyax Corp., Enzon, Affymax/Biosite; Xoma, Berkeley, Calif.; Ixsys. See, e.g., EP 368,684, PCT/GB91/01134; PCT/GB92/01755; PCT/ GB92/002240; PCT/GB92/00883; PCT/GB93/00605; U.S. Ser. No. 08/350,260 (May 12, 1994); PCT/GB94/01422; PCT/GB94/02662; PCT/GB97/01835; (CAT/MRC); WO90/ 14443; WO90/14424; WO90/14430; PCT/US94/1234; WO92/18619; WO96/07754; (Scripps); EP 614 989 (MorphoSys); WO95/16027 (BioInvent); WO88/06630; WO90/3809 (Dyax); U.S. Pat. No. 4,704,692 (Enzon); PCT/ US91/02989 (Affymax); WO89/06283; EP 371 998; EP 550 400; (Xoma); EP 229 046; PCT/US91/07149 (Ixsys); or stochastically generated peptides or proteins—U.S. Pat. Nos. 5,723,323, 5,763,192, 5,814,476, 5,817,483, 5,824, 514, 5,976,862, WO 86/05803, EP 590 689 (Ixsys, now Applied Molecular Evolution (AME), each entirely incorporated herein by reference) or that rely upon immunization of transgenic animals (e.g., SCID mice, Nguyen et al., Microbiol. Immunol. 41:901–907 (1997); Sandhu et al., Crit. Rev. Biotechnol. 16:95–118 (1996); Eren et al., Immunol. 93:154–161 (1998), each entirely incorporated by reference as well as related patents and application) that are capable of producing a repertoire of human antibodies, as known in the art and/or as described herein. Such techniques, include, but are not limited to, ribosome display (Hanes et al., Proc. Natl. Acad. Sci. USA, 94:4937–4942 (May 1997); Hanes et al., Proc. Natl. Acad. Sci. USA, 95:14130–14135 (November 1998)); single cell antibody producing technologies (e.g., selected lymphocyte antibody method ("SLAM") (U.S. Pat. No. 5,627,052, Wen et al., J. Immunol. 17:887–892 (1987); Babcook et al., Proc. Natl. Acad. Sci. USA 93:7843–7848 (1996)); gel microdroplet and flow cytometry (Powell et al., Biotechnol. 8:333–337 (1990); One Cell Systems, Cambridge, Mass.; Gray et al., J. Imm. Meth. 182:155–163 (1995); Kenny et al., Bio/Technol.

10

13:787–790 (1995)); B-cell selection (Steenbakkers et al., Molec. Biol. Reports 19:125–134 (1994); Jonak et al., Progress Biotech, Vol. 5, In Vitro Immunization in Hybridoma Technology, Borrebaeck, ed., Elsevier Science Publishers B. V., Amsterdam, Netherlands (1988)).

Methods for engineering or humanizing non-human or human antibodies can also be used and are well known in the art. Generally, a humanized or engineered antibody has one or more amino acid residues from a source which is non-human, e.g., but not limited to mouse, rat, rabbit, non-human primate or other mammal. These human amino acid residues are often referred to as "import" residues, which are typically taken from an "import" variable, constant or other domain of a known human sequence. Known human Ig sequences are disclosed, e.g., www.ncbi.nlm.nih.gov/entrez/ query.fcgi; www.atcc.org/phage/hdb.html; www. sciquest.com/; www.abcam.com/; www.antibodyresource.com/onlinecomp.html; www.public.iastate.edu/ ~pedro/research_tools.html; www.mgen.uni-heidelberg.de/ SD/IT/IT.html; www.whfreeman.com/immunology/CH05/ kuby05.htm; www.library.thinkquest.org/12429/Immune/ Antibody.html; www.hhmi.org/grants/lectures/1996/vlab/; www.path.cam.ac.uk/~mrc7/mikeimages.html; www.antibodyresource.com/; mcb.harvard.edu/BioLinks/ Immunology.html.www.immunologylink.com/; pathbox.wustl.edu/~hcenter/index.html; www.biotech. ufl.edu/-hcl/; www.pebio.com/pa/340913/340913.html; www.nal.usda.gov/awic/pubs/antibody/; www.m.ehimeu.ac.jp/~yasuhito/Elisa.html; www.biodesign.com/ table.asp; www.icnet.uk/axp/facs/davies/links.html; www.biotech.ufl.edu/~fccl/protocol.html; www.isacnet.org/sites_geo.html; aximtl.imt.uni-marburg.de/~rek/ AEPStart.html; baserv.uci.kun.nl/~jraats/links1.html; www.recab.uni-hd.de/immuno.bme.nwu.edu/; www.mrccpe.cam.ac.uk/imt-doc/public/INTRO.html; www.ibt.unam.mx/vir/V_mice.html; imgt.cnusc.fr:8104/; www.biochem.ucl.ac.uk/~martin/abs/index.html; antibody.bath.ac.uk/; abgen.cvm.tamu.edu/lab/ wwwabgen.html; www.unizh.ch/~honegger/AHOseminar/ Slide01.html; www.cryst.bbk.ac.uk/~ubcg07s/; www.nimr.mrc.ac.uk/CC/ccaewg/ccaewg.htm; www.path.cam.ac.uk/~mrc7/humanisation/TAHHP.html; www.ibt.unam.mx/vir/structure/stat_aim.html; www.biosci.missouri.edu/smithgp/index.html; www.cryst.bioc.cam.ac.uk/~fmolina/Web-pages/Pept/ spottech.html; www.jerini.de/fr_products.htm; www.patents.ibm.com/ibm.html.Kabat et al., Sequences of Proteins of Immunological Interest, U.S. Dept. Health (1983), each entirely incorporated by reference. Such imported sequences can be used to reduce immunogenicity or reduce, enhance or modify binding, affinity, on-rate, off-rate, avidity, specificity, half-life, or any other suitable characteristic, as known in the art. Generally part or all of the non-human or human CDR sequences are maintained while the non-human sequences of the variable and constant regions are replaced with human or other amino acids. Antibodies can also optionally be humanized with retention of high affinity for the antigen and other favorable biological properties. To achieve this goal, humanized antibodies can be optionally prepared by a process of analysis of the parental sequences and various conceptual humanized products using three-dimensional models of the parental and humanized sequences. Three-dimensional immunoglobulin models are commonly available and are familiar to those skilled in the art. Computer programs are available which illustrate and display probable three-dimensional conformational structures of selected candidate immunoglobulin

US 6,902,734 B2

**11**

sequences. Inspection of these displays permits analysis of the likely role of the residues in the functioning of the candidate immunoglobulin sequence, i.e., the analysis of residues that influence the ability of the candidate immunoglobulin to bind its antigen. In this way, FR residues can be selected and combined from the consensus and import sequences so that the desired antibody characteristic, such as increased affinity for the target antigen(s), is achieved. In general, the CDR residues are directly and most substantially involved in influencing antigen binding. Humanization or engineering of antibodies of the present invention can be performed using any known method, such as but not limited to those described in, Winter (Jones et al., Nature 321:522 (1986); Riechmann et al., Nature 332:323 (1988); Verhoeyen et al., Science 239: 1534 (1988)), Sims et al., J. Immunol. 151: 2296 (1993); Chothia and Lesk, J. Mol. Biol. 196:901 (1987), Carter et al., Proc. Natl. Acad. Sci. U.S.A. 89:4285 (1992); Presta et al., J. Immunol. 151:2623 (1993), U.S. Pat. Nos: 5,723,323, 5,976,862, 5,824,514, 5,817,483, 5,814,476, 5,763,192, 5,723,323, 5,766,886, 5,714,352, 6,204,023, 6,180,370, 5,693,762, 5,530,101, 5,585,089, 5,225,539; 4,816,567, PCT/: US98/16280, US96/18978, US91/09630, US91/05939, US94/01234, GB89/01334, GB91/01134, GB92/01755; WO90/14443, WO90/14424, WO90/14430, EP 229246, each entirely incorporated herein by reference, included references cited therein.

The anti-IL-12 antibody can also be optionally generated by immunization of a transgenic animal (e.g., mouse, rat, hamster, non-human primate, and the like) capable of producing a repertoire of human antibodies, as described herein and/or as known in the art. Cells that produce a human anti-IL-12 antibody can be isolated from such animals and immortalized using suitable methods, such as the methods described herein.

Transgenic mice that can produce a repertoire of human antibodies that bind to human antigens can be produced by known methods (e.g., but not limited to, U.S. Pat. Nos. 5,770,428, 5,569,825, 5,545,806, 5,625,126, 5,625,825, 5,633,425, 5,661,016 and 5,789,650 issued to Lonberg et al.; Jakobovits et al. WO 98/50433, Jakobovits et al. WO 98/24893, Lonberg et al. WO 98/24884, Lonberg et al. WO 97/13852, Lonberg et al. WO 94/25585, Kucherlapate et al. WO 96/34096, Kucherlapate et al. EP 0463 151 B1, Kucherlapate et al. EP 0710 719 A1, Surani et al. U.S. Pat. No. 5,545,807, Bruggemann et al. WO 90/04036, Bruggemann et al. EP 0438 474 B1, Lonberg et al. EP 0814 259 A2, Lonberg et al. GB 2 272 440 A, Lonberg et al. *Nature* 368:856–859 (1994), Taylor et al., *Int. Immunol.* 6(4) 579–591 (1994), Green et al, *Nature Genetics* 7:13–21 (1994), Mendez et al., *Nature Genetics* 15:146–156 (1997), Taylor et al., *Nucleic Acids Research* 20(23):6287–6295 (1992), Tuaillon et al., *Proc Natl Acad Sci USA* 90(8) 3720–3724 (1993), Lonberg et al., *Int Rev Immunol* 13(1): 65–93 (1995) and Fishwald et al., *Nat Biotechnol* 14(7): 845–851 (1996), which are each entirely incorporated herein by reference). Generally, these mice comprise at least one transgene comprising DNA from at least one human immunoglobulin locus that is functionally rearranged, or which can undergo functional rearrangement. The endogenous immunoglobulin loci in such mice can be disrupted or deleted to eliminate the capacity of the animal to produce antibodies encoded by endogenous genes.

Screening antibodies for specific binding to similar proteins or fragments can be conveniently achieved using peptide display libraries. This method involves the screening of large collections of peptides for individual members having the desired function or structure. Antibody screening

**12**

of peptide display libraries is well known in the art. The displayed peptide sequences can be from 3 to 5000 or more amino acids in length, frequently from 5–100 amino acids long, and often from about 8 to 25 amino acids long. In addition to direct chemical synthetic methods for generating peptide libraries, several recombinant DNA methods have been described. One type involves the display of a peptide sequence on the surface of a bacteriophage or cell. Each bacteriophage or cell contains the nucleotide sequence encoding the particular displayed peptide sequence. Such methods are described in PCT Patent Publication Nos. 91/17271, 91/18980, 91/19818, and 93/08278. Other systems for generating libraries of peptides have aspects of both in vitro chemical synthesis and recombinant methods. See, PCT Patent Publication Nos. 92/05258, 92/14843, and 96/19256. See also, U.S. Pat. Nos. 5,658,754; and 5,643, 768. Peptide display libraries, vector, and screening kits are commercially available from such suppliers as Invitrogen (Carlsbad, Calif.), and Cambridge Antibody Technologies (Cambridgeshire, UK). See, e.g., U.S. Pat. Nos. 4,704,692, 4,939,666, 4,946,778, 5,260,203, 5,455,030, 5,518,889, 5,534,621, 5,656,730, 5,763,733, 5,767,260, 5,856,456, assigned to Enzon; U.S. Pat. Nos. 5,223,409, 5,403,484, 5,571,698, 5,837,500, assigned to Dyax, U.S. Pat. Nos. 5,427,908, 5,580,717, assigned to Affymax; U.S. Pat. No. 5,885,793, assigned to Cambridge antibody Technologies; U.S. Pat. No. 5,750,373, assigned to Genentech, U.S. Pat. Nos. 5,618,920, 5,595,898, 5,576,195, 5,698,435, 5,693, 493, 5,698,417, assigned to Xoma, Colligan, supra; Ausubel, supra; or Sambrook, supra, each of the above patents and publications entirely incorporated herein by reference.

Antibodies of the present invention can also be prepared using at least one anti-IL-12 antibody encoding nucleic acid to provide transgenic animals or mammals, such as goats, cows, horses, sheep, and the like, that produce such antibodies in their milk. Such animals can be provided using known methods. See, e.g., but not limited to, U.S. Pat. Nos. 5,827,690; 5,849,992; 4,873,316; 5,849,992; 5,994,616; 5,565,362; 5,304,489, and the like, each of which is entirely incorporated herein by reference.

Antibodies of the present invention can additionally be prepared using at least one anti-IL-12 antibody encoding nucleic acid to provide transgenic plants and cultured plant cells (e.g., but not limited to tobacco and maize) that produce such antibodies, specified portions or variants in the plant parts or in cells cultured therefrom. As a non-limiting example, transgenic tobacco leaves expressing recombinant proteins have been successfully used to provide large amounts of recombinant proteins, e.g., using an inducible promoter. See, e.g., Cramer et al., Curr. Top. Microbol. Immunol. 240:95–118 (1999) and references cited therein. Also, transgenic maize have been used to express mammalian proteins at commercial production levels, with biological activities equivalent to those produced in other recombinant systems or purified from natural sources. See, e.g., Hood et al., Adv. Exp. Med. Biol. 464:127–147 (1999) and references cited therein. Antibodies have also been produced in large amounts from transgenic plant seeds including antibody fragments, such as single chain antibodies (scFv's), including tobacco seeds and potato tubers. See, e.g., Conrad et al., Plant Mol. Biol. 38:101–109 (1998) and reference cited therein. Thus, antibodies of the present invention can also be produced using transgenic plants, according to know methods. See also, e.g., Fischer et al., Biotechnol. Appl. Biochem. 30:99–108 (October, 1999), Ma et al., Trends Biotechnol. 13:522–7 (1995); Ma et al., Plant Physiol. 109:341–6 (1995); Whitelam et al., Biochem. Soc. Trans.

13

22:940–944 (1994); and references cited therein. Each of the above references is entirely incorporated herein by reference.

The antibodies of the invention can bind human IL-12 with a wide range of affinities ($K_D$). In a preferred embodiment, at least one human mAb of the present invention can optionally bind human IL-12 with high affinity. For example, a human mAb can bind human IL-12 with a $K_D$ equal to or less than about $10^{-7}$ M, such as but not limited to, 0.1–9.9 (or any range or value therein) X $10^{-7}$, $10^{-8}$, $10^{-9}$, $10^{-10}$, $10^{-11}$, $10^{-12}$, $10^{-13}$ or any range or value therein.

The affinity or avidity of an antibody for an antigen can be determined experimentally using any suitable method. (See, for example, Berzofsky, et al., "Antibody-Antigen Interactions," In *Fundamental Immunology*, Paul, W. E., Ed., Raven Press: New York, N.Y. (1984); Kuby, Janis *Immunology*, W. H. Freeman and Company: New York, N.Y. (1992); and methods described herein). The measured affinity of a particular antibody-antigen interaction can vary if measured under different conditions (e.g., salt concentration, pH). Thus, measurements of affinity and other antigen-binding parameters (e.g., $K_D$, $K_a$, $K_d$) are preferably made with standardized solutions of antibody and antigen, and a standardized buffer, such as the buffer described herein.

Nucleic Acid Molecules

Using the information provided herein, such as the nucleotide sequences encoding at least 70–100% of the contiguous amino acids of at least one of SEQ ID NOS:1, 2, 3, 4, 5, 6, 7, 8, specified fragments, variants or consensus sequences thereof, or a deposited vector comprising at least one of these sequences, a nucleic acid molecule of the present invention encoding at least one anti-IL-12 antibody can be obtained using methods described herein or as known in the art.

Nucleic acid molecules of the present invention can be in the form of RNA, such as mRNA, hnRNA, tRNA or any other form, or in the form of DNA, including, but not limited to, cDNA and genomic DNA obtained by cloning or produced synthetically, or any combinations thereof. The DNA can be triple-stranded, double-stranded or single-stranded, or any combination thereof. Any portion of at least one strand of the DNA or RNA can be the coding strand, also known as the sense strand, or it can be the non-coding strand, also referred to as the anti-sense strand.

Isolated nucleic acid molecules of the present invention can include nucleic acid molecules comprising an open reading frame (ORF), optionally with one or more introns, e.g., but not limited to, at least one specified portion of at least one CDR, as GDR1, CDR2 and/or CDR3 of at least one heavy chain (e.g., SEQ ID NOS: 1–3) or light chain (e.g., SEQ ID NOS: 4–6); nucleic acid molecules comprising the coding sequence for an anti-IL-12 antibody or variable region (e.g., SEQ ID NOS:7,8); and nucleic acid molecules which comprise a nucleotide sequence substantially different from those described above but which, due to the degeneracy of the genetic code, still encode at least one anti-IL-12 antibody as described herein and/or as known in the art. Of course, the genetic code is well known in the art. Thus, it would be routine for one skilled in the art to generate such degenerate nucleic acid variants that code for specific anti-IL-12 antibodies of the present invention. See, e.g., Ausubel, et al., supra, and such nucleic acid variants are included in the present invention. Non-limiting examples of isolated nucleic acid molecules of the present invention include SEQ ID NOS:10–15, corresponding to non-limiting examples of a nucleic acid encoding, respectively, HG

14

CDR1, HG CDR2, HG CDR3, LC CDR1, LC CDR2, LC CDR3, HG variable region and LC variable region.

As indicated herein, nucleic acid molecules of the present invention which comprise a nucleic acid encoding an anti-IL-12 antibody can include, but are not limited to, those encoding the amino acid sequence of an antibody fragment, by itself; the coding sequence for the entire antibody or a portion thereof; the coding sequence for an antibody, fragment or portion, as well as additional sequences, such as the coding sequence of at least one signal leader or fusion peptide, with or without the aforementioned additional coding sequences, such as at least one intron, together with additional, non-coding sequences, including but not limited to, non-coding 5' and 3' sequences, such as the transcribed, non-translated sequences that play a role in transcription, mRNA processing, including splicing and polyadenylation signals (for example—ribosome binding and stability of mRNA); an additional coding sequence that codes for additional amino acids, such as those that provide additional functionalities. Thus, the sequence encoding an antibody can be fused to a marker sequence, such as a sequence encoding a peptide that facilitates purification of the fused antibody comprising an antibody fragment or portion.

Polynucleotides Which Selectively Hybridize to a Polynucleotide as Described Herein

The present invention provides isolated nucleic acids that hybridize under selective hybridization conditions to a polynucleotide disclosed herein. Thus, the polynucleotides of this embodiment can be used for isolating, detecting, and/or quantifying nucleic acids comprising such polynucleotides. For example, polynucleotides of the present invention can be used to identify, isolate, or amplify partial or full-length clones in a deposited library. In some embodiments, the polynucleotides are genomic or cDNA sequences isolated, or otherwise complementary to, a cDNA from a human or mammalian nucleic acid library.

Preferably, the cDNA library comprises at least 80% full-length sequences, preferably at least 85% or 90% full-length sequences, and more preferably at least 95% full-length sequences. The cDNA libraries can be normalized to increase the representation of rare sequences. Low or moderate stringency hybridization conditions are typically, but not exclusively, employed with sequences having a reduced sequence identity relative to complementary sequences. Moderate and high stringency conditions can optionally be employed for sequences of greater identity. Low stringency conditions allow selective hybridization of sequences having about 70% sequence identity and can be employed to identify orthologous or paralogous sequences.

Optionally, polynucleotides of this invention will encode at least a portion of an antibody encoded by the polynucleotides described herein. The polynucleotides of this invention embrace nucleic acid sequences that can be employed for selective hybridization to a polynucleotide encoding an antibody of the present invention. See, e.g., Ausubel, supra; Colligan, supra, each entirely incorporated herein by reference.

Construction of Nucleic Acids

The isolated nucleic acids of the present invention can be made using (a) recombinant methods, (b) synthetic techniques, (c) purification techniques, or combinations thereof, as well-known in the art.

The nucleic acids can conveniently comprise sequences in addition to a polynucleotide of the present invention. For example, a multi-cloning site comprising one or more endonuclease restriction sites can be inserted into the nucleic acid to aid in isolation of the polynucleotide. Also, translatable

US 6,902,734 B2

**15**

sequences can be inserted to aid in the isolation of the translated polynucleotide of the present invention. For example, a hexa-histidine marker sequence provides a convenient means to purify the proteins of the present invention. The nucleic acid of the present invention—excluding the coding sequence—is optionally a vector, adapter, or linker for cloning and/or expression of a polynucleotide of the present invention.

Additional sequences can be added to such cloning and/or expression sequences to optimize their function in cloning and/or expression, to aid in isolation of the polynucleotide, or to improve the introduction of the polynucleotide into a cell. Use of cloning vectors, expression vectors, adapters, and linkers is well known in the art. (See, e.g., Ausubel, supra; or Sambrook, supra)

Recombinant Methods for Constructing Nucleic Acids

The isolated nucleic acid compositions of this invention, such as RNA, cDNA, genomic DNA, or any combination thereof, can be obtained from biological sources using any number of cloning methodologies known to those of skill in the art. In some embodiments, oligonucleotide probes that selectively hybridize, under stringent conditions, to the polynucleotides of the present invention are used to identify the desired sequence in a cDNA or genomic DNA library. The isolation of RNA, and construction of cDNA and genomic libraries, is well known to those of ordinary skill in the art. (See, e.g., Ausubel, supra; or Sambrook, supra)

Nucleic Acid Screening and Isolation Methods

A cDNA or genomic library can be screened using a probe based upon the sequence of a polynucleotide of the present invention, such as those disclosed herein. Probes can be used to hybridize with genomic DNA or cDNA sequences to isolate homologous genes in the same or different organisms. Those of skill in the art will appreciate that various degrees of stringency of hybridization can be employed in the assay; and either the hybridization or the wash medium can be stringent. As the conditions for hybridization become more stringent, there must be a greater degree of complementarity between the probe and the target for duplex formation to occur. The degree of stringency can be controlled by one or more of temperature, ionic strength, pH and the presence of a partially denaturing solvent such as formamide. For example, the stringency of hybridization is conveniently varied by changing the polarity of the reactant solution through, for example, manipulation of the concentration of formamide within the range of 0% to 50%. The degree of complementarity (sequence identity) required for detectable binding will vary in accordance with the stringency of the hybridization medium and/or wash medium. The degree of complementarity will optimally be 100%, or 70–100%, or any range or value therein. However, it should be understood that minor sequence variations in the probes and primers can be compensated for by reducing the stringency of the hybridization and/or wash medium.

Methods of amplification of RNA or DNA are well known in the art and can be used according to the present invention without undue experimentation, based on the teaching and guidance presented herein.

Known methods of DNA or RNA amplification include, but are not limited to, polymerase chain reaction (PCR) and related amplification processes (see, e.g., U.S. Pat. Nos. 4,683,195, 4,683,202, 4,800,159, 4,965,188, to Mullis, et al.; U.S. Pat. Nos. 4,795,699 and 4,921,794 to Tabor, et al; U.S. Pat. No. 5,142,033 to Innis; U.S. Pat. No. 5,122,464 to Wilson, et al.; U.S. Pat. No. 5,091,310 to Innis; U.S. Pat. No. 5,066,584 to Gyllensten, et al; U.S. Pat. No. 4,889,818 to Gelfand, et al; U.S. Pat. No. 4,994,370 to Silver, et al; U.S.

**16**

Pat. No. 4,766,067 to Biswas; U.S. Pat. No. 4,656,134 to Ringold) and RNA mediated amplification that uses anti-sense RNA to the target sequence as a template for double-stranded DNA synthesis (U.S. Pat. No. 5,130,238 to Malek, et al, with the tradename NASBA), the entire contents of which references are incorporated herein by reference. (See, e.g., Ausubel, supra; or Sambrook, supra.)

For instance, polymerase chain reaction (PCR) technology can be used to amplify the sequences of polynucleotides of the present invention and related genes directly from genomic DNA or cDNA libraries. PCR and other in vitro amplification methods can also be useful, for example, to clone nucleic acid sequences that code for proteins to be expressed, to make nucleic acids to use as probes for detecting the presence of the desired mRNA in samples, for nucleic acid sequencing, or for other purposes. Examples of techniques sufficient to direct persons of skill through in vitro amplification methods are found in Berger, supra, Sambrook, supra, and Ausubel, supra, as well as Mullis, et al., U.S. Pat. No. 4,683,202 (1987); and Innis, et al., PCR Protocols A Guide to Methods and Applications, Eds., Academic Press Inc., San Diego, Calif. (1990). Commercially available kits for genomic PCR amplification are known in the art. See, e.g., Advantage-GC Genomic PCR Kit (Clontech). Additionally, e.g., the T4 gene 32 protein (Boehringer Mannheim) can be used to improve yield of long PCR products.

Synthetic Methods for Constructing Nucleic Acids

The isolated nucleic acids of the present invention can also be prepared by direct chemical synthesis by known methods (see, e.g., Ausubel, et al., supra). Chemical synthesis generally produces a single-stranded oligonucleotide, which can be converted into double-stranded DNA by hybridization with a complementary sequence, or by polymerization with a DNA polymerase using the single strand as a template. One of skill in the art will recognize that while chemical synthesis of DNA can be limited to sequences of about 100 or more bases, longer sequences can be obtained by the ligation of shorter sequences.

Recombinant Expression Cassettes

The present invention further provides recombinant expression cassettes comprising a nucleic acid of the present invention. A nucleic acid sequence of the present invention, for example a cDNA or a genomic sequence encoding an antibody of the present invention, can be used to construct a recombinant expression cassette that can be introduced into at least one desired host cell. A recombinant expression cassette will typically comprise a polynucleotide of the present invention operably linked to transcriptional initiation regulatory sequences that will direct the transcription of the polynucleotide in the intended host cell. Both heterologous and non-heterologous (i.e., endogenous) promoters can be employed to direct expression of the nucleic acids of the present invention.

In some embodiments, isolated nucleic acids that serve as promoter, enhancer, or other elements can be introduced in the appropriate position (upstream, downstream or in intron) of a non-heterologous form of a polynucleotide of the present invention so as to up or down regulate expression of a polynucleotide of the present invention. For example, endogenous promoters can be altered in vivo or in vitro by mutation, deletion and/or substitution.

Vectors and Host Cells

The present invention also relates to vectors that include isolated nucleic acid molecules of the present invention, host cells that are genetically engineered with the recombinant vectors, and the production of at least one anti-IL-12 anti-

US 6,902,734 B2

17

body by recombinant techniques, as is well known in the art. See, e.g., Sambrook, et al., supra; Ausubel, et al., supra, each entirely incorporated herein by reference.

The polynucleotides can optionally be joined to a vector containing a selectable marker for propagation in a host. Generally, a plasmid vector is introduced in a precipitate, such as a calcium phosphate precipitate, or in a complex with a charged lipid. If the vector is a virus, it can be packaged in vitro using an appropriate packaging cell line and then transduced into host cells.

The DNA insert should be operatively linked to an appropriate promoter. The expression constructs will further contain sites for transcription initiation, termination and, in the transcribed region, a ribosome binding site for translation. The coding portion of the mature transcripts expressed by the constructs will preferably include a translation initiating at the beginning and a termination codon (e.g., UAA, UGA or UAG) appropriately positioned at the end of the mRNA to be translated, with UAA and UAG preferred for mammalian or eukaryotic cell expression.

Expression vectors will preferably but optionally include at least one selectable marker. Such markers include, e.g., but not limited to, methotrexate (MTX), dihydrofolate reductase (DHFR, U.S. Pat. Nos. 4,399,216; 4,634,665; 4,656,134; 4,956,288; 5,149,636; 5,179,017), ampicillin, neomycin (G418), mycophenolic acid, or glutamine synthetase (GS, U.S. Pat. Nos. 5,122,464; 5,770,359; 5,827, 739) resistance for eukaryotic cell culture, and tetracycline or ampicillin resistance genes for culturing in *E. coli* and other bacteria or prokaryotics (the above patents are entirely incorporated hereby by reference). Appropriate culture mediums and conditions for the above-described host cells are known in the art. Suitable vectors will be readily apparent to the skilled artisan. Introduction of a vector construct into a host cell can be effected by calcium phosphate transfection, DEAE-dextran mediated transfection, cationic lipid-mediated transfection, electroporation, transduction, infection or other known methods. Such methods are described in the art, such as Sambrook, supra, Chapters 1–4 and 16–18; Ausubel, supra, Chapters 1, 9, 13, 15, 16.

At least one antibody of the present invention can be expressed in a modified form, such as a fusion protein, and can include not only secretion signals, but also additional heterologous functional regions. For instance, a region of additional amino acids, particularly charged amino acids, can be added to the N-terminus of an antibody to improve stability and persistence in the host cell, during purification, or during subsequent handling and storage. Also, peptide moieties can be added to an antibody of the present invention to facilitate purification. Such regions can be removed prior to final preparation of an antibody or at least one fragment thereof. Such methods are described in many standard laboratory manuals, such as Sambrook, supra, Chapters 17.29–17.42 and 18.1–18.74; Ausubel, supra, Chapters 16, 17 and 18.

Those of ordinary skill in the art are knowledgeable in the numerous expression systems available for expression of a nucleic acid encoding a protein of the present invention.

Alternatively, nucleic acids of the present invention can be expressed in a host cell by turning on (by manipulation) in a host cell that contains endogenous DNA encoding an antibody of the present invention. Such methods are well known in the art, e.g., as described in U.S. Pat. Nos. 5,580,734, 5,641,670, 5,733,746, and 5,733,761, entirely incorporated herein by reference.

Illustrative of cell cultures useful for the production of the antibodies, specified portions or variants thereof, are mammalian cells. Mammalian cell systems often will be in the form of monolayers of cells although mammalian cell suspensions or bioreactors can also be used. A number of suitable host cell lines capable of expressing intact glycosylated proteins have been developed in the art, and include the COS-1 (e.g., ATCC CRL 1650), COS-7 (e.g., ATCC CRL-1651), HEK293, BHK21 (e.g., ATCC CRL-10), CHO (e.g., ATCC CRL 1610) and BSC-1 (e.g., ATCC CRL-26) cell lines, Cos-7 cells, CHO cells, hep G2 cells, P3X63Ag8.653, SP2/0-Ag14, 293 cells, HeLa cells and the like, which are readily available from, for example, American Type Culture Collection, Manassas, Va. (www.atcc.org). Preferred host cells include cells of lymphoid origin such as myeloma and lymphoma cells. Particularly preferred host cells are P3X63Ag8.653 cells (ATCC Accession Number CRL-1580) and SP2/0-Ag14 cells (ATCC Accession Number CRL-1851). In a particularly preferred embodiment, the recombinant cell is a P3X63Ab8.653 or a SP2/0-Ag14 cell.

Expression vectors for these cells can include one or more of the following expression control sequences, such as, but not limited to an origin of replication; a promoter (e.g., late or early SV40 promoters, the CMV promoter (U.S. Pat. Nos. 5,168,062; 5,385,839), an HSV tk promoter, a pgk (phosphoglycerate kinase) promoter, an EF-1 alpha promoter (U.S. Pat. No. 5,266,491), at least one human immunoglobulin promoter; an enhancer, and/or processing information sites, such as ribosome binding sites, RNA splice sites, polyadenylation sites (e.g., an SV40 large T Ag poly A addition site), and transcriptional terminator sequences. See, e.g., Ausubel et al., supra; Sambrook, et al., supra. Other cells useful for production of nucleic acids or proteins of the present invention are known and/or available, for instance, from the American Type Culture Collection Catalogue of Cell Lines and Hybridomas (www.atcc.org) or other known or commercial sources.

When eukaryotic host cells are employed, polyadenlyation or transcription terminator sequences are typically incorporated into the vector. An example of a terminator sequence is the polyadenlyation sequence from the bovine growth hormone gene. Sequences for accurate splicing of the transcript can also be included. An example of a splicing sequence is the VP1 intron from SV40 (Sprague, et al., J. Virol. 45:773–781 (1983)). Additionally, gene sequences to control replication in the host cell can be incorporated into the vector, as known in the art.

Purification of an Antibody

An anti-IL-12 antibody can be recovered and purified from recombinant cell cultures by well-known methods including, but not limited to, protein A purification, ammonium sulfate or ethanol precipitation, acid extraction, anion or cation exchange chromatography, phosphocellulose chromatography, hydrophobic interaction chromatography, affinity chromatography, hydroxylapatite chromatography and lectin chromatography. High performance liquid chromatography ("HPLC") can also be employed for purification. See, e.g., Colligan, Current Protocols in Immunology, or Current Protocols in Protein Science, John Wiley & Sons, New York, N.Y., (1997–2001), e.g., Chapters 1, 4, 6, 8, 9, 10, each entirely incorporated herein by reference.

Antibodies of the present invention include naturally purified products, products of chemical synthetic procedures, and products produced by recombinant techniques from a eukaryotic host, including, for example, yeast, higher plant, insect and mammalian cells. Depending upon the host employed in a recombinant production procedure, the antibody of the present invention can be glycosylated or can be non-glycosylated, with glycosylated preferred. Such

US 6,902,734 B2

19 20

methods are described in many standard laboratory manuals, such as Sambrook, supra, Sections 17.37–17.42; Ausubel, supra, Chapters 10, 12, 13, 16, 18 and 20, Colligan, Protein Science, supra, Chapters 12–14, all entirely incorporated herein by reference.

Anti-IL-12 Antibodies

The isolated antibodies of the present invention comprise an antibody encoded by any one of the polynucleotides of the present invention as discussed more fully herein, or any isolated or prepared antibody. Preferably, the human antibody or antigen-binding fragment binds human IL-12 and, thereby partially or substantially neutralizes at least one biological activity of the protein. An antibody, or specified portion or variant thereof, that partially or preferably substantially neutralizes at least one biological activity of at least one IL-12 protein or fragment can bind the protein or fragment and thereby inhibit activities mediated through the binding of LL-12 to the LL-12 receptor or through other IL-12-dependent or mediated mechanisms. As used herein, the temi "neutralizing antibody" refers to an antibody that can inhibit an IL-12-dependent activity by about 20–120%, preferably by at least about 10, 20, 30, 40, 50, 55, 60, 65, 70, 75, 80, 85, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100% or more depending on the assay. The capacity of an anti-IL-12 antibody to inhibit an IL-12-dependent activity is preferably assessed by at least one suitable IL-12 protein or receptor assay, as described herein and/or as known in the art. A human antibody of the invention can be of any class (IgG, IgA, IgM, IgE, IgD, etc.) or isotype and can comprise a kappa or lambda light chain. In one embodiment, the human antibody comprises an IgG heavy chain or defined fragment, for example, at least one of isotypes, IgG1, IgG2, IgG3 or IgG4. Antibodies of this type can be prepared by employing a transgenic mouse or other transgenic non-human mammal comprising at least one human light chain (e.g., IgG, IgA and IgM (e.g., γ1, γ2, γ3, γ4) transgenes as described herein and/or as known in the art. In another embodiment, the anti-human IL-12 human antibody comprises an IgG1 heavy chain and an IgG1 light chain.

At least one antibody of the invention binds at least one specified epitope specific to at least one IL-12 protein, subunit, fragment, portion or any combination thereof. The at least one epitope can comprise at least one antibody binding region that comprises at least one portion of said protein, which epitope is preferably comprised of at least one extracellular, soluble, hydrophillic, external or cytoplasmic portion of said protein. The at least one specified epitope can comprise any combination of at least one amino acid sequence of at least 1–3 amino acids to the entire specified portion of contiguous amino acids of the SEQ ID NO:9.

Generally, the human antibody or antigen-binding fragment of the present invention will comprise an antigenbinding region that comprises at least one human complementarity determining region (CDR1, CDR2 and CDR3) or variant of at least one heavy chain variable region and at least one human complementarity determining region (CDR1, CDR2 and CDR3) or variant of at least one light chain variable region. As a non-limiting example, the antibody or antigen-binding portion or variant can comprise at least one of the heavy chain CDR3 having the amino acid sequence of SEQ ID NO:3, and/or a light chain CDR3 having the amino acid sequence of SEQ ID NO:6. In a particular embodiment, the antibody or antigen-binding fragment can have an antigen-binding region that comprises at least a portion of at least one heavy chain CDR (i.e., CDR1, CDR2 and/or CDR3) having the amino acid sequence of the corresponding CDRs 1, 2 and/or 3 (e.g.,

SEQ ID NOS:1, 2, and/or 3). In another particular embodiment, the antibody or antigen-binding portion or variant can have an antigen-binding region that comprises at least a portion of at least one light chain CDR (i.e., CDR1, CDR2 and/or CDR3) having the amino acid sequence of the corresponding CDRs 1, 2 and/or 3 (e.g., SEQ ID NOS: 4, 5, and/or 6). In a preferred embodiment the three heavy chain CDRs and the three light chain CDRs of the anitbody or antigen-binding fragment have the amino acid sequence of the corresponding CDR of at least one of mAb 12B75, C340, or any others as described herein. Such antibodies can be prepared by chemically joining together the various portions (e.g., CDRs, framework) of the antibody using conventional techniques, by preparing and expressing a (i.e., one or more) nucleic acid molecule that encodes the antibody using conventional techniques of recombinant DNA technology or by using any other suitable method.

The anti-IL-12 antibody can comprise at least one of a heavy or light chain variable region having a defined amino acid sequence. For example, in a preferred embodiment, the anti-IL-12 antibody comprises at least one of at least one heavy chain variable region, optionally having the amino acid sequence of SEQ ID NO:7 and/or at least one light chain variable region, optionally having the amino acid sequence of SEQ ID NO:8. Antibodies that bind to human IL-12 and that comprise a defined heavy or light chain variable region can be prepared using suitable methods, such as phage display (Katsube, Y., et al., *Int J Mol. Med*, 1(5):863–868 (1998)) or methods that employ transgenic animals, as known in the art and/or as described herein. For example, a transgenic mouse, comprising a functionally rearranged human immunoglobulin heavy chain transgene and a transgene comprising DNA from a human immunoglobulin light chain locus that can undergo functional rearrangement, can be immunized with human IL-12 or a fragment thereof to elicit the production of antibodies. If desired, the antibody producing cells can be isolated and hybridomas or other immortalized antibody-producing cells can be prepared as described herein and/or as known in the art. Alternatively, the antibody, specified portion or variant can be expressed using the encoding nucleic acid or portion thereof in a suitable host cell.

The invention also relates to antibodies, antigen-binding fragments, immunoglobulin chains and CDRs comprising amino acids in a sequence that is substantially the same as an amino acid sequence described herein. Preferably, such antibodies or antigen-binding fragments and antibodies comprising such chains or CDRs can bind human IL-12 with high affinity (e.g., $K_D$ less than or equal to about $10^{-9}$ M). Amino acid sequences that are substantially the same as the sequences described herein include sequences comprising conservative amino acid substitutions, as well as amino acid deletions and/or insertions. A conservative amino acid substitution refers to the replacement of a first amino acid by a second amino acid that has chemical and/or physical properties (e.g, charge, structure, polarity, hydrophobicity/hydrophilicity) that are similar to those of the first amino acid. Conservative substitutions include replacement of one amino acid by another within the following groups: lysine (K), arginine (R) and histidine (H); aspartate (D) and glutamate (E); asparagine (N), glutamine (Q), serine (S), threonine (T), tyrosine (Y), K, R, H, D and E; alanine (A), valine (V), leucine (L), isoleucine (I), proline (P), phenylalanine (F), tryptophan (W), methionine (M), cysteine (C) and glycine (G); F, W and Y; C, S and T.

Amino Acid Codes

The amino acids that make up anti-IL-12 antibodies of the present invention are often abbreviated. The amino acid

US 6,902,734 B2

21

designations can be indicated by designating the amino acid by its single letter code, its three letter code, name, or three nucleotide codon(s) as is well understood in the art (see Alberts, B., et al., Molecular Biology of The Cell, Third Ed., Garland Publishing, Inc., New York, 1994):

| SINGLE LETTER CODE | THREE LETTER CODE | NAME | THREE NUCLEOTIDE CODON(S) |
|---|---|---|---|
| A | Ala | Alanine | GCA, GCC, GCG, GCU |
| C | Cys | Cysteine | UGC, UGU |
| D | Asp | Aspartic acid | GAC, GAU |
| E | Glu | Glutamic acid | GAA, GAG |
| F | Phe | Phenylalanine | UUC, UUU |
| G | Gly | Glycine | GGA, GGC, GGG, GGU |
| H | His | Histidine | CAC, CAU |
| I | Ile | Isoleucine | AUA, AUC, AUU |
| K | Lys | Lysine | AAA, AAG |
| L | Leu | Leucine | UUA, UUG, CUA, CUC, CUG, CUU |
| M | Met | Methionine | AUG |
| N | Asn | Asparagine | AAC, AAU |
| P | Pro | Proline | CCA, CCC, CCG, CCU |
| Q | Gln | Glutamine | CAA, CAG |
| R | Arg | Arginine | AGA, AGG, CGA, CGC, CGG, CGU |
| S | Ser | Serine | AGC, AGU, UCA, UCC, UCG, UCU |
| T | Thr | Threonine | ACA, ACC, ACG, ACU |
| V | Val | Valine | GUA, GUC, GUG, GUU |
| W | Trp | Tryptophan | UGG |
| Y | Tyr | Tyrosine | UAC, UAU |

An anti-IL-12 antibody of the present invention can include one or more amino acid substitutions, deletions or additions, either from natural mutations or human manipulation, as specified herein.

Of course, the number of amino acid substitutions a skilled artisan would make depends on many factors, including those described herein. Generally speaking, the number of amino acid substitutions, insertions or deletions for any given anti-IL-12 Ig-derived protein, fragment or variant will not be more than 40, 30, 20, 19, 18, 17, 16, 15, 14, 13, 12, 11, 10, 9, 8, 7, 6, 5, 4, 3, 2, 1, such as 1–30 or any range or value therein, as specified herein.

Amino acids in an anti-IL-12 antibody of the present invention that are essential for function can be identified by methods known in the art, such as site-directed mutagenesis or alanine-scanning mutagenesis (e.g., Ausubel, supra, Chapters 8, 15; Cunningham and Wells, Science 244:1081–1085 (1989)). The latter procedure introduces single alanine mutations at every residue in the molecule. The resulting mutant molecules are then tested for biological activity, such as, but not limited to at least one IL-12 neutralizing activity. Sites that are critical for antibody binding can also be identified by structural analysis such as crystallization, nuclear magnetic resonance or photoaffinity labeling (Smith, et al., J. Mol. Biol. 224:899–904 (1992) and de Vos, et al., Science 255:306–312 (1992)).

Anti-IL-12 antibodies of the present invention can include, but are not limited to, at least one portion, sequence or combination selected from 5 to all of the contiguous amino acids of at least one of SEQ ID NOS:1, 2, 3, 4, 5, 6.

IL-12 antibodies or specified portions or variants of the present invention can include, but are not limited to, at least one portion, sequence or combination selected from at least 3–5 contiguous amino acids of SEQ ID NO:1, 5–17 contiguous amino acids of SEQ ID NO:2, 5–10 contiguous amino acids of SEQ ID NO:3, 5–11 contiguous amino acids of SEQ ID NO:4, 5–7 contiguous amino acids of SEQ ID

22

NO:5; 5–9 contiguous amino acids of SEQ ID NO:6; Leu21, Lys76, Met83, Ser85 of SEQ ID NO:7.

A(n) anti-IL-12 antibody can further optionally comprise a polypeptide of at least one of 70–100% of 5, 17, 10, 11, 7, 9, 119, or 108 contiguous amino acids of at least one of SEQ ID NOS:1, 2, 3, 4, 5, 6, 7 or 8.

In one embodiment, the amino acid sequence of an immunoglobulin chain, or portion thereof (e.g., variable region, CDR) has about 70–100% identity (e.g., 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100 or any range or value therein) to the amino acid sequence of the corresponding chain of at least one of SEQ ID NOS:7, 8. For example, the amino acid sequence of a light chain variable region can be compared with the sequence of SEQ ID NO:8, or the amino acid sequence of a heavy chain CDR3 can be compared with SEQ ID NO:3. Preferably, 70–100% amino acid identity (i.e., 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100 or any range or value therein) is determined using a suitable computer algorithm, as known in the art.

Exemplary heavy chain and light chain variable regions sequences are provided in SEQ ID NOS: 7 and 8. The antibodies of the present invention, or specified variants thereof, can comprise any number of contiguous amino acid residues from an antibody of the present invention, wherein that number is selected from the group of integers consisting of from 10–100% of the number of contiguous residues in an anti-IL-12 antibody. Optionally, this subsequence of contiguous amino acids is at least about 10, 20, 30, 40, 50, 60, 70, 80, 90, 100, 110, 120, 130, 140, 150, 160, 170, 180, 190, 200, 210, 220, 230, 240, 250 or more amino acids in length, or any range or value therein. Further, the number of such subsequences can be any integer selected from the group consisting of from 1 to 20, such as at least 2, 3, 4, or 5.

As those of skill will appreciate, the present invention includes at least one biologically active antibody of the present invention. Biologically active antibodies have a specific activity at least 20%, 30%, or 40%, and preferably at least 50%, 60%, or 70%, and most preferably at least 80%, 90%, or 95%–1000% of that of the native (non-synthetic), endogenous or related and known antibody. Methods of assaying and quantifying measures of enzymatic activity and substrate specificity, are well known to those of skill in the art.

In another aspect, the invention relates to human antibodies and antigen-binding fragments, as described herein, which are modified by the covalent attachment of an organic moiety. Such modification can produce an antibody or antigen-binding fragment with improved pharmacokinetic properties (e.g., increased in vivo serum half-life). The organic moiety can be a linear or branched hydrophilic polymeric group, fatty acid group, or fatty acid ester group. In particular embodiments, the hydrophilic polymeric group can have a molecular weight of about 800 to about 120,000 Daltons and can be a polyalkane glycol (e.g., polyethylene glycol (PEG), polypropylene glycol (PPG)), carbohydrate polymer, amino acid polymer or polyvinyl pyrolidone, and the fatty acid or fatty acid ester group can comprise from about eight to about forty carbon atoms.

The modified antibodies and antigen-binding fragments of the invention can comprise one or more organic moieties that are covalently bonded, directly or indirectly, to the antibody. Each organic moiety that is bonded to an antibody or antigen-binding fragment of the invention can independently be a hydrophilic polymeric group, a fatty acid group or a fatty acid ester group. As used herein, the term "fatty acid" encompasses mono-carboxylic acids and di-carboxylic

23

acids. A "hydrophilic polymeric group," as the term is used herein, refers to an organic polymer that is more soluble in water than in octane. For example, polylysine is more soluble in water than in octane. Thus, an antibody modified by the covalent attachment of polylysine is encompassed by the invention. Hydrophilic polymers suitable for modifying antibodies of the invention can be linear or branched and include, for example, polyalkane glycols (e.g., PEG, monomethoxy-polyethylene glycol (mPEG), PPG and the like), carbohydrates (e.g., dextran, cellulose, oligosaccharides, polysaccharides and the like), polymers of hydrophilic amino acids (e.g., polylysine, polyarginine, polyaspartate and the like), polyalkane oxides (e.g., polyethylene oxide, polypropylene oxide and the like) and polyvinyl pyrolidone. Preferably, the hydrophilic polymer that modifies the antibody of the invention has a molecular weight of about 800 to about 150,000 Daltons as a separate molecular entity. For example $PEG_{5000}$ and $PEG_{20,000}$ wherein the subscript is the average molecular weight of the polymer in Daltons, can be used. The hydrophilic polymeric group can be substituted with one to about six alkyl, fatty acid or fatty acid ester groups. Hydrophilic polymers that are substituted with a fatty acid or fatty acid ester group can be prepared by employing suitable methods. For example, a polymer comprising an amine group can be coupled to a carboxylate of the fatty acid or fatty acid ester, and an activated carboxylate (e.g., activated with N,N-carbonyl diimidazole) on a fatty acid or fatty acid ester can be coupled to a hydroxyl group on a polymer.

Fatty acids and fatty acid esters suitable for modifying antibodies of the invention can be saturated or can contain one or more units of unsaturation. Fatty acids that are suitable for modifying antibodies of the invention include, for example, n-dodecanoate ($C_{12}$, laurate), n-tetradecanoate ($C_{14}$, myristate), n-octadecanoate ($C_{18}$, stearate), n-eicosanoate ($C_{20}$, arachidate), n-docosanoate ($C_{22}$, behenate), n-triacontanoate ($C_{30}$), n-tetracontanoate ($C_{40}$), cis-Δ9-octadecanoate ($C_{18}$, oleate), all cis-Δ5,8,11,14-eicosatetraenoate ($C_{20}$, arachidonate), octanedioic acid, tetradecanedioic acid, octadecanedioic acid, docosanedioic acid, and the like. Suitable fatty acid esters include monoesters of dicarboxylic acids that comprise a linear or branched lower alkyl group. The lower alkyl group can comprise from one to about twelve, preferably one to about six, carbon atoms.

The modified human antibodies and antigen-binding fragments can be prepared using suitable methods, such as by reaction with one or more modifying agents. A "modifying agent" as the term is used herein, refers to a suitable organic group (e.g., hydrophilic polymer, a fatty acid, a fatty acid ester) that comprises an activating group. An "activating group" is a chemical moiety or functional group that can, under appropriate conditions, react with a second chemical group thereby forming a covalent bond between the modifying agent and the second chemical group. For example, amine-reactive activating groups include electrophilic groups such as tosylate, mesylate, halo (chloro, bromo, fluoro, iodo), N-hydroxysuccinimidyl esters (NHS), and the like. Activating groups that can react with thiols include, for example, maleimide, iodoacetyl, acrylolyl, pyridyl disulfides, 5-thiol-2-nitrobenzoic acid thiol (TNB-thiol), and the like. An aldehyde functional group can be coupled to amine- or hydrazide-containing molecules, and an azide group can react with a trivalent phosphorous group to form phosphoramidate or phosphorimide linkages. Suitable methods to introduce activating groups into molecules are known in the art (see for example, Hermanson, G. T., *Bioconjugate*

24

*Techniques*, Academic Press: San Diego, Calif. (1996)). An activating group can be bonded directly to the organic group (e.g., hydrophilic polymer, fatty acid, fatty acid ester), or through a linker moiety, for example a divalent $C_1$–$C_{12}$ group wherein one or more carbon atoms can be replaced by a heteroatom such as oxygen, nitrogen or sulfur. Suitable linker moieties include, for example, tetraethylene glycol, —$(CH_2)_3$—, —NH—$(CH_2)_6$—NH—, —$(CH_2)_2$—NH— and —$CH_2$—O—$CH_2$—$CH_2$—O—$CH_2$—$CH_2$—O—CH—NH—. Modifying agents that comprise a linker moiety can be produced, for example, by reacting a mono-Boc-alkyldiamine (e.g., mono-Boc-ethylenediamine, mono-Boc-diaminohexane) with a fatty acid in the presence of 1-ethyl-3-(3-dimethylaminopropyl) carbodiimide (EDC) to form an amide bond between the free amine and the fatty acid carboxylate. The Boc protecting group can be removed from the product by treatment with trifluoroacetic acid (TFA) to expose a primary amine that can be coupled to another carboxylate as described, or can be reacted with maleic anhydride and the resulting product cyclized to produce an activated maleimido derivative of the fatty acid. (See, for example, Thompson, et al., WO 92/16221 the entire teachings of which are incorporated herein by reference.)

The modified antibodies of the invention can be produced by reacting a human antibody or antigen-binding fragment with a modifying agent. For example, the organic moieties can be bonded to the antibody in a non-site specific manner by employing an amine-reactive modifying agent, for example, an NHS ester of PEG. Modified human antibodies or antigen-binding fragments can also be prepared by reducing disulfide bonds (e.g., intra-chain disulfide bonds) of an antibody or antigen-binding fragment. The reduced antibody or antigen-binding fragment can then be reacted with a thiol-reactive modifying agent to produce the modified antibody of the invention. Modified human antibodies and antigen-binding fragments comprising an organic moiety that is bonded to specific sites of an antibody of the present invention can be prepared using suitable methods, such as reverse proteolysis (Fisch et al., *Bioconjugate Chem.*, 3:147–153 (1992); Werlen et al., *Bioconjugate Chem.*, 5:411–417 (1994); Kumaran et al., *Protein Sci.* 6(10): 2233–2241 (1997); Itoh et al., *Bioorg. Chem.*, 24(1): 59–68 (1996); Capellas et al., *Biotechnol. Bioeng.*, 56(4):456–463 (1997)), and the methods described in Hermanson, G. T., *Bioconjugate Techniques*, Academic Press: San Diego, Calif. (1996).

Anti-Idiotype Antibodies to Anti-IL-12 IG Derived Protein Compositions

In addition to monoclonal or chimeric anti-IL-12 antibodies, the present invention is also directed to an anti-idiotypic (anti-Id) antibody specific for such antibodies of the invention. An anti-Id antibody is an antibody which recognizes unique determinants generally associated with the antigen-binding region of another antibody. The anti-Id can be prepared by immunizing an animal of the same species and genetic type (e.g. mouse strain) as the source of the Id antibody with the antibody or a CDR containing region thereof. The immunized animal will recognize and respond to the idiotypic determinants of the immunizing antibody and produce an anti-Id antibody. The anti-Id antibody may also be used as an "immunogen" to induce an immune response in yet another animal, producing a so-called anti-anti-Id antibody.

Anti-IL-12 IG Derived Protein Compositions

The present invention also provides at least one anti-IL-12 antibody composition comprising at least one, at least two, at least three, at least four, at least five, at least six or more

25

anti-IL-12 antibodies thereof, as described herein and/or as known in the art that are provided in a non-naturally occurring composition, mixture or form. Such compositions comprise non-naturally occurring compositions comprising at least one or two full length, C- and/or N-terminally deleted variants, domains, fragments, or specified variants, of the anti-IL-12 antibody amino acid sequence selected from the group consisting of 70–100% of the contiguous amino acids of SEQ ID NOS:1, 2, 3, 4, 5, 6, 7 or 8, or specified fragments, domains or variants thereof. Preferred anti-IL-12 derived protein, fragment or variant compositions include at least one or two full length, fragments, domains or variants as at least one CDR containing portions of the anti-IL-12 antibody sequence of 70–100% of SEQ ID NOS: 1, 2, 3, 4, 5, 6, or specified fragments, domains or variants thereof. Further preferred compositions comprise 40–99% of at least one of 70–100% of SEQ ID NOS: 1, 2, 3, 4, 5, 6, or specified fragments, domains or variants thereof. Such composition percentages are by weight, volume, concentration, molarity, or molality as liquid or dry solutions, mixtures, suspension, emulsions or colloids, as known in the art or as described herein.

Anti-IL-12 antibody compositions of the present invention can further comprise at least one of any suitable and effective amount of a composition or pharmaceutical composition comprising at least one anti-IL-12 antibody to a cell, tissue, organ, animal or patient in need of such modulation, treatment or therapy, optionally further comprising at least one selected from at least one TNF antagonist (e.g., but not limited to a TNF antibody or fragment, a soluble TNF receptor or fragment, fusion proteins thereof, or a small molecule TNF antagonist), an antirheumatic (e.g., methotrexate, auranofin, aurothioglucose, azathioprine, etanercept, gold sodium thiomalate, hydroxychloroquine sulfate, leflunomide, sulfasalzine), a muscle relaxant, a narcotic, a non-steroid anti-inflammatory drug (NSAD)), an analgesic, an anesthetic, a sedative, a local anesthetic, a neuromuscular blocker, an antimicrobial (e.g., an aminoglycoside, an antifungal, an antiparasitic, an antiviral, a carbapenem, cephalosporin, a fluororquinolone, a macrolide, a penicillin, a sulfonamide, a tetracycline, another antimicrobial), an antipsoriatic, a corticosteriod, an anabolic steroid, a diabetes related agent, a mineral, a nutritional, a thyroid agent, a vitamin, a calcium related hormone, an antidiarrheal, an antitussive, an antiemetic, an antiulcer, a laxative, an anticoagulant, an erythropoieitin (e.g., epoetin alpha), a filgrastim (e.g., G-CSF, Neupogen), a sargramostim (GM-CSF, Leukine), an immunization, an immunoglobulin, an immunosuppressive (e.g., basiliximab, cyclosporine, daclizumab), a growth hormone, a hormone replacement drug, an estrogen receptor modulator, a mydriatic, a cycloplegic, an alkylating agent, an antimetabolite, a mitotic inhibitor, a radiopharmaceutical, an antidepressant, antimanic agent, an antipsychotic, an anxiolytic, a hypnotic, a sympathomimetic, a stimulant, donepezil, tacrine, an asthma medication, a beta agonist, an inhaled steroid, a leukotriene inhibitor, a methylxanthine, a cromolyn, an epinephrine or analog, domase alpha (Pulmozyme), a cytokine or a cytokine antagonist. Non-limiting examples of such cytokines include, but are not limited to, any of IL-1 to IL-23. Suitable dosages are well known in the art. See, e.g., Wells et al., eds., Pharmaco-therapy Handbook, 2nd Edition, Appleton and Lange, Stamford, Conn. (2000); PDR Pharmacopoeia, Tarascon Pocket Pharmacopoeia 2000, Deluxe Edition, Tarascon Publishing, Loma Linda, Calif. (2000), each of which references are entirely incorporated herein by reference.

26

Such anti-cancer or anti-infectives can also include toxin molecules that are associated, bound, co-formulated or co-administered with at least one antibody of the present invention. The toxin can optionally act to selectively kill the pathologic cell or tissue. The pathologic cell can be a cancer or other cell. Such toxins can be, but are not limited to, purified or recombinant toxin or toxin fragment comprising at least one functional cytotoxic domain of toxin, e.g., selected from at least one of ricin, diphtheria toxin, a venom toxin, or a bacterial toxin. The term toxin also includes both endotoxins and exotoxins produced by any naturally occurring, mutant or recombinant bacteria or viruses which may cause any pathological condition in humans and other mammals, including toxin shock, which can result in death. Such toxins may include, but are not limited to, enterotoxigenic *E. coli* heat-labile enterotoxin (LT), heat-stable enterotoxin (ST), *Shigella* cytotoxin, *Aeromonas* enterotoxins, toxic shock syndrome toxin-1 (TSST-1), Staphylococcal enterotoxin A (SEA), B (SEB), or C (SEC), Streptococcal enterotoxins and the like. Such bacteria include, but are not limited to, strains of a species of enterotoxigenic *E. coli* (ETEC), enterohemorrhagic *E. coli* (e.g., strains of serotype 0157:H7), *Staphylococcus* species (e.g., *Staphylococcus aureus, Staphylococcus pyogenes*), *Shigella* species (e.g., *Shigella dysenteriae, Shigella flexneri, Shigella boydii*, and *Shigella sonnei*), *Salmonella* species (e.g., *Salmonella typhi, Salmonella cholera-suis, Salmonella enteritidis*), *Clostridium* species (e.g., *Clostridium perfringens, Clostridium dificile, Clostridium botulinum*), *Camphlobacter* species (e.g., *Camphlobacter jejuni, Camphlobacter fetus*), *Heliobacter* species, (e.g., *Heliobacter pylori*), *Aeromonas* species (e.g., *Aeromonas sobria, Aeromonas hydrophila, Aeromonas caviae*), *Pleisomonas shigelloides, Yersina enterocolitica, Vibrios* species (e.g., *Vibrios cholerae, Vibrios parahemolyticus*), *Klebsiella* species, *Pseudomonas aeruginosa*, and *Streptococci*. See, e.g., Stein, ed., INTERNAL MEDICINE, 3rd ed., pp 1–13, Little, Brown and Co., Boston, (1990); Evans et al., eds., Bacterial Infections of Humans: Epidemiology and Control, 2d. Ed., pp 239–254, Plenum Medical Book Co., New York (1991); Mandell et al, Principles and Practice of Infectious Diseases, 3d. Ed., Churchill Livingstone, New York (1990); Berkow et al, eds., *The Merck Manual*, 16th edition, Merck and Co., Rahway, N.J., 1992; Wood et al, FEMS Microbiology Immunology, 76:121–134 (1991); Marrack et al, Science, 248:705–711 (1990), the contents of which references are incorporated entirely herein by reference.

Anti-IL-12 antibody compounds, compositions or combinations of the present invention can further comprise at least one of any suitable auxiliary, such as, but not limited to, diluent, binder, stabilizer, buffers, salts, lipophilic solvents, preservative, adjuvant or the like. Pharmaceutically acceptable auxiliaries are preferred. Non-limiting examples of, and methods of preparing such sterile solutions are well known in the art, such as, but limited to, Gennaro, Ed., *Remington's Pharmaceutical Sciences*, 18th Edition, Mack Publishing Co. (Easton, Pa.) 1990. Pharmaceutically acceptable carriers can be routinely selected that are suitable for the mode of administration, solubility and/or stability of the anti-IL-12 antibody, fragment or variant composition as well known in the art or as described herein.

Pharmaceutical excipients and additives useful in the present composition include but are not limited to proteins, peptides, amino acids, lipids, and carbohydrates (e.g., sugars, including monosaccharides, di-, tri-, tetra-, and oligosaccharides; derivatized sugars such as alditols, aldonic acids, esterified sugars and the like; and polysaccharides or

US 6,902,734 B2

27

28

sugar polymers), which can be present singly or in combination, comprising alone or in combination 1–99.99% by weight or volume. Exemplary protein excipients include serum albumin such as human serum albumin (HSA), recombinant human albumin (rHA), gelatin, casein, and the like. Representative amino acid/antibody components, which can also function in a buffering capacity, include alanine, glycine, arginine, betaine, histidine, glutamic acid, aspartic acid, cysteine, lysine, leucine, isoleucine, valine, methionine, phenylalanine, aspartame, and the like. One preferred amino acid is glycine.

Carbohydrate excipients suitable for use in the invention include, for example, monosaccharides such as fructose, maltose, galactose, glucose, D-mannose, sorbose, and the like; disaccharides, such as lactose, sucrose, trehalose, cellobiose, and the like; polysaccharides, such as raffinose, melezitose, maltodextrins, dextrans, starches, and the like; and alditols, such as mannitol, xylitol, maltitol, lactitol, xylitol sorbitol (glucitol), myoinositol and the like. Preferred carbohydrate excipients for use in the present invention are mannitol, trehalose, and raffinose.

Anti-IL-12 antibody compositions can also include a buffer or a pH adjusting agent; typically, the buffer is a salt prepared from an organic acid or base. Representative buffers include organic acid salts such as salts of citric acid, ascorbic acid, gluconic acid, carbonic acid, tartaric acid, succinic acid, acetic acid, or phthalic acid; Tris, tromethamine hydrochloride, or phosphate buffers. Preferred buffers for use in the present compositions are organic acid salts such as citrate.

Additionally, anti-IL-12 antibody compositions of the invention can include polymeric excipients/additives such as polyvinylpyrrolidones, ficolls (a polymeric sugar), dextrates (e.g., cyclodextrins, such as 2-hydroxypropyl-β-cyclodextrin), polyethylene glycols, flavoring agents, antimicrobial agents, sweeteners, antioxidants, antistatic agents, surfactants (e.g., polysorbates such as "TWEEN 20" and "TWEEN 80"), lipids (e.g., phospholipids, fatty acids), steroids (e.g., cholesterol), and chelating agents (e.g., EDTA).

These and additional known pharmaceutical excipients and/or additives suitable for use in the anti-IL-12 antibody, portion or variant compositions according to the invention are known in the art, e.g., as listed in "Remington: The Science & Practice of Pharmacy", 19th ed., Williams & Williams, (1995), and in the "Physician's Desk Reference", 52nd ed., Medical Economics, Montvale, N.J. (1998), the disclosures of which are entirely incorporated herein by reference. Preferred carrier or excipient materials are carbohydrates (e.g., saccharides and alditols) and buffers (e.g., citrate) or polymeric agents.

Formulations

As noted above, the invention provides for stable formulations, which is preferably a phosphate buffer with saline or a chosen salt, as well as preserved solutions and formulations containing a preservative as well as multi-use preserved formulations suitable for pharmaceutical or veterinary use, comprising at least one anti-IL-12 antibody in a pharmaceutically acceptable formulation. Preserved formulations contain at least one known preservative or optionally selected from the group consisting of at least one phenol, m-cresol, p-cresol, o-cresol, chlorocresol, benzyl alcohol, phenylmercuric nitrite, phenoxyethanol, formaldehyde, chlorobutanol, magnesium chloride (e.g., hexahydrate), alkylparaben (methyl, ethyl, propyl, butyl and the like), benzalkonium chloride, benzethonium chloride, sodium dehydroacetate and thimerosal, or mixtures thereof in an aqueous diluent. Any suitable concentration or mixture can be used as known in the art, such as 0.001–5%, or any range or value therein, such as, but not limited to 0.001, 0.003, 0.005, 0.009, 0.01, 0.02, 0.03, 0.05, 0.09, 0.1, 0.2, 0.3, 0.4, 0.5, 0.6, 0.7, 0.8, 0.9, 1.0, 1.1, 1.2, 1.3, 1.4, 1.5, 1.6, 1.7, 1.8, 1.9, 2.0, 2.1, 2.2, 2.3, 2.4, 2.5, 2.6, 2.7, 2.8, 2.9, 3.0, 3.1, 3.2, 3.3, 3.4, 3.5, 3.6, 3.7, 3.8, 3.9, 4.0, 4.3, 4.5, 4.6, 4.7, 4.8, 4.9, or any range or value therein. Non-limiting examples include, no preservative, 0.1–2% m-cresol (e.g., 0.2, 0.3, 0.4, 0.5, 0.9, 1.0%), 0.1–3% benzyl alcohol (e.g., 0.5, 0.9, 1.1., 1.5, 1.9, 2.0, 2.5%), 0.001–0.5% thimerosal (e.g., 0.005, 0.01), 0.001–2.0% phenol (e.g., 0.05, 0.25, 0.28, 0.5, 0.9, 1.0%), 0.0005–1.0% alkylparaben(s) (e.g., 0.00075, 0.0009, 0.001, 0.002, 0.005, 0.0075, 0.009, 0.01, 0.02, 0.05, 0.075, 0.09, 0.1, 0.2, 0.3, 0.5, 0.75, 0.9, 1.0%), and the like.

As noted above, the invention provides an article of manufacture, comprising packaging material and at least one vial comprising a solution of at least one anti-IL-12 antibody with the prescribed buffers and/or preservatives, optionally in an aqueous diluent, wherein said packaging material comprises a label that indicates that such solution can be held over a period of 1, 2, 3, 4, 5, 6, 9, 12, 18, 20, 24, 30, 36, 40, 48, 54, 60, 66, 72 hours or greater. The invention further comprises an article of manufacture, comprising packaging material, a first vial comprising lyophilized at least one anti-IL-12 antibody, and a second vial comprising an aqueous diluent of prescribed buffer or preservative, wherein said packaging material comprises a label that instructs a patient to reconstitute the at least one anti-IL-12 antibody in the aqueous diluent to form a solution that can be held over a period of twenty-four hours or greater.

The at least one anti-IL-12 antibody used in accordance with the present invention can be produced by recombinant means, including from mammalian cell or transgenic preparations, or can be purified from other biological sources, as described herein or as known in the art.

The range of at least one anti-IL-12 antibody in the product of the present invention includes amounts yielding upon reconstitution, if in a wet/dry system, concentrations from about 1.0 $\mu$g/ml to about 1000 mg/ml, although lower and higher concentrations are operable and are dependent on the intended delivery vehicle, e.g., solution formulations will differ from transdermal patch, pulmonary, transmucosal, or osmotic or micro pump methods.

Preferably, the aqueous diluent optionally further comprises a pharmaceutically acceptable preservative. Preferred preservatives include those selected from the group consisting of phenol, m-cresol, p-cresol, o-cresol, chlorocresol, benzyl alcohol, alkylparaben (methyl, ethyl, propyl, butyl and the like), benzalkonium chloride, benzethonium chloride, sodium dehydroacetate and thimerosal, or mixtures thereof. The concentration of preservative used in the formulation is a concentration sufficient to yield an anti-microbial effect. Such concentrations are dependent on the preservative selected and are readily determined by the skilled artisan.

Other excipients, e.g. isotonicity agents, buffers, antioxidants, preservative enhancers, can be optionally and preferably added to the diluent. An isotonicity agent, such as glycerin, is commonly used at known concentrations. A physiologically tolerated buffer is preferably added to provide improved pH control. The formulations can cover a wide range of pHs, such as from about pH 4 to about pH 10, and preferred ranges from about pH 5 to about pH 9, and a most preferred range of about 6.0 to about 8.0. Preferably the formulations of the present invention have pH between about 6.8 and about 7.8. Preferred buffers include phosphate

29

30

buffers, most preferably sodium phosphate, particularly phosphate buffered saline (PBS).

Other additives, such as a pharmaceutically acceptable solubilizers like Tween 20 (polyoxyethylene (20) sorbitan monolaurate), Tween 40 (polyoxyethylene (20) sorbitan monopalmitate), Tween 80 (polyoxyethylene (20) sorbitan monooleate), Pluronic F68 (polyoxyethylene polyoxypropylene block copolymers), and PEG (polyethylene glycol) or non-ionic surfactants such as polysorbate 20 or 80 or poloxamer 184 or 188, Pluronic® polyls, other block co-polymers, and chelators such as EDTA and EGTA can optionally be added to the formulations or compositions to reduce aggregation. These additives are particularly useful if a pump or plastic container is used to administer the formulation. The presence of pharmaceutically acceptable surfactant mitigates the propensity for the protein to aggregate.

The formulations of the present invention can be prepared by a process which comprises mixing at least one anti-IL-12 antibody and a preservative selected from the group consisting of phenol, m-cresol, p-cresol, o-cresol, chlorocresol, benzyl alcohol, alkylparaben, (methyl, ethyl, propyl, butyl and the like), benzalkonium chloride, benzethonium chloride, sodium dehydroacetate and thimerosal or mixtures thereof in an aqueous diluent. Mixing the at least one anti-IL-12 antibody and preservative in an aqueous diluent is carried out using conventional dissolution and mixing procedures. To prepare a suitable formulation, for example, a measured amount of at least one anti-IL-12 antibody in buffered solution is combined with the desired preservative in a buffered solution in quantities sufficient to provide the protein and preservative at the desired concentrations. Variations of this process would be recognized by one of ordinary skill in the art. For example, the order the components are added, whether additional additives are used, the temperature and pH at which the formulation is prepared, are all factors that can be optimized for the concentration and means of administration used.

The claimed formulations can be provided to patients as clear solutions or as dual vials comprising a vial of lyophilized at least one anti-IL-12 antibody that is reconstituted with a second vial containing water, a preservative and/or excipients, preferably a phosphate buffer and/or saline and a chosen salt, in an aqueous diluent. Either a single solution vial or dual vial requiring reconstitution can be reused multiple times and can suffice for a single or multiple cycles of patient treatment and thus can provide a more convenient treatment regimen than currently available.

The present claimed articles of manufacture are useful for administration over a period of immediately to twenty-four hours or greater. Accordingly, the presently claimed articles of manufacture offer significant advantages to the patient. Formulations of the invention can optionally be safely stored at temperatures of from about 2 to about 40° C. and retain the biologically activity of the protein for extended periods of time, thus, allowing a package label indicating that the solution can be held and/or used over a period of 6, 12, 18, 24, 36, 48, 72, or 96 hours or greater. If preserved diluent is used, such label can include use up to 1–12 months, one-half, one and a half, and/or two years.

The solutions of at least one anti-IL-12 antibody in the invention can be prepared by a process that comprises mixing at least one antibody in an aqueous diluent. Mixing is carried out using conventional dissolution and mixing procedures. To prepare a suitable diluent, for example, a measured amount of at least one antibody in water or buffer is combined in quantities sufficient to provide the protein and optionally a preservative or buffer at the desired con-

centrations. Variations of this process would be recognized by one of ordinary skill in the art. For example, the order the components are added, whether additional additives are used, the temperature and pH at which the formulation is prepared, are all factors that can be optimized for the concentration and means of administration used.

The claimed products can be provided to patients as clear solutions or as dual vials comprising a vial of lyophilized at least one anti-IL-12 antibody that is reconstituted with a second vial containing the aqueous diluent. Either a single solution vial or dual vial requiring reconstitution can be reused multiple times and can suffice for a single or multiple cycles of patient treatment and thus provides a more convenient treatment regimen than currently available.

The claimed products can be provided indirectly to patients by providing to pharmacies, clinics, or other such institutions and facilities, clear solutions or dual vials comprising a vial of lyophilized at least one anti-IL-12 antibody that is reconstituted with a second vial containing the aqueous diluent. The clear solution in this case can be up to one liter or even larger in size, providing a large reservoir from which smaller portions of the at least one antibody solution can be retrieved one or multiple times for transfer into smaller vials and provided by the pharmacy or clinic to their customers and/or patients.

Recognized devices comprising these single vial systems include those pen-injector devices for delivery of a solution such as BD Pens, BD Autoject®, Humaject®, NovoPen®, B-D®Pen, AutoPen®, and OptiPen®, GenotropinPen®, Genotronorm Pen®, Humatro Pen®, Reco-Pen®, Roferon Pen®, Biojector®, iject®, J-tip Needle-Free Injector®, Intraject®, Medi-Ject®, e.g., as made or developed by Becton Dickensen (Franklin Lakes, N.J., www.bectondickenson.com), Disetronic (Burgdorf, Switzerland, www.disetronic.com; Bioject, Portland, Oreg. (www.bioject.com); National Medical Products, Weston Medical (Peterborough, UK, www.weston-medical.com), Medi-Ject Corp (Minneapolis, Minn., www.mediject.com). Recognized devices comprising a dual vial system include those pen-injector systems for reconstituting a lyophilized drug in a cartridge for delivery of the reconstituted solution such as the HumatroPen®.

The products presently claimed include packaging material. The packaging material provides, in addition to the information required by the regulatory agencies, the conditions under which the product can be used. The packaging material of the present invention provides instructions to the patient to reconstitute the at least one anti-IL-12 antibody in the aqueous diluent to form a solution and to use the solution over a period of 2–24 hours or greater for the two vial, wet/dry, product. For the single vial, solution product, the label indicates that such solution can be used over a period of 2–24 hours or greater. The presently claimed products are useful for human pharmaceutical product use.

The formulations of the present invention can be prepared by a process that comprises mixing at least one anti-IL-12 antibody and a selected buffer, preferably a phosphate buffer containing saline or a chosen salt. Mixing the at least one antibody and buffer in an aqueous diluent is carried out using conventional dissolution and mixing procedures. To prepare a suitable formulation, for example, a measured amount of at least one antibody in water or buffer is combined with the desired buffering agent in water in quantities sufficient to provide the protein and buffer at the desired concentrations. Variations of this process would be recognized by one of ordinary skill in the art. For example, the order the components are added, whether additional additives are used, the

US 6,902,734 B2

31

temperature and pH at which the formulation is prepared, are all factors that can be optimized for the concentration and means of administration used.

The claimed stable or preserved formulations can be provided to patients as clear solutions or as dual vials comprising a vial of lyophilized at least one anti-IL-12 antibody that is reconstituted with a second vial containing a preservative or buffer and excipients in an aqueous diluent. Either a single solution vial or dual vial requiring reconstitution can be reused multiple times and can suffice for a single or multiple cycles of patient treatment and thus provides a more convenient treatment regimen than currently available.

At least one anti-IL-12 antibody in either the stable or preserved formulations or solutions described herein, can be administered to a patient in accordance with the present invention via a variety of delivery methods including SC or IM injection; transdermal, pulmonary, transmucosal, implant, osmotic pump, cartridge, micro pump, or other means appreciated by the skilled artisan, as well-known in the art.

Therapeutic Applications

The present invention also provides a method for modulating or treating at least one immune related disease, in a cell, tissue, organ, animal, or patient including, but not limited to, at least one of rheumatoid arthritis, juvenile rheumatoid arthritis, systemic onset juvenile rheumatoid arthritis, psoriatic arthritis, ankylosing spondilitis, gastric ulcer, seronegative arthropathies, osteoarthritis, inflammatory bowel disease, ulcerative colitis, systemic lupus erythematosus, antiphospholipid syndrome, iridocyclitis/uveitis/optic neuritis, idiopathic pulmonary fibrosis, systemic vasculitis/wegener's granulomatosis, sarcoidosis, orchitis/vasectomy reversal procedures, allergic/atopic diseases, asthma, allergic rhinitis, eczema, allergic contact dermatitis, allergic conjunctivitis, hypersensitivity pneumonitis, transplants, organ transplant rejection, graft-versus-host disease, systemic inflammatory response syndrome, sepsis syndrome, gram positive sepsis, gram negative sepsis, culture negative sepsis, fungal sepsis, neutropenic fever, urosepsis, meningococcemia, trauma/hemorrhage, burns, ionizing radiation exposure, acute pancreatitis, adult respiratory distress syndrome, rheumatoid arthritis, alcohol-induced hepatitis, chronic inflammatory pathologies, sarcoidosis, Crohn's pathology, sickle cell anemia, diabetes, nephrosis, atopic diseases, hypersensitivity reactions, allergic rhinitis, hay fever, perennial rhinitis, conjunctivitis, endomettiosis, asthma, urticaria, systemic anaphalaxis, dermatitis, pernicious anemia, hemolytic disease, thrombocytopenia, graft rejection of any organ or tissue, kidney transplant rejection, heart transplant rejection, liver transplant rejection, pancreas transplant rejection, lung transplant rejection, bone manow transplant (BMT) rejection, skin allograft rejection, cartilage transplant rejection, bone graft rejection, small bowel transplant rejection, fetal thymus implant rejection, parathyroid transplant rejection, xenograft rejection of any organ or tissue, allograft rejection, anti-receptor hypersensitivity reactions, Graves disease, Raynoud's disease, type B insulin-resistant diabetes, asthma, myasthenia gravis, antibody-meditated cytotoxicity, type III hypersensitivity reactions, systemic lupus erythematosus, POEMS syndrome (polyneuropathy, organomegaly, endocrinopathy, monoclonal gammopathy, and skin changes syndrome), polyneuropathy, organomegaly, endocrinopathy, monoclonal gammopathy, skin changes syndrome, antiphospholipid syndrome, pemphigus, scleroderma, mixed connective tissue disease,

32

idiopathic Addison's disease, diabetes mellitus, chronic active hepatitis, primary billiary cirrhosis, vitiligo, vasculitis, post-MI cardiotomy syndrome, type IV hypersensitivity, contact dermatitis, hypersensitivity pneumonitis, allograft rejection, granulomas due to intracellular organisms, drug sensitivity, metabolic/idiopathic, Wilson's disease, hemachromatosis, alpha-1-antitrypsin deficiency, diabetic retinopathy, hashimoto's thyroiditis, osteoporosis, hypothalamic-pituitary-adrenal axis evaluation, primary biliary cirrhosis, thyroiditis, encephalomyelitis, cachexia, cystic fibrosis, neonatal chronic lung disease, chronic obstructive pulmonary disease (COPD), familial hematophagocytic lymphohistiocytosis, dermatologic conditions, psoriasis, alopecia, nephrotic syndrome, nephritis, glomerular nephritis, acute renal failure, hemodialysis, uremia, toxicity, preeclampsia, okt3 therapy, anti-cd3 therapy, cytokine therapy, chemotherapy, radiation therapy (e.g., including but not limited to asthenia, anemia, cachexia, and the like), chronic salicylate intoxication, and the like. See, e.g., the Merck Manual, 12th–17th Editions, Merck & Company, Rahway, N.J. (1972, 1977, 1982, 1987, 1992, 1999), Pharmacotherapy Handbook, Wells et al., eds., Second Edition, Appleton and Lange, Stamford, Conn. (1998, 2000), each entirely incorporated by reference.

The present invention also provides a method for modulating or treating at least one cardiovascular disease in a cell, tissue, organ, animal, or patient, including, but not limited to, at least one of cardiac stun syndrome, myocardial infarction, congestive heart failure, stroke, ischemic stroke, hemorrhage, arteriosclerosis, atherosclerosis, restenosis, diabetic atherosclerotic disease, hypertension, arterial hypertension, renovascular hypertension, syncope, shock, syphilis of the cardiovascular system, heart failure, cor pulmonale, primary pulmonary hypertension, cardiac arrhythmias, atrial ectopic beats, atrial flutter, atrial fibrillation (sustained or paroxysmal), post perfusion syndrome, cardiopulmonary bypass inflammation response, chaotic or multifocal atrial tachycardia, regular narrow QRS tachycardia, specific arrythmias, ventricular fibrillation, His bundle arrythmias, atrioventricular block, bundle branch block, myocardial ischemic disorders, coronary artery disease, angina pectoris, myocardial infarction, cardiomyopathy, dilated congestive cardiomyopathy, restrictive cardiomyopathy, valvular heart diseases, endocarditis, pericardial disease, cardiac tumors, aortic and peripheral aneurysms, nortic dissection, inflammation of the aorta, occlusion of the abdominal aorta and its branches, peripheral vascular disorders, occlusive arterial disorders, peripheral atherosclerotic disease, thromboangitis obliterans, functional peripheral arterial disorders, Raynaud's phenomenon and disease, acrocyanosis, erythromelalgia, venous diseases, venous thrombosis, varicose veins, arteriovenous fistula, lymphederma, lipedema, unstable angina, reperfusion injury, post pump syndrome, ischemia-reperfusion injury, and the like. Such a method can optionally comprise administering an effective amount of a composition or pharmaceutical composition comprising at least one anti-IL-12 antibody to a cell, tissue, organ, animal or patient in need of such modulation, treatment or therapy.

The present invention also provides a method for modulating or treating at least one infectious disease in a cell, tissue, organ, animal or patient, including, but not limited to, at least one of: acute or chronic bacterial infection, acute and chronic parasitic or infectious processes, including bacterial, viral and fungal infections, HIV infection/HIV neuropathy, meningitis, hepatitis (A, B or C, or the like), septic arthritis,

33

peritonitis, pneumonia, epiglottitis, *e. coli* 0157:h7, hemolytic uremic syndrome/thrombolytic thrombocytopenic purpura, malaria, dengue hemorrhagic fever, leishmaniasis, leprosy, toxic shock syndrome, streptococcal myositis, gas gangrene, mycobacterium tuberculosis, mycobacterium avium intracellulare, pneumocystis carinii pneumonia, pelvic inflammatory disease, orchitis/ epidydimitis, legionella, lyme disease, influenza a, epsteinbarr virus, vital-associated hemaphagocytic syndrome, vital encephalitis/aseptic meningitis, and the like;

The present invention also provides a method for modulating or treating at least one malignant disease in a cell, tissue, organ, animal or patient, including, but not limited to, at least one of: leukemia, acute leukemia, acute lymphoblastic leukemia (ALL), B-cell, T-cell or FAB ALL, acute myeloid leukemia (AML), chronic myelocytic leukemia (CML), chronic lymphocytic leukemia (CLL), hairy cell leukemia, myelodyplastic syndrome (MDS), a lymphoma, Hodgkin's disease, a malignant lymphoma, non-hodgkin's lymphoma, Burkitt's lymphoma, multiple myeloma, Kaposi's sarcoma, colorectal carcinoma, pancreatic carcinoma, nasopharyngeal carcinoma, malignant histiocytosis, paraneoplastic syndrome/hypercalcemia of malignancy, solid tumors, adenocarcinomas, sarcomas, malignant melanoma, hemangioma, metastatic disease, cancer related bone resorption, cancer related bone pain, and the like.

The present invention also provides a method for modulating or treating at least one neurologic disease in a cell, tissue, organ, animal or patient, including, but not limited to, at least one of: neurodegenerative diseases, multiple sclerosis, migraine headache, AIDS dementia complex, demyelinating diseases, such as multiple sclerosis and acute transverse mycitis; extrapyramidal and cerebellar disorders, such as lesions of the corticospinal system; disorders of the basal ganglia or cerebellar disorders; hyperkinetic movement disorders, such as Huntington's Chorea and senile chorea; drug-induced movement disorders, such as those induced by drugs which block CNS dopamine receptors; hypokinetic movement disorders, such as Parkinson's disease; Progressive supranucleo Palsy; structural lesions of the cerebellum; spinocerebellar degenerations, such as spinal ataxia, Friedreich's ataxia, cerebellar cortical degenerations, multiple systems degenerations (Mencel, Dejerine-Thomas, Shi-Drager, and Machado-Joseph); systemic disorders (Refsum's disease, abetalipoprotemia, ataxia, telangiectasia, and mitochondrial multi-system disorder); demyelinating core disorders, such as multiple sclerosis, acute transverse myelitis; and disorders of the motor unit, such as neurogenic muscular atrophies (anterior horn cell degeneration, such as amyotrophic lateral sclerosis, infantile spinal muscular atrophy and juvenile spinal muscular atrophy); Alzheimer's disease; Down's Syndrome in middle age; Diffuse Lewy body disease; Senile Dementia of Lewy body type; Wernicke-Korsakoff syndrome; chronic alcoholism; Creutzfeldt-Jakob disease; Subacute sclerosing panencephalitis, Hallerrorden-Spatz disease; and Dementia pugilistica, and the like. Such a method can optionally comprise administering an effective amount of a composition or pharmaceutical composition comprising at least one TNF antibody or specified portion or variant to a cell, tissue, organ, animal or patient in need of such modulation, treatment or therapy. See, e.g., the Merck Manual, 16th Edition, Merck & Company, Rahway, N.J. (1992).

Any method of the present invention can comprise administering an effective amount of a composition or pharmaceutical composition comprising at least one anti-IL-12 antibody to a cell, tissue, organ, animal or patient in need of

34

such modulation, treatment or therapy. Such a method can optionally further comprise co-administration or combination therapy for treating such immune diseases, wherein the administering of said at least one anti-IL-12 antibody, specified portion or variant thereof, further comprises administering, before concurrently, and/or after, at least one selected from at least one TNF antagonist (e.g., but not limited to a TNF antibody or fragment, a soluble TNF receptor or fragment, fusion proteins thereof, or a small molecule TNF antagonist), an antirheumatic (e.g., methotrexate, auranofin, aurothioglucose, azathioprine, etanercept, gold sodium thiomalate, hydroxychloroquine sulfate, leflunomide, sulfasalzine), a muscle relaxant, a narcotic, a non-steroid anti-inflammatory drug (NSAID), an analgesic, an anesthetic, a sedative, a local anesthetic, a neuromuscular blocker, an antimicrobial (e.g., aminoglycoside, an antifungal, an antiparasitic, an antiviral, a carbapenem, cephalosporin, a flurorquinolone, a macrolide, a penicillin, a sulfonamide, a tetracycline, another antimicrobial), an antipsoriatic, a corticosteriod, an anabolic steroid, a diabetes related agent, a mineral, a nutritional, a thyroid agent, a vitamin, a calcium related hormone, an antidiarrheal, an antitussive, an antiemetic, an antiulcer, a laxative, an anticoagulant, an crythropoietin (e.g., epoetin alpha), a filgrastim (e.g., G-CSF, Neupogen), a sargramostim (GM-CSF, Leukine), an immunization, an immunoglobulin, an immunosuppressive (e.g., basiliximab, cyclosporine, daclizumab), a growth hormone, a hormone replacement drug, an estrogen receptor modulator, a mydriatic, a cycloplegic, an alkylating agent, an antimetabolite, a mitotic inhibitor, a radiopharmaceutical, an antidepressant, antimanic agent, an antipsychotic, an anxiolytic, a hypnotic, a sympathomimetic, a stimulant, donepezil, tacrine, an asthma medication, a beta agonist, an inhaled steroid, a leukotriene inhibitor, a methylxanthine, a cromolyn, an epinephrine or analog, domase alpha (Pulmozyme), a cytokine or a cytokine antagonist. Suitable dosages are well known in the art. See, e.g., Wells et al., eds., Pharmacotherapy Handbook, 2nd Edition, Appleton and Lange, Stamford, Conn. (2000); PDR Pharmacopoeia, Tarascon Pocket Pharmacopoeia 2000, Deluxe Edition, Tarascon Publishing, Loma Linda, Calif. (2000), each of which references are entirely incorporated herein by reference.

TNF antagonists suitable for compositions, combination therapy, co-administration, devices and/or methods of the present invention (further comprising at least one anti body, specified portion and variant thereof, of the present invention), include, but are not limited to, anti-TNF antibodies, antigen-binding fragments thereof, and receptor molecules which bind specifically to TNF; compounds which prevent and/or inhibit TNF synthesis, TNF release or its action on target cells, such as thalidomide, tenidap, phosphodiesterase inhibitors (e.g, pentoxifylline and rolipram), A2b adenosine receptor agonists and A2b adenosine receptor enhancers; compounds which prevent and/or inhibit TNF receptor signalling, such as mitogen activated protein (MAP) kinase inhibitors; compounds which block and/or inhibit membrane TNF cleavage, such as metalloproteinase inhibitors; compounds which block and/or inhibit TNF activity, such as angiotensin converting enzyme (ACE) inhibitors (e.g., captopril); and compounds which block and/or inhibit TNF production and/or synthesis, such as MAP kinase inhibitors.

As used herein, a "tumor necrosis factor antibody," "TNF antibody," "TNFα antibody," or fragment and the like decreases, blocks, inhibits, abrogates or interferes with

**35**

TNFα activity in vitro, in situ and/or preferably in vivo. For example, a suitable TNF human antibody of the present invention can bind TNFα and includes anti-TNF antibodies, antigen-binding fragments thereof, and specified mutants or domains thereof that bind specifically to TNFα. A suitable TNF antibody or fragment can also decrease block, abrogate, interfere, prevent and/or inhibit TNF RNA, DNA or protein synthesis, TNF release, TNF receptor signaling, membrane TNF cleavage, TNF activity, TNF production and/or synthesis.

Chimeric antibody cA2 consists of the antigen binding variable region of the high-affinity neutralizing mouse anti-human TNFα IgG1 antibody, designated A2, and the constant regions of a human IgG1, kappa immunoglobulin. The human IgG1 Fc region improves allogeneic antibody effector function, increases the circulating serum half-life and decreases the immunogenicity of the antibody. The avidity and epitope specificity of the chimeric antibody cA2 is derived from the variable region of the murine antibody A2. In a particular embodiment, a preferred source for nucleic acids encoding the variable region of the murine antibody A2 is the A2 hybridoma cell line.

Chimeric A2 (cA2) neutralizes the cytotoxic effect of both natural and recombinant human TNFα in a dose dependent manner. From binding assays of chimeric antibody cA2 and recombinant human TNFα, the affinity constant of chimeric antibody cA2 was calculated to be $1.04 \times 10^{10} M^{-1}$. Preferred methods for determining monoclonal antibody specificity and affinity by competitive inhibition can be found in Harlow, et al., *antibodies: A Laboratory Manual*, Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y., 1988; Colligan et al., eds., *Current Protocols in Immunology*, Greene Publishing Assoc. and Wiley Interscience, New York, (1992–2000); Kozbor et al., *Immunol. Today*, 4:72–79 (1983); Ausubel et al., eds. *Current Protocols in Molecular Biology*, Wiley Interscience, New York (1987–2000); and Muller, *Meth. Enzymol.*, 92:589–601 (1983), which references are entirely incorporated herein by reference.

In a particular embodiment, murine monoclonal antibody A2 is produced by a cell line designated c134A. Chimeric antibody cA2 is produced by a cell line designated c168A.

Additional examples of monoclonal anti-TNF antibodies that can be used in the present invention are described in the art (see, e.g., U.S. Pat. No. 5,231,024; Möller, A. et al., *Cytokine* 2(3):162–169 (1990); U.S. application Ser. No. 07/943,852 (filed Sep. 11, 1992); Rathjen et al., International Publication No. WO 91/02078 (published Feb. 21, 1991); Rubin et al., EPO Patent Publication No. 0 218 868 (published Apr. 22, 1987); Yone et al., EPO Patent Publication No. 0 288 088 (Oct. 26, 1988); Liang, et al., *Biochem. Biophys. Res. Comm.* 137:847–854 (1986); Meager, et al., *Hybridoma* 6:305–311 (1987); Fendly et al., *Hybridoma* 6:359–369 (1987); Bringman, et al., *Hybridoma* 6:489–507 (1987); and Hirai, et al., *J. Immunol. Meth.* 96:57–62 (1987), which references are entirely incorporated herein by reference).

TNF Receptor Molecules

Preferred TNF receptor molecules useful in the present invention are those that bind TNFα with high affinity (see, e.g., Feldmann et al., International Publication No. WO 92/07076 (published Apr. 30, 1992); Schall el al., *Cell* 61:361–370 (1990); and Loetscher et al., *Cell* 61:351–359 (1990), which references are entirely incorporated herein by reference) and optionally possess low immunogenicity. In particular, the 55 kDa (p55 TNF-R) and the 75 kDa (p75 TNF-R) TNF cell surface receptors are useful in the present

**36**

invention. Truncated forms of these receptors, comprising the extracellular domains (ECD) of the receptors or functional portions thereof (see, e.g., Corcoran et al., *Eur. J. Biochem.* 223:831–844) (1994)), are also useful in the present invention. Truncated forms of the TNF receptors, comprising the ECD, have been detected in urine and serum as 30 kDa and 40 kDa TNFα inhibitory binding proteins (Engelmann, H. et al., *J. Biol. Chem.* 265:1531–1536 (1990)). TNF receptor multimeric molecules and TNF immunoreceptor fusion molecules, and derivatives and fragments or portions thereof, are additional examples of TNF receptor molecules which are useful in the methods and compositions of the present invention. The TNF receptor molecules which can be used in the invention are characterized by their ability to treat patients for extended periods with good to excellent alleviation of symptoms and low toxicity. Low immunogenicity and/or high affinity, as well as other undefined properties, can contribute to the therapeutic results achieved.

TNF receptor multimeric molecules useful in the present invention comprise all or a functional portion of the ECD of two or more TNF receptors linked via one or more polypeptide linkers or other nonpeptide linkers, such as polyethylene glycol (PEG). The multimeric molecules can further comprise a signal peptide of a secreted protein to direct expression of the multimeric molecule. These multimeric molecules and methods for their production have been described in U.S. application Ser. No. 08/437,533 (filed May 9, 1995), the content of which is entirely incorporated herein by reference.

TNF immunoreceptor fusion molecules useful in the methods and compositions of the present invention comprise at least one portion of one or more immunoglobulin molecules and all or a functional portion of one or more TNF receptors. These immunoreceptor fusion molecules can be assembled as monomers, or hetero- or homo-multimers. The immunoreceptor fusion molecules can also be monovalent or multivalent. An example of such a TNF immunoreceptor fusion molecule is TNF receptor/IgG fusion protein. TNF immunoreceptor fusion molecules and methods for their production have been described in the art (Lesslauer et al., *Eur. J. Immunol.* 21:2883–2886 (1991); Ashkenazi et al., *Proc. Natl. Acad. Sci. USA* 88:10535–10539 (1991); Peppel et al., *J. Exp. Med.* 174:1483–1489 (1991); Kolls et al., *Proc. Natl. Acad. Sci. USA* 91:215–219 (1994); Butler et al., *Cytokine* 6(6):616–623 (1994); Baker et al., *Eur. J. Immunol.* 24:2040–2048 (1994); Beutler et al., U.S. Pat. No. 5,447,851; and U.S. application Ser. No. 08/442,133 (filed May 16, 1995), each of which references are entirely incorporated herein by reference). Methods for producing immunoreceptor fusion molecules can also be found in Capon et al., U.S. Pat. No. 5,116,964; Capon et al., U.S. Pat. No. 5,225,538; and Capon et al., *Nature* 337:525–531 (1989), which references are entirely incorporated herein by reference.

A functional equivalent, derivative, fragment or region of TNF receptor molecule refers to the portion of the TNF receptor molecule, or the portion of the TNF receptor molecule sequence which encodes TNF receptor molecule, that is of sufficient size and sequences to functionally resemble TNF receptor molecules that can be used in the present invention (e.g., bind TNFα with high affinity and possess low immunogenicity). A functional equivalent of TNF receptor molecule also includes modified TNF receptor molecules that functionally resemble TNF receptor molecules that can be used in the present invention (e.g., bind TNFα with high affinity and possess low immunogenicity).

US 6,902,734 B2

37

For example, a functional equivalent of TNF receptor molecule can contain a "SILENT" codon or one or more amino acid substitutions, deletions or additions (e.g., substitution of one acidic amino acid for another acidic amino acid; or substitution of one codon encoding the same or different hydrophobic amino acid for another codon encoding a hydrophobic amino acid). See Ausubel et al., *Current Protocols in Molecular Biology*, Greene Publishing Assoc. and Wiley-Interscience, New York (1987–2000).

Cytokines include any known cytokine. See, e.g., www. CopewithCytokines.com. Cytokine antagonists include, but are not limited to, any antibody, fragment or mimetic, any soluble receptor, fragment or mimetic, any small molecule antagonist, or any combination thereof.

Therapeutic Treatments.

Any method of the present invention can comprise a method for treating an IL-12 mediated disorder, comprising administering an effective amount of a composition or pharmaceutical composition comprising at least one anti-IL-12 antibody to a cell, tissue, organ, animal or patient in need of such modulation, treatment or therapy. Such a method can optionally further comprise co-administration or combination therapy for treating such immune diseases, wherein the administering of said at least one anti-IL-12 antibody, specified portion or variant thereof, further comprises administering, before concurrently, and/or after, at least one selected from at least one TNF antagonist (e.g., but not limited to a TNF antibody or fragment, a soluble TNF receptor or fragment, fusion proteins thereof, or a small molecule TNF antagonist), an antirheumatic (e.g., methotrexate, auranofin, aurothioglucose, azathioprine, etanercept, gold sodium thiomalate, hydroxychloroquine sulfate, leflunomide, sulfasalzine), a muscle relaxant, a narcotic, a non-steroid anti-inflammatory drug (NSAID), an analgesic, an anesthetic, a sedative, a local anesthetic, a neuromuscular blocker, an antimicrobial (e.g., aminoglycoside, an antifungal, an antiparasitic, an antiviral, a carbapenem, cephalosporin, a fluoroquinolone, a macrolide, a penicillin, a sulfonamide, a tetracycline, another antimicrobial), an antipsoriatic, a corticosteriod, an anabolic steroid, a diabetes related agent, a mineral, a nutritional, a thyroid agent, a vitamin, a calcium related hormone, an antidiarrheal, an antitussive, an antiemetic, an antiulcer, a laxative, an anticoagulant, an erythropoieitin (e.g., epoetin alpha), a filgrastim (e.g., G-CSF, Neupogen), a sargramostim (GM-CSF, Leukine), an immunization, an immunoglobulin, an immunosuppressive (e.g., basiliximab, cyclosporine, daclizumab), a growth hormone, a hormone replacement drug, an estrogen receptor modulator, a mydriatic, a cycloplegic, an alkylating agent, an antimetabolite, a mitotic inhibitor, a radiopharmaceutical, an antidepressant, antimanic agent, an antipsychotic, an anxiolytic, a hypnotic, a sympathomimetic, a stimulant, donepezil, tacrine, an asthma medication, a beta agonist, an inhaled steroid, a leukotriene inhibitor, a methylxanthine, a cromolyn, an epinephrine or analog, dornase alpha (Pulmozyme), a cytokine or a cytokine antagonist.

Typically, treatment of pathologic conditions is effected by administering an effective amount or dosage of at least one anti-IL-12 antibody composition that total, on average, a range from at least about 0.01 to 500 milligrams of at least one anti-IL-12 antibody per kilogram of patient per dose, and preferably from at least about 0.1 to 100 milligrams antibody/kilogram of patient per single or multiple administration, depending upon the specific activity of contained in the composition. Alternatively, the effective serum concentration can comprise 0.1–5000 $\mu$g/ml serum concen-

38

tration per single or multiple administration. Suitable dosages are known to medical practitioners and will, of course, depend upon the particular disease state, specific activity of the composition being administered, and the particular patient undergoing treatment. In some instances, to achieve the desired therapeutic amount, it can be necessary to provide for repeated administration, i.e., repeated individual administrations of a particular monitored or metered dose, where the individual administrations are repeated until the desired daily dose or effect is achieved.

Preferred doses can optionally include 0.1, 0.2, 0.3, 0.4, 0.5, 0.6, 0.7, 0.8, 0.9, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99 and/or 100–500 mg/kg/administration, or any range, value or fraction thereof, or to achieve a serum concentration of 0.1, 0.5, 0.9, 1.0, 1.1, 1.2, 1.5, 1.9, 2.0, 2.5, 2.9, 3.0, 3.5, 3.9, 4.0, 4.5, 4.9, 5.0, 5.5, 5.9, 6.0, 6.5, 6.9, 7.0, 7.5, 7.9, 8.0, 8.5, 8.9, 9.0, 9.5, 9.9, 10, 10.5, 10.9, 11, 11.5, 11.9, 20, 12.5, 12.9, 13.0, 13.5, 13.9, 14.0, 14.5, 4.9, 5.0, 5.5., 5.9, 6.0, 6.5, 6.9, 7.0, 7.5, 7.9, 8.0, 8.5, 8.9, 9.0, 9.5, 9.9, 10, 10.5, 10.9, 11, 11.5, 11.9, 12, 12.5, 12.9, 13.0, 13.5, 13.9, 14, 14.5, 15, 15.5, 15.9, 16, 16.5, 16.9, 17, 17.5, 17.9, 18, 18.5, 18.9, 19, 19.5, 19.9, 20, 20.5, 20.9, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 35, 40, 45, 50, 55, 60, 65, 70, 75, 80, 85, 90, 96, 100, 200, 300, 400, 500, 600, 700, 800, 900, 1000, 1500, 2000, 2500, 3000, 3500, 4000, 4500, and/or 5000 $\mu$g/ml serum concentration per single or multiple administration, or any range, value or fraction thereof.

Alternatively, the dosage administered can vary depending upon known factors, such as the pharmacodynamic characteristics of the particular agent, and its mode and route of administration; age, health, and weight of the recipient; nature and extent of symptoms, kind of concurrent treatment, frequency of treatment, and the effect desired. Usually a dosage of active ingredient can be about 0.1 to 100 milligrams per kilogram of body weight. Ordinarily 0.1 to 50, and preferably 0.1 to 10 milligrams per kilogram per administration or in sustained release form is effective to obtain desired results.

As a non-limiting example, treatment of humans or animals can be provided as a one-time or periodic dosage of at least one antibody of the present invention 0.1 to 100 mg/kg, such as 0.5, 0.9, 1.0, 1.1, 1.5, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 40, 45, 50, 60, 70, 80, 90 or 100 mg/kg, per day, on at least one of day 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, or 40, or alternatively or additionally, at least one of week 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, or 52, or alternatively or additionally, at least one of 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, or 20 years, or any combination thereof, using single, infusion or repeated doses.

Dosage forms (composition) suitable for internal administration generally contain from about 0.1 milligram to about 500 milligrams of active ingredient per unit or container. In these pharmaceutical compositions the active ingredient will ordinarily be present in an amount of about 0.5–99.999% by weight based on the total weight of the composition.

For parenteral administration, the antibody can be formulated as a solution, suspension, emulsion or lyophilized

US 6,902,734 B2

39

powder in association, or separately provided, with a pharmaceutically acceptable parenteral vehicle. Examples of such vehicles are water, saline, Ringer's solution, dextrose solution, and 1–10% human serum albumin. Liposomes and nonaqueous vehicles such as fixed oils can also be used. The vehicle or lyophilized powder can contain additives that maintain isotonicity (e.g., sodium chloride, mannitol) and chemical stability (e.g., buffers and preservatives). The formulation is sterilized by known or suitable techniques.

Suitable pharmaceutical carriers are described in the most recent edition of Remington's Pharmaceutical Sciences, A. Osol, a standard reference text in this field.

Alternative Administration

Many known and developed modes can be used according to the present invention for administering pharmaceutically effective amounts of at least one anti-IL-12 antibody according to the present invention. While pulmonary administration is used in the following description, other modes of administration can be used according to the present invention with suitable results.

IL-12 antibodies of the present invention can be delivered in a carrier, as a solution, emulsion, colloid, or suspension, or as a dry powder, using any of a variety of devices and methods suitable for administration by inhalation or other modes described here within or known in the art.

Parenteral Formulations and Administration

Formulations for parenteral administration can contain as common excipients sterile water or saline, polyalkylene glycols such as polyethylene glycol, oils of vegetable origin, hydrogenated naphthalenes and the like. Aqueous or oily suspensions for injection can be prepared by using an appropriate emulsifier or humidifier and a suspending agent, according to known methods. Agents for injection can be a non-toxic, non-orally administrable diluting agent, such as an aqueous solution or a sterile injectable solution or suspension in a solvent. As the usable vehicle or solvent, water, Ringer's solution, isotonic saline, etc. are allowed; as an ordinary solvent, or suspending solvent, sterile involatile oil can be used. For these purposes, any kind of involatile oil and fatty acid can be used, including natural or synthetic or semisynthetic fatty oils or fatty acids; natural or synthetic or semisynthetic mono- or di- or tri-glycerides. Parental administration is known in the art and includes, but is not limited to, conventional means of injections, a gas pressured needleless injection device as described in U.S. Pat. No. 5,851,198, and a laser perforator device as described in U.S. Pat. No. 5,839,446 entirely incorporated herein by reference.

Alternative Delivery

The invention further relates to the administration of at least one anti-IL-12 antibody by parenteral, subcutaneous, intramuscular, intravenous, intrarticular, intrabronchial, intraabdominal, intracapsular, intracartilaginous, intracavitary, intracelial, intracerebellar, intracerebroventricular, intracolic, intracervical, intragastric, intrahepatic, intramyocardial, intraosteal, intrapelvic, intrapericardiac, intraperitoneal, intrapleural, intraprostatic, intrapulmonary, intrarectal, intrarenal, intraretinal, intraspinal, intrasynovial, intrathoracic, intrauterine, intravesical, bolus, vaginal, rectal, buccal, sublingual, intranasal, or transdermal means. At least one anti-IL-12 antibody composition can be prepared for use for parenteral (subcutaneous, intramuscular or intravenous) or any other administration particularly in the form of liquid solutions or suspensions; for use in vaginal or rectal administration particularly in semisolid forms such as, but not limited to, creams and suppositories; for buccal, or sublingual administration such as, but not limited to, in the form of tablets or

40

capsules; or intranasally such as, but not limited to, the form of powders, nasal drops or aerosols or certain agents; or transdermally such as not limited to a gel, ointment, lotion, suspension or patch delivery system with chemical enhancers such as dimethyl sulfoxide to either modify the skin structure or to increase the drug concentration in the transdermal patch (Junginger, et al. In "Drug Permeation Enhancement"; Hsieh, D. S., Eds., pp. 59–90 (Marcel Dekker, Inc. New York 1994, entirely incorporated herein by reference), or with oxidizing agents that enable the application of formulations containing proteins and peptides onto the skin (WO 98/53847), or applications of electric fields to create transient transport pathways such as electroporation, or to increase the mobility of charged drugs through the skin such as iontophoresis, or application of ultrasound such as sonophoresis (U.S. Pat. Nos. 4,309,989 and 4,767,402) (the above publications and patents being entirely incorporated herein by reference).

Pulmonary/Nasal Administration

For pulmonary administration, preferably at least one anti-IL-12 antibody composition is delivered in a particle size effective for reaching the lower airways of the lung or sinuses. According to the invention, at least one anti-IL-12 antibody can be delivered by any of a variety of inhalation or nasal devices known in the art for administration of a therapeutic agent by inhalation. These devices capable of depositing aerosolized formulations in the sinus cavity or alveoli of a patient include metered dose inhalers, nebulizers, dry powder generators, sprayers, and the like. Other devices suitable for directing the pulmonary or nasal administration of antibodies are also known in the art. All such devices can use use of formulations suitable for the administration for the dispensing of antibody in an aerosol. Such aerosols can be comprised of either solutions (both aqueous and non aqueous) or solid particles. Metered dose inhalers like the Ventolin® metered dose inhaler, typically use a propellant gas and require actuation during inspiration (See, e.g., WO 94/16970, WO 98/35888). Dry powder inhalers like Turbuhaler™ (Astra), Rotahaler® (Glaxo), Diskus® (Glaxo), Spiros™ inhaler (Dura), devices marketed by Inhale Therapeutics, and the Spinhaler® powder inhaler (Fisons), use breath-actuation of a mixed powder (U.S. Pat. No. 4,668,218 Astra, EP 237507 Astra, WO 97/25086 Glaxo, WO 94/08552 Dura, U.S. Pat. No. 5,458,135 Inhale, WO 94/06498 Fisons, entirely incorporated herein by reference). Nebulizers like AERx™ Aradigm, the Utravent® nebulizer (Mallinckrodt), and the Acorn II® nebulizer (Marquest Medical Products) (U.S. Pat. No. 5,404,871 Aradigm, WO 97/22376), the above references entirely incorporated herein by reference, produce aerosols from solutions, while metered dose inhalers, dry powder inhalers, etc. generate small particle aerosols. These specific examples of commercially available inhalation devices are intended to be a representative of specific devices suitable for the practice of this invention, and are not intended as limiting the scope of the invention. Preferably, a composition comprising at least one anti-IL-12 antibody is delivered by a dry powder inhaler or a sprayer. There are several desirable features of an inhalation device for administering at least one antibody of the present invention. For example, delivery by the inhalation device is advantageously reliable, reproducible, and accurate. The inhalation device can optionally deliver small dry particles, e.g. less than about 10 $\mu$m, preferably about 1–5 $\mu$m, for good respirability.

Administration of IL-12 antibody Compositions as a Spray

A spray including IL-12 antibody composition protein can be produced by forcing a suspension or solution of at least

41

one anti-IL-12 antibody through a nozzle under pressure. The nozzle size and configuration, the applied pressure, and the liquid feed rate can be chosen to achieve the desired output and particle size. An electrospray can be produced, for example, by an electric field in connection with a capillary or nozzle feed. Advantageously, particles of at least one anti-IL-12 antibody composition protein delivered by a sprayer have a particle size less than about 10 μm, preferably in the range of about 1 μm to about 5 μm, and most preferably about 2 μm to about 3 μm.

Formulations of at least one anti-IL-12 antibody composition protein suitable for use with a sprayer typically include antibody composition protein in an aqueous solution at a concentration of about 0.1 mg to about 100 mg of at least one anti-IL-12 antibody composition protein per ml of solution or mg/gm, or any range or value therein, e.g., but not limited to, 0.1, 0.2, 0.3, 0.4, 0.5, 0.6, 0.7, 0.8, 0.9, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 40, 45, 50, 60, 70, 80, 90 or 100 mg/ml or mg/gm. The formulation can include agents such as an excipient, a buffer, an isotonicity agent, a preservative, a surfactant, and, preferably, zinc. The formulation can also include an excipient or agent for stabilization of the antibody composition protein, such as a buffer, a reducing agent, a bulk protein, or a carbohydrate. Bulk proteins useful in formulating antibody composition proteins include albumin, protamine, or the like. Typical carbohydrates useful in formulating antibody composition proteins include sucrose, mannitol, lactose, trehalose, glucose, or the like. The antibody composition protein formulation can also include a surfactant, which can reduce or prevent surface-induced aggregation of the antibody composition protein caused by atomization of the solution in forming an aerosol. Various conventional surfactants can be employed, such as polyoxyethylene fatty acid esters and alcohols, and polyoxyethylene sorbitol fatty acid esters. Amounts will generally range between 0.001 and 14% by weight of the formulation. Especially preferred surfactants for purposes of this invention are polyoxyethylene sorbitan monooleate, polysorbate 80, polysorbate 20, or the like. Additional agents known in the art for formulation of a protein such as IL-12 antibodies, or specified portions or variants, can also be included in the formulation.

Administration of IL-12 Antibody Compositions by a Nebulizer

Antibody composition protein can be administered by a nebulizer, such as jet nebulizer or an ultrasonic nebulizer. Typically, in a jet nebulizer, a compressed air source is used to create a high-velocity air jet through an orifice. As the gas expands beyond the nozzle, a low-pressure region is created, which draws a solution of antibody composition protein through a capillary tube connected to a liquid reservoir. The liquid stream from the capillary tube is sheared into unstable filaments and droplets as it exits the tube, creating the aerosol. A range of configurations, flow rates, and baffle types can be employed to achieve the desired performance characteristics from a given jet nebulizer. In an ultrasonic nebulizer, high-frequency electrical energy is used to create vibrational, mechanical energy, typically employing a piezoelectric transducer. This energy is transmitted to the formulation of antibody composition protein either directly or through a coupling fluid, creating an aerosol including the antibody composition protein. Advantageously, particles of antibody composition protein delivered by a nebulizer have a particle size less than about 10 μm, preferably in the range of about 1 μm to about 5 μm, and most preferably about 2 μm to about 3 μm.

42

Formulations of at least one anti-IL-12 antibody suitable for use with a nebulizer, either jet or ultrasonic, typically include a concentration of about 0.1 mg to about 100 mg of at least one anti-IL-12 antibody protein per ml of solution. The formulation can include agents such as an excipient, a buffer, an isotonicity agent, a preservative, a surfactant, and, preferably, zinc. The formulation can also include an excipient or agent for stabilization of the at least one anti-IL-12 antibody composition protein, such as a buffer, a reducing agent, a bulk protein, or a carbohydrate. Bulk proteins useful in formulating at least one anti-IL-12 antibody composition proteins include albumin, protamine, or the like. Typical carbohydrates useful in formulating at least one anti-IL-12 antibody include sucrose, mannitol, lactose, trehalose, glucose, or the like. The at least one anti-IL-12 antibody formulation can also include a surfactant, which can reduce or prevent surface-induced aggregation of the at least one anti-IL-12 antibody caused by atomization of the solution in forming an aerosol. Various conventional surfactants can be employed, such as polyoxyethylene fatty acid esters and alcohols, and polyoxyethylene sorbital fatty acid esters. Amounts will generally range between 0.001 and 4% by weight of the formulation. Especially preferred surfactants for purposes of this invention are polyoxyethylene sorbitan mono-oleate, polysorbate 80, polysorbate 20, or the like. Additional agents known in the art for formulation of a protein such as antibody protein can also be included in the formulation.

Administration of IL-12 Antibody Compositions by a Metered Dose Inhaler

In a metered dose inhaler (MDI), a propellant, at least one anti-IL-12 antibody, and any excipients or other additives are contained in a canister as a mixture including a liquefied compressed gas. Actuation of the metering valve releases the mixture as an aerosol, preferably containing particles in the size range of less than about 10 μm, preferably about 1 μm to about 5 μm, and most preferably about 2 μm to about 3 μm. The desired aerosol particle size can be obtained by employing a formulation of antibody composition protein produced by various methods known to those of skill in the art, including jet-milling, spray drying, critical point condensation, or the like. Preferred metered dose inhalers include those manufactured by 3M or Glaxo and employing a hydrofluorocarbon propellant.

Formulations of at least one anti-IL-12 antibody for use with a metered-dose inhaler device will generally include a finely divided powder containing at least one anti-IL-12 antibody as a suspension in a non-aqueous medium, for example, suspended in a propellant with the aid of a surfactant. The propellant can be any conventional material employed for this purpose, such as chlorofluorocarbon, a hydrochlorofluorocarbon, a hydrofluorocarbon, or a hydrocarbon, including trichlorofluoromethane, dichlorodifluoromethane, dichlorotetrafluoroethanol and 1,1,1,2-tetrafluoroethane, HFA-134a (hydrofluroalkane-134a), HFA-227 (hydrofluroalkane-227), or the like. Preferably the propellant is a hydrofluorocarbon. The surfactant can be chosen to stabilize the at least one anti-IL-12 antibody as a suspension in the propellant, to protect the active agent against chemical degradation, and the like. Suitable surfactants include sorbitan trioleate, soya lecithin, oleic acid, or the like. In some cases solution aerosols are preferred using solvents such as ethanol. Additional agents known in the art for formulation of a protein such as protein can also be included in the formulation.

One of ordinary skill in the art will recognize that the methods of the current invention can be achieved by pul-

US 6,902,734 B2

43

monary administration of at least one anti-IL-12 antibody compositions via devices not described herein.

Oral Formulations and Administration

Formulations for oral rely on the co-administration of adjuvants (e.g., resorcinols and nonionic surfactants such as polyoxyethylene oleyl ether and n-hexadecylpolyethylene ether) to increase artificially the permeability of the intestinal walls, as well as the co-administration of enzymatic inhibitors (e.g., pancreatic trypsin inhibitors, diisopropylfluorophosphate (DFF) and trasylol) to inhibit enzymatic degradation. The active constituent compound of the solid-type dosage form for oral administration can be mixed with at least one additive, including sucrose, lactose, cellulose, mannitol, trehalose, raffinose, maltitol, dextran, starches, agar, arginates, chitins, chitosans, pectins, gum tragacanth, gum arabic, gelatin, collagen, casein, albumin, synthetic or semisynthetic polymer, and glyceride. These dosage forms can also contain other type(s) of additives, e.g., inactive diluting agent, lubricant such as magnesium stearate, paraben, preserving agent such as sorbic acid, ascorbic acid, .alpha.-tocopherol, antioxidant such as cysteine, disintegrator, binder, thickener, buffering agent, sweetening agent, flavoring agent, perfuming agent, etc.

Tablets and pills can be further processed into enteric-coated preparations. The liquid preparations for oral administration include emulsion, syrup, elixir, suspension and solution preparations allowable for medical use. These preparations can contain inactive diluting agents ordinarily used in said field, e.g., water. Liposomes have also been described as drug delivery systems for insulin and heparin (U.S. Pat. No. 4,239,754). More recently, microspheres of artificial polymers of mixed amino acids (proteinoids) have been used to deliver pharmaceuticals (U.S. Pat. No. 4,925, 673). Furthermore, carrier compounds described in U.S. Pat. No. 5,879,681 and U.S. Pat. No. 5,5,871,753 are used to deliver biologically active agents orally are known in the art.

Mucosal Formulations and Administration

For absorption through mucosal surfaces, compositions and methods of administering at least one anti-IL-12 antibody include an emulsion comprising a plurality of submicron particles, a mucoadhesive macromolecule, a bioactive peptide, and an aqueous continuous phase, which promotes absorption through mucosal surfaces by achieving mucoadhesion of the emulsion particles (U.S. Pat. Nos. 5,514,670). Mucous surfaces suitable for application of the emulsions of the present invention can include corneal, conjunctival, buccal, sublingual, nasal, vaginal, pulmonary, stomachic, intestinal, and rectal routes of administration. Formulations for vaginal or rectal administration, e.g. suppositories, can contain as excipients, for example, polyalkyleneglycols, vaseline, cocoa butter, and the like. Formulations for intra-nasal administration can be solid and contain as excipients, for example, lactose or can be aqueous or oily solutions of nasal drops. For buccal administration excipients include sugars, calcium stearate, magnesium stearate, pregelinatined starch, and the like (U.S. Pat. No. 5,849,695).

Transdermal Formulations and Administration

For transdermal administration, the at least one anti-IL-12 antibody is encapsulated in a delivery device such as a liposome or polymeric nanoparticles, microparticle, microcapsule, or microspheres (referred to collectively as microparticles unless otherwise stated). A number of suitable devices are known, including microparticles made of synthetic polymers such as polyhydroxy acids such as polylactic acid, polyglycolic acid and copolymers thereof, polyorthoesters, polyanhydrides, and polyphosphazenes, and natural polymers such as collagen, polyamino acids,

44

albumin and other proteins, alginate and other polysaccharides, and combinations thereof (U.S. Pat. No. 5,814,599).

Prolonged Administration and Formulations

It can be sometimes desirable to deliver the compounds of the present invention to the subject over prolonged periods of time, for example, for periods of one week to one year from a single administration. Various slow release, depot or implant dosage forms can be utilized. For example, a dosage form can contain a pharmaceutically acceptable non-toxic salt of the compounds that has a low degree of solubility in body fluids, for example, (a) an acid addition salt with a polybasic acid such as phosphoric acid, sulfuric acid, citric acid, tartaric acid, tannic acid, pamoic acid, alginic acid, polyglutamic acid, naphthalene mono- or di-sulfonic acids, polygalacturonic acid, and the like; (b) a salt with a polyvalent metal cation such as zinc, calcium, bismuth, barium, magnesium, aluminum, copper, cobalt, nickel, cadmium and the like, or with an organic cation formed from e.g., N,N'-dibenzyl-ethylenediamine or ethylenediamine; or (c) combinations of (a) and (b) e.g. a zinc tannate salt. Additionally, the compounds of the present invention or, preferably, a relatively insoluble salt such as those just described, can be formulated in a gel, for example, an aluminum monostearate gel with, e.g. sesame oil, suitable for injection. Particularly preferred salts are zinc salts, zinc tannate salts, pamoate salts, and the like. Another type of slow release depot formulation for injection would contain the compound or salt dispersed for encapsulated in a slow degrading, non-toxic, non-antigenic polymer such as a polylactic acid/polyglycolic acid polymer for example as described in U.S. Pat. No. 3,773,919. The compounds or, preferably, relatively insoluble salts such as those described above can also be formulated in cholesterol matrix silastic pellets, particularly for use in animals. Additional slow release, depot or implant formulations, e.g. gas or liquid liposomes are known in the literature (U.S. Pat. No. 5,770,222 and "Sustained and Controlled Release Drug Delivery Systems", J. R. Robinson ed., Marcel Dekker, Inc., N.Y., 1978).

Having generally described the invention, the same will be more readily understood by reference to the following examples, which are provided by way of illustration and are not intended as limiting.

EXAMPLE 1

Cloning and Expression of IL-12 Antibody in Mammalian Cells

A typical mammalian expression vector contains at least one promoter element, which mediates the initiation of transcription of mRNA, the antibody coding sequence, and signals required for the termination of transcription and polyadenylation of the transcript. Additional elements include enhancers, Kozak sequences and intervening sequences flanked by donor and acceptor sites for RNA splicing. Highly efficient transcription can be achieved with the early and late promoters from SV40, the long terminal repeats (LTRS) from Retroviruses, e.g., RSV, HTLVI, HIVI and the early promoter of the cytomegalovirus (CMV). However, cellular elements can also be used (e.g., the human actin promoter). Suitable expression vectors for use in practicing the present invention include, for example, vectors such as pIRES1neo, pRetro-Off, pRetro-On, PLXSN, or pLNCX (Clonetech Labs, Palo Alto, Calif.), pcDNA3.1 (+/−), pcDNA/Zeo (+/−) or pcDNA3.1/Hygro (+/−) (Invitrogen), PSVL and PMSG (Pharmacia, Uppsala, Sweden), pRSVcat (ATCC 37152), pSV2dhfr (ATCC

US 6,902,734 B2

45

37146) and pBC12MI (ATCC 67109). Mammalian host cells that could be used include human Hela 293, H9 and Jurkat cells, mouse NIH3T3 and C127 cells, Cos 1, Cos 7 and CV 1, quail QC1–3 cells, mouse L cells and Chinese hamster ovary (CHO) cells.

Alternatively, the gene can be expressed in stable cell lines that contain the gene integrated into a chromosome. The co-transfection with a selectable marker such as dhfr, gpt, neomycin, or hygromycin allows the identification and isolation of the transfected cells.

The transfected gene can also be amplified to express large amounts of the encoded antibody. The DHFR (dihydrofolate reductase) marker is useful to develop cell lines that carry several hundred or even several thousand copies of the gene of interest. Another useful selection marker is the enzyme glutamine synthase (GS) (Murphy, et al., Biochem. J. 227:277–279 (1991); Bebbington, et al., Bio/Technology 10:169–175 (1992)). Using these markers, the mammalian cells are grown in selective medium and the cells with the highest resistance are selected. These cell lines contain the amplified gene(s) integrated into a chromosome. Chinese hamster ovary (CHO) and NSO cells are often used for the production of antibodies.

The expression vectors pC1 and pC4 contain the strong promoter (LTR) of the Rous Sarcoma Virus (Cullen, et al., Molec. Cell. Biol. 5:438–447 (1985)) plus a fragment of the CMV-enhancer (Boshart, et al., Cell 41:521–530 (1985)). Multiple cloning sites, e.g., with the restriction enzyme cleavage sites BamHI, XbaI and Asp718, facilitate the cloning of the gene of interest. The vectors contain in addition the 3' intron, the polyadenylation and termination signal of the rat preproinsulin gene.

Cloning and Expression in CHO Cells

The vector pC4 is used for the expression of IL-12 antibody. Plasmid pC4 is a derivative of the plasmid pSV2-dhfr (ATCC Accession No. 37146). The plasmid contains the mouse DHFR gene under control of the SV40 early promoter. Chinese hamster ovary- or other cells lacking dihydrofolate activity that are transfected with these plasmids can be selected by growing the cells in a selective medium (e.g., alpha minus MEM, Life Technologies, Gaithersburg, Md.) supplemented with the chemotherapeutic agent methotrexate. The amplification of the DHFR genes in cells resistant to methotrexate (MTX) has been well documented (see, e.g., F. W. Alt, et al., J. Biol. Chem. 253:1357–1370 (1978); J. L. Hamlin and C. Ma, Biochem. et Biophys. Acta 1097:107–143 (1990); and M. J. Page and M. A. Sydenham, Biotechnology 9:64–68 (1991)). Cells grown in increasing concentrations of MTX develop resistance to the drug by overproducing the target enzyme, DHFR, as a result of amplification of the DHFR gene. If a second gene is linked to the DHFR gene, it is usually co-amplified and over-expressed. It is known in the art that this approach can be used to develop cell lines carrying more than 1,000 copies of the amplified gene(s). Subsequently, when the methotrexate is withdrawn, cell lines are obtained that contain the amplified gene integrated into one or more chromosome(s) of the host cell.

Plasmid pC4 contains for expressing the gene of interest the strong promoter of the long terminal repeat (LTR) of the Rous Sarcoma Virus (Cullen, et al., Molec. Cell. Biol. 5:438–447 (1985)) plus a fragment isolated from the enhancer of the immediate early gene of human cytomegalovirus (CMV) (Boshart, et al., Cell 41:521–530 (1985)). Downstream of the promoter are BamHI, XbaI, and Asp718 restriction enzyme cleavage sites that allow integration of the genes. Behind these cloning sites the plasmid contains

46

the 3' intron and polyadenylation site of the rat preproinsulin gene. Other high efficiency promoters can also be used for the expression, e.g., the human b-actin promoter, the SV40 early or late promoters or the long terminal repeats from other retroviruses, e.g., HIV and HTLVI. Clontech's Tet-Off and Tet-On gene expression systems and similar systems can be used to express the IL-12 in a regulated way in mammalian cells (M. Gossen, and H. Bujard, Proc. Natl. Acad. Sci. USA 89: 5547–5551 (1992)). For the polyadenylation of the mRNA other signals, e.g., from the human growth hormone or globin genes can be used as well. Stable cell lines carrying a gene of interest integrated into the chromosomes can also be selected upon co-transfection with a selectable marker such as gpt, G418 or hygromycin. It is advantageous to use more than one selectable marker in the beginning, e.g., G418 plus methotrexate.

The plasmid pC4 is digested with restriction enzymes and then dephosphorylated using calf intestinal phosphatase by procedures known in the art. The vector is then isolated from a 1% agarose gel.

The DNA sequence encoding the complete ID-12 antibody is used, e.g., as presented in SEQ ID NOS:1 and 2, corresponding to HC and LC variable regions of an IL-12 antibody of the present invention, according to known method steps. Isolated nucleic acid encoding a suitable human constant region (i.e., HC and LC regions) is also used in this construct (e.g., as provided in vector p1351).

The isolated variable and constant region encoding DNA and the dephosphorylated vector are then ligated with T4 DNA ligase. *E. coli* HB 101 or XL-1 Blue cells are then transformed and bacteria are identified that contain the fragment inserted into plasmid pC4 using, for instance, restriction enzyme analysis.

Chinese hamster ovary (CHO) cells lacking an active DHFR gene are used for transfection. 5 $\mu$g of the expression plasmid pC4 is cotransfected with 0.5 $\mu$g of the plasmid pSV2-neo using lipofecin. The plasmid pSV2neo contains a dominant selectable marker, the neo gene from Tn5 encoding an enzyme that confers resistance to a group of antibiotics, including G418. The cells are seeded in alpha minus MEM supplemented with 1 $\mu$g/ml G418. After 2 days, the cells are trypsinized and seeded in hybridoma cloning plates (Greiner, Germany) in alpha minus MEM supplemented with 10, 25, or 50 ng/ml of methotrexate plus 1 $\mu$g/ml G418. After about 10–14 days, single clones are trypsinized and then seeded in 6-well petri dishes or 10 ml flasks using different concentrations of methotrexate ate (50 nM, 100 nM, 200 nM, 400 nM, 800 nM). Clones growing at the highest concentrations of methotrexate are then transferred to new 6-well plates containing even higher concentrations of methotrexate (1 mM, 2 mM, 5 mM, 10 mM, 20 mM). The same procedure is repeated until clones are obtained that grow at a concentration of 100–200 mM. Expression of the desired gene product is analyzed, for instance, by SDS-PAGE and Western blot or by reverse phase HPLC analysis.

EXAMPLE 2

Generation of High Affinity Human IgG Monoclonal Antibodies Reactive with Human IL-12 Using Transgenic Mice

SUMMARY

Transgenic mice have been used that contain human heavy and light chain immunoglobulin genes to generate high affinity, completely human, monoclonal antibodies that

47

can be used therapeutically to inhibit the action of IL-12 for the treatment of one or more IL-12-mediated disease. (CBA/J×C57/BL6/J) $F_2$ hybrid mice containing human variable and constant region antibody transgenes for both heavy and light chains are immunized with human recombinant IL-12 (Taylor et al., Intl. Immunol. 6:579–591 (1993); Lonberg, et al., Nature 368:856–859 (1994); Neuberger, M., Nature Biotech. 14:826 (1996); Fishwild, et al., Nature Biotechnology 14:845–851(1996)). Several fusions yielded one or more panels of completely human IL-12 reactive IgG monoclonal antibodies. The completely human anti-IL-12 antibodies are further characterized. All are IgG1κ. Such antibodies are found to have affinity constants somewhere between $1 \times 10^9$ and $9 \times 10^{12}$. The unexpectedly high affinities of these fully human monoclonal antibodies make them suitable candidates for therapeutic applications in IL-12 related diseases, pathologies or disorders.

Abbreviations

BSA—bovine serum albumin
$CO_2$—carbon dioxide
DMSO—dimethyl sulfoxide
EIA—enzyme immunoassay
FBS—fetal bovine serum
$H_2O_2$—hydrogen peroxide
HRP—horseradish peroxidase\
ID—interadermal
Ig—immunoglobulin
IL-12—interleukin-12
IP—intraperitoneal
IV—intravenous
Mab—monoclonal antibody
OD—optical density
OPD—o-Phenylenediamine dihydrochloride
PEG—polyethylene glycol
PSA—penicillin, streptomycin, amphotericin
RT—room temperature
SQ—subcutaneous
v/v—volume per volume
w/v—weight per volume

Materials and Methods

Animals

Transgenic mice that can express human antibodies are known in the art (and are commercially available (e.g., from GenPharm International, San Jose, Calif.; Abgenix, Freemont, Calif., and others) that express human immunoglobulins but not mouse IgM or Igκ. For example, such transgenic mice contain human sequence transgenes that undergo V(D)J joining, heavy-chain class switching, and somatic mutation to generate a repertoire of human sequence immunoglobulins (Lonberg, et al., Nature 368:856–859 (1994)). The light chain transgene can be derived, e.g., in part from a yeast artificial chromosome clone that includes nearly half of the germline human Vκ region. In addition, the heavy-chain transgene can encode both human and human γ1 (Fishwild, et al., Nature Biotechnology 14:845–851 (1996)) and/or γ3 constant regions. Mice derived from appropriate genotypic lineages can be used in the immunization and fusion processes to generate fully human monoclonal antibodies to IL-12.

Immunization

One or more immunization schedules can be used to generate the anti-IL-12 human hybridomas. The first several fusions can be performed after the following exemplary immunization protocol, but other similar known protocols can be used. Several 14–20 week old female and/or surgically castrated transgenic male mice are immunized IP and/or ID with 1–1000 μg of recombinant human IL-12

48

emulsified with an equal volume of TITERMAX or complete Freund's adjuvant in a final volume of 100–400 μL (e.g., 200). Each mouse can also optionally receive 1–10 μg in 100 μL physiological saline at each of 2 SQ sites. The mice can then be immunized 1–7, 5–12, 10–18, 17–25 and/or 21–34 days later IP (1–400 μg) and SQ (1–400 μg×2) with IL-12 emulsified with an equal volume of TITERMAX or incomplete Freund's adjuvant. Mice can be bled 12–25 and 25–40 days later by retro-orbital puncture without anti-coagulant. The blood is then allowed to clot at RT for one hour and the serum is collected and titered using an IL-12 EIA assay according to known methods. Fusions are performed when repeated injections do not cause titers to increase. At that time, the mice can be given a final IV booster injection of 1–400 μg IL-12 diluted in 100 μL physiological saline. Three days later, the mice can be euthanized by cervical dislocation and the spleens removed aseptically and immersed in 10 mL of cold phosphate buffered saline (PBS) containing 100 U/mL penicillin, 100 μg/mL streptomycin, and 0.25 μg/mL amphotericin B (PSA). The splenocytes are harvested by sterilely perfusing the spleen with PSA-PBS. The cells are washed once in cold PSA-PBS, counted using Trypan blue dye exclusion and resuspended in RPMI 1640 media containing 25 mM Hepes.

Cell Fusion

Fusion can be carried out at a 1:1 to 1:10 ratio of murine myeloma cells to viable spleen cells according to known methods, e.g., as known in the art. As a non-limiting example, spleen cells and myeloma cells can be pelleted together. The pellet can then be slowly resuspended, over 30 seconds, in 1 mL of 50% (w/v) PEG/PBS solution (PEG molecular weight 1,450, Sigma) at 37° C. The fusion can then be stopped by slowly adding 10.5 mL of RPMI 1640 medium containing 25 mM Hepes (37° C.) over 1 minute. The fused cells are centrifuged for 5 minutes at 500–1500 rpm. The cells are then resuspended in HAT medium (RPMI 1640 medium containing 25 mM Hepes, 10% Fetal Clone I serum (Hyclone), 1 mM sodium pyruvate, 4 mM L-glutamine, 10 μg/mL gentamicin, 2.5% Origen culturing supplement (Fisher), 10% 653-conditioned RPMI 1640/Hepes media, 50 μM 2-mercaptoethanol, 100 μM hypoxanthine, 0.4 μM aminopterin, and 16 μM thymidine) and then plated at 200 μL/well in fifteen 96-well flat bottom tissue culture plates. The plates are then placed in a humidified 37° C. incubator containing 5% $CO_2$ and 95% air for 7–10 days.

Detection of Human IgG Anti-IL-12 Antibodies in Mouse Serum

Solid phase ETA's can be used to screen mouse sera for human IgG antibodies specific for human IL-12. Briefly, plates can be coated with IL-12 at 2 μg/mL in PBS overnight. After washing in 0.15M saline containing 0.02% (v/v) Tween 20, the wells can be blocked with 1% (w/v) BSA in PBS, 200 μL/well for 1 hour at RT. Plates are used immediately or frozen at −20° C. for future use. Mouse serum dilutions are incubated on the IL-12 coated plates at 50 μL/well at RT for 1 hour. The plates are washed and then probed with 50 μL/well HRP-labeled goat anti-human IgG, Fc specific diluted 1:30,000 in 1% BSA-PBS for 1 hour at RT. The plates can again be washed and 100 μL/well of the citrate-phosphate substrate solution (0.1M citric acid and 0.2M sodium phosphate, 0.01% $H_2O_2$ and 1 mg/mL OPD) is added for 15 minutes at RT. Stop solution (4N sulfuric acid) is then added at 25 μL/well and the OD's are read at 490 nm via an automated plate spectrophotometer.

US 6,902,734 B2

49

Detection of Completely Human Immunoglobulins in Hybridoma Supernates

Growth positive hybridomas secreting fully human immunoglobulins can be detected using a suitable EIA. Briefly, 96 well pop-out plates (VWR, 610744) can be coated with 10 $\mu$g/mL goat anti-human IgG Fc in sodium carbonate buffer overnight at 4° C. The plates are washed and blocked with 1% BSA-PBS for one hour at 37° C. and used immediately or frozen at −20° C. Undiluted hybridoma supernatants are incubated on the plates for one hour at 37° C. The plates are washed and probed with HRP labeled goat anti-human kappa diluted 1:10,000 in 1% BSA-PBS for one hour at 37° C. The plates are then incubated with substrate solution as described above.

Determination of Fully Human Anti-IL-12 Reactivity

Hybridomas, as above, can be simultaneously assayed for inactivity to IL-12 using a suitable RIA or other assay. For example, supernatants am incubated on goat anti-human IgG Fc plates as above, washed and then probed with radiolabeled IL-12 with appropriate counts per well for 1 hour at RT. The wells are washed twice with FBS and bound radiolabeled IL-12 is quantitated using a suitable counter.

Human IgG1κ anti-IL-12 secreting hybridomas can be expanded in cell culture and serially subcloned by limiting dilution. The resulting clonal populations can be expanded and cryopreserved in freezing medium (95% FBS, 5% DMSO) and stored in liquid nitrogen.

Isotyping

Isotype determination of the antibodies can be accomplished using an EIA in a format similar to that used to screen the mouse immune sera for specific titers. IL-12 can be coated on 96-well plates as described above and purified antibody at 2 $\mu$g/mL can be incubated on the plate for one hour at RT. The plate is washed and probed with HRP labeled goat anti-human IgG$_1$ or HRP labeled goat anti-human IgG$_3$ diluted at 1:4000 in 1% BSA-PBS for one hour at RT. The plate is again washed and incubated with substrate solution as described above.

Binding Kinetics of Human Anti-Human IL-12 Antibodies with Human IL-12

Binding characteristics for antibodies can be suitably assessed using an IL-12 capture EIA and BIAcore technology, for example. Graded concentrations of purified human IL-12 antibodies can be assessed for binding to EIA plates coated with 2 $\mu$g/mL of IL-12 in assays as described above. The OD's can be then presented as semi-log plots showing relative binding efficiencies.

Quantitative binding constants can be obtained, e.g., as follows, or by any other known suitable method. A BIAcore CM-5 (carboxymethyl) chip is placed in a BIAcore 2000 unit. HBS buffer (0.01 M HEPES, 0.15 M NaCl, 3 mM EDTA, 0.005% v/v P20 surfactant, pH 7.4) is flowed over a flow cell of the chip at 5 $\mu$L/minute until a stable baseline is obtained. A solution (100 $\mu$L) of 15 mg of EDC (N-ethyl-N'-(3-dimethyl-aminopropyl)-carbodiimide hydrochloride) in 200 $\mu$L water is added to 100 $\mu$L of a solution of 2.3 mg of NHS (N-hydroxysuccinimide) in 200 $\mu$L water. Forty (40) $\mu$L of the resulting solution is injected onto the chip. Six $\mu$L of a solution of human IL-12 (15 $\mu$g/mL in 10 mM sodium acetate, pH 4.8) is injected onto the chip, resulting in an increase of ca. 500 RU. The buffer is changed to TBS/Ca/ Mg/BSA running buffer (20 mM Tris, 0.15 M sodium chloride, 2 mM calcium chloride, 2 mM magnesium acetate, 0.5% Triton X-100, 25 $\mu$g/mL BSA, pH 7.4) and flowed over the chip overnight to equilibrate it and to hydrolyze or cap any unreacted succinimide esters.

Antibodies are dissolved in the running buffer at 33.33, 16.67, 8.33, and 4.17 nM. The flow rate is adjusted to 30

50

$\mu$L/min and the instrument temperature to 25° C. Two flow cells are used for the kinetic runs, one on which IL-12 had been immobilized (sample) and a second, underivatized flow cell (blank). 120 $\mu$L of each antibody concentration is injected over the flow cells at 30 $\mu$L/min (association phase) followed by an uninterrupted 360 seconds of buffer flow (dissociation phase). The surface of the chip is regenerated (interleukin-12/antibody complex dissociated) by two sequential injections of 30 $\mu$L each of 2 M guanidine thiocyanate.

Analysis of the data is done using BIA evaluation 3.0 or CLAMP 2.0, as known in the art. For each antibody concentration the blank sensogram is subtracted from the sample sensogram. A global fit is done for both dissociation ($k_d$, sec$^{-1}$) and association ($k_a$, mol$^{-1}$ sec$^{-1}$) and the dissociation constant ($K_D$, mol) calculated ($k_d$/$k_a$). Where the antibody affinity is high enough that the RUs of antibody captured are >100, additional dilutions of the antibody are run.

Results and Discussion

Generation of Anti-Human IL-12 Monoclonal Antibodies

Several fusions are performed and each fusion is seeded in 15 plates (1440 wells/fusion) that yield several dozen antibodies specific for human IL-12. Of these, some are found to consist of a combination of human and mouse Ig chains. The remaining hybridomas secrete anti-IL-12 antibodies consisting solely of human heavy and light chains. Of the human hybridomas, all are expected to be Ig1κ.

Binding Kinetics of Human Anti-Human IL-12 Antibodies

ELISA analysis confirms that purified antibody from most or all of these hybridomas bind IL-12 in a concentration-dependent manner. FIGS. 1-2 show the results of the relative binding efficiency of these antibodies. In this case, the avidity of the antibody for its cognate antigen (epitope) is measured. It should be noted that binding IL-12 directly to the EIA plate can cause denaturation of the protein and the apparent binding affinities cannot be reflective of binding to undenatured protein. Fifty percent binding is found over a range of concentrations.

Quantitative binding constants are obtained using BIAcore analysis of the human antibodies and reveals that several of the human monoclonal antibodies are very high affinity with $K_D$ in the range of $1\times10^{-9}$ to $7\times10^{-12}$.

Conclusions

Several fusions are performed utilizing splenocytes from hybrid mice containing human variable and constant region antibody transgenes that are immunized with human IL-12. A set of several completely human IL-12 reactive IgG monoclonal antibodies of the IgG1κ isotype are generated. The completely human anti-IL-12 antibodies are further characterized. Several of generated antibodies have affinity constants between $1\times10^{9}$ and $9\times10^{12}$. The unexpectedly high affinities of these fully human monoclonal antibodies make them suitable for therapeutic applications in IL-12-dependent diseases, pathologies or related conditions.

EXAMPLE 3

C340 is a Neutralizing Human Monoclonal Antibody

The bioactivity of IL-12 was shown to be neutralized by C340 in a variety of IL-12 dependent activity assays. Since IL-12 enhances IFN GAMMA production by NK cells and T lymphocytes, the effect of C340 antibody on the upregulation of IFN GAMMA mRNA and the effect of C340 on the production of IFN GAMMA protein was examined

US 6,902,734 B2

51

(Trinchieri, G., Current Opinion in Immunology, 9:17–23 (1997), Morris, S. C., et al., Journal of Immunology, 152:1047–1056 (1994)). The ability of C340 to neutralize IL-12 driven induction of lymphokine activated killer (LAK) cell activity was also investigated in these studies (Kutza, J. and Murasko, D. M., Mechanisms of Ageing and Development, 90:209–222 (1996), Stem, A. S., et al., Proceedings of the National Academy of Sciences of the U.S.A., 87:6808–6812 (1990)). Lastly, the effect of C340 on IL-12-mediated upregulation of CD95 cell surface expression on T and NK cells was tested (Medvedev, A. E., et al., Cytokine, 9:394–404 (1997)).

Inhibition of IFN Gamma mRNA Transcription

To determine whether C340 inhibits IL-12/IL-2 induced IFN GAMMA gene transcription in human PBL, a reverse transcription-PCR assay was performed. Specific primers for β-actin (a control for mRNA integrity and content) and IFN GAMMA were used to amplify the cDNA obtained from stimulated human PBL. FIG. 3 shows C340 down regulates IFN GAMMA mRNA in IL-12/IL-2 activated (2 hour) PBMC.

Inhibition of Intracellular IFN GAMMA as Measured by Flow Cytometry

In response to various signals and as a measure of activation, T cells and NK cells can be induced to secrete cytokines. More specifically, PBL treated with IL-2 and IL-12 initiate substantial synthesis of IFN gamma within 4–8 hours after stimulation. This production can be detected in the cytoplasm of Brefeldin-A treated PBL by flow cytometry. FIG. 4 demonstrates a 60% reduction in IFN GAMMA production in such cultures when C340 IL-12 was added in conjunction with IL-2 for five hours.

Inhibition of IL-12 Induced IFN GAMMA Secretion

FIG. 5 clearly shows that two different lots of C340 inhibited the secretion of IFN GAMMA by peripheral blood lymphocytes in a dose-dependent fashion. Four hundred picograms of IL-12 were premixed with varying amounts of C340 and then added to IL-2 stimulated cultures of PBL's. When IFN GAMMA was measured by EIA after an 18–24 hour incubation, markedly diminished amounts of IFN GAMMA were detected with as little as 1 μg/mL of C340 antibody.

Inhibition of IL-12 Induced LAK Cell Cytotoxicity

Raji cells, an IL-2 sensitive Burkitt lymphoma derived cell line, is an NK cell resistant, LAK cell sensitive cell line. Raji cells, in triplicate, were cultured for four hours with LAK cells which had been activated with 400 pg/mL IL-12 and 10 U/mL IL-2 in the presence or absence of the human monoclonal antibody C340 (5000 ng/mL or 50 ng/mL). FIG. 6 shows the results from three normal, healthy donors. IL-12+IL-2 activation of effector cells resulted in an increasing cytotoxic activity over that of cells activated with IL-2 alone. The C340 antibody inhibited this IL-12 dependent effect. The magnitude of inhibition was related to antibody concentration, with the highest concentration tested reducing cytotoxicity to background levels.

Inhibition of CD95 Upregulation

Reports have described IL-12-induced upregulation of CD95 on the surface of highly purified CD56+ PBL. As can be seen in FIGS. 7A and 7B, distributional flow cytometric analysis revealed that CD95 expression was significantly upregulated on CD3+ T cells and CD56+ NK cells after treatment with IL-12 plus IL-2 for 72 hours. Concomitant anti-IL-12 treatment inhibited CD95 expression in both CD3+ and CD56+ populations. CD3+ cells were inhibited by ~50% (FIG. 7A), whereas CD56+ cells were inhibited by

52

~85% (FIG. 7B), as evidenced by a diminished MFI index (percent greater then unstimulated control).

EXAMPLE 4

Gene Cloning and Characterization

Genomic DNA fragments containing either the C340 heavy chain gene or the C340 light chain were cloned and purified. Genomic DNA purified from C340 hybridoma cells was partially digested with Sau3A restriction enzyme and size-selected by centrifugal fractionation through a 10–40% sucrose gradient. DNA fragments in the size range of 15–23 kb were cloned into the bacteriophage vector, EMBL3, and packaged into phage particles. Several packaging reactions resulted in a library of 1 million bacteriophage clones. Approximately 600,000 clones from the library were screened by plaque hybridization using 32P-labeled genomic DNA fragments that contained either human IgG 1 heavy chain constant region sequences or human kappa light chain constant region sequences as probe. Thirteen heavy chain and nine light chain clones were detected. Of these, three heavy chain clones and four light chain clones were purified by two more rounds of screening. One of the heavy chain clones and two of the light chain clones were shown to contain the 5' and 3' ends of the coding sequences by PCR analysis of bacteriophage DNA. The DNA insert in heavy chain (HC) clone H4 was 16 kb in size and includes 3.6 kb of 5' flanking and at least 2 kb of 3' flanking sequence. The DNA insert in light chain (LC) clone LC1 was 15 kb in size and included 4.4 kb of 5' flanking and 6.0 kb of 3' flanking sequence. The complete inserts were removed from the bacteriophage vector as SalI fragments and cloned between the XhoI and SalI sites of plasmid expression vector p1351, which provided a gpt selectable marker gene. Because there was an internal SalI site in the heavy chain variable region coding sequence, two SalI fragments had to be transferred from bacteriophage H4 to the p1351 expression vector. The resulting heavy and light chain expression plasmids were termed p1560 and p1558, respectively. The orientations of the heavy and light chain genes in these two plasmids relative to the p1351 vector sequences were determined using restriction enzyme analysis and PCR, respectively. In both cases, the orientations were such that the 5' end of the Ab gene fragment was proximal to the 3' end of the gpt gene. Both strands of the coding regions of the cloned genes were sequenced. The sequences of plasmids p1560 and p1558 are presented in FIGS. 11A–11K and FIGS. 13A–13J, respectively.

EXAMPLE 5

Preparation of Recombinant Cell Lines

Heavy chain plasmid p1560 was linearized by digestion with PvuI restriction enzyme and light chain plasmid p1558 was linearized using SalI restriction enzyme. p3X63Ag8.653 (653) and SP2/0-Ag14 (SP2/0) cells were separately transfected with the premixed linearized plasmids by electroporation and cells cultured and transfectants selected using mycophenolic acid as described (Knight, et al., Molecular Immunology 30:1443 (1993)). Cell supernatants from mycophenolic acid-resistant colonies were assayed approximately two weeks later for human IgG (i.e., recombinant C340 (rC340)). For this, cell supernatants were incubated on 96-well ELISA plates that were coated with goat antibodies specific for the Fc portion of human IgG. Human IgG which bound to the coated plate was detected using alkaline phosphatase-conjugated goat anti-human IgG

US 6,902,734 B2

**53**

(heavy chain+light chain) antibody and alkaline phosphatase substrates as described (Knight, et al., Molecular Immunology 30:1443 (1993)). Cells of the higher producing clones were transferred to 24-well culture dishes in standard media and expanded (IMDM, 5% FBS, 2 mM glutamine, mycophenolic acid selection mix). The amount of antibody produced (i.e., secreated into the media of spent cultures) was carefully quantified by ELISA using purified C340 mAb as the standard. Selected clones were then expanded in T75 flasks and the production of human IgG by these clones was quantified by ELISA. Based on these values, six independent 653 transfectants and three independent SP2/0 transfectants were subcloned (by seeding an average of one cell per well in 96 well plates), the quantity of antibody produced by the subclones was determined by assaying (ELISA) supernatants from individual subclone colonies. Three subclones, 653 transfectant 19–20 (C379B) and the SP2/0 transfectants 84–81 (C381A) and 22–56 (C389A), were selected for further analysis.

Assay for rC340 Antigen Binding.

Prior to subcloning selected cell lines as described above, cell supernatants from three parental lines (653 transfectants clone 2 and clone 18 and SP2/0 transfectant clone 1) were used to test the antigen binding characteristics of rC340. The concentrations of rC340 in the three cell supernatant samples were first determined by ELISA. Titrating amounts of the supernatant samples, or purified C340 positive control, were then incubated in 96-well plates coated with 2 $\mu$g/ml of human IL-12. Bound mAb was then detected with alkaline phosphatase-conjugated goat anti-human IgG (heavy chain+light chain) antibody and the appropriate alkaline phosphatase substrates. As shown in FIG. **8**, rC340

**54**

bound specifically to human IL-12 in a manner indistinguishable from the original C340 mAb.

Characterization of Selected Cell Lines.

Growth curve analyses were performed on C379B, C381A, and C389A by seeding T75 flasks with a starting cell density of $2 \times 10^5$ cells/ml in standard media or SFM-5 serum-free media and then monitoring cell number and rC340 concentration on a daily basis until the cultures were spent. The results of cultures in standard media are shown in FIGS. **9A-9C**. Maximal C340 mAb production levels for C379B, C381A, and C389A were 135 $\mu$g/ml, 150 $\mu$g/ml, and 110 $\mu$g/ml, respectively. Attempts to adapt C379B cells to SFM-5 media were not successful. C381A cells produced the same amount of rC340 in SFM-5 media as in standard media, whereas C389A cells produced only half as much rC340 in SFM-5 media as in standard media.

The stability of rC340 mAb production over time for the three subclones was assessed by culturing cells in 24-well dishes with standard media or standard media without mycophenolic acid selection for varying periods of time. Lines C379B and C381A were observed to stably produce rC340 in the presence or absence of selection for a period of 30 days (the maximum time tested) and 75 days, respectively. Line C389A was unstable and after 43 days of culture produced just 20% as much antibody as at the beginning of the study.

It will be clear that the invention can be practiced otherwise than as particularly described in the foregoing description and examples.

Numerous modifications and variations of the present invention are possible in light of the above teachings and, therefore, are within the scope of the appended claims.

---

```
                        SEQUENCE LISTING


<160> NUMBER OF SEQ ID NOS: 15

<210> SEQ ID NO 1
<211> LENGTH: 5
<212> TYPE: PRT
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 1


Thr Tyr Trp Leu Gly
1               5


<210> SEQ ID NO 2
<211> LENGTH: 17
<212> TYPE: PRT
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 2


Ile Met Ser Pro Val Asp Ser Asp Ile Arg Tyr Ser Pro Ser Phe Gln
1               5                   10                  15
Gly


<210> SEQ ID NO 3
<211> LENGTH: 10
<212> TYPE: PRT
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 3


Pro Arg Pro Gly Gln Gly Tyr Phe Asp Phe
1               5                   10
```

US 6,902,734 B2

**55**                                                      **56**

-continued

```
<210> SEQ ID NO 4
<211> LENGTH: 11
<212> TYPE: PRT
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 4

Arg Ala Ser Gln Gly Ile Ser Ser Trp Leu Ala
1               5                   10


<210> SEQ ID NO 5
<211> LENGTH: 7
<212> TYPE: PRT
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 5

Ala Ala Ser Ser Leu Gln Ser
1               5


<210> SEQ ID NO 6
<211> LENGTH: 9
<212> TYPE: PRT
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 6

Gln Gln Tyr Asn Ile Tyr Pro Tyr Thr
1               5


<210> SEQ ID NO 7
<211> LENGTH: 119
<212> TYPE: PRT
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 7

Glu Val Gln Leu Val Gln Ser Gly Ala Glu Val Lys Lys Pro Gly Glu
1               5                   10                  15

Ser Leu Lys Ile Ser Cys Lys Gly Ser Gly Tyr Ser Phe Thr Thr Tyr
            20                  25                  30

Trp Leu Gly Trp Val Arg Gln Met Pro Gly Lys Gly Leu Asp Trp Ile
        35                  40                  45

Gly Ile Met Ser Pro Val Asp Ser Asp Ile Arg Tyr Ser Pro Ser Phe
    50                  55                  60

Gln Gly Gln Val Thr Met Ser Val Asp Lys Ser Ile Thr Thr Ala Tyr
65                  70                  75                  80

Leu Gln Trp Asn Ser Leu Lys Ala Ser Asp Thr Ala Met Tyr Tyr Cys
                85                  90                  95

Ala Arg Arg Arg Pro Gly Gln Gly Tyr Phe Asp Phe Trp Gly Gln Gly
            100                 105                 110

Thr Leu Val Thr Val Ser Ser
        115


<210> SEQ ID NO 8
<211> LENGTH: 108
<212> TYPE: PRT
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 8

Asp Ile Gln Met Thr Gln Ser Pro Ser Ser Leu Ser Ala Ser Val Gly
1               5                   10                  15

Asp Arg Val Thr Ile Thr Cys Arg Ala Ser Gln Gly Ile Ser Ser Trp
            20                  25                  30
```

US 6,902,734 B2

57                                                              58

–continued

```
Leu Ala Trp Tyr Gln Gln Lys Pro Glu Lys Ala Pro Lys Ser Leu Ile
        35                  40                  45

Tyr Ala Ala Ser Ser Leu Gln Ser Gly Val Pro Ser Arg Phe Ser Gly
    50                  55                  60

Ser Gly Ser Gly Thr Asp Phe Thr Leu Thr Ile Ser Ser Leu Gln Pro
65                  70                  75                  80

Glu Asp Phe Ala Thr Tyr Tyr Cys Gln Gln Tyr Asn Ile Tyr Pro Tyr
                85                  90                  95

Thr Phe Gly Gln Gly Thr Lys Leu Glu Ile Lys Arg
            100                 105
```

```
<210> SEQ ID NO 9
<211> LENGTH: 503
<212> TYPE: PRT
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 9
```

```
Arg Asn Leu Pro Val Ala Thr Pro Asp Pro Gly Met Phe Pro Cys Leu
1               5                   10                  15

His His Ser Gln Asn Leu Leu Arg Ala Val Ser Asn Met Leu Gln Lys
            20                  25                  30

Ala Arg Gln Thr Leu Glu Phe Tyr Pro Cys Thr Ser Glu Glu Ile Asp
        35                  40                  45

His Glu Asp Ile Thr Lys Asp Lys Thr Ser Thr Val Glu Ala Cys Leu
    50                  55                  60

Pro Leu Glu Leu Thr Lys Asn Glu Ser Cys Leu Asn Ser Arg Glu Thr
65                  70                  75                  80

Ser Phe Ile Thr Asn Gly Ser Cys Leu Ala Ser Arg Lys Thr Ser Phe
                85                  90                  95

Met Met Ala Leu Cys Leu Ser Ser Ile Tyr Glu Asp Leu Lys Met Tyr
            100                 105                 110

Gln Val Glu Phe Lys Thr Met Asn Ala Lys Leu Leu Met Asp Pro Lys
        115                 120                 125

Arg Gln Ile Phe Leu Asp Gln Asn Met Leu Ala Val Ile Asp Glu Leu
    130                 135                 140

Met Gln Ala Leu Asn Phe Asn Ser Glu Thr Val Pro Gln Lys Ser Ser
145                 150                 155                 160

Leu Glu Glu Pro Asp Phe Tyr Lys Thr Lys Ile Lys Leu Cys Ile Leu
                165                 170                 175

Leu His Ala Phe Arg Ile Arg Ala Val Thr Ile Asp Arg Val Met Ser
            180                 185                 190

Tyr Leu Asn Ala Ser Ile Trp Glu Leu Lys Lys Asp Val Tyr Val Val
        195                 200                 205

Glu Leu Asp Trp Tyr Pro Asp Ala Pro Gly Glu Met Val Val Leu Thr
    210                 215                 220

Cys Asp Thr Pro Glu Glu Asp Gly Ile Thr Trp Thr Leu Asp Gln Ser
225                 230                 235                 240

Ser Glu Val Leu Gly Ser Gly Lys Thr Leu Thr Ile Gln Val Lys Glu
                245                 250                 255

Phe Gly Asp Ala Gly Gln Tyr Thr Cys His Lys Gly Gly Glu Val Leu
            260                 265                 270

Ser His Ser Leu Leu Leu Leu His Lys Lys Glu Asp Gly Ile Trp Ser
        275                 280                 285

Thr Asp Ile Leu Lys Asp Gln Lys Glu Pro Lys Asn Lys Thr Phe Leu
    290                 295                 300
```

US 6,902,734 B2

**59**                                                                      **60**

-continued

```
Arg Cys Glu Ala Lys Asn Tyr Ser Gly Arg Phe Thr Cys Trp Trp Leu
305                 310                 315                 320

Thr Thr Ile Ser Thr Asp Leu Thr Phe Ser Val Lys Ser Ser Arg Gly
                325                 330                 335

Ser Ser Asp Pro Gln Gly Val Thr Cys Gly Ala Ala Thr Leu Ser Ala
            340                 345                 350

Glu Arg Val Arg Gly Asp Asn Lys Glu Tyr Glu Tyr Ser Val Glu Cys
        355                 360                 365

Gln Glu Asp Ser Ala Cys Pro Ala Ala Glu Glu Ser Leu Pro Ile Glu
    370                 375                 380

Val Met Val Asp Ala Val His Lys Leu Lys Tyr Glu Asn Tyr Thr Ser
385                 390                 395                 400

Ser Phe Phe Ile Arg Asp Ile Ile Lys Pro Asp Pro Pro Lys Asn Leu
                405                 410                 415

Gln Leu Lys Pro Leu Lys Asn Ser Arg Gln Val Glu Val Ser Trp Glu
            420                 425                 430

Tyr Pro Asp Thr Trp Ser Thr Pro His Ser Tyr Phe Ser Leu Thr Phe
        435                 440                 445

Cys Val Gln Val Gln Gly Lys Ser Lys Arg Glu Lys Lys Asp Arg Val
    450                 455                 460

Phe Thr Asp Lys Thr Ser Ala Thr Val Ile Cys Arg Lys Asn Ala Ser
465                 470                 475                 480

Ile Ser Val Arg Ala Gln Asp Arg Tyr Tyr Ser Ser Ser Trp Ser Glu
                485                 490                 495

Trp Ala Ser Val Pro Cys Ser
            500


<210> SEQ ID NO 10
<211> LENGTH: 15
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 10

agatatacta tgcac                                              15


<210> SEQ ID NO 11
<211> LENGTH: 51
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 11

gttatatcat ttgatggaag caataaatac tacgtagact ccgtgaaggg c    51


<210> SEQ ID NO 12
<211> LENGTH: 30
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 12

gaggcccggg gatcgtatgc ttttgatatc                             30


<210> SEQ ID NO 13
<211> LENGTH: 42
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 13

ctctcctgca gggccagtca gagtgttagc agctacttag cc               42
```

US 6,902,734 B2

61                                                                              62

-continued

```
<210> SEQ ID NO 14
<211> LENGTH: 18
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 14

gatgcatcca acagggcc                                              18


<210> SEQ ID NO 15
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 15

cagcagcgta gcaactggcc t                                          21
```

What is claimed is:

1. An isolated anti-IL-12 antibody, comprising a heavy chain variable region ($V_H$) of the amino acid sequence set forth in SEQ ID NO:7 and a light chain variable region ($V_L$) of the amino acid sequence set forth in SEQ ID NO:8.

2. The anti-IL-12 antibody according to claim 1, wherein said antibody binds IL-12 with an affinity of at least one selected from at least $10^{-9}$ M, at least $10^{-10}$ M, at least $10^{-11}$ M, or at least $10^{-12}$ M.

3. The anti-IL-12 antibody according to claim 1, wherein said antibody neutralizes an activity of IL-12 protein.

4. A composition comprising an isolated anti-IL-12 antibody having a heavy chain variable region ($V_H$) of the amino acid sequence set forth in SEQ ID NO:7 and a light chain variable region ($V_L$) of the amino acid sequence set forth in SEQ ID NO:8, and at least one pharmaceutically acceptable carrier or diluent.

*   *   *   *   *

# EXHIBIT N

US010961307B2

(12) **United States Patent**
Johanns et al.

(10) Patent No.: **US 10,961,307 B2**
(45) Date of Patent: **Mar. 30, 2021**

(54) **METHODS OF TREATING MODERATELY TO SEVERELY ACTIVE ULCERATIVE COLITIS BY ADMINISTERING AN ANTI-IL12/IL23 ANTIBODY**

(71) Applicant: **Janssen Biotech, Inc.**, Horsham, PA (US)

(72) Inventors: **Jewel Johanns**, Devon, PA (US); **Katherine Li**, Wallingford, PA (US); **Colleen Marano**, Malvern, PA (US); **Richard Strauss**, Doylestown, PA (US); **Hongyan Zhang**, Malvern, PA (US); **Christopher O'Brien**, Lafayette Hill, PA (US); **Omoniyi Adedokun**, Phoenixville, PA (US); **Kimberly Shields-Tuttle**, West Chester, PA (US)

(73) Assignee: **Janssen Biotech, Inc.**, Horsham, PA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/580,509**

(22) Filed: **Sep. 24, 2019**

(65) **Prior Publication Data**

US 2020/0095315 A1     Mar. 26, 2020

**Related U.S. Application Data**

(60) Provisional application No. 62/895,774, filed on Sep. 4, 2019, provisional application No. 62/769,818, filed on Nov. 20, 2018, provisional application No. 62/735,501, filed on Sep. 24, 2018.

(51) **Int. Cl.**

| | |
|---|---|
| *A61K 39/00* | (2006.01) |
| *C07K 16/24* | (2006.01) |
| *A61K 9/08* | (2006.01) |
| *A61K 47/22* | (2006.01) |
| *A61K 47/26* | (2006.01) |
| *A61K 47/18* | (2017.01) |
| *A61P 1/04* | (2006.01) |
| *A61K 9/00* | (2006.01) |

(52) **U.S. Cl.**
CPC .......... *C07K 16/244* (2013.01); *A61K 9/0019* (2013.01); *A61K 9/08* (2013.01); *A61K 39/00* (2013.01); *A61K 47/183* (2013.01); *A61K 47/22* (2013.01); *A61K 47/26* (2013.01); *A61P 1/04* (2018.01); *A61K 2039/505* (2013.01); *A61K 2039/54* (2013.01); *A61K 2039/545* (2013.01); *C07K 2317/31* (2013.01); *C07K 2317/565* (2013.01)

(58) **Field of Classification Search**
CPC .............. C07K 16/244; C07K 2317/21; C07K 2317/31; C07K 2317/565; C07K 2317/76; A61K 9/0019; A61K 9/08; A61K 47/22; A61K 47/26; A61K 47/183; A61K 2039/505; A61K 2039/54; A61K 2039/545; A61P 1/04
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,457,038 | A | 10/1995 | Trinchieri et al. |
| 5,547,852 | A | 8/1996 | Seller et al. |
| 5,648,467 | A | 7/1997 | Trinchieri et al. |
| 5,780,597 | A | 7/1998 | Gately et al. |
| 5,811,523 | A | 9/1998 | Trinchieri et al. |
| 5,891,680 | A | 4/1999 | Lieschke et al. |
| 6,086,876 | A | 7/2000 | Karp et al. |
| 6,225,117 | B1 | 5/2001 | Gately et al. |
| 6,300,478 | B1 | 10/2001 | Trinchieri et al. |
| 6,338,848 | B1 | 1/2002 | Leonard et al. |
| 6,495,667 | B1 | 12/2002 | Bazan |
| 6,902,734 | B2 | 6/2005 | Giles-Komar et al. |
| 6,914,128 | B1 | 7/2005 | Salfeld et al. |
| 7,063,964 | B2 | 6/2006 | Giles-Komar et al. |
| 7,166,285 | B2 | 7/2007 | Giles-Komar et al. |
| 7,279,157 | B2 | 10/2007 | Giles-Komar et al. |
| 7,560,247 | B2 | 7/2009 | Giles-Komar et al. |
| 7,887,807 | B2 | 2/2011 | Giles-Komar et al. |
| 8,084,233 | B2 | 12/2011 | Giles-Komar et al. |
| 8,329,171 | B2 | 12/2012 | Giles-Komar et al. |
| 8,703,141 | B2 | 4/2014 | Giles-Komar et al. |
| 9,409,984 | B2 | 8/2016 | Giles-Komar et al. |
| 9,676,848 | B2 | 6/2017 | Giles-Komar et al. |
| 10,259,867 | B2 | 4/2019 | Giles-Komar et al. |
| 10,519,231 | B2 | 12/2019 | Giles-Komar et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CL | 688-2000 | 3/2000 |
| EP | 0640689 A2 | 3/1995 |

(Continued)

OTHER PUBLICATIONS

https://www.ema.europa.eu/en/medicines/human/EPAR/stelara. Accessed from the internet Jul. 13, 2020. Date provided by Google search—Jan. 15, 2009.*
https://clinicaltrials.gov/ct2/show/NCT02407236. Accessed from the internet Jul. 13, 2020.*
Adedokun, et al, "Ustekinumab Pharmacokinetics and Exposure Response in a Phase 3 Randomized Trial of Patients with Ulcerative Colitis," Clinical Gastroenterology and Hepatology, 18: 2244-2255 (2020).

(Continued)

*Primary Examiner* — Robert S Landsman
(74) *Attorney, Agent, or Firm* — Eric Dichter

(57) **ABSTRACT**

Described are methods and compositions for clinical proven safe and effective treatment of ulcerative colitis, particularly moderately to severely active ulcerative colitis in patients who have had an inadequate response to or are intolerant of a conventional or existing therapy by intravenous and/or subcutaneous administration of an anti-IL-12/IL-23p40 antibody.

**34 Claims, 1 Drawing Sheet**

**Specification includes a Sequence Listing.**

## US 10,961,307 B2
Page 2

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2009/0181027 | A1 | 7/2009 | Dal Monte et al. |
| 2018/0252728 | A1 | 9/2018 | Georgantas, III et al. |
| 2020/0062841 | A1 | 2/2020 | Giles-Komar et al. |
| 2020/0262908 | A1* | 8/2020 | Jones ........................ A61P 1/00 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 790255 A2 | 8/1997 |
| EP | 433827 B1 | 3/1998 |
| EP | 804581 B1 | 9/2001 |
| EP | 1 137 766 B1 | 9/2005 |
| WO | WO 90/05147 A1 | 5/1990 |
| WO | WO 92/05256 A1 | 4/1992 |
| WO | WO 96/33735 A | 10/1996 |
| WO | WO 97/15327 A | 5/1997 |
| WO | WO 99/37682 A2 | 7/1999 |
| WO | WO 00/34459 A1 | 6/2000 |
| WO | WO 00/56772 A1 | 9/2000 |
| WO | WO 01/19373 A2 | 3/2001 |

### OTHER PUBLICATIONS

Adedokun, et al., "Pharmacokinetics and Exposure Response Relationships of Ustekinumab in Patients with Crohn's Disease," Gastroenterology, 154: 1660-1671 (2018).

Ahern et al., "Interleukin-23 Drives Intestinal Inflammation through Direct Activity on T Cell," Immunity. 33(2):279-288 (2010).

Anderson et al., "Meta-analysis identifies 29 additional ulcerative colitis risk loci, increasing the number of confirmed associations to 47," Nature Genetics, 43(3):246-252 (2011).

Baumgart, et al., "Crohn's Disease," Lancet, 380: 1590-1605 (2012).

Berg et al., "Enterocolitis and Colon Cancer in Interleukin-10-deficient Mice are Associated with Aberrant Cytokine Production and CD4+ TH1-like Responses," Journal of Clinical Investigations, 98:1010-1020 (1996).

Steven Brant, "Promises, Delivery, and Challenges of Inflammatory Bowel Disease Risk Gene Discovery," Clinical Gastroenterology and Hepatology, 11(1):22-26 (2013).

Colombel et al., "Adalimumab for Maintenance of Clinical Response and Remission in Patients with Crohn's Disease: The CHARM Trial," Gastroenterology. 132:52-65 (2007).

Danese, et al., "Ulcerative Colitis," New England Journal of Medicine, 365:1715-1725 (2011).

Davidson et al., "IL-12, But Not IFN-γPlays a Major Role in Sustaining the Chronic Phase of Colitis in IL-10-Deficient Mice," Journal of Immunology, 161:3143-3149 (1998).

Feagan et al., "Vedolizumab as Induction and Maintenance Therapy for Ulcerative Colitis," New England Journal of Medicine, 369:699-710 (2013).

Feagan, et al., "Ustekinumab as Induction and Maintenance Therapy for Crohn's Disease," New England Journal of Medicine, 375 (20): 1946-1960 (2016).

Geremia et al., "Innate and adaptive immunity in inflammatory bowel disease," Autoimmunity Reviews, 13:3-10 (2014).

Hanauer et al., "Maintenance infliximab for Crohn's Disease: the ACCENT I randomized trial," Lancet. 359:1541-1549 (2002).

Hanauer, et al., "IM-UNITI: Three-year Efficacy, Safety, and Immunogenicity of Ustekinumab Treatment of Crohn's Disease," Journal of Crohn's and Colitis: 23-32 (2020).

Janssen Research & Development, LLC, "A Study to Evaluate the Safety and Efficacy of Ustekinumab Induction and Maintenance Therapy in participants with Moderately to Severely Active Ulcerative Colitis (UNIFI)," (Dec. 19, 2019).

Janssen Research & Development, LLC, "A Multicenter, Randomized, Double-blind, Placebo-controlled, Proof-of-Concept Study of Ustekinumab in Subjects with Active Systemic Lupus Erythematosus," Clinical Trial No. NCT0239061, Approved Jan. 18, 2017.

Li, et al., "Relationship Between Combined Histologic and Endoscopic Endpoints and Efficacy of Ustekinumab Treatment in Patients with Ulcerative Colitis," Gastroenterology, S0016-5085 (20): 35107-6 (Journal Pre-proof Aug. 2020).

Loftus, et al., "Epidemiology of inflammatory bowel disease," Gastroenterology Clinics of North America, 31:1-20 (2002).

Edward V. Loftus, Jr., "Clinical Epidemiology of Inflammatory Bowel Disease: Incidence, Prevalence, and Environmental Influences," Gastroenterology, 126(6):1504-1517 (2004).

Neurath et al., "Antibodies to Interleukin 12 Abrogate Established Experimental Colitis in Mice," Journal of Experimental Medicine, 182(5):1281-1290 (1995).

Neurath, "Cytokines in inflammatory bowel disease," Nature Revs Immunology, 14(5):329-42 (2014).

Papp, et al., Efficacy and Safety of Ustekinumab, A Human Interleukin-12/23 Monoclonal Antibody, in Patients with Psoriasis: 52 Week Results from a Randomised, Double-Blind, Placebo-Controlled Trial (PHOENIX 2), The Lancet, 371: 1675-1684 (2008).

Sandborn et al., "Adalimumab Induces and Maintains Clinical Remission in Patients With Moderate-to-Severe Ulcerative Colitis," Gastroenterology. 142:257-265 (2012).

Sandborn et al., "A Randomized Trial of Ustekinumab, a Human Interleukin-12/23 Monoclonal Antibody, in Patients with Moderate-to-Severe Crohn's Disease," Gastroenterology. 135(4):1130-1141 (2008).

Sandborn et al., "Vedolizumab as Induction and Maintenance Therapy for Crohn's Disease," New England Journal of Medicine, 369:711-721 (2013).

Sandborn, et al., "Long-Term Efficacy and Safety of Ustekinumab for Crohn's disease through the second year of therapy," Alimentary Pharmacology & Therapeutics, 48: 65-77 (2018).

Sandborn, et al., "Ustekinumab Induction and Maintenance Therapy in Refractory Crohn's Disease," The New England Journal of Medicine, 367: 1519-1528 (2012).

Sands, et al., "Safety and Efficacy of Ustekinumab Induction Therapy in Patients with Moderate to Severe Ulcerative Colitis: Results from the Phase 3 UNIFI Study," American College of Gastroenterology Conference, Philadelphia, Pennsylvania (Oct. 2018). (Poster Presentation).

Sands, et al., "Ustekinumab as Induction and Maintenance Therapy for Ulcerative Colitis," The New England Journal of Medicine, 381(13): 1201-1214 (2019).

Simon, et al., "Ustekinumab for the treatment of Crohn's disease: can it find its niche?" Therapeutic Advances in Gastroenterology, 9 (1): 26-36 (2016).

Tally et al., "An Evidence-Based Systematic Review of Medical Therapies for Inflammatory Bowel Disease," American Journal of Gastroenterology, 106 Suppl 1:S2-S25 (2011).

Uhlig et al., "Differential Activity of IL-12 and IL-23 in Mucosal and Systemic Innate Immune Pathology," Immunity. 25:309-318 (2006).

Yen et al., "IL-23 is essential for T cell-mediated colitis and promoted inflammation via IL-17 and IL-6," The Journal of Clinical Investigation, 116(5):1310-1316 (2006).

Yu et al., "Expression of Interleukin-22/STAT3 signaling pathway in ulcerative colitis and related carcinogenesis," World Journal of Gastroenterology, 19(17):2638-2649 (2013).

PCT Search Report dated Jan. 13, 2020.

* cited by examiner



US 10,961,307 B2

1

## METHODS OF TREATING MODERATELY TO SEVERELY ACTIVE ULCERATIVE COLITIS BY ADMINISTERING AN ANTI-IL12/IL23 ANTIBODY

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of U.S. Provisional Application Ser. No. 62/895,774 filed 4 Sep. 2019, U.S. Provisional Application Ser. No. 62/769,818, filed 20 Nov. 2018 and U.S. Provisional Application Ser. No. 62/735,501, filed 24 Sep., 2018, the entire contents of which are incorporated herein by reference in their entireties.

### REFERENCE TO SEQUENCE LISTING SUBMITTED ELECTRONICALLY

This application contains a sequence listing, which is submitted electronically via EFS-Web as an ASCII formatted sequence listing with a file name "JBI6010USNP1Sequence Listing.txt" creation date of 28 Aug. 2018, and having a size of 14,790 bytes. The sequence listing submitted via EFS-Web is part of the specification and is herein incorporated by reference in its entirety.

### FIELD OF THE INVENTION

The invention relates to methods of providing a clinically proven safe and clinically proven effective treatment of ulcerative colitis, particularly moderately to severely active ulcerative colitis in patients who have had an inadequate response to or are intolerant of a conventional or existing therapy and/or subcutaneous administration of an anti-IL-12/IL-23p40 antibody.

### BACKGROUND OF THE INVENTION

Inflammatory bowel diseases (IBDs), including ulcerative colitis (UC), are chronic relapsing disorders characterized by destructive inflammation and epithelial injury in the gastrointestinal (GI) tract (Baumgart and Sandborn, J Clin Invest. 98:1010-1020 (1996); Danese and Fiocchi, N Engl J Med. 365:1715-1725 (2011)). The incidence of UC in the United States is estimated to be between 9 and 12 per 100,000 persons with a prevalence of 205 to 240 per 100,000 persons (Tally et al., Am J Gastroenterol. 106 Suppl 1:S2-S25 (2011)). The estimate of the prevalence of UC in Europe is approximately 1 million people (Loftus, Gastroenterology. 126(6):1504-1517 (2004); Loftus, Gastoenterol Clin N Am. 31:1-20 (2002)). The etiology of UC is unknown. However, abnormal immune responses to contents in the gut, including intestinal microbes, are thought to drive disease in genetically predisposed individuals (Geremia et al., Autoimmun Rev. 13:3-10 (2014)). Dysregulated innate and adaptive immune pathways contribute to aberrant intestinal inflammation in IBD, and cytokines, including interleukin (IL)-12, interferon-gamma (IFNγ), and IL-23 have been implicated in the pathogenesis of UC (Geremia et al., Autoimmune Rev. 2014; 13:3-10; Neurath, Nat Rev Immunol. 14(5):329-42 (2014)).

The involvement of the IL-12/23 pathway in the pathogenesis of IBD is well established, and an important role for IL-12/IL-23 pathway in intestinal inflammation has been elucidated in colitis (Ahern et al., Immunity. 33(2):279-288 (2010); Investigator's Brochure: STELARA® (ustekinumab), edition 18. Janssen Research & Develop-

2

ment, LLC (2017); Uhlig et al., Immunity. 25:309 318 (2006); Yen et al., J Clin Invest. 116(5):1310-1316 (2006)). Early studies showed that treatment with anti-IFNγ (Berg et al., J Clin Invest. 98:1010-1020 (1996); Davidson et al., J Immunol. 161:3143-3149 (1996)) or anti-IL-12p40 monoclonal antibodies (mAb) prevented disease in experimental colitis models, suggesting an important role for type 1 T helper (Th-1) cells in promoting intestinal inflammation (Neurath et al., J Exp Med. 182(5):1281-1290 (1995)). Genome-wide association studies have implicated several genetic loci in humans in the IL-12/23 pathway that are associated with increased susceptibility to UC, including IL-23R and IL-12B (Anderson et al., Nat Genet. 43(3):246-252 (2011); Brant et al., Clin Gastroenterol Hepatol. 11(1): 22-26 (2013)). Subjects with active UC were shown to have significantly more IL-23, IL-22, IL-22R1 and p-STAT3-positive cells than subjects with inactive UC and normal controls (Yu et al., World J Gastroenterol. 19(17):2638-2649 (2013)).

Biologic therapies currently approved for the treatment of UC are either tumor necrosis factor (TNF) or integrin inhibitors (Colombel et al., Gastroenterology. 132:52-65 (2007); Hanauer et al., Lancet. 359:1541-1549 (2002); Sandborn et al., N Engl J Med. 369:711-721 (2013); Sandborn et al., Gastroenterology. 142:257-265 (2012)). However, only 1 therapy of all currently approved treatments, vedolizumab, has demonstrated efficacy in subjects who have had an inadequate response to (i.e., primary nonresponse or secondary loss of response) or are intolerant of anti-TNFs (Feagan et al., N Engl J Med. 369:699 710 (2013)). Anti-TNFs have safety risks associated with immunosuppression and not all subjects adequately respond to such therapy. Furthermore, as was observed with the anti-TNFs, inadequate response, and intolerance has been identified in subjects receiving vedolizumab for the treatment of their UC. Therefore, there remains an unmet need for novel therapies with alternative mechanisms of action.

When tested, biologic therapies that are currently approved for the treatment of UC have also demonstrated efficacy in Crohn's disease (Sandborn et al., Gastroenterology. 135(4):1130-1141 (2008)). Multiple lines of evidence suggest that inflammatory bowel disease (UC and Crohn's disease) is mediated by Th1 or Th17 cells with strong contribution from the proinflammatory cytokines, IL-12, and IL-23. Ustekinumab (STELARA®) is a fully human immunoglobulin G1 mAb to human IL-12/23p40 that prevents IL-12 and IL-23 bioactivity by inhibiting their interaction with their cell surface IL-12R131 receptor protein (Investigator's Brochure: STELARA® (ustekinumab), edition 18. Janssen Research & Development, LLC (2017)). Through this mechanism of action, ustekinumab effectively neutralizes IL-12 (Th1)- and IL-23 (Th17)-mediated cellular responses. Ustekinumab has received marketing approval globally, including countries in North America, Europe, South America, and the Asia-Pacific region, for the treatment of adult subjects with moderately to severely active Crohn's disease (the first approval for Crohn's disease was received on 11 Nov. 2016), moderate to severe plaque psoriasis, or active psoriatic arthritis, as well as for pediatric subjects (12 to 17 years old) with moderate to severe plaque psoriasis.

The efficacy and safety of intravenous (IV) ustekinumab as induction therapy in Crohn's disease have been evaluated in clinical studies CRD3001 and CRD3002. In study CRD3001, subjects with demonstrated prior failure or intolerance to one or more TNF antagonists were evaluated, and in CRD3002 subjects with history of inadequate response to

US 10,961,307 B2

3

or intolerance of corticosteroids or immunomodulators, but without a history of an inadequate response or intolerance to TNF antagonists were evaluated. In these studies, two IV doses were evaluated: a 130 mg IV fixed dose (~2 mg/kg on a mg/kg basis) was chosen for the low-dose group, while body-weight range based doses approximating ~6 mg/kg IV (weight≤55 kg: ustekinumab 260 mg; weight>55 and ≤85 kg: ustekinumab 390 mg; weight>85 kg: ustekinumab: 520 mg) were chosen as the high-dose group. In both studies, ustekinumab demonstrated clinically significant efficacy compared with placebo and was well-tolerated with a favorable safety profile.

Prior to the present invention, no studies had been conducted with ustekinumab for UC. there is a need in the art for improved methods of treating UC, particularly moderately to severely active UC, in subjects who had previously failed or were intolerant of a biologic therapy or other conventional therapy, or subjects who had demonstrated corticosteroid dependence.

BRIEF SUMMARY OF THE INVENTION

The present application relates to clinically proven safe and clinically proven effective methods and compositions for treatment of moderately to severely active ulcerative colitis (UC), particularly in subjects who have had an inadequate response to or are intolerant of a conventional or existing therapy, by administration of an anti-IL-12/IL-23p40 antibody to subjects, thereby addressing a clear unmet medical need in this subject population.

In one general aspect, the application relates to a clinically proven safe and clinically proven effective method of treating moderately to severely active ulcerative colitis (UC) in a subject in need thereof, comprising administering to the subject a pharmaceutical composition comprising a safe and effective amount of an anti-IL-12/IL-23p40 antibody, wherein the antibody comprises a heavy chain variable region and a light chain variable region, the heavy chain variable region comprising: a complementarity determining region heavy chain 1 (CDRH1) amino acid sequence of SEQ ID NO:1; a CDRH2 amino acid sequence of SEQ ID NO:2; and a CDRH3 amino acid sequence of SEQ ID NO:3; and the light chain variable region comprising: a complementarity determining region light chain 1 (CDRL1) amino acid sequence of SEQ ID NO:4; a CDRL2 amino acid sequence of SEQ ID NO:5; and a CDRL3 amino acid sequence of SEQ ID NO:6.

In certain embodiments, the anti-IL-12 and/or anti-IL-23 antibody is administered intravenously to the subject, preferably at week 0, at a dosage of about 6.0 mg/kg body weight of the subject or 130 mg per administration.

In certain embodiments, the anti-IL-12 and/or anti-IL-23 antibody is administered intravenously or subcutaneously to the subject, preferably at week 8, at a dosage of about 6.0 mg/kg body weight of the subject or 90 mg per administration, respectively.

Preferably, the subject treated by methods according to embodiments of the application has had an inadequate response to or are intolerant of a conventional or existing therapy. In some embodiments, the subject had previously failed or were intolerant of a biologic therapy, such as an anti-TNF and/or vedolizumab. In some embodiments, the subject had previously failed or were intolerant of a non-biologic therapy, such as a treatment with corticosteroids, azathioprine (AZA), and/or 6 mercaptopurine (6 MP). In some embodiments, the subject had demonstrated corticosteroid dependence.

4

In another general aspect, the application relates to a clinically proven safe and clinically proven effective method of treating moderately to severely active ulcerative colitis (UC) in a subject in need thereof, comprising:

intravenously administering to the subject a pharmaceutical composition comprising an anti-IL-12/IL-23p40 antibody at a dosage of about 6.0 mg/kg body weight of the subject or 130 mg of the antibody per administration at week 0 of the treatment, and

subcutaneously administering to the subject a pharmaceutical composition comprising an anti-IL-12/IL-23p40 antibody at a dosage of 90 mg of the antibody per administration at week 8 of the treatment,

wherein the antibody comprises a heavy chain variable region and a light chain variable region, the heavy chain variable region comprising: a complementarity determining region heavy chain 1 (CDRH1) amino acid sequence of SEQ ID NO:1; a CDRH2 amino acid sequence of SEQ ID NO:2; and a CDRH3 amino acid sequence of SEQ ID NO:3; and the light chain variable region comprising: a complementarity determining region light chain 1 (CDRL1) amino acid sequence of SEQ ID NO:4; a CDRL2 amino acid sequence of SEQ ID NO:5; and a CDRL3 amino acid sequence of SEQ ID NO:6; and

wherein the subject had previously failed or were intolerant of at least one therapy selected from the group consisting of: an anti-TNF, vedolizumab, corticosteroids, azathioprine (AZA), and 6 mercaptopurine (6 MP), or the subject had demonstrated corticosteroid dependence

In certain embodiments, methods of the present application comprise intravenously (IV) and/or subcutaneously (SC) administering to the subject a pharmaceutical composition comprising an anti-IL-12 and/or anti-IL-23 antibody or antigen binding fragment comprising: (i) a heavy chain variable domain amino acid sequence of SEQ ID NO:7; and (ii) a light chain variable domain amino acid sequence of SEQ ID NO:8.

In certain embodiments, methods of the present application comprise intravenously (IV) and/or subcutaneously (SC) administering to the subject a pharmaceutical composition comprising the anti-IL-12/23p40 antibody ustekinumab, which comprises: (i) a heavy chain amino acid sequence of SEQ ID NO:10; and (ii) a light chain amino acid sequence of SEQ ID NO:11.

In certain embodiments, the IV dose at week 0 is about 6.0 mg/kg. For example, the IV dose is 260 mg for subjects with body weight≤35 kg and ≤55 kg, 390 mg for subjects with body weight>55 kg and ≤85 kg, and 520 mg for subjects with body weight>85 kg.

In certain embodiments, the subject is a responder to a treatment of a method according to an embodiment of the application and is identified as having at least one of: (1) a clinical remission based on at least one of the global submissions and the US submissions; (2) an endoscopic healing; (3) a clinical response; (4) a change from baseline in Inflammatory Bowel Disease Questionnaire (IBDQ) score; (5) a mucosal healing; (6) a decrease from baseline in Mayo score; and (7) a normalization of one or more biomarkers selected from the group consisting of C-reactive protein, fecal lactoferrin and fecal calprotectin. Preferably, at least one of (1) to (7) above is identified from the subject by week 16, more preferably by week 8 or week 4, and most preferably by week 2 of the treatment.

In certain embodiments, the present invention provides a clinically proven safe and clinically proven effective method of treating moderately to severely active UC in a subject, wherein the subject is a responder to the treatment with the

US 10,961,307 B2

5

antibody and is identified as having a statistically significant improvement in disease activity as determined by endoscopic healing with a Mayo endoscopy subscore of 0 or 1 by week 8 of treatment with the antibody.

In other embodiments, the present invention provides a clinically proven safe and clinically proven effective method of treating moderately to severely active UC in a subject, wherein the subject is a responder to the treatment with the antibody and is identified as having a statistically significant improvement in disease activity as determined by an Ulcerative Colitis Endoscopic Index of Severity (UCEIS) score of ≤4 by week 8 of treatment with the antibody.

In certain embodiments, the subject is in clinical response as determined by a decrease from baseline in the Mayo score by ≥30% and ≥3 points and a decrease from baseline in the rectal bleeding subscore ≥1 points or a rectal bleeding subscore of 0 or 1 by week 8 of treatment with the antibody.

In other embodiments, a maintenance dose of the anti-IL-12/IL-23p40 antibody is administered every 8 weeks after the treatment at week 8 or every 12 weeks after the treatment at week 8 and clinical response is maintained by the subject for at least 44 weeks.

In certain embodiments, the present invention provides a clinically proven safe and clinically proven effective method of treating moderately to severely active UC in a subject, wherein a subject identified as a non-responder to an initial treatment is administered a second treatment, preferably with an administration route different from the initial treatment. For example, a subject identified as a non-responder to an initial treatment with an IV administration of an antibody or antibody binding fragment can be treated with a subsequent subcutaneous administration of the antibody or antibody binding fragment according to embodiments of the invention.

In certain embodiments, the present application provides for a method of treating moderately to severely active UC in a subject, wherein an anti-IL-12 and/or anti-IL-23 antibody for use with IV administration is in a pharmaceutical composition comprising a solution comprising 10 mM L-histidine, 8.5% (w/v) sucrose, 0.04% (w/v) polysorbate 80, 0.4 mg/mL L methionine, and 20 µg/mL EDTA disodium salt, dehydrate, at pH 6.0.

In certain embodiments, the present application provides for a clinically proven safe and clinically proven effective method of treating moderately to severely active UC in a subject, wherein an anti-IL-12 and/or anti-IL-23 antibody for use with subcutaneous administration is in a pharmaceutical composition comprising a solution comprising 6.7 mM L-histidine, 7.6% (w/v) sucrose, 0.004% (w/v) polysorbate 80, at pH 6.0.

In certain embodiments, the present application provides a method further comprising administering to the subject one or more additional drugs used to treat UC. In a preferred embodiment, the additional drug is selected from the group consisting of: oral 5-aminosalicylate (5-ASA) compounds, oral corticosteroids, immunomodulators, 6-mercaptopurine (6-MP), azathioprine (AZA), or methotrexate (MTX).

Other aspects of the application include pharmaceutical compositions comprising an anti-IL-12 and/or anti-IL-23 antibody for use in a clinically proven safe and clinically proven effective method of treating moderately to severely active UC in a subject, as well as methods of preparing the compositions and kits comprising the pharmaceutical compositions.

In certain embodiments, a kit useful for a method of the invention comprises at least one of a pharmaceutical composition for intravenous administration of the invention and

6

pharmaceutical composition for subcutaneous administration of the invention. In other embodiments, the kit comprises both a pharmaceutical composition for intravenous administration and a pharmaceutical composition for subcutaneous administration of the invention.

### BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing summary, as well as the following detailed description of the invention, will be better understood when read in conjunction with the appended drawings. It should be understood that the invention is not limited to the precise embodiments shown in the drawings.

FIG. 1 shows a diagrammatic representation of the study design. Abbreviations: W8=Week 8; W16=Week 16; LTE=Long-term Extension.

### DETAILED DESCRIPTION OF THE INVENTION

Various publications, articles and patents are cited or described in the background and throughout the specification; each of these references is herein incorporated by reference in its entirety. Discussion of documents, acts, materials, devices, articles or the like which has been included in the present specification is for the purpose of providing context for the invention. Such discussion is not an admission that any or all of these matters form part of the prior art with respect to any inventions disclosed or claimed.

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as commonly understood to one of ordinary skill in the art to which this invention pertains. Otherwise, certain terms used herein have the meanings as set forth in the specification. All patents, published patent applications and publications cited herein are incorporated by reference as if set forth fully herein.

It must be noted that as used herein and in the appended claims, the singular forms "a," "an," and "the" include plural reference unless the context clearly dictates otherwise. Unless otherwise indicated, the term "at least" preceding a series of elements is to be understood to refer to every element in the series. Those skilled in the art will recognize, or be able to ascertain using no more than routine experimentation, many equivalents to the specific embodiments of the invention described herein. Such equivalents are intended to be encompassed by the invention.

Throughout this specification and the claims which follow, unless the context requires otherwise, the word "comprise", and variations such as "comprises" and "comprising", will be understood to imply the inclusion of a stated integer or step or group of integers or steps but not the exclusion of any other integer or step or group of integer or step. When used herein the term "comprising" can be substituted with the term "containing" or "including" or sometimes when used herein with the term "having".

When used herein "consisting of" excludes any element, step, or ingredient not specified in the claim element. When used herein, "consisting essentially of" does not exclude materials or steps that do not materially affect the basic and novel characteristics of the claim. Any of the aforementioned terms of "comprising", "containing", "including", and "having", whenever used herein in the context of an aspect or embodiment of the invention can be replaced with the term "consisting of" or "consisting essentially of" to vary scopes of the disclosure.

US 10,961,307 B2

7

As used herein, the conjunctive term "and/or" between multiple recited elements is understood as encompassing both individual and combined options. For instance, where two elements are conjoined by "and/or", a first option refers to the applicability of the first element without the second. A second option refers to the applicability of the second element without the first. A third option refers to the applicability of the first and second elements together. Any one of these options is understood to fall within the meaning, and therefore satisfy the requirement of the term "and/or" as used herein. Concurrent applicability of more than one of the options is also understood to fall within the meaning, and therefore satisfy the requirement of the term "and/or."

As used herein, "subject" means any animal, preferably a mammal, most preferably a human, whom will be or has been treated by a method according to an embodiment of the invention. The term "mammal" as used herein, encompasses any mammal. Examples of mammals include, but are not limited to, cows, horses, sheep, pigs, cats, dogs, mice, rats, rabbits, guinea pigs, non-human primates (NHPs) such as monkeys or apes, humans, etc., more preferably a human.

As used herein, the term "in combination", in the context of the administration of two or more therapies to a subject, refers to the use of more than one therapy. The use of the term "in combination" does not restrict the order in which therapies are administered to a subject. For example, a first therapy (e.g., a composition described herein) can be administered prior to (e.g., 5 minutes, 15 minutes, 30 minutes, 45 minutes, 1 hour, 2 hours, 4 hours, 6 hours, 12 hours, 16 hours, 24 hours, 48 hours, 72 hours, 96 hours, 1 week, 2 weeks, 3 weeks, 4 weeks, 5 weeks, 6 weeks, 8 weeks, or 12 weeks before), concomitantly with, or subsequent to (e.g., 5 minutes, 15 minutes, 30 minutes, 45 minutes, 1 hour, 2 hours, 4 hours, 6 hours, 12 hours, 16 hours, 24 hours, 48 hours, 72 hours, 96 hours, 1 week, 2 weeks, 3 weeks, 4 weeks, 5 weeks, 6 weeks, 8 weeks, or 12 weeks after) the administration of a second therapy to a subject.

As used herein, an "anti-IL-12 antibody," "anti-IL-23 antibody," "anti-IL-12/23p40 antibody," or "IL-12/23p40 antibody," refers to a monoclonal antibody (mAb) or antigen binding fragment thereof, that binds the 40 kDa (p40) subunit shared by the cytokines interleukin-12 and interleukin-23 (IL-12/23p40). The antibody can affect at least one of IL-12/23 activity or function, such as but not limited to, RNA, DNA or protein synthesis, IL-12/23 release, IL-12/23 receptor signaling, membrane IL-12/23 cleavage, IL-12/23 activity, IL-12/23 production and/or synthesis.

The term "antibody" is further intended to encompass antibodies, digestion fragments, specified portions and variants thereof, including antibody mimetics or comprising portions of antibodies that mimic the structure and/or function of an antibody or specified fragment or portion thereof, including single chain antibodies and fragments thereof. Functional fragments include antigen-binding fragments that bind to a mammalian IL-12/23. For example, antibody fragments capable of binding to IL-12/23 or portions thereof, including, but not limited to, Fab (e.g., by papain digestion), Fab' (e.g., by pepsin digestion and partial reduction) and F(ab')$_2$ (e.g., by pepsin digestion), facb (e.g., by plasmin digestion), pFc' (e.g., by pepsin or plasmin digestion), Fd (e.g., by pepsin digestion, partial reduction and reaggregation), Fv or scFv (e.g., by molecular biology techniques) fragments, are encompassed by the invention (see, e.g., Colligan, Immunology, supra).

Such fragments can be produced by enzymatic cleavage, synthetic or recombinant techniques, as known in the art and/or as described herein. Antibodies can also be produced

8

in a variety of truncated forms using antibody genes in which one or more stop codons have been introduced upstream of the natural stop site. For example, a combination gene encoding a F(ab')$_2$ heavy chain portion can be designed to include DNA sequences encoding the $C_H1$ domain and/or hinge region of the heavy chain. The various portions of antibodies can be joined together chemically by conventional techniques, or can be prepared as a contiguous protein using genetic engineering techniques.

As used herein, the term "human antibody" refers to an antibody in which substantially every part of the protein (e.g., CDR, framework, $C_L$, $C_H$ domains (e.g., $C_H1$, $C_H2$, $C_H3$), hinge, ($V_L$, $V_H$)) is substantially non-immunogenic in humans, with only minor sequence changes or variations. A "human antibody" can also be an antibody that is derived from or closely matches human germline immunoglobulin sequences. Human antibodies can include amino acid residues not encoded by germline immunoglobulin sequences (e.g., mutations introduced by random or site-specific mutagenesis in vitro or by somatic mutation in vivo). Often, this means that the human antibody is substantially non-immunogenic in humans. Human antibodies have been classified into groupings based on their amino acid sequence similarities. Accordingly, using a sequence similarity search, an antibody with a similar linear sequence can be chosen as a template to create a human antibody. Similarly, antibodies designated primate (monkey, baboon, chimpanzee, etc.), rodent (mouse, rat, rabbit, guinea pig, hamster, and the like) and other mammals designate such species, sub-genus, genus, sub-family, and family specific antibodies. Further, chimeric antibodies can include any combination of the above. Such changes or variations optionally and preferably retain or reduce the immunogenicity in humans or other species relative to non-modified antibodies. Thus, a human antibody is distinct from a chimeric or humanized antibody.

It is pointed out that a human antibody can be produced by a non-human animal or prokaryotic or eukaryotic cell that is capable of expressing functionally rearranged human immunoglobulin (e.g., heavy chain and/or light chain) genes. Further, when a human antibody is a single chain antibody, it can comprise a linker peptide that is not found in native human antibodies. For example, an Fv can comprise a linker peptide, such as two to about eight glycine or other amino acid residues, which connects the variable region of the heavy chain and the variable region of the light chain. Such linker peptides are considered to be of human origin.

Anti-IL-12/23p40 antibodies (also termed IL-12/23p40 antibodies) (or antibodies to IL-23) useful in the methods and compositions of the present invention can optionally be characterized by high affinity binding to IL-12/23p40, optionally and preferably, having low toxicity. In particular, an antibody, specified fragment or variant of the invention, where the individual components, such as the variable region, constant region and framework, individually and/or collectively, optionally and preferably possess low immunogenicity, is useful in the present invention. The antibodies that can be used in the invention are optionally characterized by their ability to treat subjects for extended periods with measurable alleviation of symptoms and low and/or acceptable toxicity. Low or acceptable immunogenicity and/or high affinity, as well as other suitable properties, can contribute to the therapeutic results achieved. "Low immunogenicity" is defined herein as raising significant HAHA, HACA or HAMA responses in less than about 75%, or preferably less than about 50% of the subjects treated and/or raising low titres in the subject treated (less than about 300,

US 10,961,307 B2

9

preferably less than about 100 measured with a double antigen enzyme immunoassay) (Elliott et al., Lancet 344: 1125-1127 (1994), entirely incorporated herein by reference). "Low immunogenicity" can also be defined as the incidence of titrable levels of antibodies to the anti-IL-12 antibody in subjects treated with anti-IL-12 antibody as occurring in less than 25% of subjects treated, preferably, in less than 10% of subjects treated with the recommended dose for the recommended course of therapy during the treatment period.

The terms "clinically proven efficacy" and "clinically proven effective" as used herein in the context of a dose, dosage regimen, treatment or method refer to the effectiveness of a particular dose, dosage or treatment regimen. Efficacy can be measured based on change in the course of the disease in response to an agent of the present invention. For example, an anti-IL12/23p40 of the present invention (e.g., ustekinumab) is administered to a subject in an amount and for a time sufficient to induce an improvement, preferably a sustained improvement, in at least one indicator that reflects the severity of the disorder that is being treated. Various indicators that reflect the extent of the subject's illness, disease or condition can be assessed for determining whether the amount and time of the treatment is sufficient. Such indicators include, for example, clinically recognized indicators of disease severity, symptoms, or manifestations of the disorder in question. The degree of improvement generally is determined by a physician, who can make this determination based on signs, symptoms, biopsies, or other test results, and who can also employ questionnaires that are administered to the subject, such as quality-of-life questionnaires developed for a given disease. For example, an anti-IL12/23p40 or anti-IL23 antibody of the present invention can be administered to achieve an improvement in a subject's condition related to ulcerative colitis.

Improvement can be indicated by an improvement in an index of disease activity, by amelioration of clinical symptoms or by any other measure of disease activity. Once such index of disease is the ulcerative colitis Mayo score. The Mayo score is an established, validated disease activity index for mild, moderate, and severe ulcerative colitis (UC) that is calculated as the sum of the 4 subscores of stool frequency, rectal bleeding, findings of endoscopy, and physician's global assessment (PGA), and ranges from 0-12. A score of 3 to 5 points indicates mildly active disease, a score of 6 to 10 points indicates moderately active disease, and a score of 11 to 12 points indicates severe disease. The partial Mayo score, which is the Mayo score without the endoscopy subscore, is calculated as the sum of stool frequency, rectal bleeding, and physician's global assessment subscores, and ranges from 0 to 9. The modified Mayo score, which is the Mayo score without the PGA subscore, is calculated as the sum of the stool frequency, rectal bleeding, and endoscopy subscores, and ranges from 0 to 9. Other disease activity indexes for UC include for example, Ulcerative Colitis Endoscopic Index of Severity (UCEIS) score and the Bristol Stool Form Scale (BSFS) score. The UCEIS score provides an overall assessment of endoscopic severity of UC, based on mucosal vascular pattern, bleeding, and ulceration (Travis et al., Gut. 61:535-542 (2012)). The score ranges from 3 to 11 with a higher score indicating more severe disease by endoscopy. The BSFS score is used to classify the form (or consistency) of human feces into 7 categories (Lewis and Heaton, Scand J Gastroenterol. 32(9):920-924 (1997)).

The term "clinical response" as used herein as it relates to a subject's response to drug administration, refers to a decrease from induction baseline in the Mayo score by

10

≥30% and ≥3 points, with either a decrease from baseline in the rectal bleeding subscore ≥1 or a rectal bleeding subscore of 0 or 1.

The term "clinically proven safe," as it relates to a dose, dosage regimen, treatment or method with anti-IL-12/IL-23p40 antibody of the present invention (e.g., ustekinumab), refers to a favorable risk:benefit ratio with an acceptable frequency and/or acceptable severity of treatment-emergent adverse events (referred to as AEs or TEAEs) compared to the standard of care or to another comparator. As used herein, "adverse event," "treatment-emergent adverse event," and "adverse reaction" mean any harm, unfavorable, unintended or undesired sign or outcome associated with or caused by administration of a pharmaceutical composition or therapeutic. It is an untoward medical occurrence in a subject administered a medicinal product. However, abnormal values or observations are not reported as adverse events unless considered clinically significant by the investigator. As used herein, when referring to an adverse event, "clinically apparent" means clinically significant as determined by a medical doctor or an investigator using standard acceptable to those of ordinary skill in the art. When the harm or undesired outcome of adverse events reaches such a level of severity, a regulatory agency can deem the pharmaceutical composition or therapeutic unacceptable for the proposed use. In particular, "safe" as it relates to a dose, dosage regimen or treatment with an anti-IL12/23p40 or anti-IL23 antibody of the present invention refers to with an acceptable frequency and/or acceptable severity of adverse events associated with administration of the antibody if attribution is considered to be possible, probable, or very likely due to the use of the anti-IL12/23p40 or anti-IL23 antibody.

As used herein, unless otherwise noted, the term "clinically proven" (used independently or to modify the terms "safe" and/or "effective") shall mean that it has been proven by a clinical trial wherein the clinical trial has met the approval standards of U.S. Food and Drug Administration, EMEA or a corresponding national regulatory agency. For example, the clinical study may be an adequately sized, randomized, double-blinded study used to clinically prove the effects of the drug.

As used herein, a dosage amount of an anti-IL-12/IL-23p40 antibody in "mg/kg" refers to the amount of the anti-IL-12/IL-23p40 antibody in milligrams per kilogram of the body weight of a subject to be administered with the antibody.

Antibodies of the Present Invention—Production and Generation

At least one anti-IL-12/23p40 (or anti-IL-23) used in the method of the present invention can be optionally produced by a cell line, a mixed cell line, an immortalized cell or clonal population of immortalized cells, as well known in the art. See, e.g., Ausubel, et al., ed., Current Protocols in Molecular Biology, John Wiley & Sons, Inc., NY, NY (1987-2001); Sambrook, et al., Molecular Cloning: A Laboratory Manual, 2nd Edition, Cold Spring Harbor, N.Y. (1989); Harlow and Lane, antibodies, a Laboratory Manual, Cold Spring Harbor, N.Y. (1989); Colligan, et al., eds., Current Protocols in Immunology, John Wiley & Sons, Inc., NY (1994-2001); Colligan et al., Current Protocols in Protein Science, John Wiley & Sons, NY, N.Y., (1997-2001), each entirely incorporated herein by reference.

Human antibodies that are specific for human IL-12/23p40 or IL-23 proteins or fragments thereof can be raised against an appropriate immunogenic antigen, such as an isolated IL-12/23p40 protein, IL-23 protein and/or a portion

US 10,961,307 B2

11

thereof (including synthetic molecules, such as synthetic peptides). Other specific or general mammalian antibodies can be similarly raised. Preparation of immunogenic antigens, and monoclonal antibody production can be performed using any suitable technique in view of the present disclosure.

In one approach, a hybridoma is produced by fusing a suitable immortal cell line (e.g., a myeloma cell line, such as, but not limited to, Sp2/0, Sp2/0-AG14, NSO, NS1, NS2, AE-1, L.5, L243, P3X63Ag8.653, Sp2 SA3, Sp2 MAI, Sp2 SS1, Sp2 SA5, U937, MLA 144, ACT IV, MOLT4, DA-1, JURKAT, WEHI, K-562, COS, RAJI, NIH 3T3, HL-60, MLA 144, NAMALWA, NEURO 2A, or the like, or heteromylomas, fusion products thereof, or any cell or fusion cell derived therefrom, or any other suitable cell line as known in the art) (see, e.g., www.atcc.org, www.lifetech.com, and the like), with antibody producing cells, such as, but not limited to, isolated or cloned spleen, peripheral blood, lymph, tonsil, or other immune or B cell containing cells, or any other cells expressing heavy or light chain constant or variable or framework or CDR sequences, either as endogenous or heterologous nucleic acid, as recombinant or endogenous, viral, bacterial, algal, prokaryotic, amphibian, insect, reptilian, fish, mammalian, rodent, equine, ovine, goat, sheep, primate, eukaryotic, genomic DNA, cDNA, rDNA, mitochondrial DNA or RNA, chloroplast DNA or RNA, hnRNA, mRNA, tRNA, single, double or triple stranded, hybridized, and the like or any combination thereof. See, e.g., Ausubel, supra, and Colligan, Immunology, supra, chapter 2, entirely incorporated herein by reference.

Antibody producing cells can also be obtained from the peripheral blood or, preferably, the spleen or lymph nodes, of humans or other suitable animals that have been immunized with the antigen of interest. Any other suitable host cell can also be used for expressing heterologous or endogenous nucleic acid encoding an antibody, specified fragment or variant thereof, of the present invention. The fused cells (hybridomas) or recombinant cells are isolated using selective culture conditions or other suitable known methods, and cloned by limiting dilution or cell sorting, or other known methods. Cells which produce antibodies with the desired specificity can be selected by a suitable assay (e.g., ELISA).

Other suitable methods of producing or isolating antibodies of the requisite specificity can be used, including, but not limited to, methods that select recombinant antibody from a peptide or protein library (e.g., but not limited to, a bacteriophage, ribosome, oligonucleotide, RNA, cDNA, or the like, display library; e.g., as available from Cambridge antibody Technologies, Cambridgeshire, UK; MorphoSys, Martinsreid/Planegg, DE; Biovation, Aberdeen, Scotland, UK; Biolnvent, Lund, Sweden; Dyax Corp., Enzon, Affymax/Biosite; Xoma, Berkeley, Calif.; Ixsys. See, e.g., EP 368,684, PCT/GB91/01134; PCT/GB92/01755; PCT/GB92/002240; PCT/GB92/00883; PCT/GB93/00605; U.S. Ser. No. 08/350,260(5/12/94); PCT/GB94/01422; PCT/GB94/02662; PCT/GB97/01835; (CAT/MRC); WO90/14443; WO90/14424; WO90/14430; PCT/US94/1234; WO92/18619; WO96/07754; (Scripps); WO96/13583, WO97/08320 (MorphoSys); WO95/16027 (BioInvent); WO88/06630; WO90/3809 (Dyax); U.S. Pat. No. 4,704,692 (Enzon); PCT/US91/02989 (Affymax); WO89/06283; EP 371 998; EP 550 400; (Xoma); EP 229 046; PCT/US91/07149 (Ixsys); or stochastically generated peptides or proteins—U.S. Pat. Nos. 5,723,323, 5,763,192, 5,814,476, 5,817,483, 5,824,514, 5,976,862, WO 86/05803, EP 590 689

12

(Ixsys, predecessor of Applied Molecular Evolution (AME), each entirely incorporated herein by reference)) or that rely upon immunization of transgenic animals (e.g., SCID mice, Nguyen et al., Microbiol. Immunol. 41:901-907 (1997); Sandhu et al., Crit. Rev. Biotechnol. 16:95-118 (1996); Eren et al., Immunol. 93:154-161 (1998), each entirely incorporated by reference as well as related patents and applications) that are capable of producing a repertoire of human antibodies, as known in the art and/or as described herein. Such techniques, include, but are not limited to, ribosome display (Hanes et al., Proc. Natl. Acad. Sci. USA, 94:4937-4942 (Can 1997); Hanes et al., Proc. Natl. Acad. Sci. USA, 95:14130-14135 (November 1998)); single cell antibody producing technologies (e.g., selected lymphocyte antibody method ("SLAM") (U.S. Pat. No. 5,627,052, Wen et al., J. Immunol. 17:887-892 (1987); Babcook et al., Proc. Natl. Acad. Sci. USA 93:7843-7848 (1996)); gel microdroplet and flow cytometry (Powell et al., Biotechnol. 8:333-337 (1990); One Cell Systems, Cambridge, Mass.; Gray et al., J. Imm. Meth. 182:155-163 (1995); Kenny et al., Bio/Technol. 13:787-790 (1995)); B-cell selection (Steenbakkers et al., Molec. Biol. Reports 19:125-134 (1994); Jonak et al., Progress Biotech, Vol. 5, In Vitro Immunization in Hybridoma Technology, Borrebaeck, ed., Elsevier Science Publishers B.V., Amsterdam, Netherlands (1988)).

Methods for engineering or humanizing non-human or human antibodies can also be used and are well known in the art. Generally, a humanized or engineered antibody has one or more amino acid residues from a source that is non-human, e.g., but not limited to, mouse, rat, rabbit, non-human primate or other mammal. These non-human amino acid residues are replaced by residues often referred to as "import" residues, which are typically taken from an "import" variable, constant or other domain of a known human sequence.

Known human Ig sequences are disclosed, e.g., www.ncbi.nlm.nih.gov/entrez/query.fcgi; www.ncbi.nih.gov/igblast; www.atcc.org/phage/hdb.html; www.mrc-cpe.cam.ac.uk/ALIGNMENTS.php; www.kabatdatabase.com/top.html; ftp.ncbi.nih.gov/repository/kabat; www.sciquest.com; www.abcam.com; www.antibodyresource.com/onlinecomp.html; www.public.iastate.edu/~pedro/research_tools.html; www.whfreeman.com/immunology/CH05/kuby05.htm; www.hhmi.org/grants/lectures/1996/vlab; www.path.cam.ac.uk/~mrc7/mikeimages.html; mcb.harvard.edu/BioLinks/Immunology.html; www.immunologylink.com; pathbox.wustl.edu/~hcenter/index.html; www.appliedbiosystems.com; www.nal.usda.gov/awic/pubs/antibody; www.m.ehime-u.ac.jp/~yasuhito/Elisa.html; www.biodesign.com; www.cancerresearchuk.org; www.biotech.ufl.edu; www.isac-net.org; baserv.uci.kun.n1/~jraats/links1.html; www.recab.uni-hd.de/immuno.bme.nwu.edu; www.mrc-cpe.cam.ac.uk; www.ibt.unam.antibody.bath.ac.uk; www.unizh.ch; www.cryst.bbk.ac.uk/~ubcg07s; www.nimr.mrc.ac.uk/CC/ccaewg/ccaewg.html; www.path.cam.ac.uk/~mrc7/humanisation/TAHHP.html; www.ibt.unam.mx/vir/structure/stat_aim.html; www.biosci.missouri.edu/smithgp/index.html; www.jerini.de; Kabat et al., Sequences of Proteins of Immunological Interest, U.S. Dept. Health (1983), each entirely incorporated herein by reference.

Such imported sequences can be used to reduce immunogenicity or reduce, enhance or modify binding, affinity, on-rate, off-rate, avidity, specificity, half-life, or any other suitable characteristic, as known in the art. In general, the CDR residues are directly and most substantially involved in

US 10,961,307 B2

13

influencing antigen binding. Accordingly, part or all of the non-human or human CDR sequences are maintained while the non-human sequences of the variable and constant regions can be replaced with human or other amino acids.

Antibodies can also optionally be humanized or human antibodies engineered with retention of high affinity for the antigen and other favorable biological properties. To achieve this goal, humanized (or human) antibodies can be optionally prepared by a process of analysis of the parental sequences and various conceptual humanized products using three-dimensional models of the parental and humanized sequences. Three-dimensional immunoglobulin models are commonly available and are familiar to those skilled in the art. Computer programs are available which illustrate and display probable three-dimensional conformational structures of selected candidate immunoglobulin sequences. Inspection of these displays permits analysis of the likely role of the residues in the functioning of the candidate immunoglobulin sequence, i.e., the analysis of residues that influence the ability of the candidate immunoglobulin to bind its antigen. In this way, framework (FR) residues can be selected and combined from the consensus and import sequences so that the desired antibody characteristic, such as increased affinity for the target antigen(s), is achieved.

In addition, the human anti-IL-12/23p40 (or anti-IL-23) specific antibody used in the method of the present invention can comprise a human germline light chain framework. In particular embodiments, the light chain germline sequence is selected from human VK sequences including, but not limited to, A1, A10, A11, A14, A17, A18, A19, A2, A20, A23, A26, A27, A3, A30, A5, A7, B2, B3, L1, L10, L11, L12, L14, L15, L16, L18, L19, L2, L20, L22, L23, L24, L25, L4/18a, L5, L6, L8, L9, O1, O11, O12, O14, O18, O2, O4, and O8. In certain embodiments, this light chain human germline framework is selected from V1-11, V1-13, V1-16, V1-17, V1-18, V1-19, V1-2, V1-20, V1-22, V1-3, V1-4, V1-5, V1-7, V1-9, V2-1, V2-11, V2-13, V2-14, V2-15, V2-17, V2-19, V2-6, V2-7, V2-8, V3-2, V3-3, V3-4, V4-1, V4-2, V4-3, V4-4, V4-6, V5-1, V5-2, V5-4, and V5-6.

In other embodiments, the human anti-IL-12/23p40 (or anti-IL-23) specific antibody used in the method of the present invention can comprise a human germline heavy chain framework. In particular embodiments, this heavy chain human germline framework is selected from VH1-18, VH1-2, VH1-24, VH1-3, VH1-45, VH1-46, VH1-58, VH1-69, VH1-8, VH2-26, VH2-5, VH2-70, VH3-11, VH3-13, VH3-15, VH3-16, VH3-20, VH3-21, VH3-23, VH3-30, VH3-33, VH3-35, VH3-38, VH3-43, VH3-48, VH3-49, VH3-53, VH3-64, VH3-66, VH3-7, VH3-72, VH3-73, VH3-74, VH3-9, VH4-28, VH4-31, VH4-34, VH4-39, VH4-4, VH4-59, VH4-61, VH5-51, VH6-1, and VH7-81.

In particular embodiments, the light chain variable region and/or heavy chain variable region comprises a framework region or at least a portion of a framework region (e.g., containing 2 or 3 subregions, such as FR2 and FR3). In certain embodiments, at least FRL1, FRL2, FRL3, or FRL4 is fully human. In other embodiments, at least FRH1, FRH2, FRH3, or FRH4 is fully human. In some embodiments, at least FRL1, FRL2, FRL3, or FRL4 is a germline sequence (e.g., human germline) or comprises human consensus sequences for the particular framework (readily available at the sources of known human Ig sequences described above). In other embodiments, at least FRH1, FRH2, FRH3, or FRH4 is a germline sequence (e.g., human germline) or comprises human consensus sequences for the particular framework. In preferred embodiments, the framework region is a fully human framework region.

14

Humanization or engineering of antibodies of the present invention can be performed using any known method, such as but not limited to those described in, Winter (Jones et al., Nature 321:522 (1986); Riechmann et al., Nature 332:323 (1988); Verhoeyen et al., Science 239:1534 (1988)), Sims et al., J. Immunol. 151: 2296 (1993); Chothia and Lesk, J. Mol. Biol. 196:901 (1987), Carter et al., Proc. Natl. Acad. Sci. U.S.A. 89:4285 (1992); Presta et al., J. Immunol. 151:2623 (1993), U.S. Pat. Nos. 5,723,323, 5,976,862, 5,824,514, 5,817,483, 5,814,476, 5,763,192, 5,723,323, 5,766886, 5714352, 6204023, 6180370, 5693762, 5530101, 5585089, 5225539; 4816567, PCT/: US98/16280, US96/18978, US91/09630, US91/05939, US94/01234, GB89/01334, GB91/01134, GB92/01755; WO90/14443, WO90/14424, WO90/14430, EP 229246, each entirely incorporated herein by reference, included references cited therein.

In certain embodiments, the antibody comprises an altered (e.g., mutated) Fc region. For example, in some embodiments, the Fc region has been altered to reduce or enhance the effector functions of the antibody. In some embodiments, the Fc region is an isotype selected from IgM, IgA, IgG, IgE, or other isotype. Alternatively, or additionally, it can be useful to combine amino acid modifications with one or more further amino acid modifications that alter C1q binding and/or the complement dependent cytotoxicity function of the Fc region of an IL-23 binding molecule. The starting polypeptide of particular interest can be one that binds to C1q and displays complement dependent cytotoxicity (CDC). Polypeptides with pre-existing C1q binding activity, optionally further having the ability to mediate CDC can be modified such that one or both of these activities are enhanced. Amino acid modifications that alter C1q and/or modify its complement dependent cytotoxicity function are described, for example, in WO0042072, which is hereby incorporated by reference.

As disclosed above, one can design an Fc region of the human anti-IL-12/23p40 (or anti-IL-23) specific antibody of the present invention with altered effector function, e.g., by modifying C1q binding and/or FcγR binding and thereby changing complement dependent cytotoxicity (CDC) activity and/or antibody-dependent cell-mediated cytotoxicity (ADCC) activity. "Effector functions" are responsible for activating and diminishing a biological activity (e.g., in a subject). Examples of effector functions include, but are not limited to: C1q binding; CDC; Fc receptor binding; ADCC; phagocytosis; down regulation of cell surface receptors (e.g., B cell receptor; BCR), etc. Such effector functions can require the Fc region to be combined with a binding domain (e.g., an antibody variable domain) and can be assessed using various assays (e.g., Fc binding assays, ADCC assays, CDC assays, etc.).

For example, one can generate a variant Fc region of the human anti-IL-12/23p40 (or anti-IL-23) antibody with improved C1q binding and improved FcγRIII binding (e.g., having both improved ADCC activity and improved CDC activity). Alternatively, if it is desired that effector function be reduced or ablated, a variant Fc region can be engineered with reduced CDC activity and/or reduced ADCC activity. In other embodiments, only one of these activities can be increased, and, optionally, also the other activity reduced (e.g., to generate an Fc region variant with improved ADCC activity, but reduced CDC activity and vice versa).

Fc mutations can also be introduced in engineer to alter their interaction with the neonatal Fc receptor (FcRn) and improve their pharmacokinetic properties. A collection of human Fc variants with improved binding to the FcRn have been described (Shields et al., (2001). High resolution

US 10,961,307 B2

15

mapping of the binding site on human IgG1 for FcγRI, FcγRII, FcγRIII, and FcRn and design of IgG1 variants with improved binding to the FcγR, J. Biol. Chem. 276:6591-6604).

Another type of amino acid substitution serves to alter the glycosylation pattern of the Fc region of the human anti-IL-12/23p40 (or anti-IL-23) specific antibody. Glycosylation of an Fc region is typically either N-linked or O-linked. N-linked refers to the attachment of the carbohydrate moiety to the side chain of an asparagine residue. O-linked glycosylation refers to the attachment of one of the sugars N-aceylgalactosamine, galactose, or xylose to a hydroxyamino acid, most commonly serine or threonine, although 5-hydroxyproline or 5-hydroxylysine can also be used. The recognition sequences for enzymatic attachment of the carbohydrate moiety to the asparagine side chain peptide sequences are asparagine-X-serine and asparagine-X-threonine, where X is any amino acid except proline. Thus, the presence of either of these peptide sequences in a polypeptide creates a potential glycosylation site.

The glycosylation pattern can be altered, for example, by deleting one or more glycosylation site(s) found in the polypeptide, and/or adding one or more glycosylation sites that are not present in the polypeptide. Addition of glycosylation sites to the Fc region of a human IL-23 specific antibody is conveniently accomplished by altering the amino acid sequence such that it contains one or more of the above-described tripeptide sequences (for N-linked glycosylation sites). An exemplary glycosylation variant has an amino acid substitution of residue Asn 297 of the heavy chain. The alteration can also be made by the addition of, or substitution by, one or more serine or threonine residues to the sequence of the original polypeptide (for O-linked glycosylation sites). Additionally, a change of Asn 297 to Ala can remove one of the glycosylation sites.

In certain embodiments, the human anti-IL-12/23p40 (or anti-IL-23) specific antibody of the present invention is expressed in cells that express beta (1,4)-N-acetylglucosaminyltransferase III (GnT III), such that GnT III adds GlcNAc to the human anti-IL-12/23p40 (or anti-IL-23) antibody. Methods for producing antibodies in such a fashion are provided in WO/9954342, WO/03011878, patent publication 20030003097A1, and Umana et al., Nature Biotechnology, 17:176-180, February 1999; all of which are herein specifically incorporated by reference in their entireties.

The human anti-IL-12/23p40 (or anti-IL-23) antibody can also be optionally generated by immunization of a transgenic animal (e.g., mouse, rat, hamster, non-human primate, and the like) capable of producing a repertoire of human antibodies, as described herein and/or as known in the art. Cells that produce a human anti-IL-12/23p40 (or anti-IL-23) antibody can be isolated from such animals and immortalized using suitable methods, such as the methods described herein.

Transgenic mice that can produce a repertoire of human antibodies that bind to human antigens can be produced by known methods (e.g., but not limited to, U.S. Pat. Nos. 5,770,428, 5,569,825, 5,545,806, 5,625,126, 5,625,825, 5,633,425, 5,661,016 and 5,789,650 issued to Lonberg et al.; Jakobovits et al. WO 98/50433, Jakobovits et al. WO 98/24893, Lonberg et al. WO 98/24884, Lonberg et al. WO 97/13852, Lonberg et al. WO 94/25585, Kucherlapate et al. WO 96/34096, Kucherlapate et al. EP 0463 151 B1, Kucherlapate et al. EP 0710 719 A1, Surani et al. U.S. Pat. No. 5,545,807, Bruggemann et al. WO 90/04036, Bruggemann et al. EP 0438 474 B1, Lonberg et al. EP 0814 259 A2,

16

Lonberg et al. GB 2 272 440 A, Lonberg et al. Nature 368:856-859 (1994), Taylor et al., Int. Immunol. 6(4)579-591 (1994), Green et al, Nature Genetics 7:13-21 (1994), Mendez et al., Nature Genetics 15:146-156 (1997), Taylor et al., Nucleic Acids Research 20(23):6287-6295 (1992), Tuaillon et al., Proc Natl Acad Sci USA 90(8)3720-3724 (1993), Lonberg et al., Int Rev Immunol 13(1):65-93 (1995) and Fishwald et al., Nat Biotechnol 14(7):845-851 (1996), which are each entirely incorporated herein by reference). Generally, these mice comprise at least one transgene comprising DNA from at least one human immunoglobulin locus that is functionally rearranged, or which can undergo functional rearrangement. The endogenous immunoglobulin loci in such mice can be disrupted or deleted to eliminate the capacity of the animal to produce antibodies encoded by endogenous genes.

Screening antibodies for specific binding to similar proteins or fragments can be conveniently achieved using peptide display libraries. This method involves the screening of large collections of peptides for individual members having the desired function or structure. Antibody screening of peptide display libraries is well known in the art. The displayed peptide sequences can be from 3 to 5000 or more amino acids in length, frequently from 5-100 amino acids long, and often from about 8 to 25 amino acids long. In addition to direct chemical synthetic methods for generating peptide libraries, several recombinant DNA methods have been described. One type involves the display of a peptide sequence on the surface of a bacteriophage or cell. Each bacteriophage or cell contains the nucleotide sequence encoding the particular displayed peptide sequence. Such methods are described in PCT Patent Publication Nos. 91/17271, 91/18980, 91/19818, and 93/08278.

Other systems for generating libraries of peptides have aspects of both in vitro chemical synthesis and recombinant methods. See, PCT Patent Publication Nos. 92/05258, 92/14843, and 96/19256. See also, U.S. Pat. Nos. 5,658,754; and 5,643,768. Peptide display libraries, vector, and screening kits are commercially available from suppliers as Invitrogen (Carlsbad, Calif.), and Cambridge antibody Technologies (Cambridgeshire, UK). See, e.g., U.S. Pat. Nos. 4,704,692, 4,939,666, 4,946,778, 5,260,203, 5,455,030, 5,518,889, 5,534,621, 5,656,730, 5,763,733, 5,767,260, 5,856,456, assigned to Enzon; U.S. Pat. Nos. 5,223,409, 5,403,484, 5,571,698, 5,837,500, assigned to Dyax, 5427908, 5580717, assigned to Affymax; 5885793, assigned to Cambridge antibody Technologies; 5750373, assigned to Genentech, 5618920, 5595898, 5576195, 5698435, 5693493, 5698417, assigned to Xoma, Colligan, supra; Ausubel, supra; or Sambrook, supra, each of the above patents and publications entirely incorporated herein by reference.

Antibodies used in the method of the present invention can also be prepared using at least one anti-IL-12/23p40 (or anti-IL-23) antibody encoding nucleic acid to provide transgenic animals or mammals, such as goats, cows, horses, sheep, rabbits, and the like, that produce such antibodies in their milk. Such animals can be provided using known methods. See, e.g., but not limited to, U.S. Pat. Nos. 5,827, 690; 5,849,992; 4,873,316; 5,849,992; 5,994,616; 5,565, 362; 5,304,489, and the like, each of which is entirely incorporated herein by reference.

Antibodies used in the method of the present invention can additionally be prepared using at least one anti-IL-12/23p40 (or anti-IL-23) antibody encoding nucleic acid to provide transgenic plants and cultured plant cells (e.g., but not limited to, tobacco and maize) that produce such anti-

US 10,961,307 B2

17
18

bodies, specified portions or variants in the plant parts or in cells cultured therefrom. As a non-limiting example, transgenic tobacco leaves expressing recombinant proteins have been successfully used to provide large amounts of recombinant proteins, e.g., using an inducible promoter. See, e.g., Cramer et al., Curr. Top. Microbiol. Immunol. 240:95-118 (1999) and references cited therein. Also, transgenic maize have been used to express mammalian proteins at commercial production levels, with biological activities equivalent to those produced in other recombinant systems or purified from natural sources. See, e.g., Hood et al., Adv. Exp. Med. Biol. 464:127-147 (1999) and references cited therein. Antibodies have also been produced in large amounts from transgenic plant seeds including antibody fragments, such as single chain antibodies (scFv's), including tobacco seeds and potato tubers. See, e.g., Conrad et al., Plant Mol. Biol. 38:101-109 (1998) and references cited therein. Thus, antibodies of the present invention can also be produced using transgenic plants, according to known methods. See also, e.g., Fischer et al., Biotechnol. Appl. Biochem. 30:99-108 (October, 1999), Ma et al., Trends Biotechnol. 13:522-7 (1995); Ma et al., Plant Physiol. 109:341-6 (1995); Whitelam et al., Biochem. Soc. Trans. 22:940-944 (1994); and references cited therein. Each of the above references is entirely incorporated herein by reference.

The antibodies used in the method of the invention can bind human IL-12/IL-23p40 or IL-23 with a wide range of affinities (KD). In a preferred embodiment, a human mAb can optionally bind human IL-12/IL-23p40 or IL-23 with high affinity. For example, a human mAb can bind human IL-12/IL-23p40 or IL-23 with a KD equal to or less than about 10-7 M, such as but not limited to, 0.1-9.9 (or any range or value therein)×10-7, 10-8, 10-9, 10-10, 10-11, 10-12, 10-13 or any range or value therein.

The affinity or avidity of an antibody for an antigen can be determined experimentally using any suitable method. (See, for example, Berzofsky, et al., "Antibody-Antigen Interactions," In Fundamental Immunology, Paul, W. E., Ed., Raven Press: New York, N.Y. (1984); Kuby, Janis Immunology, W. H. Freeman and Company: New York, N.Y. (1992); and methods described herein). The measured affinity of a particular antibody-antigen interaction can vary if measured under different conditions (e.g., salt concentration, pH). Thus, measurements of affinity and other antigen-binding parameters (e.g., KD, Ka, Kd) are preferably made with standardized solutions of antibody and antigen, and a standardized buffer, such as the buffer described herein.

Vectors and Host Cells

The present invention also relates to vectors that include isolated nucleic acid molecules, host cells that are genetically engineered with the recombinant vectors, and the production of at least one anti-IL-12/IL-23p40 antibody by recombinant techniques, as is well known in the art. See, e.g., Sambrook, et al., supra; Ausubel, et al., supra, each entirely incorporated herein by reference.

The polynucleotides can optionally be joined to a vector containing a selectable marker for propagation in a host. Generally, a plasmid vector is introduced in a precipitate, such as a calcium phosphate precipitate, or in a complex with a charged lipid. If the vector is a virus, it can be packaged in vitro using an appropriate packaging cell line and then transduced into host cells.

The DNA insert should be operatively linked to an appropriate promoter. The expression constructs will further contain sites for transcription initiation, termination and, in the transcribed region, a ribosome binding site for translation. The coding portion of the mature transcripts expressed by the constructs will preferably include a translation initiating at the beginning and a termination codon (e.g., UAA, UGA or UAG) appropriately positioned at the end of the mRNA to be translated, with UAA and UAG preferred for mammalian or eukaryotic cell expression.

Expression vectors will preferably but optionally include at least one selectable marker. Such markers include, e.g., but are not limited to, methotrexate (MTX), dihydrofolate reductase (DHFR, U.S. Pat. Nos. 4,399,216; 4,634,665; 4,656,134; 4,956,288; 5,149,636; 5,179,017, ampicillin, neomycin (G418), mycophenolic acid, or glutamine synthetase (GS, U.S. Pat. Nos. 5,122,464; 5,770,359; 5,827,739) resistance for eukaryotic cell culture, and tetracycline or ampicillin resistance genes for culturing in E. coli and other bacteria or prokaryotics (the above patents are entirely incorporated hereby by reference). Appropriate culture mediums and conditions for the above-described host cells are known in the art. Suitable vectors will be readily apparent to the skilled artisan. Introduction of a vector construct into a host cell can be effected by calcium phosphate transfection, DEAE-dextran mediated transfection, cationic lipid-mediated transfection, electroporation, transduction, infection or other known methods. Such methods are described in the art, such as Sambrook, supra, Chapters 1-4 and 16-18; Ausubel, supra, Chapters 1, 9, 13, 15, 16.

At least one antibody used in the method of the present invention can be expressed in a modified form, such as a fusion protein, and can include not only secretion signals, but also additional heterologous functional regions. For instance, a region of additional amino acids, particularly charged amino acids, can be added to the N-terminus of an antibody to improve stability and persistence in the host cell, during purification, or during subsequent handling and storage. Also, peptide moieties can be added to an antibody of the present invention to facilitate purification. Such regions can be removed prior to final preparation of an antibody or at least one fragment thereof. Such methods are described in many standard laboratory manuals, such as Sambrook, supra, Chapters 17.29-17.42 and 18.1-18.74; Ausubel, supra, Chapters 16, 17 and 18.

Those of ordinary skill in the art are knowledgeable in the numerous expression systems available for expression of a nucleic acid encoding a protein used in the method of the present invention. Alternatively, nucleic acids can be expressed in a host cell by turning on (by manipulation) in a host cell that contains endogenous DNA encoding an antibody. Such methods are well known in the art, e.g., as described in U.S. Pat. Nos. 5,580,734, 5,641,670, 5,733,746, and 5,733,761, entirely incorporated herein by reference.

Illustrative of cell cultures useful for the production of the antibodies, specified portions or variants thereof, are mammalian cells. Mammalian cell systems often will be in the form of monolayers of cells although mammalian cell suspensions or bioreactors can also be used. A number of suitable host cell lines capable of expressing intact glycosylated proteins have been developed in the art, and include the COS-1 (e.g., ATCC CRL 1650), COS-7 (e.g., ATCC CRL-1651), HEK293, BHK21 (e.g., ATCC CRL-10), CHO (e.g., ATCC CRL 1610) and BSC-1 (e.g., ATCC CRL-26) cell lines, Cos-7 cells, CHO cells, hep G2 cells, P3X63Ag8.653, SP2/0-Ag14, 293 cells, HeLa cells and the like, which are readily available from, for example, American Type Culture Collection, Manassas, Va. (www.atcc.org). Preferred host cells include cells of lymphoid origin, such as myeloma and lymphoma cells. Particularly preferred host cells are P3X63Ag8.653 cells (ATCC Accession Number CRL-1580) and SP2/0-Ag14 cells (ATCC Accession Num-

US 10,961,307 B2

19

ber CRL-1851). In a particularly preferred embodiment, the recombinant cell is a P3X63Ab8.653 or a SP2/0-Ag14 cell.

Expression vectors for these cells can include one or more of the following expression control sequences, such as, but not limited to, an origin of replication; a promoter (e.g., late or early SV40 promoters, the CMV promoter (U.S. Pat. Nos. 5,168,062; 5,385,839), an HSV tk promoter, a pgk (phosphoglycerate kinase) promoter, an EF-1 alpha promoter (U.S. Pat. No. 5,266,491), at least one human immunoglobulin promoter; an enhancer, and/or processing information sites, such as ribosome binding sites, RNA splice sites, polyadenylation sites (e.g., an SV40 large T Ag poly A addition site), and transcriptional terminator sequences. See, e.g., Ausubel et al., supra; Sambrook, et al., supra. Other cells useful for production of nucleic acids or proteins of the present invention are known and/or available, for instance, from the American Type Culture Collection Catalogue of Cell Lines and Hybridomas (www.atcc.org) or other known or commercial sources.

When eukaryotic host cells are employed, polyadenlyation or transcription terminator sequences are typically incorporated into the vector. An example of a terminator sequence is the polyadenlyation sequence from the bovine growth hormone gene. Sequences for accurate splicing of the transcript can also be included. An example of a splicing sequence is the VP1 intron from SV40 (Sprague, et al., J. Virol. 45:773-781 (1983)). Additionally, gene sequences to control replication in the host cell can be incorporated into the vector, as known in the art.

Purification of an Antibody

An anti-IL-12/IL-23p40 or IL-23 antibody can be recovered and purified from recombinant cell cultures by well-known methods including, but not limited to, protein A purification, ammonium sulfate or ethanol precipitation, acid extraction, anion or cation exchange chromatography, phosphocellulose chromatography, hydrophobic interaction chromatography, affinity chromatography, hydroxylapatite chromatography and lectin chromatography. High performance liquid chromatography ("HPLC") can also be employed for purification. See, e.g., Colligan, Current Protocols in Immunology, or Current Protocols in Protein Science, John Wiley & Sons, NY, N.Y., (1997-2001), e.g., Chapters 1, 4, 6, 8, 9, 10, each entirely incorporated herein by reference.

Antibodies used in the method of the present invention include naturally purified products, products of chemical synthetic procedures, and products produced by recombinant techniques from a eukaryotic host, including, for example, yeast, higher plant, insect and mammalian cells. Depending upon the host employed in a recombinant production procedure, the antibody can be glycosylated or can be non-glycosylated, with glycosylated preferred. Such methods are described in many standard laboratory manuals, such as Sambrook, supra, Sections 17.37-17.42; Ausubel, supra, Chapters 10, 12, 13, 16, 18 and 20, Colligan, Protein Science, supra, Chapters 12-14, all entirely incorporated herein by reference.

Anti-IL-12/IL-23p40 or IL-23 Antibodies

An anti-IL-12/IL-23p40 or IL-23 antibody according to the present invention includes any protein or peptide containing molecule that comprises at least a portion of an immunoglobulin molecule, such as but not limited to, at least one ligand binding portion (LBP), such as but not limited to, a complementarity determining region (CDR) of a heavy or light chain or a ligand binding portion thereof, a heavy chain or light chain variable region, a framework region (e.g., FR1, FR2, FR3, FR4 or fragment thereof,

20

further optionally comprising at least one substitution, insertion or deletion), a heavy chain or light chain constant region, (e.g., comprising at least one CH1, hinge1, hinge2, hinge3, hinge4, CH2, or CH3 or fragment thereof, further optionally comprising at least one substitution, insertion or deletion), or any portion thereof, that can be incorporated into an antibody. An antibody can include or be derived from any mammal, such as but not limited to, a human, a mouse, a rabbit, a rat, a rodent, a primate, or any combination thereof, and the like.

Preferably, the human antibody or antigen-binding fragment binds human IL-12/IL-23p40 or IL-23 and, thereby, partially or substantially neutralizes at least one biological activity of the protein. An antibody, or specified portion or variant thereof, that partially or preferably substantially neutralizes at least one biological activity of at least one IL-12/IL-23p40 or IL-23 protein or fragment can bind the protein or fragment and thereby inhibit activities mediated through the binding of IL-12/IL-23p40 or IL-23 to the IL-12 and/or IL-23 receptor or through other IL-12/IL-23p40 or IL-23-dependent or mediated mechanisms. As used herein, the term "neutralizing antibody" refers to an antibody that can inhibit an IL-12/IL-23p40 or IL-23-dependent activity by about 20-120%, preferably by at least about 10, 20, 30, 40, 50, 55, 60, 65, 70, 75, 80, 85, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100% or more depending on the assay. The capacity of an anti-IL-12/IL-23p40 or IL-23 antibody to inhibit an IL-12/IL-23p40 or IL-23-dependent activity is preferably assessed by at least one suitable IL-12/IL-23p40 or IL-23 protein or receptor assay, as described herein and/or as known in the art. A human antibody can be of any class (IgG, IgA, IgM, IgE, IgD, etc.) or isotype and can comprise a kappa or lambda light chain. In one embodiment, the human antibody comprises an IgG heavy chain or defined fragment, for example, at least one of isotypes, IgG1, IgG2, IgG3 or IgG4 (e.g., γ1, γ2, γ3, γ4). Antibodies of this type can be prepared by employing a transgenic mouse or other trangenic non-human mammal comprising at least one human light chain (e.g., IgG, IgA, and IgM) transgenes as described herein and/or as known in the art. In another embodiment, the anti-IL-23 human antibody comprises an IgG1 heavy chain and an IgG1 light chain.

An antibody binds at least one specified epitope specific to at least one IL-12/IL-23p40 or IL-23 protein, subunit, fragment, portion or any combination thereof. The at least one epitope can comprise at least one antibody binding region that comprises at least one portion of the protein, which epitope is preferably comprised of at least one extracellular, soluble, hydrophillic, external or cytoplasmic portion of the protein.

Generally, the human antibody or antigen-binding fragment will comprise an antigen-binding region that comprises at least one human complementarity determining region (CDR1, CDR2 and CDR3) or variant of at least one heavy chain variable region and at least one human complementarity determining region (CDR1, CDR2 and CDR3) or variant of at least one light chain variable region. The CDR sequences can be derived from human germline sequences or closely match the germline sequences. For example, the CDRs from a synthetic library derived from the original non-human CDRs can be used. These CDRs can be formed by incorporation of conservative substitutions from the original non-human sequence. In another particular embodiment, the antibody or antigen-binding portion or variant can have an antigen-binding region that comprises at least a portion of at least one light chain CDR (i.e., CDR1, CDR2

US 10,961,307 B2

**21**

and/or CDR3) having the amino acid sequence of the corresponding CDRs 1, 2 and/or 3.

Such antibodies can be prepared by chemically joining together the various portions (e.g., CDRs, framework) of the antibody using conventional techniques, by preparing and expressing a (i.e., one or more) nucleic acid molecule that encodes the antibody using conventional techniques of recombinant DNA technology or by using any other suitable method.

In one embodiment, an anti-IL-12/23p40 antibody useful for the invention is a monoclonal antibody, preferably a human mAb, comprising heavy chain complementarity determining regions (CDRs) HCDR1, HCDR2, and HCDR3 of SEQ ID NOs: 1, 2, and 3, respectively; and light chain CDRs LCDR1, LCDR2, and LCDR3, of SEQ ID NOs: 4, 5, and 6, respectively.

The anti-IL-12/IL-23p40 or IL-23 specific antibody can comprise at least one of a heavy or light chain variable region having a defined amino acid sequence. For example, in a preferred embodiment, the anti-IL-12/IL-23p40 or IL-23 antibody comprises an anti-IL-12/IL-23p40 antibody with a heavy chain variable region comprising an amino acid sequence at least 85%, preferably at least 90%, more preferably at least 95%, and most preferably 100% identical to SEQ ID NO:7, and a light chain variable region comprising an amino acid sequence at least 85%, preferably at least 90%, more preferably at least 95%, and most preferably 100% identical to SEQ ID NO:8.

The anti-IL-12/IL-23p40 or IL-23 specific antibody can also comprise at least one of a heavy or light chain having a defined amino acid sequence. In another preferred embodiment, the anti-IL-12/IL-23p40 or IL-23 antibody comprises an anti-IL-12/IL-23p40 antibody with a heavy chain comprising an amino acid sequence at least 85%, preferably at least 90%, more preferably at least 95%, and most preferably 100% identical to SEQ ID NO:10, and a light chain variable region comprising an amino acid sequence at least 85%, preferably at least 90%, more preferably at least 95%, and most preferably 100% identical to SEQ ID NO:11.

Preferably, the anti-IL-12/23p40 antibody is ustekinumab (Stelara®), comprising a heavy chain having the amino acid sequence of SEQ ID NO: 10 and a light chain comprising the amino acid sequence of SEQ ID NO: 11. Other examples of anti-IL12/23p40 antibodies useful for the invention include, but are not limited to, Briakinumab (ABT-874, Abbott) and other antibodies described in U.S. Pat. Nos. 6,914,128, 7,247,711, 7,700,739, the entire contents of which are incorporated herein by reference).

The invention also relates to antibodies, antigen-binding fragments, immunoglobulin chains and CDRs comprising amino acids in a sequence that is substantially the same as an amino acid sequence described herein. Preferably, such antibodies or antigen-binding fragments and antibodies comprising such chains or CDRs can bind human IL-12/IL-23p40 or IL-23 with high affinity (e.g., KD less than or equal to about 10⁻⁹M). Amino acid sequences that are substantially the same as the sequences described herein include sequences comprising conservative amino acid substitutions, as well as amino acid deletions and/or insertions. A conservative amino acid substitution refers to the replacement of a first amino acid by a second amino acid that has chemical and/or physical properties (e.g., charge, structure, polarity, hydrophobicity/hydrophilicity) that are similar to those of the first amino acid. Conservative substitutions include, without limitation, replacement of one amino acid by another within the following groups: lysine (K), arginine (R) and histidine (H); aspartate (D) and glutamate (E);

**22**

asparagine (N), glutamine (Q), serine (S), threonine (T), tyrosine (Y), K, R, H, D and E; alanine (A), valine (V), leucine (L), isoleucine (I), proline (P), phenylalanine (F), tryptophan (W), methionine (M), cysteine (C) and glycine (G); F, W and Y; C, S and T.

Antibodies that bind to human IL-12/IL-23p40 or IL-23 and that comprise a defined heavy or light chain variable region can be prepared using suitable methods, such as phage display (Katsube, Y., et al., Int J Mol. Med, 1(5):863-868 (1998)) or methods that employ transgenic animals, as known in the art and/or as described herein. For example, a transgenic mouse, comprising a functionally rearranged human immunoglobulin heavy chain transgene and a transgene comprising DNA from a human immunoglobulin light chain locus that can undergo functional rearrangement, can be immunized with human IL-12/IL-23p40 or IL-23 or a fragment thereof to elicit the production of antibodies. If desired, the antibody producing cells can be isolated and hybridomas or other immortalized antibody-producing cells can be prepared as described herein and/or as known in the art. Alternatively, the antibody, specified portion or variant can be expressed using the encoding nucleic acid or portion thereof in a suitable host cell.

An anti-IL-12/IL-23p40 or IL-23 antibody used in the method of the present invention can include one or more amino acid substitutions, deletions or additions, either from natural mutations or human manipulation, as specified herein.

The number of amino acid substitutions a skilled artisan would make depends on many factors, including those described above. Generally speaking, the number of amino acid substitutions, insertions or deletions for any given anti-IL-12/IL-23p40 or IL-23 antibody, fragment or variant will not be more than 40, 30, 20, 19, 18, 17, 16, 15, 14, 13, 12, 11, 10, 9, 8, 7, 6, 5, 4, 3, 2, 1, such as 1-30 or any range or value therein, as specified herein.

Amino acids in an anti-IL-12/IL-23p40 or IL-23 specific antibody that are essential for function can be identified by methods known in the art, such as site-directed mutagenesis or alanine-scanning mutagenesis (e.g., Ausubel, supra, Chapters 8, 15; Cunningham and Wells, Science 244:1081-1085 (1989)). The latter procedure introduces single alanine mutations at every residue in the molecule. The resulting mutant molecules are then tested for biological activity, such as, but not limited to, at least one IL-12/IL-23p40 or IL-23 neutralizing activity. Sites that are critical for antibody binding can also be identified by structural analysis, such as crystallization, nuclear magnetic resonance or photoaffinity labeling (Smith, et al., J. Mol. Biol. 224:899-904 (1992) and de Vos, et al., Science 255:306-312 (1992)).

Anti-IL-12/IL-23p40 or IL-23 antibodies can include, but are not limited to, at least one portion, sequence or combination selected from 5 to all of the contiguous amino acids of at least one of SEQ ID NOs 1, 2, 3, 4, 5, 6, 7, 8, 10, or 11.

IL-12/IL-23p40 or IL-23 antibodies or specified portions or variants can include, but are not limited to, at least one portion, sequence or combination selected from at least 3-5 contiguous amino acids of the SEQ ID NOs above; 5-17 contiguous amino acids of the SEQ ID NOs above, 5-10 contiguous amino acids of the SEQ ID NOs above, 5-11 contiguous amino acids of the SEQ ID NOs above, 5-7 contiguous amino acids of the SEQ ID NOs above; 5-9 contiguous amino acids of the SEQ ID NOs above.

An anti-IL-12/IL-23p40 or IL-23 antibody can further optionally comprise a polypeptide of at least one of 70-100% of 5, 17, 10, 11, 7, 9, 119, 108, 449, or 214

US 10,961,307 B2

23                                                                24

contiguous amino acids of the SEQ ID NOs above. In one embodiment, the amino acid sequence of an immunoglobulin chain, or portion thereof (e.g., variable region, CDR) has about 70-100% identity (e.g., 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100 or any range or value therein) to the amino acid sequence of the corresponding chain of at least one of the SEQ ID NOs above. For example, the amino acid sequence of a light chain variable region can be compared with the sequence of the SEQ ID NOs above, or the amino acid sequence of a heavy chain CDR3 can be compared with the SEQ ID NOs above. Preferably, 70-100% amino acid identity (i.e., 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100 or any range or value therein) is determined using a suitable computer algorithm, as known in the art.

"Identity," as known in the art, is a relationship between two or more polypeptide sequences or two or more polynucleotide sequences, as determined by comparing the sequences. In the art, "identity" also means the degree of sequence relatedness between polypeptide or polynucleotide sequences, as determined by the match between strings of such sequences.

"Identity" and "similarity" can be readily calculated by known methods, including, but not limited to, those described in Computational Molecular Biology, Lesk, A. M., ed., Oxford University Press, New York, 1988; Biocomputing:Informatics and Genome Projects, Smith, D. W., ed., Academic Press, New York, 1993; Computer Analysis of Sequence Data, Part I, Griffin, A. M., and Griffin, H. G., eds., Humana Press, New Jersey, 1994; Sequence Analysis in Molecular Biology, von Heinje, G., Academic Press, 1987; and Sequence Analysis Primer, Gribskov, M. and Devereux, J., eds., M Stockton Press, New York, 1991; and Carillo, H., and Lipman, D., Siam J. Applied Math., 48:1073 (1988). In addition, values for percentage identity can be obtained from amino acid and nucleotide sequence alignments generated using the default settings for the AlignX component of Vector NTI Suite 8.0 (Informax, Frederick, Md.).

Preferred methods to determine identity are designed to give the largest match between the sequences tested. Methods to determine identity and similarity are codified in publicly available computer programs. Preferred computer program methods to determine identity and similarity between two sequences include, but are not limited to, the GCG program package (Devereux, J., et al., Nucleic Acids Research 12(1): 387 (1984)), BLASTP, BLASTN, and FASTA (Atschul, S. F. et al., J. Molec. Biol. 215:403-410 (1990)). The BLAST X program is publicly available from NCBI and other sources (BLAST Manual, Altschul, S., et al., NCBINLM NIH Bethesda, Md. 20894; Altschul, S., et al., J. Mol. Biol. 215:403-410 (1990). The well-known Smith Waterman algorithm can also be used to determine identity.

Exemplary heavy chain and light chain variable regions sequences and portions thereof are provided in the SEQ ID NOs above. The antibodies of the present invention, or specified variants thereof, can comprise any number of contiguous amino acid residues from an antibody of the present invention, wherein that number is selected from the group of integers consisting of from 10-100% of the number of contiguous residues in an anti-IL-12/IL-23p40 or IL-23 antibody. Optionally, this subsequence of contiguous amino acids is at least about 10, 20, 30, 40, 50, 60, 70, 80, 90, 100, 110, 120, 130, 140, 150, 160, 170, 180, 190, 200, 210, 220, 230, 240, 250 or more amino acids in length, or any range or value therein. Further, the number of such subsequences

can be any integer selected from the group consisting of from 1 to 20, such as at least 2, 3, 4, or 5.

As those of skill will appreciate, the present invention includes at least one biologically active antibody of the present invention. Biologically active antibodies have a specific activity at least 20%, 30%, or 40%, and, preferably, at least 50%, 60%, or 70%, and, most preferably, at least 80%, 90%, or 95%-100% or more (including, without limitation, up to 10 times the specific activity) of that of the native (non-synthetic), endogenous or related and known antibody. Methods of assaying and quantifying measures of enzymatic activity and substrate specificity are well known to those of skill in the art.

In another aspect, the invention relates to human antibodies and antigen-binding fragments, as described herein, which are modified by the covalent attachment of an organic moiety. Such modification can produce an antibody or antigen-binding fragment with improved pharmacokinetic properties (e.g., increased in vivo serum half-life). The organic moiety can be a linear or branched hydrophilic polymeric group, fatty acid group, or fatty acid ester group. In particular embodiments, the hydrophilic polymeric group can have a molecular weight of about 800 to about 120,000 Daltons and can be a polyalkane glycol (e.g., polyethylene glycol (PEG), polypropylene glycol (PPG)), carbohydrate polymer, amino acid polymer or polyvinyl pyrolidone, and the fatty acid or fatty acid ester group can comprise from about eight to about forty carbon atoms.

The modified antibodies and antigen-binding fragments can comprise one or more organic moieties that are covalently bonded, directly or indirectly, to the antibody. Each organic moiety that is bonded to an antibody or antigenbinding fragment of the invention can independently be a hydrophilic polymeric group, a fatty acid group or a fatty acid ester group. As used herein, the term "fatty acid" encompasses mono-carboxylic acids and di-carboxylic acids. A "hydrophilic polymeric group," as the term is used herein, refers to an organic polymer that is more soluble in water than in octane. For example, polylysine is more soluble in water than in octane. Thus, an antibody modified by the covalent attachment of polylysine is encompassed by the invention. Hydrophilic polymers suitable for modifying antibodies of the invention can be linear or branched and include, for example, polyalkane glycols (e.g., PEG, monomethoxy-polyethylene glycol (mPEG), PPG and the like), carbohydrates (e.g., dextran, cellulose, oligosaccharides, polysaccharides and the like), polymers of hydrophilic amino acids (e.g., polylysine, polyarginine, polyaspartate and the like), polyalkane oxides (e.g., polyethylene oxide, polypropylene oxide and the like) and polyvinyl pyrolidone. Preferably, the hydrophilic polymer that modifies the antibody of the invention has a molecular weight of about 800 to about 150,000 Daltons as a separate molecular entity. For example, PEG5000 and PEG20,000, wherein the subscript is the average molecular weight of the polymer in Daltons, can be used. The hydrophilic polymeric group can be substituted with one to about six alkyl, fatty acid or fatty acid ester groups. Hydrophilic polymers that are substituted with a fatty acid or fatty acid ester group can be prepared by employing suitable methods. For example, a polymer comprising an amine group can be coupled to a carboxylate of the fatty acid or fatty acid ester, and an activated carboxylate (e.g., activated with N, N-carbonyl diimidazole) on a fatty acid or fatty acid ester can be coupled to a hydroxyl group on a polymer.

Fatty acids and fatty acid esters suitable for modifying antibodies of the invention can be saturated or can contain

US 10,961,307 B2

25

one or more units of unsaturation. Fatty acids that are suitable for modifying antibodies of the invention include, for example, n-dodecanoate (C12, laurate), n-tetradecanoate (C14, myristate), n-octadecanoate (C18, stearate), n-eicosanoate (C20, arachidate), n-docosanoate (C22, behenate), n-triacontanoate (C30), n-tetracontanoate (C40), cis-Δ9-octadecanoate (C18, oleate), all cis-Δ5,8,11,14-eicosatetraenoate (C20, arachidonate), octanedioic acid, tetradecanedioic acid, octadecanedioic acid, docosanedioic acid, and the like. Suitable fatty acid esters include mono-esters of dicarboxylic acids that comprise a linear or branched lower alkyl group. The lower alkyl group can comprise from one to about twelve, preferably, one to about six, carbon atoms.

The modified human antibodies and antigen-binding fragments can be prepared using suitable methods, such as by reaction with one or more modifying agents. A "modifying agent" as the term is used herein, refers to a suitable organic group (e.g., hydrophilic polymer, a fatty acid, a fatty acid ester) that comprises an activating group. An "activating group" is a chemical moiety or functional group that can, under appropriate conditions, react with a second chemical group thereby forming a covalent bond between the modifying agent and the second chemical group. For example, amine-reactive activating groups include electrophilic groups, such as tosylate, mesylate, halo (chloro, bromo, fluoro, iodo), N-hydroxysuccinimidyl esters (NHS), and the like. Activating groups that can react with thiols include, for example, maleimide, iodoacetyl, acrylolyl, pyridyl disulfides, 5-thiol-2-nitrobenzoic acid thiol (TNB-thiol), and the like. An aldehyde functional group can be coupled to amine- or hydrazide-containing molecules, and an azide group can react with a trivalent phosphorous group to form phosphoramidate or phosphorimide linkages. Suitable methods to introduce activating groups into molecules are known in the art (see for example, Hermanson, G. T., Bioconjugate Techniques, Academic Press: San Diego, Calif. (1996)). An activating group can be bonded directly to the organic group (e.g., hydrophilic polymer, fatty acid, fatty acid ester), or through a linker moiety, for example, a divalent C1-C12 group wherein one or more carbon atoms can be replaced by a heteroatom, such as oxygen, nitrogen or sulfur. Suitable linker moieties include, for example, tetraethylene glycol, —(CH2)3-, —NH—(CH2)6-NH—, —(CH2)2-NH— and —CH2-O—CH2-CH2-O—CH2-CH2-O—CH—NH—. Modifying agents that comprise a linker moiety can be produced, for example, by reacting a mono-Boc-alkyldiamine (e.g., mono-Boc-ethylenediamine, mono-Boc-diaminohexane) with a fatty acid in the presence of 1-ethyl-3-(3-dimethylaminopropyl) carbodiimide (EDC) to form an amide bond between the free amine and the fatty acid carboxylate. The Boc protecting group can be removed from the product by treatment with trifluoroacetic acid (TFA) to expose a primary amine that can be coupled to another carboxylate, as described, or can be reacted with maleic anhydride and the resulting product cyclized to produce an activated maleimido derivative of the fatty acid. (See, for example, Thompson, et al., WO 92/16221, the entire teachings of which are incorporated herein by reference.)

The modified antibodies can be produced by reacting a human antibody or antigen-binding fragment with a modifying agent. For example, the organic moieties can be bonded to the antibody in a non-site specific manner by employing an amine-reactive modifying agent, for example, an NHS ester of PEG. Modified human antibodies or antigen-binding fragments can also be prepared by reducing disulfide bonds (e.g., intra-chain disulfide bonds) of an antibody or antigen-binding fragment. The reduced antibody

26

or antigen-binding fragment can then be reacted with a thiol-reactive modifying agent to produce the modified antibody of the invention. Modified human antibodies and antigen-binding fragments comprising an organic moiety that is bonded to specific sites of an antibody of the present invention can be prepared using suitable methods, such as reverse proteolysis (Fisch et al., Bioconjugate Chem., 3:147-153 (1992); Werlen et al., Bioconjugate Chem., 5:411-417 (1994); Kumaran et al., Protein Sci. 6(10):2233-2241 (1997); Itoh et al., Bioorg. Chem., 24(1): 59-68 (1996); Capellas et al., Biotechnol. Bioeng., 56(4):456-463 (1997)), and the methods described in Hermanson, G. T., Bioconjugate Techniques, Academic Press: San Diego, Calif. (1996).

The method of the present invention also uses an anti-IL-12/IL-23p40 or IL-23 antibody composition comprising at least one, at least two, at least three, at least four, at least five, at least six or more anti-IL-12/IL-23p40 or IL-23 antibodies thereof, as described herein and/or as known in the art that are provided in a non-naturally occurring composition, mixture or form. Such compositions comprise non-naturally occurring compositions comprising at least one or two full length, C- and/or N-terminally deleted variants, domains, fragments, or specified variants, of the anti-IL-12/IL-23p40 or IL-23 antibody amino acid sequence selected from the group consisting of 70-100% of the contiguous amino acids of the SEQ ID NOs above, or specified fragments, domains or variants thereof. Preferred anti-IL-12/IL-23p40 or IL-23 antibody compositions include at least one or two full length, fragments, domains or variants as at least one CDR or LBP containing portions of the anti-IL-12/IL-23p40 or IL-23 antibody sequence described herein, for example, 70-100% of the SEQ ID NOs above, or specified fragments, domains or variants thereof. Further preferred compositions comprise, for example, 40-99% of at least one of 70-100% of the SEQ ID NOs above, etc., or specified fragments, domains or variants thereof. Such composition percentages are by weight, volume, concentration, molarity, or molality as liquid or dry solutions, mixtures, suspension, emulsions, particles, powder, or colloids, as known in the art or as described herein.

Antibody Compositions Comprising Further Therapeutically Active Ingredients

The antibody compositions used in the method of the invention can optionally further comprise an effective amount of at least one compound or protein selected from at least one of an anti-infective drug, a cardiovascular (CV) system drug, a central nervous system (CNS) drug, an autonomic nervous system (ANS) drug, a respiratory tract drug, a gastrointestinal (GI) tract drug, a hormonal drug, a drug for fluid or electrolyte balance, a hematologic drug, an antineoplastic, an immunomodulation drug, an ophthalmic, otic or nasal drug, a topical drug, a nutritional drug or the like. Such drugs are well known in the art, including formulations, indications, dosing and administration for each presented herein (see, e.g., Nursing 2001 Handbook of Drugs, 21st edition, Springhouse Corp., Springhouse, P A, 2001; Health Professional's Drug Guide 2001, ed., Shannon, Wilson, Stang, Prentice-Hall, Inc, Upper Saddle River, N.J.; Pharmcotherapy Handbook, Wells et al., ed., Appleton & Lange, Stamford, Conn., each entirely incorporated herein by reference).

By way of example of the drugs that can be combined with the antibodies for the method of the present invention, the anti-infective drug can be at least one selected from amebicides or at least one antiprotozoals, anthelmintics, antifungals, antimalarials, antituberculotics or at least one antileprotics, aminoglycosides, penicillins, cephalosporins,

27

tetracyclines, sulfonamides, fluoroquinolones, antivirals, macrolide anti-infectives, and miscellaneous anti-infectives. The hormonal drug can be at least one selected from corticosteroids, androgens or at least one anabolic steroid, estrogen or at least one progestin, gonadotropin, antidiabetic drug or at least one glucagon, thyroid hormone, thyroid hormone antagonist, pituitary hormone, and parathyroid-like drug. The at least one cephalosporin can be at least one selected from cefaclor, cefadroxil, cefazolin sodium, cefdinir, cefepime hydrochloride, cefixime, cefmetazole sodium, cefonicid sodium, cefoperazone sodium, cefotaxime sodium, cefotetan disodium, cefoxitin sodium, cefpodoxime proxetil, cefprozil, ceftazidime, ceftibuten, ceftizoxime sodium, ceftriaxone sodium, cefuroxime axetil, cefuroxime sodium, cephalexin hydrochloride, cephalexin monohydrate, cephradine, and loracarbef.

The at least one coricosteroid can be at least one selected from betamethasone, betamethasone acetate or betamethasone sodium phosphate, betamethasone sodium phosphate, cortisone acetate, dexamethasone, dexamethasone acetate, dexamethasone sodium phosphate, fludrocortisone acetate, hydrocortisone, hydrocortisone acetate, hydrocortisone cypionate, hydrocortisone sodium phosphate, hydrocortisone sodium succinate, methylprednisolone, methylprednisolone acetate, methylprednisolone sodium succinate, prednisolone, prednisolone acetate, prednisolone sodium phosphate, prednisolone tebutate, prednisone, triamcinolone, triamcinolone acetonide, and triamcinolone diacetate. The at least one androgen or anabolic steroid can be at least one selected from danazol, fluoxymesterone, methyltestosterone, nandrolone decanoate, nandrolone phenpropionate, testosterone, testosterone cypionate, testosterone enanthate, testosterone propionate, and testosterone transdermal system.

The at least one immunosuppressant can be at least one selected from azathioprine, basiliximab, cyclosporine, daclizumab, lymphocyte immune globulin, muromonab-CD3, mycophenolate mofetil, mycophenolate mofetil hydrochloride, sirolimus, 6-mercaptopurine, methotrexate, mizoribine, and tacrolimus.

The at least one local anti-infective can be at least one selected from acyclovir, amphotericin B, azelaic acid cream, bacitracin, butoconazole nitrate, clindamycin phosphate, clotrimazole, econazole nitrate, erythromycin, gentamicin sulfate, ketoconazole, mafenide acetate, metronidazole (topical), miconazole nitrate, mupirocin, naftifine hydrochloride, neomycin sulfate, nitrofurazone, nystatin, silver sulfadiazine, terbinafine hydrochloride, terconazole, tetracycline hydrochloride, tioconazole, and tolnaftate. The at least one scabicide or pediculicide can be at least one selected from crotamiton, lindane, permethrin, and pyrethrins. The at least one topical corticosteroid can be at least one selected from betamethasone dipropionate, betamethasone valerate, clobetasol propionate, desonide, desoximetasone, dexamethasone, dexamethasone sodium phosphate, diflorasone diacetate, fluocinolone acetonide, fluocinonide, flurandrenolide, fluticasone propionate, halcinonide, hydrocortisone, hydrocortisone acetate, hydrocortisone butyrate, hydrocorisone valerate, mometasone furoate, and triamcinolone acetonide. (See, e.g., pp. 1098-1136 of Nursing 2001 Drug Handbook.)

Anti-IL-12/IL-23p40 or IL-23 antibody compositions can further comprise at least one of any suitable and effective amount of a composition or pharmaceutical composition comprising at least one anti-IL-12/IL-23p40 or IL-23 antibody contacted or administered to a cell, tissue, organ, animal or subject in need of such modulation, treatment or

28

therapy, optionally further comprising at least one selected from at least one TNF antagonist (e.g., but not limited to a TNF chemical or protein antagonist, TNF monoclonal or polyclonal antibody or fragment, a soluble TNF receptor (e.g., p55, p70 or p85) or fragment, fusion polypeptides thereof, or a small molecule TNF antagonist, e.g., TNF binding protein I or II (TBP-1 or TBP-II), nerelimonmab, infliximab, eternacept, CDP-571, CDP-870, afelimomab, lenercept, and the like), an antirheumatic (e.g., methotrexate, auranofin, aurothioglucose, azathioprine, etanercept, gold sodium thiomalate, hydroxychloroquine sulfate, leflunomide, sulfasalzine), an immunization, an immunoglobulin, an immunosuppressive (e.g., azathioprine, basiliximab, cyclosporine, daclizumab), a cytokine or a cytokine antagonist. Non-limiting examples of such cytokines include, but are not limited to, any of IL-1 to IL-23 et al. (e.g., IL-1, IL-2, etc.). Suitable dosages are well known in the art. See, e.g., Wells et al., eds., Pharmacotherapy Handbook, 2nd Edition, Appleton and Lange, Stamford, Conn. (2000); PDR Pharmacopoeia, Tarascon Pocket Pharmacopoeia 2000, Deluxe Edition, Tarascon Publishing, Loma Linda, Calif. (2000), each of which references are entirely incorporated herein by reference.

Anti-IL-12/IL-23p40 or IL-23 antibody compounds, compositions or combinations used in the method of the present invention can further comprise at least one of any suitable auxiliary, such as, but not limited to, diluent, binder, stabilizer, buffers, salts, lipophilic solvents, preservative, adjuvant or the like. Pharmaceutically acceptable auxiliaries are preferred. Non-limiting examples of, and methods of preparing such sterile solutions are well known in the art, such as, but limited to, Gennaro, Ed., Remington's Pharmaceutical Sciences, 18th Edition, Mack Publishing Co. (Easton, Pa.) 1990. Pharmaceutically acceptable carriers can be routinely selected that are suitable for the mode of administration, solubility and/or stability of the anti-IL-12/IL-23p40, fragment or variant composition as well known in the art or as described herein.

Pharmaceutical excipients and additives useful in the present composition include, but are not limited to, proteins, peptides, amino acids, lipids, and carbohydrates (e.g., sugars, including monosaccharides, di-, tri-, tetra-, and oligosaccharides; derivatized sugars, such as alditols, aldonic acids, esterified sugars and the like; and polysaccharides or sugar polymers), which can be present singly or in combination, comprising alone or in combination 1-99.99% by weight or volume. Exemplary protein excipients include serum albumin, such as human serum albumin (HSA), recombinant human albumin (rHA), gelatin, casein, and the like. Representative amino acid/antibody components, which can also function in a buffering capacity, include alanine, glycine, arginine, betaine, histidine, glutamic acid, aspartic acid, cysteine, lysine, leucine, isoleucine, valine, methionine, phenylalanine, aspartame, and the like. One preferred amino acid is glycine.

Carbohydrate excipients suitable for use in the invention include, for example, monosaccharides, such as fructose, maltose, galactose, glucose, D-mannose, sorbose, and the like; disaccharides, such as lactose, sucrose, trehalose, cellobiose, and the like; polysaccharides, such as raffinose, melezitose, maltodextrins, dextrans, starches, and the like; and alditols, such as mannitol, xylitol, maltitol, lactitol, xylitol sorbitol (glucitol), myoinositol and the like. Preferred carbohydrate excipients for use in the present invention are mannitol, trehalose, and raffinose.

Anti-IL-12/IL-23p40 or IL-23 antibody compositions can also include a buffer or a pH adjusting agent; typically, the

US 10,961,307 B2

29

buffer is a salt prepared from an organic acid or base. Representative buffers include organic acid salts, such as salts of citric acid, ascorbic acid, gluconic acid, carbonic acid, tartaric acid, succinic acid, acetic acid, or phthalic acid; Tris, tromethamine hydrochloride, or phosphate buffers. Preferred buffers for use in the present compositions are organic acid salts, such as citrate.

Additionally, anti-IL-12/IL-23p40 or IL-23 antibody compositions can include polymeric excipients/additives, such as polyvinylpyrrolidones, ficolls (a polymeric sugar), dextrates (e.g., cyclodextrins, such as 2-hydroxypropyl-β-cyclodextrin), polyethylene glycols, flavoring agents, anti-microbial agents, sweeteners, antioxidants, antistatic agents, surfactants (e.g., polysorbates such as "TWEEN 20" and "TWEEN 80"), lipids (e.g., phospholipids, fatty acids), steroids (e.g., cholesterol), and chelating agents (e.g., EDTA).

These and additional known pharmaceutical excipients and/or additives suitable for use in the anti-IL-12/IL-23p40 or IL-23 antibody, portion or variant compositions according to the invention are known in the art, e.g., as listed in "Remington: The Science & Practice of Pharmacy," 19th ed., Williams & Williams, (1995), and in the "Physician's Desk Reference," 52nd ed., Medical Economics, Montvale, N.J. (1998), the disclosures of which are entirely incorporated herein by reference. Preferred carrier or excipient materials are carbohydrates (e.g., saccharides and alditols) and buffers (e.g., citrate) or polymeric agents. An exemplary carrier molecule is the mucopolysaccharide, hyaluronic acid, which can be useful for intraarticular delivery.

Formulations

As noted above, the invention provides for stable formulations, which preferably comprise a phosphate buffer with saline or a chosen salt, as well as preserved solutions and formulations containing a preservative as well as multi-use preserved formulations suitable for pharmaceutical or veterinary use, comprising at least one anti-IL-12/IL-23p40 or IL-23 antibody in a pharmaceutically acceptable formulation. Preserved formulations contain at least one known preservative or optionally selected from the group consisting of at least one phenol, m-cresol, p-cresol, o-cresol, chlorocresol, benzyl alcohol, phenylmercuric nitrite, phenoxyethanol, formaldehyde, chlorobutanol, magnesium chloride (e.g., hexahydrate), alkylparaben (methyl, ethyl, propyl, butyl and the like), benzalkonium chloride, benzethonium chloride, sodium dehydroacetate and thimerosal, or mixtures thereof in an aqueous diluent. Any suitable concentration or mixture can be used as known in the art, such as 0.001-5%, or any range or value therein, such as, but not limited to 0.001, 0.003, 0.005, 0.009, 0.01, 0.02, 0.03, 0.05, 0.09, 0.1, 0.2, 0.3, 0.4, 0.5, 0.6, 0.7, 0.8, 0.9, 1.0, 1.1, 1.2, 1.3, 1.4, 1.5, 1.6, 1.7, 1.8, 1.9, 2.0, 2.1, 2.2, 2.3, 2.4, 2.5, 2.6, 2.7, 2.8, 2.9, 3.0, 3.1, 3.2, 3.3, 3.4, 3.5, 3.6, 3.7, 3.8, 3.9, 4.0, 4.3, 4.5, 4.6, 4.7, 4.8, 4.9, or any range or value therein. Non-limiting examples include, no preservative, 0.1-2% m-cresol (e.g., 0.2, 0.3. 0.4, 0.5, 0.9, 1.0%), 0.1-3% benzyl alcohol (e.g., 0.5, 0.9, 1.1, 1.5, 1.9, 2.0, 2.5%), 0.001-0.5% thimerosal (e.g., 0.005, 0.01), 0.001-2.0% phenol (e.g., 0.05, 0.25, 0.28, 0.5, 0.9, 1.0%), 0.0005-1.0% alkylparaben(s) (e.g., 0.00075, 0.0009, 0.001, 0.002, 0.005, 0.0075, 0.009, 0.01, 0.02, 0.05, 0.075, 0.09, 0.1, 0.2, 0.3, 0.5, 0.75, 0.9, 1.0%), and the like.

As noted above, the method of the invention uses an article of manufacture, comprising packaging material and at least one vial comprising a solution of at least one anti-IL-12/IL-23p40 or IL-23 antibody with the prescribed buffers and/or preservatives, optionally in an aqueous diluent, wherein said packaging material comprises a label

30

that indicates that such solution can be held over a period of 1, 2, 3, 4, 5, 6, 9, 12, 18, 20, 24, 30, 36, 40, 48, 54, 60, 66, 72 hours or greater. The invention further uses an article of manufacture, comprising packaging material, a first vial comprising lyophilized anti-IL-12/IL-23p40 or IL-23 antibody, and a second vial comprising an aqueous diluent of prescribed buffer or preservative, wherein said packaging material comprises a label that instructs a subject to reconstitute the anti-IL-12/IL-23p40 or IL-23 antibody in the aqueous diluent to form a solution that can be held over a period of twenty-four hours or greater.

The anti-IL-12/IL-23p40 or IL-23 antibody used in accordance with the present invention can be produced by recombinant means, including from mammalian cell or transgenic preparations, or can be purified from other biological sources, as described herein or as known in the art.

The range of the anti-IL-12/IL-23p40 or IL-23 antibody includes amounts yielding upon reconstitution, if in a wet/dry system, concentrations from about 1.0 µg/ml to about 1000 mg/ml, although lower and higher concentrations are operable and are dependent on the intended delivery vehicle, e.g., solution formulations will differ from transdermal patch, pulmonary, transmucosal, or osmotic or micro pump methods.

Preferably, the aqueous diluent optionally further comprises a pharmaceutically acceptable preservative. Preferred preservatives include those selected from the group consisting of phenol, m-cresol, p-cresol, o-cresol, chlorocresol, benzyl alcohol, alkylparaben (methyl, ethyl, propyl, butyl and the like), benzalkonium chloride, benzethonium chloride, sodium dehydroacetate and thimerosal, or mixtures thereof. The concentration of preservative used in the formulation is a concentration sufficient to yield an anti-microbial effect. Such concentrations are dependent on the preservative selected and are readily determined by the skilled artisan.

Other excipients, e.g., isotonicity agents, buffers, antioxidants, and preservative enhancers, can be optionally and preferably added to the diluent. An isotonicity agent, such as glycerin, is commonly used at known concentrations. A physiologically tolerated buffer is preferably added to provide improved pH control. The formulations can cover a wide range of pHs, such as from about pH 4 to about pH 10, and preferred ranges from about pH 5 to about pH 9, and a most preferred range of about 6.0 to about 8.0. Preferably, the formulations of the present invention have a pH between about 6.8 and about 7.8. Preferred buffers include phosphate buffers, most preferably, sodium phosphate, particularly, phosphate buffered saline (PBS).

Other additives, such as a pharmaceutically acceptable solubilizers like Tween 20 (polyoxyethylene (20) sorbitan monolaurate), Tween 40 (polyoxyethylene (20) sorbitan monopalmitate), Tween 80 (polyoxyethylene (20) sorbitan monooleate), Pluronic F68 (polyoxyethylene polyoxypropylene block copolymers), and PEG (polyethylene glycol) or non-ionic surfactants, such as polysorbate 20 or 80 or poloxamer 184 or 188, Pluronic® polyls, other block copolymers, and chelators, such as EDTA and EGTA, can optionally be added to the formulations or compositions to reduce aggregation. These additives are particularly useful if a pump or plastic container is used to administer the formulation. The presence of pharmaceutically acceptable surfactant mitigates the propensity for the protein to aggregate.

The formulations can be prepared by a process which comprises mixing at least one anti-IL-12/IL-23p40 or IL-23 antibody and a preservative selected from the group consisting of phenol, m-cresol, p-cresol, o-cresol, chlorocresol,

US 10,961,307 B2

31                                          32

benzyl alcohol, alkylparaben, (methyl, ethyl, propyl, butyl and the like), benzalkonium chloride, benzethonium chloride, sodium dehydroacetate and thimerosal or mixtures thereof in an aqueous diluent. Mixing the at least one anti-IL-12/IL-23p40 or IL-23 specific antibody and preservative in an aqueous diluent is carried out using conventional dissolution and mixing procedures. To prepare a suitable formulation, for example, a measured amount of at least one anti-IL-12/IL-23p40 or IL-23 antibody in buffered solution is combined with the desired preservative in a buffered solution in quantities sufficient to provide the protein and preservative at the desired concentrations. Variations of this process would be recognized by one of ordinary skill in the art. For example, the order the components are added, whether additional additives are used, the temperature and pH at which the formulation is prepared, are all factors that can be optimized for the concentration and means of administration used.

The formulations can be provided to subjects as clear solutions or as dual vials comprising a vial of lyophilized anti-IL-12/IL-23p40 or IL-23 specific antibody that is reconstituted with a second vial containing water, a preservative and/or excipients, preferably, a phosphate buffer and/or saline and a chosen salt, in an aqueous diluent. Either a single solution vial or dual vial requiring reconstitution can be reused multiple times and can suffice for a single or multiple cycles of subject treatment and thus can provide a more convenient treatment regimen than currently available.

The present articles of manufacture are useful for administration over a period ranging from immediate to twenty-four hours or greater. Accordingly, the presently claimed articles of manufacture offer significant advantages to the subject. Formulations of the invention can optionally be safely stored at temperatures of from about 2° C. to about 40° C. and retain the biologically activity of the protein for extended periods of time, thus allowing a package label indicating that the solution can be held and/or used over a period of 6, 12, 18, 24, 36, 48, 72, or 96 hours or greater. If preserved diluent is used, such label can include use up to 1-12 months, one-half, one and a half, and/or two years.

The solutions of anti-IL-12/IL-23p40 or IL-23 specific antibody can be prepared by a process that comprises mixing at least one antibody in an aqueous diluent. Mixing is carried out using conventional dissolution and mixing procedures. To prepare a suitable diluent, for example, a measured amount of at least one antibody in water or buffer is combined in quantities sufficient to provide the protein and, optionally, a preservative or buffer at the desired concentrations. Variations of this process would be recognized by one of ordinary skill in the art. For example, the order the components are added, whether additional additives are used, the temperature and pH at which the formulation is prepared, are all factors that can be optimized for the concentration and means of administration used.

The claimed products can be provided to subjects as clear solutions or as dual vials comprising a vial of lyophilized at least one anti-IL-12/IL-23p40 or IL-23 specific antibody that is reconstituted with a second vial containing the aqueous diluent. Either a single solution vial or dual vial requiring reconstitution can be reused multiple times and can suffice for a single or multiple cycles of subject treatment and thus provides a more convenient treatment regimen than currently available.

The claimed products can be provided indirectly to subjects by providing to pharmacies, clinics, or other such institutions and facilities, clear solutions or dual vials comprising a vial of lyophilized at least one anti-IL-12/IL-23p40

or IL-23 specific antibody that is reconstituted with a second vial containing the aqueous diluent. The clear solution in this case can be up to one liter or even larger in size, providing a large reservoir from which smaller portions of the at least one antibody solution can be retrieved one or multiple times for transfer into smaller vials and provided by the pharmacy or clinic to their customers and/or subjects.

Recognized devices comprising single vial systems include pen-injector devices for delivery of a solution, such as BD Pens, BD Autojector®, Humaject®, NovoPen®, B-D® Pen, AutoPen®, and OptiPen®, GenotropinPen®, Genotronorm Pen®, Humatro Pen®, Reco-Pen®, Roferon Pen®, Biojector®, Iject®, J-tip Needle-Free Injector®, Intraject®, Medi-Ject®, Smartject® e.g., as made or developed by Becton Dickensen (Franklin Lakes, N.J., www.bectondickenson.com), Disetronic (Burgdorf, Switzerland, www.disetronic.com; Bioject, Portland, Oreg. (www.bioject.com); National Medical Products, Weston Medical (Peterborough, UK, www.weston-medical.com), Medi-Ject Corp (Minneapolis, Minn., www.mediject.com), and similarly suitable devices. Recognized devices comprising a dual vial system include those pen-injector systems for reconstituting a lyophilized drug in a cartridge for delivery of the reconstituted solution, such as the HumatroPen®. Examples of other devices suitable include pre-filled syringes, auto-injectors, needle free injectors, and needle free IV infusion sets.

The products can include packaging material. The packaging material provides, in addition to the information required by the regulatory agencies, the conditions under which the product can be used. The packaging material of the present invention provides instructions to the subject, as applicable, to reconstitute the at least one anti-IL-12/IL-23p40 or IL-23 antibody in the aqueous diluent to form a solution and to use the solution over a period of 2-24 hours or greater for the two vial, wet/dry, product. For the single vial, solution product, pre-filled syringe or auto-injector, the label indicates that such solution can be used over a period of 2-24 hours or greater. The products are useful for human pharmaceutical product use.

The formulations used in the method of the present invention can be prepared by a process that comprises mixing an anti-IL-12/IL-23p40 and a selected buffer, preferably, a phosphate buffer containing saline or a chosen salt. Mixing the anti-IL-12/IL-23p40 antibody and buffer in an aqueous diluent is carried out using conventional dissolution and mixing procedures. To prepare a suitable formulation, for example, a measured amount of at least one antibody in water or buffer is combined with the desired buffering agent in water in quantities sufficient to provide the protein and buffer at the desired concentrations. Variations of this process would be recognized by one of ordinary skill in the art. For example, the order the components are added, whether additional additives are used, the temperature and pH at which the formulation is prepared, are all factors that can be optimized for the concentration and means of administration used.

The method of the invention provides pharmaceutical compositions comprising various formulations useful and acceptable for administration to a human or animal subject. Such pharmaceutical compositions are prepared using water at "standard state" as the diluent and routine methods well known to those of ordinary skill in the art. For example, buffering components such as histidine and histidine monohydrochloride hydrate, can be provided first followed by the addition of an appropriate, non-final volume of water diluent, sucrose and polysorbate 80 at "standard state."

US 10,961,307 B2

33

Isolated antibody can then be added. Last, the volume of the pharmaceutical composition is adjusted to the desired final volume under "standard state" conditions using water as the diluent. Those skilled in the art will recognize a number of other methods suitable for the preparation of the pharmaceutical compositions.

The pharmaceutical compositions can be aqueous solutions or suspensions comprising the indicated mass of each constituent per unit of water volume or having an indicated pH at "standard state." As used herein, the term "standard state" means a temperature of 25° C.+/−2° C. and a pressure of 1 atmosphere. The term "standard state" is not used in the art to refer to a single art recognized set of temperatures or pressure, but is instead a reference state that specifies temperatures and pressure to be used to describe a solution or suspension with a particular composition under the reference "standard state" conditions. This is because the volume of a solution is, in part, a function of temperature and pressure. Those skilled in the art will recognize that pharmaceutical compositions equivalent to those disclosed here can be produced at other temperatures and pressures. Whether such pharmaceutical compositions are equivalent to those disclosed here should be determined under the "standard state" conditions defined above (e.g. 25° C.+/−2° C. and a pressure of 1 atmosphere).

Importantly, such pharmaceutical compositions can contain component masses "about" a certain value (e.g. "about 0.53 mg L-histidine") per unit volume of the pharmaceutical composition or have pH values about a certain value. A component mass present in a pharmaceutical composition or pH value is "about" a given numerical value if the isolated antibody present in the pharmaceutical composition is able to bind a peptide chain while the isolated antibody is present in the pharmaceutical composition or after the isolated antibody has been removed from the pharmaceutical composition (e.g., by dilution). Stated differently, a value, such as a component mass value or pH value, is "about" a given numerical value when the binding activity of the isolated antibody is maintained and detectable after placing the isolated antibody in the pharmaceutical composition.

Competition binding analysis is performed to determine if the IL-12/IL-23p40 or IL-23 specific mAbs bind to similar or different epitopes and/or compete with each other. Abs are individually coated on ELISA plates. Competing mAbs are added, followed by the addition of biotinylated hrIL-12 or IL-23. For positive control, the same mAb for coating can be used as the competing mAb ("self-competition"). IL-12/IL-23p40 or IL-23 binding is detected using streptavidin. These results demonstrate whether the mAbs recognize similar or partially overlapping epitopes on IL-12/IL-23p40 or IL-23.

In one embodiment of the pharmaceutical compositions, the isolated antibody concentration is from about 77 to about 104 mg per ml of the pharmaceutical composition. In another embodiment of the pharmaceutical compositions the pH is from about 5.5 to about 6.5.

The stable or preserved formulations can be provided to subjects as clear solutions or as dual vials comprising a vial of lyophilized at least one anti-IL-12/IL-23p40 that is reconstituted with a second vial containing a preservative or buffer and excipients in an aqueous diluent. Either a single solution vial or dual vial requiring reconstitution can be reused multiple times and can suffice for a single or multiple cycles of subject treatment and thus provides a more convenient treatment regimen than currently available.

Other formulations or methods of stabilizing the anti-IL-12/IL-23p40 can result in other than a clear solution of lyophilized powder comprising the antibody. Among non-

34

clear solutions are formulations comprising particulate suspensions, said particulates being a composition containing the anti-IL-12/IL-23p40 in a structure of variable dimension and known variously as a microsphere, microparticle, nanoparticle, nanosphere, or liposome. Such relatively homogenous, essentially spherical, particulate formulations containing an active agent can be formed by contacting an aqueous phase containing the active agent and a polymer and a nonaqueous phase followed by evaporation of the nonaqueous phase to cause the coalescence of particles from the aqueous phase as taught in U.S. Pat. No. 4,589,330. Porous microparticles can be prepared using a first phase containing active agent and a polymer dispersed in a continuous solvent and removing said solvent from the suspension by freeze-drying or dilution-extraction-precipitation as taught in U.S. Pat. No. 4,818,542. Preferred polymers for such preparations are natural or synthetic copolymers or polymers selected from the group consisting of glelatin agar, starch, arabinogalactan, albumin, collagen, polyglycolic acid, polylactic aced, glycolide-L(−) lactide poly(epsilon-caprolactone, poly(epsilon-caprolactone-CO-lactic acid), poly(epsilon-caprolactone-CO-glycolic acid), poly(B-hydroxy butyric acid), polyethylene oxide, polyethylene, poly (alkyl-2-cyanoacrylate), poly(hydroxyethyl methacrylate), polyamides, poly(amino acids), poly(2-hydroxyethyl DL-aspartamide), poly(ester urea), poly(L-phenylalanine/ethylene glycol/1,6-diisocyanatohexane) and poly(methyl methacrylate). Particularly preferred polymers are polyesters, such as polyglycolic acid, polylactic aced, glycolide-L(−) lactide poly(epsilon-caprolactone, poly(epsilon-caprolactone-CO-lactic acid), and poly(epsilon-caprolactone-CO-glycolic acid. Solvents useful for dissolving the polymer and/or the active include: water, hexafluoroisopropanol, methylenechloride, tetrahydrofuran, hexane, benzene, or hexafluoroacetone sesquihydrate. The process of dispersing the active containing phase with a second phase can include pressure forcing said first phase through an orifice in a nozzle to affect droplet formation.

Dry powder formulations can result from processes other than lyophilization, such as by spray drying or solvent extraction by evaporation or by precipitation of a crystalline composition followed by one or more steps to remove aqueous or non-aqueous solvent. Preparation of a spray-dried antibody preparation is taught in U.S. Pat. No. 6,019, 968. The antibody-based dry powder compositions can be produced by spray drying solutions or slurries of the antibody and, optionally, excipients, in a solvent under conditions to provide a respirable dry powder. Solvents can include polar compounds, such as water and ethanol, which can be readily dried. Antibody stability can be enhanced by performing the spray drying procedures in the absence of oxygen, such as under a nitrogen blanket or by using nitrogen as the drying gas. Another relatively dry formulation is a dispersion of a plurality of perforated microstructures dispersed in a suspension medium that typically comprises a hydrofluoroalkane propellant as taught in WO 9916419. The stabilized dispersions can be administered to the lung of a subject using a metered dose inhaler. Equipment useful in the commercial manufacture of spray dried medicaments are manufactured by Buchi Ltd. or Niro Corp.

An anti-IL-12/IL-23p40 in either the stable or preserved formulations or solutions described herein, can be administered to a subject in accordance with the present invention via a variety of delivery methods including SC or IM injection; transdermal, pulmonary, transmucosal, implant, osmotic pump, cartridge, micro pump, or other means appreciated by the skilled artisan, as well-known in the art.

US 10,961,307 B2

35

36

Therapeutic Applications

The present invention also provides a method for modulating or treating ulcerative colitis, in a cell, tissue, organ, animal, or subject, as known in the art or as described herein, using at least one IL-23 antibody of the present invention, e.g., administering or contacting the cell, tissue, organ, animal, or subject with a therapeutic effective amount of IL-12/IL-23p40 or IL-23 specific antibody.

Any method of the present invention can comprise administering an effective amount of a composition or pharmaceutical composition comprising an IL-12/IL-23p40 to a cell, tissue, organ, animal or subject in need of such modulation, treatment or therapy. Such a method can optionally further comprise co-administration or combination therapy for treating such diseases or disorders, wherein the administering of said at least one IL-12/IL-23p40, specified portion or variant thereof, further comprises administering, before concurrently, and/or after, at least one selected from at least one TNF antagonist (e.g., but not limited to, a TNF chemical or protein antagonist, TNF monoclonal or polyclonal antibody or fragment, a soluble TNF receptor (e.g., p55, p70 or p85) or fragment, fusion polypeptides thereof, or a small molecule TNF antagonist, e.g., TNF binding protein I or II (TBP-1 or TBP-II), nerelimonmab, infliximab, eternacept (Enbrel™), adalimulab (Humira™), CDP-571, CDP-870, afelimomab, lenercept, and the like), an antirheumatic (e.g., methotrexate, auranofin, aurothioglucose, azathioprine, gold sodium thiomalate, hydroxychloroquine sulfate, leflunomide, sulfasalzine), a muscle relaxant, a narcotic, a non-steroid anti-inflammatory drug (NSAID) (e.g., 5-aminosalicylate), an analgesic, an anesthetic, a sedative, a local anesthetic, a neuromuscular blocker, an antimicrobial (e.g., aminoglycoside, an antifungal, an antiparasitic, an antiviral, a carbapenem, cephalosporin, a fluorquinolone, a macrolide, a penicillin, a sulfonamide, a tetracycline, another antimicrobial), an antipsoriatic, a corticosteriod, an anabolic steroid, a diabetes related agent, a mineral, a nutritional, a thyroid agent, a vitamin, a calcium related hormone, an antidiarrheal, an antitussive, an antiemetic, an antiulcer, a laxative, an anticoagulant, an erythropoietin (e.g., epoetin alpha), a filgrastim (e.g., G-CSF, Neupogen), a sargramostim (GM-CSF, Leukine), an immunization, an immunoglobulin, an immunosuppressive (e.g., basiliximab, cyclosporine, daclizumab), a growth hormone, a hormone replacement drug, an estrogen receptor modulator, a mydriatic, a cycloplegic, an alkylating agent, an antimetabolite, a mitotic inhibitor, a radiopharmaceutical, an antidepressant, antimanic agent, an antipsychotic, an anxiolytic, a hypnotic, a sympathomimetic, a stimulant, donepezil, tacrine, an asthma medication, a beta agonist, an inhaled steroid, a leukotriene inhibitor, a methylxanthine, a cromolyn, an epinephrine or analog, dornase alpha (Pulmozyme), a cytokine or a cytokine antagonist. Suitable dosages are well known in the art. See, e.g., Wells et al., eds., Pharmacotherapy Handbook, 2nd Edition, Appleton and Lange, Stamford, Conn. (2000); PDR Pharmacopoeia, Tarascon Pocket Pharmacopoeia 2000, Deluxe Edition, Tarascon Publishing, Loma Linda, Calif. (2000); Nursing 2001 Handbook of Drugs, 21st edition, Springhouse Corp., Springhouse, Pa., 2001; Health Professional's Drug Guide 2001, ed., Shannon, Wilson, Stang, Prentice-Hall, Inc, Upper Saddle River, N.J., each of which references are entirely incorporated herein by reference.

Therapeutic Treatments

Treatment of ulcerative colitis is affected by administering an effective amount or dosage of an anti-IL-12/23p40 composition in a subject in need thereof. The dosage administered can vary depending upon known factors, such as the pharmacodynamic characteristics of the particular agent, and its mode and route of administration; age, health, and weight of the recipient; nature and extent of symptoms, kind of concurrent treatment, frequency of treatment, and the effect desired. In some instances, to achieve the desired therapeutic amount, it can be necessary to provide for repeated administration, i.e., repeated individual administrations of a particular monitored or metered dose, where the individual administrations are repeated until the desired daily dose or effect is achieved.

In one exemplary regimen of providing safe and effective treatment of severely active UC in a subject in need thereof, a total dosage of about 130 mg of an anti-IL-12/IL-23p40 antibody is administered intravenously to the subject per administration. For example, the total volume of the composition administered is appropriately adjusted to provide to the subject the target dosage of the antibody at 80 mg, 90 mg, 100 mg, 110 mg, 120 mg, 130 mg, 140 mg, 150 mg, 160 mg, 170 mg or 180 mg per administration.

In another exemplary regimen of providing safe and effective treatment of severely active UC in a subject in need thereof, a total dosage of about 6.0 mg/kg 1.5 mg/kg of an anti-IL-12/IL-23p40 antibody is administered intravenously to the subject per administration. For example, the total volume of the composition administered is appropriately adjusted to provide to the subject the target dosage of the antibody at 3.0 mg/kg, 3.5 mg/kg, 4.0 mg/kg, 4.5 mg/kg, 5.0 mg/kg, 5.5 mg/kg, 6.0 mg/kg, 6.5 mg/kg, 7.0 mg/kg, 7.5 mg/kg, 8.0 mg/kg, 8.5 mg/kg, or 9.0 mg/kg body weight of the subject per administration.

The total dosage of an anti-IL-12/IL-23p40 antibody to be administered to the subject per administration can be administered by intravenous infusion over a period of about 30 minutes to 180 minutes, preferably 60 minutes to 120 minutes, such as 30 minutes, 60 minutes, 90 minutes, 120 minutes, 150 minutes, or 180 minutes.

In yet another exemplary regimen of providing safe and effective treatment of severely active UC in a subject in need thereof, a total dosage of about 90 mg of an anti-IL-12/IL-23p40 antibody is administered subcutaneously to the subject per administration. For example, the total volume of the composition administered is appropriately adjusted to provide to the subject the target dosage of the antibody at 40 mg, 50 mg, 60 mg, 70 mg, 80 mg, 90 mg, 100 mg, 110 mg, 120 mg, 130 mg or 140 mg per administration. The target dosage per administration can be administered in a single subcutaneous injection or in multiple subcutaneous injections, such as 1, 2, 3, 4, 5, or more subcutaneous injections.

The total dosage of the anti-IL-12/IL-23p40 antibody can be administered once per day, once per week, once per month, once every six months, etc. for a period of one day, one week, one month, six months, 1 year, 2 years or longer. Multiple administrations of the anti-IL-12/IL-23p40 antibody, each at a total dosage of described herein, can be administered to a subject in need thereof.

Dosage forms (composition) suitable for internal administration generally contain from about 0.001 milligram to about 500 milligrams of active ingredient per unit or container.

For parenteral administration, the antibody can be formulated as a solution, suspension, emulsion, particle, powder, or lyophilized powder in association, or separately provided, with a pharmaceutically acceptable parenteral vehicle. Examples of such vehicles are water, saline, Ringer's solution, dextrose solution, and 1-10% human serum albumin. Liposomes and nonaqueous vehicles, such as fixed oils, can

US 10,961,307 B2

37

also be used. The vehicle or lyophilized powder can contain additives that maintain isotonicity (e.g., sodium chloride, mannitol) and chemical stability (e.g., buffers and preservatives). The formulation is sterilized by known or suitable techniques.

Suitable pharmaceutical carriers are described in the most recent edition of Remington's Pharmaceutical Sciences, A. Osol, a standard reference text in this field.

Many known and developed modes can be used according to the present invention for administering pharmaceutically effective amounts of an IL-12/IL-23p40 antibody. IL-12/IL-23p40 or IL-23 antibodies of the present invention can be delivered in a carrier, as a solution, emulsion, colloid, or suspension, or as a dry powder, using any of a variety of devices and methods suitable for administration by inhalation or other modes described here within or known in the art.

Formulations for parenteral administration can contain as common excipients sterile water or saline, polyalkylene glycols, such as polyethylene glycol, oils of vegetable origin, hydrogenated naphthalenes and the like. Aqueous or oily suspensions for injection can be prepared by using an appropriate emulsifier or humidifier and a suspending agent, according to known methods. Agents for injection can be a non-toxic, non-orally administrable diluting agent, such as aqueous solution, a sterile injectable solution or suspension in a solvent. As the usable vehicle or solvent, water, Ringer's solution, isotonic saline, etc. are allowed; as an ordinary solvent or suspending solvent, sterile involatile oil can be used. For these purposes, any kind of involatile oil and fatty acid can be used, including natural or synthetic or semisynthetic fatty oils or fatty acids; natural or synthetic or semisynthtetic mono- or di- or tri-glycerides. Parental administration is known in the art and includes, but is not limited to, conventional means of injections, a gas pressured needleless injection device as described in U.S. Pat. No. 5,851,198, and a laser perforator device as described in U.S. Pat. No. 5,839,446 entirely incorporated herein by reference.

Alternative Delivery

The invention further relates to the administration of an anti-IL-12/IL-23p40 or IL-23 antibody by parenteral, subcutaneous, intramuscular, intravenous, intrarticular, intrabronchial, intraabdominal, intracapsular, intracartilaginous, intracavitary, intracelial, intracerebellar, intracerebroventricular, intracolic, intracervical, intragastric, intrahepatic, intramyocardial, intraosteal, intrapelvic, intrapericardiac, intraperitoneal, intrapleural, intraprostatic, intrapulmonary, intrarectal, intrarenal, intraretinal, intraspinal, intrasynovial, intrathoracic, intrauterine, intravesical, intralesional, bolus, vaginal, rectal, buccal, sublingual, intranasal, or transdermal means. An anti-IL-12/IL-23p40 or IL-23 antibody composition can be prepared for use for parenteral (subcutaneous, intramuscular or intravenous) or any other administration particularly in the form of liquid solutions or suspensions; for use in vaginal or rectal administration particularly in semisolid forms, such as, but not limited to, creams and suppositories; for buccal, or sublingual administration, such as, but not limited to, in the form of tablets or capsules; or intranasally, such as, but not limited to, the form of powders, nasal drops or aerosols or certain agents; or transdermally, such as not limited to a gel, ointment, lotion, suspension or patch delivery system with chemical enhancers such as dimethyl sulfoxide to either modify the skin structure or to increase the drug concentration in the transdermal patch (Junginger, et al. In "Drug Permeation Enhancement;" Hsieh, D. S., Eds., pp. 59-90 (Marcel Dekker, Inc. New York 1994, entirely incorporated herein by reference), or with

38

oxidizing agents that enable the application of formulations containing proteins and peptides onto the skin (WO 98/53847), or applications of electric fields to create transient transport pathways, such as electroporation, or to increase the mobility of charged drugs through the skin, such as iontophoresis, or application of ultrasound, such as sonophoresis (U.S. Pat. Nos. 4,309,989 and 4,767,402) (the above publications and patents being entirely incorporated herein by reference).

EMBODIMENTS

The invention provides also the following non-limiting embodiments.

1. A method of treating moderately to severely active ulcerative colitis (UC) in a subject in need thereof, comprising administering to the subject a pharmaceutical composition comprising a clinically proven safe and clinically proven effective amount of an anti-IL-12/IL-23p40 antibody, wherein the antibody comprises a heavy chain variable region and a light chain variable region, the heavy chain variable region comprising: a complementarity determining region heavy chain 1 (CDRH1) amino acid sequence of SEQ ID NO:1; a CDRH2 amino acid sequence of SEQ ID NO:2; and a CDRH3 amino acid sequence of SEQ ID NO:3; and the light chain variable region comprising: a complementarity determining region light chain 1 (CDRL1) amino acid sequence of SEQ ID NO:4; a CDRL2 amino acid sequence of SEQ ID NO:5; and a CDRL3 amino acid sequence of SEQ ID NO:6.

2. The method of embodiment 1, wherein the antibody comprises the heavy chain variable region of the amino acid sequence of SEQ ID NO:7 and the light chain variable region of the amino acid sequence of SEQ ID NO:8.

3. The method of embodiment 1, wherein the antibody comprises a heavy chain of the amino acid sequence of SEQ ID NO:10 and a light chain of the amino acid sequence of SEQ ID NO:11.

4. The method of any one of embodiments 1 to 3, wherein the antibody is administered intravenously to the subject, preferably at week 0 of the treatment, at a dosage of about 6.0 mg/kg body weight of the subject or 130 mg per administration.

5. The method of any one of embodiments 1 to 4, wherein the antibody is further administered subcutaneously to the subject, preferably at week 8 of the treatment, at a dosage of about 90 mg per administration.

6. The method of any one of embodiments 1 to 5, wherein the subject had previously failed or were intolerant of at least one therapy selected from the group consisting of an anti-TNF, vedolizumab, corticosteroids, azathioprine (AZA), and 6 mercaptopurine (6 MP), or the subject had demonstrated corticosteroid dependence.

7. The method of embodiment 5, wherein the antibody is administered in a maintenance dose every 8 weeks after the treatment at week 8 or every 12 weeks after the treatment at week 8.

8. The method of embodiment 7, wherein the subject is a responder to the treatment with the antibody and is identified as having a clinical remission based on at least one of the global definition and the US definition by week 16, preferably by week 8, more preferably by week 2, of the treatment and the clinical remission continues at least 44 weeks after week 0.

39

9. The method of embodiment 8, wherein the subject is in corticosteroid-free clinical remission at least 44 weeks after week 0.

10. The method of embodiment 7, wherein the subject is a responder to the treatment with the antibody and is identified as having an endoscopic healing continuing at least 44 weeks after week 0.

11. The method of embodiment 7, wherein the subject is a responder to the treatment with the antibody and is identified as achieving a clinical response based on the Mayo endoscopy subscore continuing at least 44 weeks after week 0.

12. The method of embodiment 7, wherein the subject is a responder to the treatment with the antibody and is identified as having a change from baseline in Inflammatory Bowel Disease Questionnaire (IBDQ) score continuing at least 44 weeks after week 0.

13. The method of embodiment 7, wherein the subject is a responder to the treatment with the antibody and is identified as having a mucosal healing continuing at least 44 weeks after week 0.

14. The method of embodiment 7, wherein the subject is a responder to the treatment with the antibody and is identified as having a decrease from baseline in Mayo score continuing at least 44 weeks after week 0.

15. The method of embodiment 7, wherein the subject is a responder to the treatment with the antibody and is identified as having a normalization of one or more biomarkers selected from the group consisting of C-reactive protein, fecal lactoferrin and fecal calprotectin continuing at least 44 weeks after week 0.

16. The method of embodiment 7, wherein the subject is in clinical response as determined by a decrease from baseline in the Mayo score by ≥30% and ≥3 points and a decrease from baseline in the rectal bleeding subscore ≥1 points or a rectal bleeding subscore of 0 or 1 continuing at least 44 weeks after week 0.

17. A method of treating moderately to severely active ulcerative colitis (UC) in a subject in need thereof, comprising:
   a. intravenously administering to the subject an anti-IL-12/IL-23p40 antibody in a first pharmaceutical composition at a dosage of about 6.0 mg/kg body weight of the subject or 130 mg per administration at week 0 of the treatment, and
   b. subcutaneously administering to the subject the anti-IL-12/IL-23p40 antibody in a second pharmaceutical composition at a dosage of 90 mg per administration, preferably at week 8 of the treatment, wherein the antibody comprises a heavy chain variable region and a light chain variable region, the heavy chain variable region comprising: a complementarity determining region heavy chain 1 (CDRH1) amino acid sequence of SEQ ID NO:1; a CDRH2 amino acid sequence of SEQ ID NO:2; and a CDRH3 amino acid sequence of SEQ ID NO:3; and the light chain variable region comprising: a complementarity determining region light chain 1 (CDRL1) amino acid sequence of SEQ ID NO:4; a CDRL2 amino acid sequence of SEQ ID NO:5; and a CDRL3 amino acid sequence of SEQ ID NO:6; and wherein the subject had previously failed or were intolerant of at least one therapy selected from the group consisting of: an anti-TNF, vedolizumab, corticosteroids, azathioprine (AZA), and 6 mer-

40

captopurine (6 MP), or the subject had demonstrated corticosteroid dependence.

18. The method of embodiment 17, wherein the antibody comprises the heavy chain variable region of the amino acid sequence of SEQ ID NO:7 and the light chain variable region of the amino acid sequence of SEQ ID NO:8.

19. The method of embodiment 17, wherein the antibody comprises a heavy chain of the amino acid sequence of SEQ ID NO:10 and a light chain of the amino acid sequence of SEQ ID NO:11.

20. The method of any one of embodiments 1-19, wherein the pharmaceutical composition for intravenous administration further comprises a solution comprising 10 mM L-histidine, 8.5% (w/v) sucrose, 0.04% (w/v) polysorbate 80, 0.4 mg/mL L-methionine, and 20 μg/mL EDTA disodium salt, dehydrate, at pH 6.0.

21. The method of any one of embodiments 1-20, wherein the pharmaceutical composition for subcutaneous administration further comprises a solution comprising 6.7 mM L-histidine, 7.6% (w/v) sucrose, 0.004% (w/v) polysorbate 80, at pH 6.0.

22. The method of any one of embodiments 1-21, wherein the subject is a responder to the treatment with the antibody and is identified as having a clinical remission based on at least one of the global definition and the US definition by week 16, preferably by week 8, more preferably by week 2, of the treatment.

23. The method of any one of embodiments 1-22, wherein the subject is a responder to the treatment with the antibody and is identified as having an endoscopic healing by week 16, preferably by week 8, more preferably by week 2, of the treatment.

24. The method of any one of embodiments 1-23, wherein the subject is a responder to the treatment with the antibody and is identified as achieving a clinical response based on the Mayo endoscopy subscore by week 16, preferably by week 8, more preferably by week 2, of the treatment.

25. The method of any one of embodiments 1-24, wherein the subject is a responder to the treatment with the antibody and is identified as having a change from baseline in Inflammatory Bowel Disease Questionnaire (IBDQ) score by week 16, preferably by week 8, more preferably by week 2, of the treatment.

26. The method of any one of embodiments 1-25, wherein the subject is a responder to the treatment with the antibody and is identified as having a mucosal healing by week 16, preferably by week 8, more preferably by week 2, of the treatment.

27. The method of any one of embodiments 1-26, wherein the subject is a responder to the treatment with the antibody and is identified as having a decrease from baseline in Mayo score by week 16, preferably by week 8, more preferably by week 2, of the treatment.

28. The method of any one of embodiments 1-27, wherein the subject is a responder to the treatment with the antibody and is identified as having a normalization of one or more biomarkers selected from the group consisting of C-reactive protein, fecal lactoferrin and fecal calprotectin by week 16, preferably by week 8, more preferably by week 2, of the treatment.

29. The method of any one of embodiments 1-28, wherein the subject is in clinical response as determined by a decrease from baseline in the Mayo score by ≥30% and ≥3 points and a decrease from baseline in the rectal bleeding subscore ≥1 points or a rectal bleeding sub-

US 10,961,307 B2

41

score of 0 or 1 by week 16, preferably by week 8, more preferably by week 2, of the treatment.

30. The method of any one of embodiments 17-21, wherein the subject is not a responder to the treatment with the antibody by week 8 and is a responder to the treatment by week 16 of the treatment.

31. A method of treating moderately to severely active ulcerative colitis (UC) in a subject in need thereof, comprising:

  a. intravenously administering to the subject an anti-IL-12/IL-23p40 antibody in a first pharmaceutical composition at a dosage of about 6.0 mg/kg body weight of the subject or 130 mg per administration at week 0 of the treatment, and

  b. subcutaneously administering to the subject the anti-IL-12/IL-23p40 antibody in a second pharmaceutical composition at a dosage of 90 mg per administration, preferably at week 8 of the treatment, wherein the antibody comprises a heavy chain variable region and a light chain variable region, the heavy chain variable region comprising: a complementarity determining region heavy chain 1 (CDRH1) amino acid sequence of SEQ ID NO:1; a CDRH2 amino acid sequence of SEQ ID NO:2; and a CDRH3 amino acid sequence of SEQ ID NO:3; and the light chain variable region comprising: a complementarity determining region light chain 1 (CDRL1) amino acid sequence of SEQ ID NO:4; a CDRL2 amino acid sequence of SEQ ID NO:5; and a CDRL3 amino acid sequence of SEQ ID NO:6 followed by a maintenance therapy

  wherein the maintenance therapy comprises subcutaneously administering to the subject the anti-IL-12/IL-23p40 antibody at a dosage of 90 mg per administration, once every 8 weeks or once every 12 weeks, and wherein the maintenance therapy is provided for 44 weeks.

32. A pharmaceutical composition of an anti-IL-12/IL-23p40 antibody, comprising an antibody and packaging comprising one or more drug product label elements disclosed in Annex I including data from a randomized, double-blind, placebo-controlled, clinical study in adult men and women with moderately to severely active ulcerative colitis (UC), wherein the antibody comprises: (i) a heavy chain variable region and a light chain variable region, the heavy chain variable region comprising: a complementarity determining region heavy chain 1 (CDRH1) amino acid sequence of SEQ ID NO:1; a CDRH2 amino acid sequence of SEQ ID NO:2; and a CDRH3 amino acid sequence of SEQ ID NO:3; and the light chain variable region comprising: a complementarity determining region light chain 1 (CDRL1) amino acid sequence of SEQ ID NO:4; a CDRL2 amino acid sequence of SEQ ID NO:5; and a CDRL3 amino acid sequence of SEQ ID NO:6; (ii) a heavy chain variable region of the amino acid sequence of SEQ ID NO:7 and a light chain variable region of the amino acid sequence of SEQ ID NO:8; or (iii) a heavy chain of the amino acid sequence of SEQ ID NO:10 and a light chain of the amino acid sequence of SEQ ID NO:11.

33. A method of selling a drug product comprising ustekinumab, comprising: manufacturing ustekinumab; promoting that a therapy comprising ustekinumab is safe and effective for treatment of a subject with ulcerative colitis, wherein performing the steps a) and

42

b) results in a health care professional (HCP) to purchase the drug product; thereby selling the drug product.

Having generally described the invention, the same will be more readily understood by reference to the following Examples, which are provided by way of illustration and are not intended as limiting. Further disclosures of the invention are illustrated by the following non-limiting Examples. The disclosures of all citations in the specification are expressly incorporated herein by reference.

EXAMPLES

Example 1: Induction Study of Ustekinumab in the Treatment of Ulcerative Colitis in Humans

The following multicenter, randomized, double-blind, placebo-controlled, clinical study in adult men and women with moderately to severely active ulcerative colitis (UC) was performed: A Phase 3, Randomized, Double-blind, Placebo-controlled, Parallel-group, Multicenter Study to Evaluate the Safety and Efficacy of ustekinumab Induction and Maintenance Therapy in Subjects with Moderately to Severely Active Ulcerative Colitis

Overall Rationale

A study was performed to assess the efficacy of intravenous (IV) administration of ustekinumab in subjects with moderately to severely active ulcerative colitis who demonstrated inadequate response or failure to tolerate conventional (corticosteroids or 6-mercaptopurine/azathioprine [6-MP/AZA]) or biologic therapy (TNF antagonist and/or the integrin antagonist, vedolizumab). Subjects received a single 130 mg, a single 6 mg/kg IV dose, or placebo at Week 0. Subjects who demonstrated no clinical response at Week 8 received an additional IV or subcutaneous (SC) dose at Week 8.

Objectives

The primary objectives of the study included (1) evaluating the efficacy of ustekinumab in inducing clinical remission in subjects with moderately to severely active UC; and (2) evaluating the safety of the IV ustekinumab in subjects with moderately to severely active UC.

The secondary objectives of the study included (1) evaluating the efficacy of IV ustekinumab in inducing endoscopic healing (i.e. improvement in the endoscopic appearance of mucosa) in subjects with moderately to severely active UC; (2) evaluating the efficacy of IV ustekinumab in inducing clinical response in subjects with moderately to severely active UC; (3) evaluating the impact of IV ustekinumab on disease-specific health-related quality of life; (4) evaluating the efficacy of ustekinumab treatment on mucosal healing (i.e, endoscopic healing and histologic healing); (5) evaluating the efficacy of induction therapy with IV ustekinumab by biologic failure status; and (6) evaluating the pharmacokinetics (PK), immunogenicity, and pharmacodynamics (PD) of ustekinumab induction therapy in subjects with moderately to severely active UC, including changes in C-reactive protein (CRP), fecal calprotectin, fecal lactoferrin, and other PD biomarkers.

The exploratory objectives of the study included (1) evaluating response using the Mayo score without the physician's global assessment (PGA) subscore and (2) evaluating the performance of the Bristol Stool Form Scale (BSFS) score.

Experimental Design

The Phase 3 development program for ustekinumab comprised 2 separate studies, an induction study and a mainte-

US 10,961,307 B2

43

nance study. In the induction study, subjects were randomized at Week 0 into one of three treatment groups: placebo, low-dose ustekinumab, and high-dose ustekinumab. At Week 8, all subjects were evaluated for the primary endpoint of clinical remission and clinical response. Subjects who achieved a clinical response at Week 8 were eligible to enter the maintenance study. Subjects who did not achieve clinical response at Week 8 received a second dose of ustekinumab at Week 8 of treatment.

At Week 16, subjects who did not achieve clinical response at Week 8 were re-evaluated for clinical response. Subjects who achieved clinical response at Week 16 were eligible to enter the maintenance study. Subjects who did not achieve clinical response at Week 16 were not eligible to enter the maintenance study and had a safety follow-up visit approximately 20 weeks after their last dose of study agent (Week 8).

Subjects who were in clinical response to IV ustekinumab during induction comprised the primary population in the maintenance study. The maintenance study is a randomized withdrawal study designed to evaluate maintenance therapy using SC ustekinumab and is currently ongoing.

Dosage and Administration

Subjects received a single IV dose of ustekinumab or placebo at Week 0 of the study. The induction study antibodies with the administered doses are as follows:

Ustekinumab at a low, fixed dose of 130 mg

Ustekinumab at a high, weight-range based dose of ~6 mg/kg:

Ustekinumab 260 mg (body-weight≤55 kg)
Ustekinumab 390 mg (body-weight>55 kg but ≤85 kg)
Ustekinumab 520 mg (body-weight>85 kg)

Subjects who did not present a clinical response received a second dose of ustekinumab at Week 8. The study antibodies with the second administered doses are as follows:

Subjects who were randomized to placebo at Week 0 received 1 dose of ustekinumab ~6 mg/kg IV+placebo SC (to maintain the blind) at Week 8.

Subjects who were randomized to ustekinumab at Week 0 received 1 dose of ustekinumab 90 mg SC+placebo IV (to maintain the blind) at Week 8.

Safety Evaluations

Safety was evaluated based on AEs and clinical laboratory test results (i.e., hematology and serum chemistry). Adverse events were either voluntarily reported by the subject or were obtained by means of interviewing subjects in a non-directed manner at study visits. Safety evaluations included the following clinical laboratory tests:

Hematology: Hemoglobin (Hb), hematocrit, red blood cell count, white blood cell (WBC) count, and platelets.

Serum Chemistry: Sodium, potassium, chloride, blood urea nitrogen (BUN), creatinine, aspartate aminotransferase (AST), alanine aminotransferase (ALT), total and direct bilirubin, alkaline phosphatase, calcium, phosphate, albumin, total protein.

Screening: Serology for human immunodeficiency virus antibody, serology for hepatitis C virus (HCV) antibody, serology for hepatitis B virus (HBV) antibody, hepatitis B surface antigen, HBV surface antibody (anti-HBs), and HBV core (anti-HBc) antibody total, QuantiFERON-TB Gold test, pregnancy (β human chorionic gonadotropin [(β-HCG]).

Pharmacokinetics

Blood samples for the measurement of serum ustekinumab concentrations were collected at Week 0 (preand postinfusion) and Weeks 2, 4, and 8. Analyses of serum ustekinumab concentrations were performed using a vali-

44

dated electrochemiluminescent immunoassay (ECLIA) method on the Meso Scale Discovery (MSD®) platform (Gaithersburg, Md., USA). The lowest quantifiable concentration in a sample for the ECLIA method using the MSD platform was 0.1688 μg/mL.

Immunogenicity

Antibodies to ustekinumab were evaluated using serum samples collected from all subjects. Analyses of antibodies to ustekinumab were performed using a validated, drug-tolerant, electrochemiluminescence immunoassay (ECLIA), in which ustekinumab was used to capture and detect induced immune responses to ustekinumab. Antibody titers were determined for all subjects who had antibodies to ustekinumab and the neutralizing antibody (Nab) status of anti-drug antibody positive samples were determined.

Efficacy Evaluation

Efficacy evaluations were collected throughout the study. Mayo score and partial Mayo score, Ulcerative Colitis Endoscopic Index of Severity (UCEIS), Bristol Stool Form Scale (BSFS), C-reactive protein (CRP), fecal lactoferrin, fecal calprotectin, Inflammatory Bowel Disease Questionnaire (IBDQ), 36-item Short Form Health Survey (SF-36), and EuroQoL-5D Health Questionnaire were all evaluated to determine efficacy. The efficacy criteria were defined as follows:

Clinical remission (global submissions): Mayo score ≤2 points, with no individual subscore >1.

Clinical remission (US submissions): absolute stool number ≤3, rectal bleeding subscore of 0, and Mayo endoscopy subscore of 0 or 1.

Clinical response: a decrease from induction baseline in the Mayo score by ≥30% and ≥3 points, with either a decrease from baseline in the rectal bleeding subscore ≥1 or a rectal bleeding subscore of 0 or 1.

Endoscopic healing (i.e., improvement in the endoscopic appearance of the mucosa): Mayo endoscopy subscore of 0 or 1.

Histologic healing: based on the Geboes score and is defined as 0 to <5% neutrophils in epithelium and no crypt destruction, erosions, ulcerations, or granulations.

Mucosal healing: both endoscopic healing and histologic healing.

Normal or inactive mucosal disease: Mayo endoscopy subscore of 0.

Symptomatic remission: Mayo stool frequency subscore of 0 or 1 and a rectal bleeding subscore of 0.

Normalization of CRP concentration: CRP concentration ≤3 mg/L.

Normalization of fecal lactoferrin concentration: fecal lactoferrin concentration ≤7.24 μg/g.

Normalization of fecal calprotectin concentration: fecal calprotectin concentration ≤250 mg/kg.

Modified Mayo score response:

Definition 1: a decrease in the modified Mayo score of ≥2 points and ≥35% and either a decrease in the rectal bleeding subscore of ≥1 or a rectal bleeding subscore of 0 or 1.

Definition 2: a decrease in the modified Mayo score of ≥2 points and ≥30% and either a decrease in rectal bleeding of ≥1 or a rectal bleeding score of 0 or 1.

Safety Results

Intravenous ustekinumab doses of both ~6 mg/kg and 130 mg were generally well-tolerated with a safety profile that was generally comparable with placebo through Week 8.0f the 960 subjects in the safety analysis set, 1 or more treatment-emergent AEs was reported through Week 8 for 50.0%, 41.4%, and 48.0% of subjects in the ~6 mg/kg, 130

US 10,961,307 B2

45

46

mg, and placebo groups, respectively. Through Week 8, serious adverse effects (SAEs) were reported for 3.1%, 3.7%, and 6.6% of subjects in the ~6 mg/kg, 130 mg, and placebo groups, respectively.

AEs within 1 hour of infusion were 0.9%, 2.2%, and 1.9% in the ~6 mg/kg, 130 mg, and placebo groups, respectively.

The proportions of subjects with 1 or more infections were 15.3%, 15.9%, and 15.0% in the ~6 mg/kg, 130 mg, and placebo groups, respectively. Serious infections were reported for 0.3%, 0.6%, and 1.3% of subjects in the ~6 mg/kg, 130 mg, and placebo groups, respectively.

Pharmacokinetics Results

Serum samples were collected at Week 0 (preadministration), Week 0 (1 hr post-administration, Week 2, Week 4, and Week 8. For subjects randomized to ustekinumab treatment, a single IV infusion of ustekinumab was given either as a weight-based tiered dose of ~6 mg/kg (ie, 260 mg for subjects with body-weight≤55 kg, 390 mg for subjects with body-weight>55 kg and <85 kg, or 520 mg for subjects with body-weight>85 kg), or as a fixed dose of 130 mg. Considering that the median body-weight of subjects in the 130 mg group was 72 kg, the ustekinumab 130 mg dose corresponded to ~2 mg/kg on a per-kg basis. Thus, on average, ustekinumab exposure in the ~6 mg/kg group was approximately 3 times that of the 130 mg group. In line with this expectation, after a single IV administration of ustekinumab ~6 mg/kg or 130 mg, median serum ustekinumab concentrations were approximately dose proportional at all sampling timepoints through Week 8. Median peak serum ustekinumab concentrations, which were observed 1 hour after the end of the infusion at Week 0, were 127.0 µg/mL and 43.16 µg/mL for the ~6 mg/kg and 130 mg groups, respectively. At Week 8, the time of the primary efficacy endpoint, the median serum ustekinumab concentrations were 8.59 µg/mL and 2.51 µg/mL for the ~6 mg/kg and 130 mg groups, respectively.

Subjects who were not in clinical response at Week 8 following administration of placebo IV at Week 0 received ustekinumab ~6 mg/kg IV at Week 8, while subjects who were not in clinical response at Week 8 following administration of ustekinumab IV at Week 0 received ustekinumab 90 mg SC at Week 8. Among subjects who received placebo IV at Week 0 and who subsequently received ustekinumab ~6 mg/kg IV at Week 8, median serum ustekinumab concentration at Week 16 (8 weeks after the ustekinumab IV dose) was slightly higher than that observed at Week 8 (among subjects who received ustekinumab ~6 mg/kg IV at Week 0 [10.51 µg/mL versus 8.59 µg/mL, respectively]). Among subjects who received ustekinumab 90 mg SC at Week 8 (following their initial IV ustekinumab dose at Week 0), the median serum ustekinumab concentration at Week 16 was slightly higher in those who received ustekinumab ~6 mg/kg IV at Week 0 compared to those who received ustekinumab 130 mg at Week 0 (1.92 µg/mL versus 1.59 µg/mL, respectively)

Immunogenicity Results

Of the 635 subjects in the ustekinumab groups with appropriate samples for the assessment of antibodies to ustekinumab, 4 (0.6%) subjects were positive for antibodies to ustekinumab through Week 8. Of these 4 subjects, 2 (50%) were positive for NAbs.

Of 822 subjects who received ustekinumab at any time through Week 16, and had appropriate samples for the assessment of anti-drug antibodies (ADAs), 18 subjects (2.2%) were positive for antibodies to ustekinumab through the final safety visit. Of these, 4 of 15 subjects (26.7%) were positive for NAbs among those evaluable for NAbs through

the final safety visit. Among subjects who received ustekinumab 90 mg SC at Week 8, the incidence of antibodies to ustekinumab through Week 16 was numerically higher in the 130 mg IV→90 mg SC group compared to the ~6 mg/kg IV→90 mg SC group (4.5% [6 of 132 subjects] vs 1.0% [1 of 101 subjects]).

Efficacy Results

Clinical Remission at Week 8-Global Definition

At Week 8, significantly greater proportions of subjects in the ~6 mg/kg and 130 mg groups achieved clinical remission (15.5% and 15.6%, respectively) compared with subjects in the placebo group (5.3%; p<0.001 for both comparisons; Table 1).

TABLE 1

| | Placebo | Ustekinumab IV | | |
|---|---|---|---|---|
| | IV | 130 mg | 6 mg/kg | Combined |
| Primary Efficacy Analysis Set Week 8 (N) | 319 | 320 | 322 | 642 |
| Subjects in clinical remission | 319 17 (5.3%) | 320 50 (15.6%) | 322 50 (15.5%) | 642 100 (15.6%) |
| Adjusted Treatment difference (97.5% CI) | | 10.3 (5.7, 14.9) | 10.2 (5.6, 14.8) | 10.2 (6.6, 13.9) |
| p-value | | <0.001 | <0.001 | <0.001 |

N = number of subjects;
CI = confidence interval

Clinical Remission at Week 8-US Definition

At Week 8, significantly greater proportions of subjects in the ~6 mg/kg and 130 mg groups achieved clinical remission (18.9% and 16.6%, respectively) compared with subjects in the placebo group (6.3%; p<0.001 for both comparisons; Table 2).

TABLE 2

Number of Subjects in Clinical Remission (US Definition) at Week 8

| | Placebo | Ustekinumab IV | | |
|---|---|---|---|---|
| | IV | 130 mg | 6 mg/kg | Combined |
| Primary Efficacy Analysis Set Week 8 (N) | 319 | 320 | 322 | 642 |
| Subjects in clinical remission | 319 20 (6.3%) | 320 53 (16.6%) | 322 61 (18.9%) | 642 114 (17.8%) |
| Adjusted Treatment difference (97.5% CI) | | 10.3 (4.8, 15.8) | 12.7 (7.0, 18.4) | 11.5 (7.0, 16) |
| p-value | | <0.001 | <0.001 | <0.001 |

N = number of subjects;
CI = confidence interval

Endoscopic Healing at Week 8

At Week 8, significantly greater proportions of subjects in the ~6 mg/kg and 130 mg groups achieved endoscopic healing (27.0% and 26.3%, respectively) compared with subjects in the placebo group (13.8%; p<0.001 for both comparisons; Table 3).

US 10,961,307 B2

47

TABLE 3

Number of Subjects with Endoscopic Healing at Week 8

| | Placebo | Ustekinumab IV | | |
| | IV | 130 mg | 6 mg/kg | Combined |
|---|---|---|---|---|
| Primary Efficacy Analysis Set | 319 | 320 | 322 | 642 |
| Week 8 (N) | 319 | 320 | 322 | 642 |
| Subjects with endoscopic healing | 44 (13.8%) | 84 (26.3%) | 87 (27.0%) | 171 (26.6%) |
| Adjusted Treatment difference | | 12.4 | 13.3 | 12.8 |
| (95% CI) | | (6.5, 18.4) | (7.3, 19.3) | (7.9, 17.8) |
| (97.5% CI) | | (5.2, 19.2) | (6.4, 20.1) | (7.2, 18.5) |
| p-value | | <0.001 | <0.001 | <0.001 |

N = number of subjects;
CI = confidence interval

**Clinical Response at Week 8**

At Week 8, significantly greater proportions of subjects in the ~6 mg/kg and 130 mg groups achieved clinical response (61.8% and 51.3%, respectively) compared with subjects in the placebo group (31.3%; p<0.001 for both comparisons; Table 4).

TABLE 4

Number of Subjects in Clinical Response

| | Placebo IV | Ustekinumab IV | | |
| | | 130 mg | 6 mg/kg | Combined |
|---|---|---|---|---|
| Primary Efficacy Analysis Set | 319 | 320 | 322 | 642 |
| Week 8 (N) | 319 | 320 | 322 | 642 |
| Subjects in clinical response | 100 (31.3%) | 164 (51.3%) | 199 (61.8%) | 363 (56.5%) |
| Adjusted Treatment difference | | 19.9 | 30.5 | 25.2 |
| (95% CI) | | (12.8, 27.3) | (23.2, 37.8) | (18.9, 31.5) |
| (97.5% CI) | | (11.4, 28.3) | (22.2, 38.8) | (18.0, 32.4) |
| p-value | | <0.001 | <0.001 | <0.001 |

N = number of subjects;
CI = confidence interval

**Change in Baseline in Total IBDQ Score at Week 8**

At baseline, median IBDQ scores were similar across all treatment groups. At Week 8, the median improvements from baseline in the IBDQ scores were significantly greater in the ~6 mg/kg and 130 mg groups (31.0 and 31.5, respectively) compared with the placebo group (10.0; p<0.001 for both comparisons).

**Clinical Remission at Week 8**

When remission was assessed as clinical remission (global definition) with a rectal bleeding subscore of 0 at Week 8, the proportions of subjects who achieved this endpoint were almost identical to that observed based on the primary efficacy analysis (global definition). Significantly greater proportions of subjects in the ~6 mg/kg and 130 mg groups achieved this endpoint (15.2% and 15.3%, respectively) compared with subjects in the placebo group (5.3%; p<0.001 for both comparisons).

**Symptomatic Remission at Week 8**

At Week 8, significantly greater proportions of subjects in the ~6 mg/kg and 130 mg groups achieved symptomatic

48

remission (44.7% and 41.3%, respectively) compared with subjects in the placebo group (22.6%; p<0.001 for both comparisons).

**Histologic Healing at Week 8**

Histologic healing was defined as 0 to <5% neutrophils in epithelium and no crypt destruction, erosions, ulcerations, or granulations. At Week 8, significantly greater proportions of subjects in the ~6 mg/kg and 130 mg groups achieved histologic healing (35.6% and 37.9%, respectively) compared with subjects in the placebo group (21.9%; p<0.001 for both comparisons).

**Change from Baseline in Mayo Score at Week 8**

At baseline, the mean Mayo scores were the same across all treatment groups (8.9 for all groups). At Week 8, the mean decreases from baseline in Mayo scores were significantly greater in the ~6 mg/kg and 130 mg groups (3.5 and 3.2, respectively) compared with the placebo group (1.8; p<0.001 for both comparisons).

**Change from Baseline in Partial Mayo Score Through Week 8**

At baseline, the mean partial Mayo scores were the same across all treatment groups (6.2 for all groups). As early as Week 2 and continuing for visits through Week 8, the mean decreases in the partial Mayo score were significantly greater in the ~6 mg/kg and 130 mg groups compared with the placebo group. At Week 2, the mean decreases from baseline in the partial Mayo scores were 1.6 and 1.5, in the ~6 mg/kg and 130 mg, respectively, compared with 1.0 in the placebo group (p<0.001 for both comparisons). At Week 8, the mean decreases from baseline in the partial Mayo scores were 2.9 and 2.6, in the ~6 mg/kg and 130 mg, compared with 1.5 in the placebo group (p<0.001 for both comparisons).

**UCEIS Score at Week 8**

The UCEIS score provides an overall assessment of endoscopic severity of UC, based on mucosal vascular pattern, bleeding, and ulceration. The score ranges from 3 to 11 with a higher score indicating more severe disease by endoscopy. The UCEIS score was assessed only during the central read of the video of the endoscopy.

At baseline, the mean UCEIS scores were similar across all treatment groups (7.6, 7.5, 7.5 in the ~6 mg/kg, 130 mg and placebo groups, respectively). At Week 8, the mean decreases from baseline in UCEIS scores were significantly greater in the ~6 mg/kg and 130 mg groups (1.3 and 1.1, respectively) compared with the placebo group (0.5; p<0.001 for both comparisons).

At Week 8, significantly greater proportions of subjects in the ~6 mg/kg and 130 mg groups had a UCEIS score of <4 (20.2% and 19.1%, respectively) compared with subjects in the placebo group (11.0%; p<0.001 and p=0.004, respectively). It is hypothesized that a UCEIS score of ≤4 is associated with Mayo endoscopic subscores of 0 or 1 that have defined endoscopic healing in this study.

**Bristol Stool Form Scale Score**

The BSFS score at a visit was the average of the 3-day daily average of the BSFS score prior to the visit. The same 3 days used to calculate the stool frequency and rectal bleeding subscores of the Mayo score were used to calculate the average BSFS score for the visit.

Approximately 40% (370/961) of randomized subjects had BSFS score collected at baseline. At baseline, 99.2% (367/370) of the subjects had average BSFS scores of ≥3 and the majority of subjects (54.3%) had average BSFS scores of ≥6, indicating diarrhea. As early as Week 2 and continuing for visits through Week 8, the proportions of subjects with diarrhea (average BSFS scores of ≥6) were smaller in the ~6

US 10,961,307 B2

49

50

mg/kg and 130 mg groups compared with the placebo group. At Week 8, 22.8%, 21.1%, and 32.0% of subjects had diarrhea (average BSFS scores of ≥6) in the ~6 mg/kg, 130 mg and placebo groups, respectively. Furthermore, at Week 8 the proportion of subjects with normal stool (≥3 and <5) was greater in the ~6 mg/kg and 130 mg groups compared with placebo (48.3%, 48.9%, and 29.3%, respectively).

Normalization of C-Reactive Protein

C-reactive protein (CRP) is used as a marker of inflammation in subjects with IBD. In UC, elevated CRP has been associated with severe clinical activity, an elevated sedimentation rate, and active disease as detected by colonoscopy. C-reactive protein was assayed using a validated, high-sensitivity CRP assay.

At baseline, the proportion of subjects who had abnormal CRP (>3 mg/L) was similar across all treatment groups; overall, 59.2% of randomized subjects had abnormal CRP concentrations at baseline. As early as Week 2 and continuing for visits through Week 8, among subjects who had abnormal values at baseline, significantly greater proportions of subjects in the ~6 mg/kg and 130 mg groups achieved normalization of CRP (≤3 mg/L) compared with the placebo group. At Week 8, 38.7% and 34.1% of subjects achieved normalization of CRP in the ~6 mg/kg and 130 mg groups, respectively, compared with 21.1% of subjects in the placebo group (p<0.001 for both comparisons).

Normalization of Fecal Lactoferrin

At baseline, the proportions of subjects with abnormal fecal lactoferrin (>7.24 µg/g) were similar across all treatment groups; overall 90.0% of randomized subjects had abnormal fecal lactoferrin concentrations at baseline. At Week 4 and Week 8, among subjects who had abnormal values at baseline, significantly greater proportions of subjects in the ~6 mg/kg and 130 mg groups achieved normalization of fecal lactoferrin (≤7.24 µg/g) compared with the placebo group. At Week 8, 14.6% and 17.2% of subjects in the ~6 mg/kg and 130 mg groups, respectively, achieved normalization of fecal lactoferrin compared with 9.3% of subjects in the placebo group (p=0.042, p=0.006, respectively, for the ustekinumab groups).

Normalization of Fecal Calprotectin

At baseline, the proportions of subjects with abnormal fecal calprotectin (>250 mg/kg) were slightly greater in the ~6 mg/kg group (85.1%) compared with the placebo group (78.4%); 82.5% of subjects in the 130 mg group had abnormal fecal calprotectin at baseline. At Week 2 and Week 4, among subjects who had abnormal values at baseline, significantly greater proportions of subjects in the ~6 mg/kg and 130 mg groups achieved normalization of fecal calprotectin (≤250 mg/kg). At Week 8, among subjects with abnormal fecal calprotectin at baseline, the proportions of subjects with normalized fecal calprotectin, though not significant, were numerically greater in the ustekinumab ~6 mg/kg and 130 mg groups (25.5% and 24.2%, respectively), compared with subjects in the placebo group (20.4%; p=0.148, p=0.301 for both comparisons, respectively).

Example 2: Maintenance Study of Ustekinumab in the Treatment of Ulcerative Colitis in Humans

Methodology

In this randomized-withdrawal maintenance study, all subjects enrolled were to be responders to study agent administered in the induction study. Primary (randomized) population: Subjects who were in clinical response to IV ustekinumab following induction comprised the primary population in the maintenance study. This population included the following: subjects who were randomized to receive ustekinumab (ie, 130 mg IV or ~6 mg/kg IV) at Week 0 of the induction study and were in clinical response at induction Week 8; and subjects who were randomized to receive placebo at Week 0 of the induction study and were not in clinical response at induction Week 8 but were in clinical response at induction Week 16 after receiving a dose of IV ustekinumab (~6 mg/kg) at induction Week 8 (placebo→ustekinumab ~6 mg/kg IV). These subjects were randomized in a 1:1:1 ratio at maintenance Week 0 to receive ustekinumab 90 mg SC every 8 weeks (q8w), ustekinumab 90 mg SC every 12 weeks (q12w), or placebo SC. Nonrandomized population: Additional subjects entering the maintenance study were not randomized in the primary population and received maintenance treatment in this study as follows: ustekinumab induction delayed responders (ie, subjects who were not in clinical response to IV ustekinumab at induction Week 8 but were in clinical response at induction Week 16 after receiving ustekinumab 90 mg SC at induction Week 8) received ustekinumab 90 mg SC q8w; and placebo induction responders (ie, subjects who were in clinical response to placebo IV induction) received placebo SC. Nonrandomized subjects were followed for both efficacy and safety but were not included in the key efficacy analyses.

All subjects received their assigned dose of SC study agent at the maintenance Week 0 visit. Thereafter, to maintain the blind, all subjects received study agent at all scheduled study agent administration visits. Subjects were assessed for clinical flare at every visit and, if loss of clinical response was confirmed, were eligible for rescue medication. The main portion of the maintenance study was through Week 44 and a long-term study extension will continue through Week 220.

Number of Subjects (Planned and Analyzed):

783 subjects who completed the induction study and were in clinical response to induction study agent were enrolled in this maintenance study. The numbers of subjects in each treatment group at maintenance Week 0 were as follows:

Randomized (primary) population (523 subjects [327 subjects were planned]):

176 subjects were randomized to ustekinumab 90 mg SC q8w.

172 subjects were randomized to ustekinumab 90 mg SC q12w.

175 subjects were randomized to placebo SC.

Nonrandomized population (260 subjects):

157 subjects who were ustekinumab induction delayed responders (ie, were not in clinical response to ustekinumab at induction Week 8 but were in clinical response at induction Week 16) received ustekinumab 90 mg SC q8w.

103 subjects who were in clinical response to placebo IV induction (placebo induction responders) received placebo SC.

Diagnosis and Main Criteria for Inclusion:

All subjects enrolled into this randomized-withdrawal maintenance study were those with moderately to severely active UC who had an inadequate response or had failed to tolerate conventional therapy (ie, corticosteroids or immunomodulators) or biologic therapy (ie, a TNF antagonist and/or vedolizumab), and demonstrated a clinical response to study agent during the induction study. This included subjects who were in clinical response to IV ustekinumab, in clinical response to IV placebo, or in delayed clinical response to ustekinumab, and had not received a protocol-prohibited medication change during the induction study.

US 10,961,307 B2

51

Criteria for Evaluation:

Pharmacokinetics (PK): Serum ustekinumab concentration

Immunogenicity: Antibodies to ustekinumab

Pharmacodynamics (PD)/biomarkers: Serum biomarkers; fecal microbiome; RNA expression and histologic assessment of disease activity and healing in mucosal biopsies

Genetics and epigenetics: Whole blood deoxyribonucleic acid (DNA)

Efficacy: Mayo score and partial Mayo score, UC Endoscopic Index of Severity (UCEIS), CRP, fecal lactoferrin, and fecal calprotectin

Health-related Quality of Life: Inflammatory Bowel Disease Questionnaire (IBDQ), 36-item Short Form Health Survey (SF-36), EuroQoL-5D Health Questionnaire (EQ-5D)

Health economics: UC disease-related hospitalizations and surgeries; productivity Visual Analog Scale (VAS), and Work Productivity and Activity Impairment Questionnaire-General Health (WPAI-GH)

Safety: Adverse events (AEs), serious adverse events (SAEs), infections, injection site reactions, allergic reactions, hematology and chemistry parameters, vital signs, physical examinations, and early detection of tuberculosis

Endpoints

The primary endpoint was clinical remission at Week 44. The definition of clinical remission (as well as the testing procedure) is different for submissions in the US and outside the US to accommodate the global and US preferred definitions of clinical remission. Each definition of clinical remission was applied to all subjects in the primary efficacy analysis set.

The global definition of the primary endpoint of clinical remission was defined as a Mayo score ≤2 points, with no individual subscore >1.

The US definition of clinical remission was defined as an absolute stool number ≤3, a Mayo rectal bleeding subscore of 0, and a Mayo endoscopy subscore of 0 or 1.

The major secondary endpoints, listed in the order in which they were tested, were:

Maintenance of clinical response through Week 44

Endoscopic healing at Week 44

Clinical remission and not receiving concomitant corticosteroids (corticosteroid-free clinical remission) at Week 44

Maintenance of clinical remission through Week 44 among the subjects who had achieved clinical remission at maintenance baseline

For the 3rd and 4th major secondary endpoints, the global definition of clinical remission was used to support submissions for countries outside the US and the US definition of clinical remission was used to support the submission in the United States.

Demographic and baseline disease characteristics were summarized based on the 961 subjects in the primary efficacy analysis set.

Analyses of multiplicity-controlled endpoints, except for the fourth major secondary endpoint related to maintenance of clinical remission, were conducted using a Cochran-Mantel-Haenszel (CMH) chi square test stratified by clinical remission (global definition) status at maintenance baseline (yes/no as determined by the IWRS) and induction treatment (placebo IV [I-0]→ustekinumab ∼6 mg/kg IV [I-8], ustekinumab 130 mg IV [I-0], or ustekinumab ∼6 mg/kg IV

52

[I-0]). For the fourth major secondary endpoint (maintenance of clinical remission), a CMH chi-square test stratified by induction treatment was used.

Global and US-specific multiple testing procedures were prespecified to control the overall Type 1 error rate at the 0.05 level over the multiplicity-controlled endpoints in this study (Section 3.11.2.7.3). All statistical testing was performed at the 2-sided 0.05 significance level. Nominal p-values are presented.

Safety was assessed by summarizing the frequency and type of treatment-emergent adverse events (AEs), laboratory parameters (hematology and chemistry), and vital signs parameters. Safety summaries are provided separately for randomized subjects, nonrandomized subjects, and all treated subjects. Presentation of the safety data focuses on the randomized population.

Results:

Study Population

A total of 783 subjects who completed the induction study and were in clinical response to induction study agent were enrolled in this maintenance study. Of these, 523 subjects were in the targeted primary population for the maintenance study and were randomized to receive a SC administration of ustekinumab or placebo at maintenance Week 0 (176, 172, and 175 subjects in the ustekinumab 90 mg SC q8w, ustekinumab 90 mg SC q12w, and placebo groups, respectively). The remaining 250 subjects were in the nonrandomized population, including 157 ustekinumab induction delayed responders (who received ustekinumab 90 mg SC q8w) and 103 placebo induction responders (who received placebo). All enrolled subjects who were assigned treatment at maintenance baseline received their study agent at that time.

Prior to Week 40 (last dosing visit of the maintenance study), 85 subjects (16.3%) in the primary population discontinued study agent. The proportion of subjects who discontinued study agent was greater in the placebo group (24.6%) than those in the ustekinumab q8w and q12w groups (10.2% and 14.0%, respectively). The most common reasons for discontinuation were lack of efficacy and an adverse event due to worsening of UC. Prior to Week 44, 29 subjects (5.5%) in the primary population terminated study participation; the most common reason for termination of study participation was withdrawal of consent.

Baseline clinical disease characteristics were representative of a population of subjects with moderately to severely active UC that was refractory to available therapies and were generally well-balanced across the 3 treatment groups. The median duration of disease was 6.05 years and the median baseline Mayo score was 9.0, with 86.9% and 13.1% presenting with moderate and severe UC, respectively. At induction baseline, 52.2% of subjects in the primary population of the maintenance study were taking corticosteroids, 26.6% were taking immunomodulatory drugs, and 70.7% were taking aminosalicylates. The majority of subjects (93.5%) had an inadequate response to, or were intolerant of, corticosteroids and/or 6-MP/AZA, or demonstrated corticosteroid dependence at induction baseline. Overall in the primary population, 47.6% of subjects had a history of documented biologic failure and 52.4% of subjects did not. Also, 47.2% had failed at least 1 anti-TNF whereas 13.4% had failed both an anti-TNF and vedolizumab, and 49.3% were naïve to biologic therapy; 2 subjects were biologic failures to only vedolizumab.

Efficacy Results

Ustekinumab maintenance therapy demonstrated efficacy in a population of subjects with moderately to severely

US 10,961,307 B2

53                                                                     54

active UC who had previously failed or were intolerant of conventional or biologic therapies, including TNF antagonists and/or vedolizumab, and were in clinical response 8 weeks after receiving a single dose of ustekinumab IV induction therapy.

Based on the pre-specified global and US-specific multiple testing procedures, statistical significance can be claimed for both ustekinumab dose regimens (90 mg q8w and 90 mg q12w) for the primary endpoint of clinical remission at Week 44 and the three major secondary endpoints of maintenance of clinical response through Week 44, endoscopic healing at Week 44, and corticosteroid-free clinical remission at Week 44. Additionally, statistical significance can be claimed for maintenance of clinical remission through Week 44 (among the subjects who had achieved clinical remission at maintenance baseline) for both ustekinumab doses based on the US-specific testing procedure, and for the ustekinumab q12w regimen based on the global testing procedure.

Clinical Efficacy in the Primary Population (ie, Subjects in Clinical Response 8 Weeks After Receiving Ustekinumab IV Induction Therapy)

Primary Endpoint: Clinical Remission

The proportions of subjects in clinical remission (based on the global definition) at Week 44 were significantly greater in the ustekinumab q8w group and ustekinumab q12w group (43.8% and 38.4%, respectively) compared with subjects in the placebo group (24.0%; p<0.001 and p=0.002, respectively).

The proportions of subjects in clinical remission (based on the US-specific definition) at Week 44 were significantly greater in the ustekinumab q8w group and ustekinumab q12w group (42.6% and 39.5%, respectively) compared with subjects in the placebo group (24.6%; p<0.001 and p=0.002, respectively).

The effect of ustekinumab on achieving clinical remission (based on both the global and US specific definitions) was generally consistent across subgroups (including subjects who were biologic failures and those who were not biologic failures as well as subjects who were receiving concomitant immunomodulators or corticosteroids at induction baseline and those who were not) and was robust to prespecified changes in data-handling rules.

Major Secondary Endpoints: Maintenance of Clinical Response, Endoscopic Healing, Corticosteroid-Free Clinical Remission, and Maintenance of Clinical Remission

The proportions of subjects who maintained clinical response through Week 44, achieved endoscopic healing, achieved corticosteroid-free remission (applying both global and US specific definitions of clinical remission) were significantly greater (p<0.01) in the ustekinumab q8w and q12w groups compared with that in the placebo group.

The proportions of subjects who maintained clinical remission among the subjects who had achieved clinical remission at maintenance baseline was numerically greater for both the ustekinumab q8w and q12w groups compared with that in the placebo group (applying both the global and US specific definition of clinical remission). Statistical significance (p<0.01) was achieved for both comparisons of the q8w and q12w groups versus

placebo using the US-specific definition of clinical remission; however, statistical significance was only achieved for the q12w group (p<0.01) compared to placebo using the global definition of clinical remission.

Other Histologic, Mucosal, Clinical, and Endoscopic Endpoints

The analyses summarized below were not adjusted for multiplicity. Statements of statistical significance are based on nominal p-values.

The proportions of subjects who achieved histologic healing (ie, neutrophil infiltration in <5% of crypts, no crypt destruction, and no erosions, ulcerations, or granulation tissue) at Week 44 were significantly (p<0.001) greater in the ustekinumab q8w and q12w groups compared with the placebo group.

The proportions of subjects who achieved mucosal healing (a combination of endoscopic healing and histologic healing) at Week 44 were significantly (p<0.01) greater in the ustekinumab q8w and q12w groups compared with the placebo group.

Applying both global and US-specific definitions of clinical remission, the proportions of subjects achieving corticosteroid-free remission for at least 90 days prior to Week 44 was significantly greater (p<0.01) in the ustekinumab q8w and q12w groups compared with that in the placebo group. Furthermore, among subjects receiving corticosteroids at maintenance baseline, significantly greater proportions of subjects (p<0.05) were in clinical remission and not receiving concomitant corticosteroids for at least 90 days prior to Week 44 in the ustekinumab q8w and q12w groups compared with those in the placebo group.

The efficacy of ustekinumab maintenance treatment was also demonstrated in clinical outcomes as measured by maintained improvement in the partial Mayo score, maintenance of symptomatic remission as well as maintenance of endoscopic healing. Further evidence of the efficacy of ustekinumab maintenance treatment was observed in partial Mayo score and symptomatic remission over time as well as symptom control (stool frequency and rectal bleeding).

Inflammatory Biomarkers

Over time through Week 44, the ustekinumab treatment groups maintained their CRP, fecal lactoferrin, and fecal calprotectin concentration levels observed at maintenance baseline, whereas median CRP, fecal lactoferrin, and fecal calprotectin concentrations worsened (increased) in the placebo group.

At Week 44, the proportion of subjects with normalized CRP, fecal calprotectin and fecal lactoferrin were generally significantly greater in the ustekinumab q8w and q12w groups compared with the placebo group.

Clinical Endpoints by Biologic Failure Status

For subjects with and subjects without a history of biologic failure, the proportions of subjects who achieved each of the primary and major secondary endpoints and mucosal healing were generally greater in the ustekinumab q8w and q12w groups compared with subjects in the placebo group.

In some cases, where treatment effects were similar in the biologic non-failure and failure populations,

US 10,961,307 B2

55

there was a consistent trend in the biologic-failure subjects across endpoints that the treatment effect for the ustekinumab q8w group was greater than that for the ustekinumab q12w group. This trend was not observed in the biologic non-failure population.

Efficacy Based on Inflammatory Biomarker Subgroups

Among subjects with a higher inflammatory burden (elevated CRP and/or elevated fecal inflammatory markers) at either induction or maintenance baseline, while both dosages generally demonstrated efficacy compared to placebo, the efficacy of ustekinumab q8w seemed to be better across the range of clinical endpoints than the ustekinumab q12w group. However, in subjects with low inflammatory burden at baseline, the ustekinumab q8w and q12w groups demonstrated similar efficacy over the endpoints.

Health-Related Quality of Life

Through Week 44, subjects in the ustekinumab q8w and q12w groups were generally able to maintain improvement in health-related quality of life as assessed using the IBDQ, SF 36 and EQ 5D instruments compared to subjects in the placebo group.

Outcomes for the Ustekinumab 90 mg q8w Dose and Ustekinumab 90 mg q12w Dose

While both the ustekinumab q8w and q12w groups demonstrated generally similar efficacy for the primary and major secondary endpoints, q8w was modestly better than q12w based on the following more objective and stringent measures of efficacy, including:

Endoscopic and mucosal healing at Week 44

Durable partial Mayo remission at Week 44

Corticosteroid-free clinical remission as well as the elimination of corticosteroids for at least 90 days prior to Week 44 among subjects receiving corticosteroids at maintenance baseline

Furthermore, when efficacy was examined over time (for the following endpoints), the q8w group showed greater efficacy than the q12w group:

Mayo stool frequency and rectal bleeding subscores indicating inactive or mild disease (ie, subscores of 0 or 1), as well as an absolute stool number ≤3 over time through Week 44.

Partial Mayo remission and symptomatic remission over time through Week 44

Median changes from baseline in fecal lactoferrin and calprotectin concentrations over time through Week 44.

Efficacy in Ustekinumab Induction Delayed Responders

Subjects who were delayed responders to ustekinumab induction therapy were able to maintain clinical response and achieve clinical remission, endoscopic, histologic, and mucosal healing (a combination of endoscopic healing and histologic healing) while receiving ustekinumab 90 mg q8w.

Efficacy and Pharmacokinetics/Immunogenicity

In general, during maintenance, a positive association was observed between serum ustekinumab concentration and the clinical efficacy outcomes of clinical remission and endoscopic healing. In addition, lower levels of inflammation, as measured by CRP, were observed in subjects with higher serum ustekinumab concentrations.

56

Among subjects receiving maintenance ustekinumab, the development of antibodies to ustekinumab did not appear to have an impact on clinical efficacy as measured by multiple endpoints such as clinical remission, endoscopic healing, clinical response, and change from maintenance baseline in Mayo score; however, the interpretation of the data is limited by the small sample size.

Pharmacokinetic and Immunogenicity Results

Following maintenance treatment with ustekinumab 90 mg SC q8w or q12w, steady-state was reached at approximately 8 or 12 weeks after subjects began receiving ustekinumab 90 mg SC q8w, or ustekinumab 90 mg SC q12w maintenance dose regimens, respectively. Median steady state trough serum ustekinumab concentrations over time were approximately 3-fold greater the concentrations in the ustekinumab q8w group (2.69 µg/mL to 3.09 µg/mL) than in the q12w group (0.92 µg/mL to 1.19 µg/mL).

Following maintenance dose regimens of ustekinumab 90 mg SC q8w or q12w, serum ustekinumab concentrations were sustained through Week 44 in almost all subjects, with a smaller proportion of subjects with undetectable trough concentrations over time in the 90 mg q8w group (0.7% to 2.4%) compared to those in the 90 mg q12w group (4.9% to 7.1%). The median ustekinumab concentration in subjects in the placebo group was below detectable levels by Week 16.

The impact of the different ustekinumab IV induction doses on serum ustekinumab concentrations during maintenance continued to diminish over time, as expected.

Median trough serum ustekinumab concentrations tended to be lower in subjects with higher body weight.

Nonrandomized subjects in the ustekinumab induction delayed responders group tended to have lower serum ustekinumab concentrations over time compared to randomized subjects in the ustekinumab q8w group following SC administration of the same ustekinumab dose regimen of 90 mg q8w.

Among 680 treated subjects with appropriate samples for the assessment of antibodies to ustekinumab, 39 (5.7%) were positive for antibodies to ustekinumab through 52 weeks of treatment, the majority with antibody titers ≤1:800. Of the 39 treated subjects who were positive for antibodies to ustekinumab in this maintenance study, 11 (28.2%) were positive for neutralizing antibodies.

In all randomized treatment groups, median serum ustekinumab concentrations were lower over time in subjects who were positive for antibodies to ustekinumab compared with levels in subjects who were negative for antibodies to ustekinumab.

Safety Results

Subcutaneous maintenance regimens of ustekinumab 90 mg administered q12w or q8w through Week 44 were generally well tolerated and consistent with the known safety profile of ustekinumab.

AEs were reported in 77.3%, 69.2%, and 78.9% of subjects in the ustekinumab q8w, ustekinumab q12w, and placebo groups, respectively.

Reasonably related AEs were reported in 26.1%, 17.4%, and 28.6% of subjects in the ustekinumab q8w, ustekinumab q12w, and placebo groups, respectively.

US 10,961,307 B2

57

Infections (as identified by the investigator) were reported in 48.9%, 33.7%, and 46.3% of subjects in the ustekinumab q8w, ustekinumab q12w, and placebo groups, respectively.

Infections requiring oral or parenteral antibiotic treatment were reported in 22.7%, 15.7%, and 19.4% of subjects in the ustekinumab q8w, ustekinumab q12w, and placebo groups, respectively.

Serious infections were infrequent among randomized subjects and were reported in 1.7%, 3.5%, and 2.3% in the ustekinumab q8w, ustekinumab q12w, and placebo groups, respectively. Opportunistic infections were identified in 3 subjects (all in the randomized population); cytomegalovirus colitis was diagnosed for 2 subjects in the ustekinumab q12w group and 1 subject was diagnosed with concurrent moderate AEs of ophthalmic and labial herpes. No cases of active TB were reported among ustekinumab-treated subjects through Week 44.

The proportion of randomized subjects with AEs leading to discontinuation of study agent was higher in the placebo group than in the q12w and q8w groups and the most frequent AEs leading to discontinuation in the placebo group was worsening UC.

Among all treated subjects, including delayed ustekinumab induction responders, the overall safety profile was consistent with that observed in the randomized population.

There was 1 death reported for a subject who was a delayed ustekinumab induction responder and was receiving ustekinumab q8w. The cause of death was attributed to acute respiratory failure that occurred during thyroid surgery for a multinodular goiter.

Among all treated subjects, 2 subjects (1 subject in the ustekinumab induction delayed-responders group [receiving ustekinumab q8w] and 1 subject randomized to the placebo group who had received ustekinumab IV during induction) reported serious major adverse cardiovascular events; both events were associated with perioperative complications.

Among all treated subjects, there were 6 subjects for whom malignancies were reported (5 ustekinumab-treated subjects and 1 placebo-only subject).

Three ustekinumab-treated subjects reported non-melanoma skin cancers (NMSCs); all had either a prior history of azathioprine or 6-MP treatment and 2 were on concomitant immunomodulator therapy at the time of the diagnosis.

Two ustekinumab-treated subjects were reported to have solid tumors; one subject with a papillary renal cell carcinoma (q12w) and one subject with colon cancer (q8w); both tumors were detected early during the subject's participation in this maintenance study.

There were no cases of anaphylaxis or delayed hypersensitivity reactions identified among ustekinumab treated subjects.

There were no notable differences in the proportions of subjects with post-baseline maximum toxicity Grade ≥1 chemistry and hematology laboratory between the placebo and respective ustekinumab groups. Grade 3 and Grade 4 chemistry and hematology laboratory values were infrequent.

58

Health Economics and Medical Resource Utilization Results

Through Week 44, fewer subjects in the combined ustekinumab group had a UC disease-related hospitalization or surgery compared with the placebo group.

At Week 44, change from maintenance baseline in productivity visual analog scores (VAS) demonstrated improvement in subjects in the ustekinumab treatment groups and worsening in subjects in the placebo group.

At Week 44, percentages within each of the 4 WPAI-GH domains were maintained from maintenance baseline for the ustekinumab treatment groups, with additional improvement observed in subjects in the ustekinumab q8w group for percent impairment while working due to health, percent overall work impairment due to health, and percent activity impairment due to health. For subjects in the placebo group, percentages for all 4 WPAI-GH domains worsened (ie, increased).

Conclusions

The ustekinumab maintenance study provided consistent and definitive evidence that the ustekinumab 90 mg SC q12w and q8w dose regimens were both effective in adult subjects with moderately to severely active UC who had responded to a single IV ustekinumab induction dose.

The efficacy of ustekinumab was observed in subjects who were biologic failures as well as those who failed conventional but not biologic therapy (ie, biology-naïve).

Of note, while both doses of ustekinumab were effective, the q8w dose regimen demonstrated modestly better efficacy across several objective and/or more stringent endpoints (eg, endoscopic healing and durable partial Mayo remission) as well as in over-time analyses of symptomatic and partial Mayo remission.

Maintenance dosing with ustekinumab SC dose regimens of 90 mg q12w and 90 mg q8w was generally well-tolerated over 44 weeks in this population of adult subjects with moderate to severe ulcerative colitis.

The safety and efficacy data from this study support a positive benefit/risk profile for ustekinumab SC maintenance therapy.

The European Commission has approved STELARA® (ustekinumab) for the treatment of ulcerative colitis (UC) in Europe as of Sep. 4, 2019. The approved label is shown in Annex I below describing the intravenous preparation (Sections 1-10) and subcutaneous preparation (Sections 1-10).

The present invention comprises a pharmaceutical composition of an anti-IL-12/IL-23p40 antibody and packaging comprising one or more label elements disclosed in Annex I, wherein the antibody comprises: (i) a heavy chain variable region and a light chain variable region, the heavy chain variable region comprising: a complementarity determining region heavy chain 1 (CDRH1) amino acid sequence of SEQ ID NO:1; a CDRH2 amino acid sequence of SEQ ID NO:2; and a CDRH3 amino acid sequence of SEQ ID NO:3; and the light chain variable region comprising: a complementarity determining region light chain 1 (CDRL1) amino acid sequence of SEQ ID NO:4; a CDRL2 amino acid sequence of SEQ ID NO:5; and a CDRL3 amino acid sequence of SEQ ID NO:6; (ii) a heavy chain variable region of the amino acid sequence of SEQ ID NO:7 and a light chain variable region of the amino acid sequence of SEQ ID NO:8; or (iii) a heavy chain of the amino acid sequence of SEQ ID NO:10 and a light chain of the amino acid sequence of SEQ ID NO:11.

US 10,961,307 B2

**59**

Annex I

Summary of Product Characteristics

1. Name of the Medicinal Product
STELARA 130 mg concentrate for solution for infusion

2. Qualitative and Quantitative Composition
Each vial contains 130 mg ustekinumab in 26 mL (5 mg/mL).

Ustekinumab is a fully human IgG1K monoclonal antibody to interleukin (IL)-12/23 produced in a murine myeloma cell line using recombinant DNA technology.

For the full list of excipients, see section 6.1.

3. Pharmaceutical Form
Concentrate for solution for infusion.
The solution is clear, colourless to light yellow.

4. Clinical Particulars

4.1 Therapeutic Indications

Crohn's Disease
STELARA is indicated for the treatment of adult patients with moderately to severely active Crohn's disease who have had an inadequate response with, lost response to, or were intolerant to either conventional therapy or a TNFα antagonist or have medical contraindications to such therapies.

Ulcerative Colitis
STELARA is indicated for the treatment of adult patients with moderately to severely active ulcerative colitis who have had an inadequate response with, lost response to, or were intolerant to either conventional therapy or a biologic or have medical contraindications to such therapies (see section 5.1).

4.2 Posology and Method of Administration
STELARA concentrate for solution for infusion is intended for use under the guidance and supervision of physicians experienced in the diagnosis and treatment of Crohn's disease or ulcerative colitis. STELARA concentrate for solution for infusion should only be used for the intravenous induction dose.

Posology

Crohn's Disease and Ulcerative Colitis
STELARA treatment is to be initiated with a single intravenous dose based on body weight. The infusion solution is to be composed of the number of vials of STELARA 130 mg as specified in Label Table 1 (see section 6.6 for preparation).

LABEL TABLE 1

| Initial intravenous dosing of STELARA | | |
|---|---|---|
| Body weight of patient at the time of dosing | Recommended dose[a] | Number of 130 mg STELARA Vials |
| ≤55 kg | 260 mg | 2 |
| >55 kg to ≤85 kg | 390 mg | 3 |
| >85 kg | 520 mg | 4 |

[a]Approximately 6 mg/kg

The first subcutaneous dose should be given at week 8 following the intravenous dose. For the posology of the subsequent subcutaneous dosing regimen, see section 4.2 of the STELARA solution for injection (vial) and solution for injection in pre-filled syringe SmPC.

Elderly (≥65 Years)
No dose adjustment is needed for elderly patients (see section 4.4).

**60**

Renal and Hepatic Impairment
STELARA has not been studied in these patient populations. No dose recommendations can be made.

Paediatric Population
The safety and efficacy of STELARA for the treatment of Crohn's disease or ulcerative colitis in children less than 18 years have not yet been established. No data are available.

Method of Administration
STELARA 130 mg is for intravenous use only. It should be administered over at least one hour. For instructions on dilution of the medicinal product before administration, see section 6.6.

4.3 Contraindications
Hypersensitivity to the active substance or to any of the excipients listed in section 6.1.

Clinically important, active infection (e.g. active tuberculosis; see section 4.4).

4.4 Special Warnings and Precautions for Use

Traceability
In order to improve the traceability of biological medicinal products, the tradename and the batch number of the administered product should be clearly recorded.

Infections
Ustekinumab may have the potential to increase the risk of infections and reactivate latent infections. In clinical studies, serious bacterial, fungal, and viral infections have been observed in patients receiving STELARA (see section 4.8).

Caution should be exercised when considering the use of STELARA in patients with a chronic infection or a history of recurrent infection (see section 4.3).

Prior to initiating treatment with STELARA, patients should be evaluated for tuberculosis infection. STELARA must not be given to patients with active tuberculosis (see section 4.3). Treatment of latent tuberculosis infection should be initiated prior to administering STELARA. Anti-tuberculosis therapy should also be considered prior to initiation of STELARA in patients with a history of latent or active tuberculosis in whom an adequate course of treatment cannot be confirmed. Patients receiving STELARA should be monitored closely for signs and symptoms of active tuberculosis during and after treatment.

Patients should be instructed to seek medical advice if signs or symptoms suggestive of an infection occur. If a patient develops a serious infection, the patient should be closely monitored and STELARA should not be administered until the infection resolves.

Malignancies
Immunosuppressants like ustekinumab have the potential to increase the risk of malignancy. Some patients who received STELARA in clinical studies developed cutaneous and non-cutaneous malignancies (see section 4.8).

No studies have been conducted that include patients with a history of malignancy or that continue treatment in patients who develop malignancy while receiving STELARA. Thus, caution should be exercised when considering the use of STELARA in these patients.

All patients, in particular those greater than 60 years of age, patients with a medical history of prolonged immunosuppressant therapy or those with a history of PUVA treatment, should be monitored for the appearance of non-melanoma skin cancer (see section 4.8).

Systemic and Respiratory Hypersensitivity Reactions

Systemic
Serious hypersensitivity reactions have been reported in the postmarketing setting, in some cases several days after treatment. Anaphylaxis and angioedema have occurred. If an

US 10,961,307 B2

61

62

anaphylactic or other serious hypersensitivity reaction occurs, appropriate therapy should be instituted and administration of STELARA should be discontinued (see section 4.8).

Respiratory

Cases of allergic alveolitis and eosinophilic pneumonia have been reported during post-approval use of ustekinumab. Clinical presentations included cough, dyspnoea, and interstitial infiltrates following one to three doses. Serious outcomes have included respiratory failure and prolonged hospitalisation. Improvement has been reported after discontinuation of ustekinumab and also, in some cases, administration of corticosteroids. If infection has been excluded and diagnosis is confirmed, discontinue ustekinumab and institute appropriate treatment (see section 4.8).

Vaccinations

It is recommended that live viral or live bacterial vaccines (such as *Bacillus* of Calmette and Guérin (BCG)) should not be given concurrently with STELARA. Specific studies have not been conducted in patients who had recently received live viral or live bacterial vaccines. No data are available on the secondary transmission of infection by live vaccines in patients receiving STELARA. Before live viral or live bacterial vaccination, treatment with STELARA should be withheld for at least 15 weeks after the last dose and can be resumed at least 2 weeks after vaccination. Prescribers should consult the Summary of Product Characteristics for the specific vaccine for additional information and guidance on concomitant use of immunosuppressive agents post-vaccination.

Patients receiving STELARA may receive concurrent inactivated or non-live vaccinations.

Long term treatment with STELARA does not suppress the humoral immune response to pneumococcal polysaccharide or tetanus vaccines (see section 5.1).

Concomitant Immunosuppressive Therapy

In psoriasis studies, the safety and efficacy of STELARA in combination with immunosuppressants, including biologics, or phototherapy have not been evaluated. In psoriatic arthritis studies, concomitant MTX use did not appear to influence the safety or efficacy of STELARA. In Crohn's disease and ulcerative colitis studies, concomitant use of immunosuppressants or corticosteroids did not appear to influence the safety or efficacy of STELARA. Caution should be exercised when considering concomitant use of other immunosuppressants and STELARA or when transitioning from other immunosuppressive biologics (see section 4.5).

Immunotherapy

STELARA has not been evaluated in patients who have undergone allergy immunotherapy. It is not known whether STELARA may affect allergy immunotherapy.

Serious Skin Conditions

In patients with psoriasis, exfoliative dermatitis has been reported following ustekinumab treatment (see section 4.8). Patients with plaque psoriasis may develop erythrodermic psoriasis, with symptoms that may be clinically indistinguishable from exfoliative dermatitis, as part of the natural course of their disease. As part of the monitoring of the patient's psoriasis, physicians should be alert for symptoms of erythrodermic psoriasis or exfoliative dermatitis. If these symptoms occur, appropriate therapy should be instituted. STELARA should be discontinued if a drug reaction is suspected.

Special Populations

Elderly (≥65 Years)

No overall differences in efficacy or safety in patients age 65 and older who received STELARA were observed compared to younger patients in clinical studies in approved indications, however the number of patients aged 65 and older is not sufficient to determine whether they respond differently from younger patients. Because there is a higher incidence of infections in the elderly population in general, caution should be used in treating the elderly.

Sodium Content

STELARA contains less than 1 mmol sodium (23 mg) per dose, i.e. essentially 'sodium-free'. STELARA is however, diluted in sodium chloride 9 mg/ml (0.9%) solution for infusion. This should be taken into consideration for patients on a controlled sodium diet (see section 6.6).

4.5 Interaction with Other Medicinal Products and Other Forms of Interaction

Live vaccines should not be given concurrently with STELARA (see section 4.4).

No interaction studies have been performed in humans. In the population pharmacokinetic analyses of the phase III studies, the effect of the most frequently used concomitant medicinal products in patients with psoriasis (including paracetamol, ibuprofen, acetylsalicylic acid, metformin, atorvastatin, levothyroxine) on pharmacokinetics of ustekinumab was explored. There were no indications of an interaction with these concomitantly administered medicinal products. The basis for this analysis was that at least 100 patients (>5% of the studied population) were treated concomitantly with these medicinal products for at least 90% of the study period. The pharmacokinetics of ustekinumab was not impacted by concomitant use of MTX, NSAIDs, 6-mercaptopurine, azathioprine and oral corticosteroids in patients with psoriatic arthritis, Crohn's disease or ulcerative colitis, or prior exposure to anti-TNFα agents, in patients with psoriatic arthritis or Crohn's disease or by prior exposure to biologics (i.e. anti-TNFα agents and/or vedolizumab) in patients with ulcerative colitis.

The results of an in vitro study do not suggest the need for dose adjustments in patients who are receiving concomitant CYP450 substrates (see section 5.2).

In psoriasis studies, the safety and efficacy of STELARA in combination with immunosuppressants, including biologics, or phototherapy have not been evaluated. In psoriatic arthritis studies, concomitant MTX use did not appear to influence the safety or efficacy of STELARA. In Crohn's disease and ulcerative colitis studies, concomitant use of immunosuppressants or corticosteroids did not appear to influence the safety or efficacy of STELARA. (see section 4.4).

4.6 Fertility, Pregnancy and Lactation

Women of Childbearing Potential

Women of childbearing potential should use effective methods of contraception during treatment and for at least 15 weeks after treatment.

US 10,961,307 B2

| 63 | 64 |

**Pregnancy**

There are no adequate data from the use of ustekinumab in pregnant women. Animal studies do not indicate direct or indirect harmful effects with respect to pregnancy, embryonic/foetal development, parturition or postnatal development (see section 5.3). As a precautionary measure, it is preferable to avoid the use of STELARA in pregnancy.

**Breast-Feeding**

It is unknown whether ustekinumab is excreted in human breast milk. Animal studies have shown excretion of ustekinumab at low levels in breast milk. It is not known if ustekinumab is absorbed systemically after ingestion. Because of the potential for adverse reactions in nursing infants from ustekinumab, a decision on whether to discontinue breast-feeding during treatment and up to 15 weeks after treatment or to discontinue therapy with STELARA must be made taking into account the benefit of breast-feeding to the child and the benefit of STELARA therapy to the woman.

**Fertility**

The effect of ustekinumab on human fertility has not been evaluated (see section 5.3).

4.7 Effects on Ability to Drive and Use Machines

STELARA has no or negligible influence on the ability to drive and use machines.

4.8 Undesirable Effects

Summary of the Safety Profile

The most common adverse reactions (>5%) in controlled periods of the adult psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis clinical studies with ustekinumab were nasopharyngitis and headache. Most were considered to be mild and did not necessitate discontinuation of study treatment. The most serious adverse reaction that has been reported for STELARA is serious hypersensitivity reactions including anaphylaxis (see section 4.4). The overall safety profile was similar for patients with psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis.

Tabulated List of Adverse Reactions

The safety data described below reflect exposure in adults to ustekinumab in 14 phase 2 and phase 3 studies in 6,709 patients (4,135 with psoriasis and/or psoriatic arthritis, 1,749 with Crohn's disease and 825 patients with ulcerative colitis). This includes exposure to STELARA in the controlled and non-controlled periods of the clinical studies for at least 6 months or 1 year (4,577 and 3,253 patients respectively with psoriasis, psoriatic arthritis, Crohn's disease or ulcerative colitis) and exposure for at least 4 or 5 years (1,482 and 838 patients with psoriasis respectively).

Label Table 2 provides a list of adverse reactions from adult psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis clinical studies as well as adverse reactions reported from post-marketing experience. The adverse reactions are classified by System Organ Class and frequency, using the following convention: Very common (≥1/10), Common (≥1/100 to <1/10), Uncommon (≥1/1,000 to <1/100), Rare (≥1/10,000 to <1/1,000), Very rare (<1/10,000), not known (cannot be estimated from the available data). Within each frequency grouping, adverse reactions are presented in order of decreasing seriousness.

LABEL TABLE 2

| List of adverse reactions | |
|---|---|
| System Organ Class | Frequency: Adverse reaction |
| Infections and infestations | Common: Upper respiratory tract infection, nasopharyngitis, sinusitis |
| | Uncommon: Cellulitis, dental infections, herpes zoster, lower respiratory tract infection, viral upper respiratory tract infection, vulvovaginal mycotic infection |
| Immune system disorders | Uncommon: Hypersensitivity reactions (including rash, urticaria) |
| | Rare: Serious hypersensitivity reactions (including anaphylaxis, angioedema) |
| Psychiatric disorders | Uncommon: Depression |
| Nervous system disorders | Common: Dizziness, headache |
| | Uncommon: Facial palsy |
| Respiratory, thoracic and mediastinal disorders | Common: Oropharyngeal pain |
| | Uncommon: Nasal congestion |
| | Rare: Allergic alveolitis, eosinophilic pneumonia |
| Gastrointestinal disorders | Common: Diarrhoea, nausea, vomiting |
| Skin and subcutaneous tissue disorders | Common: Pruritus |
| | Uncommon: Pustular psoriasis, skin exfoliation, acne |
| | Rare: Exfoliative dermatitis |
| Musculoskeletal and connective tissue disorders | Common: Back pain, myalgia, arthralgia |
| General disorders and administration site conditions | Common: Fatigue, injection site erythema, injection site pain |
| | Uncommon: Injection site reactions (including haemorrhage, haematoma, induration, swelling and pruritus), asthenia |

Description of Selected Adverse Reactions

Infections

In the placebo-controlled studies of patients with psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis, the rates of infection or serious infection were similar between ustekinumab-treated patients and those treated with placebo. In the placebo-controlled period of these clinical studies, the rate of infection was 1.36 per patient-year of follow-up in ustekinumab-treated patients, and 1.34 in placebo-treated patients. Serious infections occurred at the rate of 0.03 per patient-year of follow-up in ustekinumab-treated patients (30 serious infections in 930 patient-years of follow-up) and 0.03 in placebo-treated patients (15 serious infections in 434 patient-years of follow-up) (see section 4.4).

In the controlled and non-controlled periods of psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis clinical studies, representing 11,581 patient-years of exposure in 6,709 patients, the median follow up was 1.0 years; 1.1 years for psoriatic disease studies, 0.6 year for Crohn's disease studies and 1.0 years for ulcerative colitis studies. The rate of infection was 0.91 per patient-year of follow-up in ustekinumab-treated patients, and the rate of serious infections was 0.02 per patient-year of follow-up in ustekinumab-treated patients (199 serious infections in 11,581 patient-years of follow-up) and serious infections reported included pneumonia, anal abscess, cellulitis, diverticulitis, gastroenteritis and viral infections.

In clinical studies, patients with latent tuberculosis who were concurrently treated with isoniazid did not develop tuberculosis.

US 10,961,307 B2

65

66

Malignancies

In the placebo-controlled period of the psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis clinical studies, the incidence of malignancies excluding non-melanoma skin cancer was 0.11 per 100 patient-years of follow-up for ustekinumab-treated patients (1 patient in 929 patient-years of follow-up) compared with 0.23 for placebo-treated patients (1 patient in 434 patient-years of follow-up). The incidence of non-melanoma skin cancer was 0.43 per 100 patient-years of follow-up for ustekinumab-treated patients (4 patients in 929 patient-years of follow-up) compared to 0.46 for placebo-treated patients (2 patients in 433 patient-years of follow-up).

In the controlled and non-controlled periods of psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis clinical studies, representing 11,561 patient-years of exposure in 6,709 patients, the median follow-up was 1.0 years; 1.1 years for psoriatic disease studies, 0.6 year for Crohn's disease studies and 1.0 years for ulcerative colitis studies. Malignancies excluding non-melanoma skin cancers were reported in 62 patients in 11,561 patient-years of follow-up (incidence of 0.54 per 100 patient-years of follow-up for ustekinumab-treated patients). The incidence of malignancies reported in ustekinumab-treated patients was comparable to the incidence expected in the general population (standardised incidence ratio=0.93 [95% confidence interval: 0.71, 1.20], adjusted for age, gender and race). The most frequently observed malignancies, other than non-melanoma skin cancer, were prostate, colorectal, melanoma and breast cancers. The incidence of non-melanoma skin cancer was 0.49 per 100 patient-years of follow-up for ustekinumab-treated patients (56 patients in 11,545 patient-years of follow-up). The ratio of patients with basal versus squamous cell skin cancers (3:1) is comparable with the ratio expected in the general population (see section 4.4).

Hypersensitivity and Infusion Reactions

In Crohn's disease and ulcerative colitis intravenous induction studies, no events of anaphylaxis or other serious infusion reactions were reported following the single intravenous dose. In these studies, 2.2% of 785 placebo treated patients and 1.9% of 790 patients treated with the recommended dose of ustekinumab reported adverse events occurring during or within an hour of the infusion.

Paediatric Population

Undesirable effects in paediatric patients 12 years and older with plaque psoriasis. The safety of ustekinumab has been studied in a phase 3 study of 110 patients from 12 to 17 years of age for up to 60 weeks. In this study, the adverse events reported were similar to those seen in previous studies in adults with plaque psoriasis.

Reporting of Suspected Adverse Reactions

Reporting suspected adverse reactions after authorisation of the medicinal product is important. It allows continued monitoring of the benefit/risk balance of the medicinal product. Healthcare professionals are asked to report any suspected adverse reactions via the national reporting system listed in Appendix V.

4.9 Overdose

Single doses up to 6 mg/kg have been administered intravenously in clinical studies without dose-limiting toxicity. In case of overdose, it is recommended that the patient be monitored for any signs or symptoms of adverse reactions and appropriate symptomatic treatment be instituted immediately.

5. Pharmacological Properties

5.1 Pharmacodynamic Properties

Pharmacotherapeutic group: Immunosuppressants, interleukin inhibitors, ATC code: L04AC05.

Mechanism of Action

Ustekinumab is a fully human IgG1κ monoclonal antibody that binds with specificity to the shared p40 protein subunit of human cytokines interleukin (IL)-12 and IL-23. Ustekinumab inhibits the bioactivity of human IL-12 and IL-23 by preventing p40 from binding to the IL-12Rβ1 receptor protein expressed on the surface of immune cells. Ustekinumab cannot bind to IL-12 or IL-23 that is already bound to IL-12Rβ1 cell surface receptors. Thus, ustekinumab is not likely to contribute to complement- or antibody-mediated cytotoxicity of cells with IL-12 and/or IL-23 receptors. IL-12 and IL-23 are heterodimeric cytokines secreted by activated antigen presenting cells, such as macrophages and dendritic cells, and both cytokines participate in immune functions; IL-12 stimulates natural killer (NK) cells and drives the differentiation of CD4+ T cells toward the T helper 1 (Th1) phenotype, IL-23 induces the T helper 17 (Th17) pathway. However, abnormal regulation of IL 12 and IL 23 has been associated with immune mediated diseases, such as psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis.

By binding the shared p40 subunit of IL-12 and IL-23, ustekinumab may exert its clinical effects in psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis through interruption of the Th1 and Th17 cytokine pathways, which are central to the pathology of these diseases.

In patients with Crohn's disease and ulcerative colitis, treatment with ustekinumab resulted in a decrease in inflammatory markers including C-Reactive Protein (CRP) and fecal calprotectin during the induction phase, which were then maintained throughout the maintenance phase.

Immunisation

During the long term extension of Psoriasis Study 2 (PHOENIX 2), adult patients treated with STELARA for at least 3.5 years mounted similar antibody responses to both pneumococcal polysaccharide and tetanus vaccines as a non-systemically treated psoriasis control group. Similar proportions of adult patients developed protective levels of anti-pneumococcal and anti-tetanus antibodies and antibody titers were similar among STELARA-treated and control patients.

Clinical Efficacy

Crohn's Disease

The safety and efficacy of ustekinumab was assessed in three randomized, double-blind, placebo-controlled, multicenter studies in adult patients with moderately to severely active Crohn's disease (Crohn's Disease Activity Index [CDAI] score of ≥220 and ≤450). The clinical development program consisted of two 8-week intravenous induction studies (UNITI-1 and UNITI-2) followed by a 44 week subcutaneous randomized withdrawal maintenance study (IM-UNITI) representing 52 weeks of therapy.

The induction studies included 1409 (UNITI-1, n=769; UNITI-2 n=640) patients. The primary endpoint for both

US 10,961,307 B2

67

68

induction studies was the proportion of subjects in clinical response (defined as a reduction in CDAI score of ≥100 points) at week 6. Efficacy data were collected and analyzed through week 8 for both studies. Concomitant doses of oral corticosteroids, immunomodulators, aminosalicylates and antibiotics were permitted and 75% of patients continued to receive at least one of these medications. In both studies, patients were randomised to receive a single intravenous administration of either the recommended tiered dose of approximately 6 mg/kg (see Table 1, section 4.2), a fixed dose of 130 mg ustekinumab, or placebo at week 0.

Patients in UNITI-1 had failed or were intolerant to prior anti-TNFα therapy. Approximately 48% of the patients had failed 1 prior anti-TNFα therapy and 52% had failed 2 or 3 prior anti-TNFα therapies. In this study, 29.1% of the patients had an inadequate initial response (primary non-responders), 69.4% responded but lost response (secondary non-responders), and 36.4% were intolerant to anti-TNFα therapies.

Patients in UNITI-2 had failed at least one conventional therapy, including corticosteroids or immunomodulators, and were either anti-TNF-α naïve (68.6%) or had previously received but not failed anti-TNFα therapy (31.4%).

In both UNITI-1 and UNITI-2, a significantly greater proportion of patients were in clinical response and remission in the ustekinumab treated group compared to placebo (Label Table 3). Clinical response and remission were significant as early as week 3 in ustekinumab treated patients and continued to improve through week 8. In these induction studies, efficacy was higher and better sustained in the tiered dose group compared to the 130 mg dose group, and tiered dosing is therefore the recommended intravenous induction dose.

The maintenance study (IM-UNITI), evaluated 388 patients who achieved 100 point clinical response at week 8 of induction with ustekinumab in studies UNITI-1 and UNITI-2. Patients were randomized to receive a subcutaneous maintenance regimen of either 90 mg ustekinumab every 8 weeks, 90 mg ustekinumab every 12 weeks or placebo for 44 weeks (for recommended maintenance posology, see section 4.2 of the STELARA Solution for injection (vial) and Solution for injection in pre filled syringe SmPC).

Significantly higher proportions of patients maintained clinical remission and response in the ustekinumab treated groups compared to the placebo group at week 44 (see Label Table 4).

LABEL TABLE 4

Maintenance of Clinical Response and Remission in IM-UNITI (week 44; 52 weeks from initiation of the induction dose)

| | Placebo* N = 131[†] | 90 mg ustekinumab every 8 weeks N = 128[†] | 90 mg ustekinumab every 12 weeks N = 129[†] |
|---|---|---|---|
| Clinical Remission | 36% | 53%[a] | 49%[b] |
| Clinical Response | 44% | 59%[b] | 58%[b] |
| Corticosteroid-Free Clinical Remission | 30% | 47%[a] | 43%[c] |
| Clinical Remission in patients: | | | |
| in remission at the start of maintenance therapy | 46% (36/79) | 67% (52/78)[a] | 56% (44/78) |
| who entered from study CRD3002[‡] | 44% (31/70) | 63% (45/72)[c] | 57% (41/72) |

LABEL TABLE 3

Induction of Clinical Response and Remission in UNITI-1 and UNITI 2

| | UNITI-1* | | UNITI-2** | |
|---|---|---|---|---|
| | Placebo N = 247 | Recommended dose of ustekinumab N = 249 | Placebo N = 209 | Recommended dose of ustekinumab N = 209 |
| Clinical Remission, week 8 | 18 (7.3%) | 52 (20.9%)[a] | 41 (19.6%) | 84 (40.2%)[a] |
| Clinical Response (100 point), week 6 | 53 (21.5%) | 84 (33.7%)[b] | 60 (28.7%) | 116 (55.5%)[a] |
| Clinical Response (100 point), week 8 | 50 (20.2%) | 94 (37.8%)[a] | 67 (32.1%) | 121 (57.9%)[a] |
| 70 Point Response, week 3 | 67 (27.1%) | 101 (40.6%)[b] | 66 (31.6%) | 106 (50.7%)[a] |
| 70 Point Response, week 6 | 75 (30.4%) | 109 (43.8%)[b] | 81 (38.8%) | 135 (64.6%)[a] |

Clinical remission is defined as CDAI score <150; Clinical response is defined as reduction in CDAI score by at least 100 points or being in clinical remission
70 point response is defined as reduction in CDAI score by at least 70 points
*Anti-TNFα failures
**Conventional therapy failures
[a]p < 0.001
[b]p < 0.01

69

### LABEL TABLE 4-continued

Maintenance of Clinical Response and Remission in IM-UNITI
(week 44; 52 weeks from initiation of the induction dose)

| | Placebo*<br>N = 131[†] | 90 mg<br>ustekinumab<br>every 8 weeks<br>N = 128[†] | 90 mg<br>ustekinumab<br>every 12 weeks<br>N = 129[†] |
|---|---|---|---|
| who are Anti-TNFα naive | 49% (25/51) | 65% (34/52)[c] | 57% (30/53) |
| who entered from study CRD3001[§] | 26% (16/61) | 41% (23/56) | 39% (22/57) |

[Clinical remission is defined as CDAI score <150; Clinical response is defined as reduction in CDAI of at least 100 points or being in clinical remission
*The placebo group consisted of patients who were in response to ustekinumab and were randomized to receive placebo at the start of maintenance therapy.
[†]Patients who were in 100 point clinical response to ustekinumab at start of maintenance therapy
[‡]Patients who failed conventional therapy but not anti-TNFα therapy
[§]Patients who are anti-TNFα refractory/intolerant
[a]p < 0.01
[b]p < 0.05
[c]nominally significant (p < 0.05)

In IM-UNITI, 29 of 129 patients did not maintain response to ustekinumab when treated every 12 weeks and were allowed to dose adjust to receive ustekinumab every 8 weeks. Loss of response was defined as a CDAI score ≥220 points and a ≥100 point increase from the CDAI score at baseline. In these patients, clinical remission was achieved in 41.4% of patients 16 weeks after dose adjustment.

Patients who were not in clinical response to ustekinumab induction at week 8 of the UNITI-1 and UNITI-2 induction studies (476 patients) entered into the non-randomized portion of the maintenance study (IM-UNITI) and received a 90 mg subcutaneous injection of ustekinumab at that time. Eight weeks later, 50.5% of the patients achieved clinical response and continued to receive maintenance dosing every 8 weeks; among these patients with continued maintenance dosing, a majority maintained response (68.1%) and achieved remission (50.2%) at week 44, at proportions that were similar to the patients who initially responded to ustekinumab induction.

Of 131 patients who responded to ustekinumab induction, and were randomized to the placebo group at the start of the maintenance study, 51 subsequently lost response and received 90 mg ustekinumab subcutaneously every 8 weeks. The majority of patients who lost response and resumed ustekinumab did so within 24 weeks of the induction infusion. Of these 51 patients, 70.6% achieved clinical response and 39.2% percent achieved clinical remission 16 weeks after receiving the first subcutaneous dose of ustekinumab.

In IM-UNITI, patients who completed the study through week 44 were eligible to continue treatment in a study extension. Among patients who entered the study extension, clinical remission and response were generally maintained through week 92 for both patients who failed TNF-therapies and those who failed conventional therapies.

No new safety concerns were identified in this study extension with up to 2 years of treatment in patients with Crohn's Disease.

Endoscopy

Endoscopic appearance of the mucosa was evaluated in 252 patients with eligible baseline endoscopic disease activity in a substudy. The primary endpoint was change from baseline in Simplified Endoscopic Disease Severity Score for Crohn's Disease (SES-CD), a composite score across 5 ileo-colonic segments of presence/size of ulcers, proportion of mucosal surface covered by ulcers, proportion of mucosal surface affected by any other lesions and presence/type of

70

narrowing/strictures. At week 8, after a single intravenous induction dose, the change in SES-CD score was greater in the ustekinumab group (n=155, mean change=−2.8) than in the placebo group (n=97, mean change=−0.7, p=0.012).

Fistula Response

In a subgroup of patients with draining fistulas at baseline (8.8%; n=26), 12/15 (80%) of ustekinumab-treated patients achieved a fistula response over 44 weeks (defined as ≥50% reduction from baseline of the induction study in the number of draining fistulas) compared to 5/11 (45.5%) exposed to placebo.

Health-Related Quality of Life

Health-related quality of life was assessed by Inflammatory Bowel Disease Questionnaire (IBDQ) and SF-36 questionnaires. At week 8, patients receiving ustekinumab showed statistically significantly greater and clinically meaningful improvements on IBDQ total score and SF-36 Mental Component Summary Score in both UNITI-1 and UNITI-2, and SF-36 Physical Component Summary Score in UNITI-2, when compared to placebo. These improvements were generally better maintained in ustekinumab-treated patients in the IM-UNITI study through week 44 when compared to placebo. Improvement in health-related quality of life was generally maintained during the extension through week 92.

Ulcerative Colitis

The safety and efficacy of ustekinumab was assessed in two randomized, double-blind, placebo-controlled, multicenter studies in adult patients with moderately to active ulcerative colitis (Mayo score 6 to 12; Endoscopy subscore ≥2). The clinical development program consisted of one intravenous induction study (referred to as UNIFI-I) with treatment of up to 16 weeks followed by a 44 week subcutaneous randomized withdrawal maintenance study (referred to as UNIFI-M) representing at least 52 weeks of therapy.

Efficacy results presented for UNIFI-I and UNIFI-M were based on central review of endoscopies.

UNIFI-I included 961 patients. The primary endpoint for the induction study was the proportion of subjects in clinical remission at week 8. Patients were randomised to receive a single intravenous administration of either the recommended tiered dose of approximately 6 mg/kg (see Label Table 1, section 4.2), a fixed dose of 130 mg ustekinumab, or placebo at week 0.

Concomitant doses of oral corticosteroids, immunomodulators, and aminosalicylates were permitted and 90% of patients continued to receive at least one of these medications. Enrolled patients had to have failed conventional therapy (corticosteroids or immunomodulators) or at least one biologic (a TNFα antagonist and/or vedolizumab). 49% of patients had failed conventional therapy, but not a biologic (of which 94% where biological-naïve). 51% of patients had failed or were intolerant to a biologic. Approximately 50% of the patients had failed at least 1 prior anti-TNFα therapy (of which 48% were primary non-responders) and 17% had failed at least 1 anti-TNFα therapy and vedolizumab.

In UNIFI-I a significantly greater proportion of patients were in clinical remission in the ustekinumab treated group compared to placebo at week 8 (Label Table 5). As early as Week 2, the earliest scheduled study visit, and at each visit thereafter, a higher proportion of ustekinumab patients had no rectal bleeding or achieved normal stool frequency as compared with placebo patients. Significant differences in

US 10,961,307 B2

**71**

partial Mayo score and symptomatic remission were observed between ustekinumab and placebo as early as Week 2.

Efficacy was higher in the tiered dose group (6 mg/kg) compared to the 130 mg dose group in select endpoints, and tiered dosing is therefore the recommended intravenous induction dose.

LABEL TABLE 5

Summary of Key Efficacy Outcomes in UNIFI-I (Week 8)

| | Placebo N = 319 | Recommended dose of ustekinumab$^{£}$ N = 322 |
|---|---|---|
| Clinical Remission* | 5% | 16%$^{a}$ |
| In patients who failed conventional therapy, but not a biologic | 9% (15/158) | 19% (29/156)$^{c}$ |
| In patients who failed biological therapy$^{¥}$ | 1% (2/161) | 13% (21/166)$^{b}$ |
| In patients who failed both a TNF and vedolizumab | 0% (0/47) | 10% (6/58)$^{c}$ |
| Clinical Response$^{§}$ | 31% | 62%$^{a}$ |
| In patients who failed conventional therapy, but not a biologic | 35% (56/158) | 67% (104/156)$^{b}$ |
| In patients who failed biological therapy$^{¥}$ | 27% (44/161) | 57% (95/166)$^{b}$ |
| In patients who failed both a TNF and vedolizumab | 28% (13/47) | 52% (30/58)$^{c}$ |
| Mucosal Healing$^{†}$ | 14% | 27%$^{a}$ |
| In patients who failed conventional therapy, but not a biologic | 21% (33/158) | 33% (52/156)$^{c}$ |
| In patients who failed biological therapy | 7% (11/161) | 21% (35/166)$^{b}$ |

**72**

LABEL TABLE 5-continued

Summary of Key Efficacy Outcomes in UNIFI-I (Week 8)

| | Placebo N = 319 | Recommended dose of ustekinumab$^{£}$ N = 322 |
|---|---|---|
| Symptomatic Remission$^{‡}$ | 23% | 45%$^{b}$ |
| Combined Symptomatic Remission and Mucosal Healing$^{⊥}$ | 8% | 21%$^{b}$ |

$^{£}$Infusion dose of ustekinumab using the weight-based dosage regimen specified in Label Table 1.
*Clinical remission is defined as Mayo score ≤ 2 points, with no individual subscore >1.
$^{§}$Clinical response is defined as a decrease from baseline in the Mayo score by ≥30% and ≥3 points, with either a decrease from baseline in the rectal bleeding subscore ≥1 or a rectal bleeding subscore of 0 or 1.
$^{¥}$A TNFα antagonist and/or vedolizumab.
$^{†}$Mucosal healing is defined as a Mayo endoscopic subscore of 0 or 1.
$^{‡}$Symptomatic remission is defined as a Mayo stool frequency subscore of 0 or 1 and a rectal bleeding subscore of 0.
$^{⊥}$Combined symptomatic remission and mucosal healing is defined as a stool frequency subscore of 0 or 1, a rectal bleeding subscore of 0, and an endoscopy subscore of 0 or 1.
$^{a}$p < 0.001
$^{b}$Nominally significant (p < 0.001)
$^{c}$Nominally significant (p < 0.05)

UNIFI-M, evaluated 523 patients who achieved clinical response with single IV administration of ustekinumab in UNIFI-I. Patients were randomized to receive a subcutaneous maintenance regimen of either 90 mg ustekinumab every 8 weeks, 90 mg ustekinumab every 12 weeks or placebo for 44 weeks (for recommended maintenance posology, see section 4.2 of the STELARA Solution for injection (vial) and Solution for injection in pre filled syringe SmPC).

Significantly greater proportions of patients were in clinical remission in both ustekinumab treated groups compared to the placebo group at week 44 (see Label Table 6).

LABEL TABLE 6

Summary of Key Efficacy Measures in UNIFI-M (week 44; 52 weeks from initiation of the induction dose)

| | Placebo* N = 175 | 90 mg ustekinumab every 8 Weeks N = 176 | 90 mg ustekinumab every 12 Weeks N = 172 |
|---|---|---|---|
| Clinical Remission** | 24% | 44%$^{a}$ | 38%$^{b}$ |
| In patients who failed conventional therapy, but not a biologic | 31% (27/87) | 48% (41/85)$^{d}$ | 49% (50/102)$^{d}$ |
| In patients who failed biological therapy$^{¥}$ | 17% (15/88) | 40% (36/91)$^{c}$ | 23% (16/70)$^{d}$ |
| In patients who failed both a TNF and vedolizumab | 15% (4/27) | 33% (7/21)$^{e}$ | 23% (5/22)$^{e}$ |
| Maintenance of Clinical Response through week 44$^{§}$ | 45% | 71%$^{a}$ | 68%$^{a}$ |
| In patients who failed conventional therapy, but not a biologic | 51% (44/87) | 78% (66/85)$^{c}$ | 77% (78/102)$^{c}$ |
| In patients who failed biological therapy$^{¥}$ | 39% (34/88) | 65% (59/91)$^{c}$ | 56% (39/70)$^{d}$ |
| In patients who failed both a TNF and vedolizumab | 41% (11/27) | 67% (14/21)$^{e}$ | 50% (11/22)$^{e}$ |
| Mucosal Healing$^{†}$ | 29% | 51%$^{a}$ | 44%$^{b}$ |
| Maintenance of Clinical Remission through week 44$^{£}$ | 38% (17/45) | 58% (22/38) | 65% (26/40)$^{c}$ |
| Corticosteroid Free Clinical Remission$^{€}$ | 23% | 42%$^{b}$ | 38%$^{b}$ |
| Durable Remission$^{∥}$ | 35% | 57%$^{c}$ | 48%$^{d}$ |

US 10,961,307 B2

73      74

LABEL TABLE 6-continued

| | Placebo* N = 175 | 90 mg ustekinumab every 8 Weeks N = 176 | 90 mg ustekinumab every 12 Weeks N = 172 |
|---|---|---|---|
| Summary of Key Efficacy Measures in UNIFI-M (week 44; 52 weeks from initiation of the induction dose) | | | |
| Symptomatic Remission‡ | 45% | 68%c | 62%d |
| Combined Symptomatic Remission and Mucosal Healing↓ | 28% | 48%c | 41%d |

*Following response to IV ustekinumab.
**Clinical remission is defined as Mayo score ≤2 points, with no individual subscore >1.
§Clinical response is defined as a decrease from baseline in the Mayo score by ≥30% and ≥3 points, with either a decrease from baseline in the rectal bleeding subscore ≥1 or a rectal bleeding subscore of 0 or 1.
^A TNFα antagonist and/or vedolizumab.
†Mucosal healing is defined as a Mayo endoscopic sub-score of 0 or 1.
‡Maintenance of clinical remission through Week 44 is defined as patients in clinical remission through Week 44 among patients in clinical remission at maintenance baseline.
cCorticosteroid-free clinical remission is defined as patients in clinical remission and not receiving corticosteroids at Week 44.
∫Durable Remission is defined as partial Mayo remission at ≥80% of all visits prior to Week 44 and in partial Mayo remission at last visit (Week 44).
‡Symptomatic remission is defined as a Mayo stool frequency subscore of 0 or 1 and a rectal bleeding subscore of 0.
↓Combined symptomatic remission and mucosal healing is defined as a stool frequency subscore of 0 or 1, a rectal bleeding subscore of 0, and an endoscopy subscore of 0.
ap < 0.001
bp < 0.05
cNominally significant (p < 0.001)
dNominally significant (p < 0.05)
eNot statistically significant

The beneficial effect of ustekinumab on clinical response, mucosal healing and clinical remission was observed in induction and in maintenance both in patients who failed conventional therapy but not a biologic therapy, as well as in those who had failed at least one prior TNFα antagonist therapy including in patients with a primary non-response to TNFα antagonist therapy. A beneficial effect was also observed in induction in patients who failed at least one prior TNFα antagonist therapy and vedolizumab, however the number of patients in this subgroup was too small to draw definitive conclusions about the beneficial effect in this group during maintenance.

Week 16 Responders to Ustekinumab Induction

Ustekinumab treated patients who were not in response at week 8 of UNIFI-I received an administration of 90 mg SC ustekinumab at week 8 (36% of patients). Of those patients, 9% of patients who were initially randomized to the recommended induction dose achieved clinical remission and 58% achieved clinical response at Week 16.

Patients who were not in clinical response to ustekinumab induction at week 8 of the UNFI-I study but were in response at week 16 (157 patients) entered into the non-randomized portion of UNIFI-M and continued to receive maintenance dosing every 8 weeks; among these patients, a majority (62%) maintained response and 30% achieved remission at week 44.

Endoscopic Normalization

Endoscopic normalization was defined as a Mayo endoscopic subscore of 0 and was observed as early as week 8 of UNIFI-I. At week 44 of UNIFI-M, it was achieved in 24% and 29% of patients treated with ustekinumab every 12 or 8 weeks, respectively, as compared to 18% of patients in the placebo group.

Histologic & Histo Endoscopic Mucosal Healing

Histologic healing (defined as neutrophil infiltration in <5% of crypts, no crypt destruction, and no erosions, ulcerations, or granulation tissue) was assessed at week 8 of UNIFI-I and Week 44 of UNIFI-M. At week 8, after a single intravenous induction dose, significantly greater proportions of patients in the recommended dose group achieved histologic healing (36%) compared with patients in the placebo group (22%). At Week 44 maintenance of this effect was observed with significantly more patients in histologic healing in the every 12 week (54%) and every 8 week (59%) ustekinumab groups as compared to placebo (33%).

A combined endpoint of histo-endoscopic mucosal healing defined as subjects having both mucosal healing and histologic healing was evaluated at week 8 of UNIFI-I and week 44 of UNIFI-M. Patients receiving ustekinumab at the recommended dose showed significant improvements on the histo-endoscopic mucosal healing endpoint at week 8 in the ustekinumab group (18%) as compared to the placebo group (9%). At week 44, maintenance of this effect was observed with significantly more patients in histo-endoscopic mucosal healing in the every 12 week (39%) and every 8 week (46%) ustekinumab groups compared to placebo (24%).

Health-Related Quality of Life

Health-related quality of life was assessed by Inflammatory Bowel Disease Questionnaire (IBDQ), SF-36 and EuroQoL-5D (EQ-5D) questionnaires.

At week 8 of UNIFI-I, patients receiving ustekinumab showed significantly greater and clinically meaningful improvements on IBDQ total score, EQ-5D and EQ-5D VAS, and SF-36 Mental Component Summary Score and SF-36 Physical Component Summary Score when compared to placebo. These improvements were maintained in ustekinumab-treated patients in UNIFI-M through week 44.

Patients receiving ustekinumab experienced significantly more improvements in work productivity as assessed by greater reductions in overall work impairment and in activity impairment as assessed by the WPAI-GH questionnaire than patients receiving placebo.

US 10,961,307 B2

75

**Hospitalizations and Ulcerative Colits (UC) Related Surgeries**

Through week 8 of UNIFI-I, the proportions of subjects with UC disease related hospitalizations were significantly lower for subjects in the ustekinumab recommended dose group (1.6%, 5/322) compared with subjects in the placebo group (4.4%, 14/319) and no subjects underwent UC disease related surgeries in subjects receiving ustekinumab at the recommended induction dose compared to 0.6% (2/319) subjects in the placebo group.

Through week 44 of UNIFI-M, a significantly lower number of UC-related hospitalizations was observed in subjects in the combined ustekinumab group (2.0%, 7/348) as compared with subjects in the placebo group (5.7%, 10/175). A numerically lower number of subjects in the ustekinumab group (0.6%, 2/348) underwent UC disease related surgeries compared with subjects in the placebo group (1.7%, 3/175) through week 44.

Immunogenicity

Antibodies to ustekinumab may develop during ustekinumab treatment and most are neutralising. The formation of anti-ustekinumab antibodies is associated with increased clearance of ustekinumab in patients with Crohn's disease or ulcerative colitis. No reduced efficacy was observed. There is no apparent correlation between the presence of anti-ustekinumab antibodies and the occurrence of injection site reactions.

Paediatric Population

The European Medicines Agency has deferred the obligation to submit the results of studies with ustekinumab in one or more subsets of the paediatric population in Crohn's Disease and ulcerative colitis (see section 4.2 for information on paediatric use).

5.2 Pharmacokinetic Properties

Following the recommended intravenous induction dose, median peak serum ustekinumab concentration, observed 1 hour after the infusion, was 126.1 µg/mL in patients with Crohn's disease and 127.0 µg/mL in patients with ulcerative colitis.

Distribution

Median volume of distribution during the terminal phase (Vz) following a single intravenous administration to patients with psoriasis ranged from 57 to 83 mL/kg.

Biotransformation

The exact metabolic pathway for ustekinumab is unknown.

Elimination

Median systemic clearance (CL) following a single intravenous administration to patients with psoriasis ranged from 1.99 to 2.34 mL/day/kg. Median half-life ($t_{1/2}$) of ustekinumab was approximately 3 weeks in patients with ulcerative colitis, Crohn's disease, psoriasis and/or psoriatic arthritis, ranging from 15 to 32 days across all psoriasis and psoriatic arthritis studies.

Dose Linearity

The systemic exposure of ustekinumab ($C_{max}$ and AUC) increased in an approximately dose-proportional manner after a single intravenous administration at doses ranging from 0.09 mg/kg to 4.5 mg/kg.

Special Populations

No pharmacokinetic data are available in patients with impaired renal or hepatic function. No specific studies have been conducted with intravenous ustekinumab in elderly or paediatric patients.

In patients with Crohn's disease and ulcerative colitis, variability in ustekinumab clearance was affected by body weight, serum albumin level, sex, and antibody to

76

ustekinumab status while body weight was the main covariate affecting the volume of distribution. Additionally in Crohn's disease, clearance was affected by C-reactive protein, TNF antagonist failure status and race (Asian versus non-Asian). The impact of these covariates was within ±20% of the typical or reference value of the respective PK parameter, thus dose adjustment is not warranted for these covariates. Concomitant use of immunomodulators did not have a significant impact on ustekinumab disposition.

Regulation of CYP450 Enzymes

The effects of IL-12 or IL-23 on the regulation of CYP450 enzymes were evaluated in an in vitro study using human hepatocytes, which showed that IL-12 and/or IL-23 at levels of 10 ng/mL did not alter human CYP450 enzyme activities (CYP1A2, 2B6, 2C9, 2C19, 2D6, or 3A4; see section 4.5).

5.3 Preclinical Safety Data

Non-clinical data reveal no special hazard (e.g. organ toxicity) for humans based on studies of repeated-dose toxicity and developmental and reproductive toxicity, including safety pharmacology evaluations. In developmental and reproductive toxicity studies in cynomolgus monkeys, neither adverse effects on male fertility indices nor birth defects or developmental toxicity were observed. No adverse effects on female fertility indices were observed using an analogous antibody to IL-12/23 in mice.

Dose levels in animal studies were up to approximately 45-fold higher than the highest equivalent dose intended to be administered to psoriasis patients and resulted in peak serum concentrations in monkeys that were more than 100-fold higher than observed in humans. Carcinogenicity studies were not performed with ustekinumab due to the lack of appropriate models for an antibody with no cross-reactivity to rodent IL-12/23 p40.

6. Pharmaceutical Particulars

6.1 List of Excipients

EDTA disodium salt dihydrate

L-histidine

L-histidine monohydrochloride monohydrate

L-methionine

Polysorbate 80

Sucrose

Water for injection

6.2 Incompatibilities

In the absence of compatibility studies, this medicinal product must not be mixed with other medicinal products. STELARA should only be diluted with sodium chloride 9 mg/mL (0.9%) solution. STELARA should not be administered concomitantly in the same intravenous line with other medicinal products.

6.3 Shelf Life

3 years.

Do not freeze.

Chemical and physical in-use stability has been demonstrated for 8 hours at 15-25° C.

From a microbiological point of view, unless the method of dilution precludes the risk of microbial contamination, the product should be used immediately. If not used immediately, in-use storage times and conditions are the responsibility of user.

6.4 Special Precautions for Storage

Store in a refrigerator (2° C.-8° C.). Do not freeze.

Keep the vial in the outer carton in order to protect from light.

For storage conditions after dilution of the medicinal product, see section 6.3

US 10,961,307 B2

77

6.5 Nature and Contents of Container

26 mL solution in a type 1 glass 30 mL vial closed with a coated butyl rubber stopper. STELARA is available in a 1 vial pack.

6.6 Special Precautions for Disposal and Other Handling

The solution in the STELARA vial should not be shaken. The solution should be visually inspected for particulate matter or discoloration prior to administration. The solution is clear, colourless to light yellow. The medicinal product should not be used if the solution is discoloured or cloudy, or if foreign particulate matter is present.

Dilution

STELARA concentrate for solution for infusion must be diluted and prepared by a healthcare professional using aseptic technique.

1. Calculate the dose and the number of STELARA vials needed based on patient weight (see section 4.2, Label Table 1). Each 26 mL vial of STELARA contains 130 mg of ustekinumab. Only use complete vials of STELARA.

2. Withdraw and discard a volume of the sodium chloride 9 mg/mL (0.9%) solution from the 250 mL infusion bag equal to the volume of STELARA to be added. (discard 26 mL sodium chloride for each vial of STELARA needed, for 2 vials-discard 52 mL, for 3 vials-discard 78 mL, for 4 vials-discard 104 mL)

3. Withdraw 26 mL of STELARA from each vial needed and add it to the 250 mL infusion bag. The final volume in the infusion bag should be 250 mL. Gently mix.

4. Visually inspect the diluted solution before administration. Do not use if visibly opaque particles, discoloration or foreign particles are observed.

5. Administer the diluted solution over a period of at least one hour. Once diluted, the infusion should be completed within eight hours of the dilution in the infusion bag.

6. Use only an infusion set with an in-line, sterile, non-pyrogenic, low protein-binding filter (pore size 0.2 micrometer).

7. Each vial is for single use only and any unused medicinal product should be disposed of in accordance with local requirements.

7. Marketing Authorisation Holder
   Janssen-Cilag International NV
   Turnhoutseweg 30
   2340 Beerse
   Belgium

8. Marketing Authorisation Number(S)
   EU/1/08/494/005

9. Date of First Authorisation/Renewal of the Authorisation
   Date of first authorisation: 16 Jan. 2009
   Date of latest renewal: 19 Sep. 2013

10. Date of Revision of the Text
    Detailed information on this medicinal product is available on the website of the European Medicines Agency http://www.ema.europa.eu/

1. Name of the Medicinal Product
   STELARA 45 mg solution for injection
   STELARA 90 mg solution for injection
   STELARA 45 mg solution for injection in pre-filled syringe
   STELARA 90 mg solution for injection in pre-filled syringe

2. Qualitative and Quantitative Composition
   STELARA 45 mg Solution for Injection
   Each vial contains 45 mg ustekinumab in 0.5 mL.
   STELARA 90 mg Solution for Injection
   Each vial contains 90 mg ustekinumab in 1 mL.

78

STELARA 45 mg Solution for Injection in Pre-Filled Syringe

Each pre-filled syringe contains 45 mg ustekinumab in 0.5 mL.

STELARA 90 mg Solution for Injection in Pre-Filled Syringe

Each pre-filled syringe contains 90 mg ustekinumab in 1 mL.

Ustekinumab is a fully human IgG1κ monoclonal antibody to interleukin (IL)-12/23 produced in a murine myeloma cell line using recombinant DNA technology.

For the full list of excipients, see section 6.1.

3. Pharmaceutical Form

STELARA 45 mg Solution for Injection

Solution for injection.

STELARA 90 mg Solution for Injection

Solution for injection.

STELARA 45 mg Solution for Injection in Pre-Filled Syringe

Solution for injection.

STELARA 90 mg Solution for Injection in Pre-Filled Syringe

Solution for injection.

The solution is clear to slightly opalescent, colourless to light yellow.

4. Clinical Particulars

4.1 Therapeutic Indications

Plaque Psoriasis

STELARA is indicated for the treatment of moderate to severe plaque psoriasis in adults who failed to respond to, or who have a contraindication to, or are intolerant to other systemic therapies including ciclosporin, methotrexate (MTX) or PUVA (psoralen and ultraviolet A) (see section 5.1).

Paediatric Plaque Psoriasis

STELARA is indicated for the treatment of moderate to severe plaque psoriasis in adolescent patients from the age of 12 years and older, who are inadequately controlled by, or are intolerant to, other systemic therapies or phototherapies (see section 5.1).

Psoriatic Arthritis (PsA)

STELARA, alone or in combination with MTX, is indicated for the treatment of active psoriatic arthritis in adult patients when the response to previous non-biological disease-modifying anti-rheumatic drug (DMARD) therapy has been inadequate (see section 5.1).

Crohn's Disease

STELARA is indicated for the treatment of adult patients with moderately to severely active Crohn's disease who have had an inadequate response with, lost response to, or were intolerant to either conventional therapy or a TNFα antagonist or have medical contraindications to such therapies.

Ulcerative Colitis

STELARA is indicated for the treatment of adult patients with moderately to severely active ulcerative colitis who have had an inadequate response with, lost response to, or were intolerant to either conventional therapy or a biologic or have medical contraindications to such therapies (see section 5.1).

US 10,961,307 B2

**79**

**4.2 Posology and Method of Administration**

STELARA is intended for use under the guidance and supervision of physicians experienced in the diagnosis and treatment of conditions for which STELARA is indicated.

Posology

Plaque Psoriasis

The recommended posology of STELARA is an initial dose of 45 mg administered subcutaneously, followed by a 45 mg dose 4 weeks later, and then every 12 weeks thereafter.

Consideration should be given to discontinuing treatment in patients who have shown no response up to 28 weeks of treatment.

Patients with Body Weight>100 kg

For patients with a body weight>100 kg the initial dose is 90 mg administered subcutaneously, followed by a 90 mg dose 4 weeks later, and then every 12 weeks thereafter. In these patients, 45 mg was also shown to be efficacious. However, 90 mg resulted in greater efficacy. (see section 5.1, Label Table 4)

Psoriatic Arthritis (PsA)

The recommended posology of STELARA is an initial dose of 45 mg administered subcutaneously, followed by a 45 mg dose 4 weeks later, and then every 12 weeks thereafter. Alternatively, 90 mg may be used in patients with a body weight>100 kg.

Consideration should be given to discontinuing treatment in patients who have shown no response up to 28 weeks of treatment.

Elderly (≥65 years)

No dose adjustment is needed for elderly patients (see section 4.4).

Renal and Hepatic Impairment

STELARA has not been studied in these patient populations. No dose recommendations can be made.

Paediatric Population

The safety and efficacy of STELARA in children with psoriasis less than 12 years of age or in children with psoriatic arthritis less than 18 years of age have not yet been established.

Paediatric Plaque Psoriasis (12 Years and Older)

The recommended dose of STELARA based on body weight is shown below (Label Tables 1 and 2). STELARA should be administered at Weeks 0 and 4, then every 12 weeks thereafter.

LABEL TABLE 1

| Recommended dose of STELARA for paediatric psoriasis | |
| --- | --- |
| Body weight at the time of dosing | Recommended Dose |
| <60  kg | 0.75  mg/kg[a] |
| ≥60–≤100 kg | 45  mg |
| >100 kg | 90  mg |

[a]To calculate the volume of injection (mL) for patients < 60 kg, use the following formula: body weight (kg) x 0.0083 (mL/kg) or see Label Table 2. The calculated volume should be rounded to the nearest 0.01 mL and administered using a 1 mL graduated syringe. A 45 mg vial is available for paediatric patients who need to receive less than the full 45 mg dose.

LABEL TABLE 2

| Injection volumes of STELARA for paediatric psoriasis patients <60 kg | | |
| --- | --- | --- |
| Body weight at time of dosing (kg) | Dose (mg) | Volume of injection (mL) |
| 30 | 22.5 | 0.25 |
| 31 | 23.3 | 0.26 |

**80**

LABEL TABLE 2-continued

| Injection volumes of STELARA for paediatric psoriasis patients <60 kg | | |
| --- | --- | --- |
| Body weight at time of dosing (kg) | Dose (mg) | Volume of injection (mL) |
| 32 | 24.0 | 0.27 |
| 33 | 24.8 | 0.27 |
| 34 | 25.5 | 0.28 |
| 35 | 26.3 | 0.29 |
| 36 | 27.0 | 0.30 |
| 37 | 27.8 | 0.31 |
| 38 | 28.5 | 0.32 |
| 39 | 29.3 | 0.32 |
| 40 | 30.0 | 0.33 |
| 41 | 30.8 | 0.34 |
| 42 | 31.5 | 0.35 |
| 43 | 32.3 | 0.36 |
| 44 | 33.0 | 0.37 |
| 45 | 33.8 | 0.37 |
| 46 | 34.5 | 0.38 |
| 47 | 35.3 | 0.39 |
| 48 | 36.0 | 0.40 |
| 49 | 36.8 | 0.41 |
| 50 | 37.5 | 0.42 |
| 51 | 38.3 | 0.42 |
| 52 | 39.0 | 0.43 |
| 53 | 39.8 | 0.44 |
| 54 | 40.5 | 0.45 |
| 55 | 41.3 | 0.46 |
| 56 | 42.0 | 0.46 |
| 57 | 42.8 | 0.47 |
| 58 | 43.5 | 0.48 |
| 59 | 44.3 | 0.49 |

Consideration should be given to discontinuing treatment in patients who have shown no response up to 28 weeks of treatment.

Crohn's Disease and Ulcerative Colitis

In the treatment regimen, the first dose of STELARA is administered intravenously. For the posology of the intravenous dosing regimen, see section 4.2 of the STELARA 130 mg Concentrate for solution for infusion SmPC.

The first subcutaneous administration of 90 mg STELARA should take place at week 8 after the intravenous dose. After this, dosing every 12 weeks is recommended.

Patients who have not shown adequate response at 8 weeks after the first subcutaneous dose, may receive a second subcutaneous dose at this time (see section 5.1).

Patients who lose response on dosing every 12 weeks may benefit from an increase in dosing frequency to every 8 weeks (see section 5.1, section 5.2).

Patients may subsequently be dosed every 8 weeks or every 12 weeks according to clinical judgment (see section 5.1).

Consideration should be given to discontinuing treatment in patients who show no evidence of therapeutic benefit 16 weeks after the IV induction dose or 16 weeks after switching to the 8-weekly maintenance dose.

Immunomodulators and/or corticosteroids may be continued during treatment with STELARA. In patients who have responded to treatment with STELARA, corticosteroids may be reduced or discontinued in accordance with standard of care.

In Crohn's disease, if therapy is interrupted, resumption of treatment with subcutaneous dosing every 8 weeks is safe and effective.

Elderly (≥65 Years)

No dose adjustment is needed for elderly patients (see section 4.4).

US 10,961,307 B2

81

Renal and Hepatic Impairment

STELARA has not been studied in these patient populations. No dose recommendations can be made.

Paediatric Population

The safety and efficacy of STELARA in treatment of Crohn's disease or ulcerative colitis in children less than 18 years have not yet been established. No data are available.

Method of Administration

STELARA 45 mg and 90 mg vials or pre-filled syringes are for subcutaneous injection only. If possible, areas of the skin that show psoriasis should be avoided as injection sites.

After proper training in subcutaneous injection technique, patients or their caregivers may inject STELARA if a physician determines that it is appropriate. However, the physician should ensure appropriate follow-up of patients. Patients or their caregivers should be instructed to inject the prescribed amount of STELARA according to the directions provided in the package leaflet.

Comprehensive instructions for administration are given in the package leaflet.

For further instructions on preparation and special precautions for handling, see section 6.6.

4.3 Contraindications

Hypersensitivity to the active substance or to any of the excipients listed in section 6.1.

Clinically important, active infection (e.g. active tuberculosis; see section 4.4).

4.4 Special Warnings and Precautions for Use

Traceability

In order to improve the traceability of biological medicinal products, the tradename and the batch number of the administered product should be clearly recorded.

Infections

Ustekinumab may have the potential to increase the risk of infections and reactivate latent infections. In clinical studies, serious bacterial, fungal, and viral infections have been observed in patients receiving STELARA (see section 4.8).

Caution should be exercised when considering the use of STELARA in patients with a chronic infection or a history of recurrent infection (see section 4.3).

Prior to initiating treatment with STELARA, patients should be evaluated for tuberculosis infection. STELARA must not be given to patients with active tuberculosis (see section 4.3). Treatment of latent tuberculosis infection should be initiated prior to administering STELARA. Anti-tuberculosis therapy should also be considered prior to initiation of STELARA in patients with a history of latent or active tuberculosis in whom an adequate course of treatment cannot be confirmed. Patients receiving STELARA should be monitored closely for signs and symptoms of active tuberculosis during and after treatment.

Patients should be instructed to seek medical advice if signs or symptoms suggestive of an infection occur. If a patient develops a serious infection, the patient should be closely monitored and STELARA should not be administered until the infection resolves.

Malignancies

Immunosuppressants like ustekinumab have the potential to increase the risk of malignancy. Some patients who received STELARA in clinical studies developed cutaneous and non-cutaneous malignancies (see section 4.8).

No studies have been conducted that include patients with a history of malignancy or that continue treatment in patients who develop malignancy while receiving STELARA. Thus, caution should be exercised when considering the use of STELARA in these patients.

82

All patients, in particular those greater than 60 years of age, patients with a medical history of prolonged immunosuppressant therapy or those with a history of PUVA treatment, should be monitored for the appearance of non-melanoma skin cancer (see section 4.8).

Systemic and respiratory hypersensitivity reactions

Systemic

Serious hypersensitivity reactions have been reported in the postmarketing setting, in some cases several days after treatment. Anaphylaxis and angioedema have occurred. If an anaphylactic or other serious hypersensitivity reaction occurs, appropriate therapy should be instituted and administration of STELARA should be discontinued (see section 4.8).

Respiratory

Cases of allergic alveolitis and eosinophilic pneumonia have been reported during post-approval use of ustekinumab. Clinical presentations included cough, dyspnoea, and interstitial infiltrates following one to three doses. Serious outcomes have included respiratory failure and prolonged hospitalisation. Improvement has been reported after discontinuation of ustekinumab and also, in some cases, administration of corticosteroids. If infection has been excluded and diagnosis is confirmed, discontinue ustekinumab and institute appropriate treatment (see section 4.8).

Latex Sensitivity

The needle cover on the syringe in the STELARA pre-filled syringe is manufactured from dry natural rubber (a derivative of latex), which may cause allergic reactions in individuals sensitive to latex.

Vaccinations

It is recommended that live viral or live bacterial vaccines (such as *Bacillus* of Calmette and Guérin (BCG)) should not be given concurrently with STELARA. Specific studies have not been conducted in patients who had recently received live viral or live bacterial vaccines. No data are available on the secondary transmission of infection by live vaccines in patients receiving STELARA. Before live viral or live bacterial vaccination, treatment with STELARA should be withheld for at least 15 weeks after the last dose and can be resumed at least 2 weeks after vaccination. Prescribers should consult the Summary of Product Characteristics for the specific vaccine for additional information and guidance on concomitant use of immunosuppressive agents post-vaccination.

Patients receiving STELARA may receive concurrent inactivated or non-live vaccinations.

Long term treatment with STELARA does not suppress the humoral immune response to pneumococcal polysaccharide or tetanus vaccines (see section 5.1).

Concomitant Immunosuppressive Therapy

In psoriasis studies, the safety and efficacy of STELARA in combination with immunosuppressants, including biologics, or phototherapy have not been evaluated. In psoriatic arthritis studies, concomitant MTX use did not appear to influence the safety or efficacy of STELARA. In Crohn's disease and ulcerative colitis studies, concomitant use of immunosuppressants or corticosteroids did not appear to influence the safety or efficacy of STELARA. Caution should be exercised when considering concomitant use of other immunosuppressants and STELARA or when transitioning from other immunosuppressive biologics (see section 4.5).

US 10,961,307 B2

83

Immunotherapy

STELARA has not been evaluated in patients who have undergone allergy immunotherapy. It is not known whether STELARA may affect allergy immunotherapy.

Serious Skin Conditions

In patients with psoriasis, exfoliative dermatitis has been reported following ustekinumab treatment (see section 4.8). Patients with plaque psoriasis may develop erythrodermic psoriasis, with symptoms that may be clinically indistinguishable from exfoliative dermatitis, as part of the natural course of their disease. As part of the monitoring of the patient's psoriasis, physicians should be alert for symptoms of erythrodermic psoriasis or exfoliative dermatitis. If these symptoms occur, appropriate therapy should be instituted. STELARA should be discontinued if a drug reaction is suspected.

Special Populations

Elderly (≥65 years)

No overall differences in efficacy or safety in patients age 65 and older who received STELARA were observed compared to younger patients in clinical studies in approved indications, however the number of patients aged 65 and older is not sufficient to determine whether they respond differently from younger patients. Because there is a higher incidence of infections in the elderly population in general, caution should be used in treating the elderly.

4.5 Interaction with Other Medicinal Products and Other Forms of Interaction

Live vaccines should not be given concurrently with STELARA (see section 4.4).

No interaction studies have been performed in humans. In the population pharmacokinetic analyses of the phase III studies, the effect of the most frequently used concomitant medicinal products in patients with psoriasis (including paracetamol, ibuprofen, acetylsalicylic acid, metformin, atorvastatin, levothyroxine) on pharmacokinetics of ustekinumab was explored. There were no indications of an interaction with these concomitantly administered medicinal products. The basis for this analysis was that at least 100 patients (>5% of the studied population) were treated concomitantly with these medicinal products for at least 90% of the study period. The pharmacokinetics of ustekinumab was not impacted by concomitant use of MTX, NSAIDs, 6-mercaptopurine, azathioprine and oral corticosteroids in patients with psoriatic arthritis, Crohn's disease or ulcerative colitis, or prior exposure to anti-TNFα agents, in patients with psoriatic arthritis or Crohn's disease or by prior exposure to biologics (i.e. anti-TNFα agents and/or vedolizumab) in patients with ulcerative colitis.

The results of an in vitro study do not suggest the need for dose adjustments in patients who are receiving concomitant CYP450 substrates (see section 5.2).

In psoriasis studies, the safety and efficacy of STELARA in combination with immunosuppressants, including biologics, or phototherapy have not been evaluated. In psoriatic arthritis studies, concomitant MTX use did not appear to influence the safety or efficacy of STELARA. In Crohn's disease and ulcerative colitis studies, concomitant use of immunosuppressants or corticosteroids did not appear to influence the safety or efficacy of STELARA. (see section 4.4).

4.6 Fertility, Pregnancy and Lactation

Women of Childbearing Potential

Women of childbearing potential should use effective methods of contraception during treatment and for at least 15 weeks after treatment.

84

Pregnancy

There are no adequate data from the use of ustekinumab in pregnant women. Animal studies do not indicate direct or indirect harmful effects with respect to pregnancy, embryonic/foetal development, parturition or postnatal development (see section 5.3). As a precautionary measure, it is preferable to avoid the use of STELARA in pregnancy.

Breast-Feeding

It is unknown whether ustekinumab is excreted in human breast milk. Animal studies have shown excretion of ustekinumab at low levels in breast milk. It is not known if ustekinumab is absorbed systemically after ingestion. Because of the potential for adverse reactions in nursing infants from ustekinumab, a decision on whether to discontinue breast-feeding during treatment and up to 15 weeks after treatment or to discontinue therapy with STELARA must be made taking into account the benefit of breast-feeding to the child and the benefit of STELARA therapy to the woman.

Fertility

The effect of ustekinumab on human fertility has not been evaluated (see section 5.3).

4.7 Effects on Ability to Drive and Use Machines

STELARA has no or negligible influence on the ability to drive and use machines.

4.8 Undesirable Effects

Summary of the Safety Profile

The most common adverse reactions (>5%) in controlled periods of the adult psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis clinical studies with ustekinumab were nasopharyngitis and headache. Most were considered to be mild and did not necessitate discontinuation of study treatment. The most serious adverse reaction that has been reported for STELARA is serious hypersensitivity reactions including anaphylaxis (see section 4.4). The overall safety profile was similar for patients with psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis.

Tabulated List of Adverse Reactions

The safety data described below reflect exposure in adults to ustekinumab in 14 phase 2 and phase 3 studies in 6,709 patients (4,135 with psoriasis and/or psoriatic arthritis, 1,749 with Crohn's disease and 825 patients with ulcerative colitis). This includes exposure to STELARA in the controlled and non-controlled periods of the clinical studies for at least 6 months or 1 year (4,577 and 3,253 patients respectively with psoriasis, psoriatic arthritis, Crohn's disease or ulcerative colitis) and exposure for at least 4 or 5 years (1,482 and 838 patients with psoriasis respectively).

Table 3 provides a list of adverse reactions from adult psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis clinical studies as well as adverse reactions reported from post-marketing experience. The adverse reactions are classified by System Organ Class and frequency, using the following convention: Very common (≥1/10), Common (≥1/100 to <1/10), Uncommon (≥1/1,000 to <1/100), Rare (≥1/10,000 to <1/1,000), Very rare (<1/10,000), not known (cannot be estimated from the available data). Within each frequency grouping, adverse reactions are presented in order of decreasing seriousness.

US 10,961,307 B2

85

86

LABEL TABLE 3

List of adverse reactions

| System Organ Class | Frequency: Adverse reaction |
|---|---|
| Infections and infestations | Common: Upper respiratory tract infection, nasopharyngitis, sinusitis<br>Uncommon: Cellulitis, dental infections, herpes zoster, lower respiratory tract infection, viral upper respiratory tract infection, vulvovaginal mycotic infection |
| Immune system disorders | Uncommon: Hypersensitivity reactions (including rash, urticaria)<br>Rare: Serious hypersensitivity reactions (including anaphylaxis, angioedema) |
| Psychiatric disorders | Uncommon: Depression |
| Nervous system disorders | Common: Dizziness, headache<br>Uncommon: Facial palsy |
| Respiratory, thoracic and mediastinal disorders | Common: Oropharyngeal pain<br>Uncommon: Nasal congestion<br>Rare: Allergic alveolitis, eosinophilic pneumonia |
| Gastrointestinal disorders | Common: Diarrhoea, nausea, vomiting |
| Skin and subcutaneous tissue disorders | Common: Pruritus<br>Uncommon: Pustular psoriasis, skin exfoliation, acne<br>Rare: Exfoliative dermatitis |
| Musculoskeletal and connective tissue disorders | Common: Back pain, myalgia, arthralgia |
| General disorders and administration site conditions | Common: Fatigue, injection site erythema, injection site pain<br>Uncommon: Injection site reactions (including haemorrhage, haematoma, induration, swelling and pruritus), asthenia |

Description of Selected Adverse Reactions

Infections

In the placebo-controlled studies of patients with psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis, the rates of infection or serious infection were similar between ustekinumab-treated patients and those treated with placebo. In the placebo-controlled period of these clinical studies, the rate of infection was 1.36 per patient-year of follow-up in ustekinumab-treated patients, and 1.34 in placebo-treated patients. Serious infections occurred at the rate of 0.03 per patient-year of follow-up in ustekinumab-treated patients (30 serious infections in 930 patient-years of follow-up) and 0.03 in placebo-treated patients (15 serious infections in 434 patient-years of follow-up) (see section 4.4).

In the controlled and non-controlled periods of psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis clinical studies, representing 11,581 patient-years of exposure in 6,709 patients, the median follow up was 1.0 years; 1.1 years for psoriatic disease studies, 0.6 year for Crohn's disease studies, and 1.0 years for ulcerative colitis studies. The rate of infection was 0.91 per patient-year of follow-up in ustekinumab-treated patients, and the rate of serious infections was 0.02 per patient-year of follow-up in ustekinumab-treated patients (199 serious infections in 11,581 patient-years of follow-up) and serious infections reported included pneumonia, anal abscess, cellulitis, diverticulitis, gastroenteritis and viral infections.

In clinical studies, patients with latent tuberculosis who were concurrently treated with isoniazid did not develop tuberculosis.

Malignancies

In the placebo-controlled period of the psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis clinical studies, the incidence of malignancies excluding non-melanoma skin cancer was 0.11 per 100 patient-years of follow-up for ustekinumab-treated patients (1 patient in 929 patient-years of follow-up) compared with 0.23 for placebo-treated patients (1 patient in 434 patient-years of follow-up). The incidence of non-melanoma skin cancer was 0.43 per 100 patient-years of follow-up for ustekinumab-treated patients (4 patients in 929 patient-years of follow-up) compared to 0.46 for placebo-treated patients (2 patients in 433 patient-years of follow-up).

In the controlled and non-controlled periods of psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis clinical studies, representing 11,561 patient-years of exposure in 6,709 patients, the median follow-up was 1.0 years; 1.1 years for psoriatic disease studies, 0.6 year for Crohn's disease studies and 1.0 years for ulcerative colitis studies. Malignancies excluding non-melanoma skin cancers were reported in 62 patients in 11,561 patient-years of follow-up (incidence of 0.54 per 100 patient-years of follow-up for ustekinumab-treated patients). The incidence of malignancies reported in ustekinumab-treated patients was comparable to the incidence expected in the general population (standardised incidence ratio=0.93 [95% confidence interval: 0.71, 1.20], adjusted for age, gender and race). The most frequently observed malignancies, other than non-melanoma skin cancer, were prostate, colorectal, melanoma and breast cancers. The incidence of non-melanoma skin cancer was 0.49 per 100 patient-years of follow-up for ustekinumab-treated patients (56 patients in 11,545 patient-years of follow-up). The ratio of patients with basal versus squamous cell skin cancers (3:1) is comparable with the ratio expected in the general population (see section 4.4).

Hypersensitivity Reactions

During the controlled periods of the psoriasis and psoriatic arthritis clinical studies of ustekinumab, rash and urticaria have each been observed in <1% of patients (see section 4.4).

Paediatric Population

Undesirable effects in paediatric patients 12 years and older with plaque psoriasis

The safety of ustekinumab has been studied in a phase 3 study of 110 patients from 12 to 17 years of age for up to 60 weeks. In this study, the adverse events reported were similar to those seen in previous studies in adults with plaque psoriasis.

Reporting of Suspected Adverse Reactions

Reporting suspected adverse reactions after authorisation of the medicinal product is important. It allows continued monitoring of the benefit/risk balance of the medicinal product. Healthcare professionals are asked to report any suspected adverse reactions via the national reporting system listed in Appendix V.

4.9 Overdose

Single doses up to 6 mg/kg have been administered intravenously in clinical studies without dose-limiting toxicity. In case of overdose, it is recommended that the patient be monitored for any signs or symptoms of adverse reactions and appropriate symptomatic treatment be instituted immediately.

5. Pharmacological Properties

5.1 Pharmacodynamic Properties

Pharmacotherapeutic group: Immunosuppressants, interleukin inhibitors, ATC code: L04AC05.

Mechanism of Action

Ustekinumab is a fully human IgG1K monoclonal antibody that binds with specificity to the shared p40 protein subunit of human cytokines interleukin (IL)-12 and IL-23.

US 10,961,307 B2

87

Ustekinumab inhibits the bioactivity of human IL-12 and IL-23 by preventing p40 from binding to the IL-12Rβ1 receptor protein expressed on the surface of immune cells. Ustekinumab cannot bind to IL-12 or IL-23 that is already bound to IL-12Rβ1 cell surface receptors. Thus, ustekinumab is not likely to contribute to complement- or antibody-mediated cytotoxicity of cells with IL-12 and/or IL-23 receptors. IL-12 and IL-23 are heterodimeric cytokines secreted by activated antigen presenting cells, such as macrophages and dendritic cells, and both cytokines participate in immune functions; IL-12 stimulates natural killer (NK) cells and drives the differentiation of CD4+ T cells toward the T helper 1 (Th1) phenotype, IL-23 induces the T helper 17 (Th17) pathway. However, abnormal regulation of IL 12 and IL 23 has been associated with immune mediated diseases, such as psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis.

By binding the shared p40 subunit of IL-12 and IL-23, ustekinumab may exert its clinical effects in psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis through interruption of the Th1 and Th17 cytokine pathways, which are central to the pathology of these diseases.

In patients with Crohn's disease and ulcerative colitis, treatment with ustekinumab resulted in a decrease in inflammatory markers including C-Reactive Protein (CRP) and fecal calprotectin during the induction phase, which were then maintained throughout the maintenance phase.

Immunization

During the long term extension of Psoriasis Study 2 (PHOENIX 2), adult patients treated with STELARA for at least 3.5 years mounted similar antibody responses to both pneumococcal polysaccharide and tetanus vaccines as a non-systemically treated psoriasis control group. Similar proportions of adult patients developed protective levels of anti-pneumococcal and anti-tetanus antibodies and antibody titers were similar among STELARA-treated and control patients.

Clinical Efficacy

Plaque Psoriasis (Adults)

The safety and efficacy of ustekinumab was assessed in 1,996 patients in two randomised, double-blind, placebo-controlled studies in patients with moderate to severe plaque psoriasis and who were candidates for phototherapy or systemic therapy. In addition, a randomised, blinded assessor, active-controlled study compared ustekinumab and etanercept in patients with moderate to severe plaque psoriasis who had had an inadequate response to, intolerance to, or contraindication to ciclosporin, MTX, or PUVA.

88

Psoriasis Study 1 (PHOENIX 1) evaluated 766 patients. 53% of these patients were either non-responsive, intolerant, or had a contraindication to other systemic therapy. Patients randomised to ustekinumab received 45 mg or 90 mg doses at Weeks 0 and 4 and followed by the same dose every 12 weeks. Patients randomised to receive placebo at Weeks 0 and 4 crossed over to receive ustekinumab (either 45 mg or 90 mg) at Weeks 12 and 16 followed by dosing every 12 weeks. Patients originally randomised to ustekinumab who achieved Psoriasis Area and Severity Index 75 response (PASI improvement of at least 75% relative to baseline) at both Weeks 28 and 40 were re-randomised to receive ustekinumab every 12 weeks or to placebo (i.e., withdrawal of therapy). Patients who were re-randomised to placebo at week 40 reinitiated ustekinumab at their original dosing regimen when they experienced at least a 50% loss of their PASI improvement obtained at week 40. All patients were followed for up to 76 weeks following first administration of study treatment.

Psoriasis Study 2 (PHOENIX 2) evaluated 1,230 patients. 61% of these patients were either non-responsive, intolerant, or had a contraindication to other systemic therapy. Patients randomised to ustekinumab received 45 mg or 90 mg doses at Weeks 0 and 4 followed by an additional dose at 16 weeks. Patients randomised to receive placebo at Weeks 0 and 4 crossed over to receive ustekinumab (either 45 mg or 90 mg) at Weeks 12 and 16. All patients were followed for up to 52 weeks following first administration of study treatment.

Psoriasis Study 3 (ACCEPT) evaluated 903 patients with moderate to severe psoriasis who inadequately responded to, were intolerant to, or had a contraindication to other systemic therapy and compared the efficacy of ustekinumab to etanercept and evaluated the safety of ustekinumab and etanercept. During the 12-week active-controlled portion of the study, patients were randomised to receive etanercept (50 mg twice a week), ustekinumab 45 mg at Weeks 0 and 4, or ustekinumab 90 mg at Weeks 0 and 4.

Baseline disease characteristics were generally consistent across all treatment groups in Psoriasis Studies 1 and 2 with a median baseline PASI score from 17 to 18, median baseline Body Surface Area (BSA)≥20, and median Dermatology Life Quality Index (DLQI) range from 10 to 12.

Approximately one third (Psoriasis Study 1) and one quarter (Psoriasis Study 2) of subjects had Psoriatic Arthritis (PsA). Similar disease severity was also seen in Psoriasis Study 3.

The primary endpoint in these studies was the proportion of patients who achieved PASI 75 response from baseline at week 12 (see Label Tables 4 and 5).

LABEL TABLE 4

| Summary of clinical response in Psoriasis Study 1 (PHOENIX 1) and Psoriasis Study 2 (PHOENIX 2) | | | | |
|---|---|---|---|---|
| | Week 12 2 doses (week 0 and week 4) | | Week 28 3 doses (week 0, week 4 and week 16) | |
| | PBO | 45 mg | 90 mg | 45 mg | 90 mg |
| Psoriasis Study 1 | | | | | |
| Number of patients randomised | 255 | 255 | 256 | 250 | 243 |
| PASI 50 response N (%) | 26 (10%) | 213 (84%)[a] | 220 (86%)[a] | 228 (91%) | 234 (96%) |
| PASI 75 response N (%) | 8 (3%) | 171 (67%)[a] | 170 (66%)[a] | 178 (71%) | 191 (79%) |
| PASI 90 response N (%) | 5 (2%) | 106 (42%)[a] | 94 (37%)[a] | 123 (49%) | 135 (56%) |
| PGA[b] of cleared or minimal N (%) | 10 (4%) | 151 (59%)[a] | 156 (61%)[a] | 146 (58%) | 160 (66%) |

US 10,961,307 B2

| 89 | 90 |

### LABEL TABLE 4-continued

Summary of clinical response in Psoriasis Study 1 (PHOENIX 1) and Psoriasis Study 2 (PHOENIX 2)

| | Week 12 2 doses (week 0 and week 4) | | | Week 28 3 doses (week 0, week 4 and week 16) | |
|---|---|---|---|---|---|
| | PBO | 45 mg | 90 mg | 45 mg | 90 mg |
| Number of patients ≤100 kg | 166 | 168 | 164 | 164 | 153 |
| PASI 75 response N (%) | 6 (4%) | 124 (74%) | 107 (65%) | 130 (79%) | 124 (81%) |
| Number of patients >100 kg | 89 | 87 | 92 | 86 | 90 |
| PASI 75 response N (%) | 2 (2%) | 47 (54%) | 63 (68%) | 48 (56%) | 67 (74%) |
| Psoriasis Study 2 | | | | | |
| Number of patients randomised | 410 | 409 | 411 | 397 | 400 |
| PASI 50 response N (%) | 41 (10%) | 342 (84%)[a] | 367 (89%)[a] | 369 (93%) | 380 (95%) |
| PASI 75 response N (%) | 15 (4%) | 273 (67%)[a] | 311 (76%)[a] | 276 (70%) | 314 (79%) |
| PASI 90 response N (%) | 3 (1%) | 173 (42%)[a] | 209 (51%)[a] | 178 (45%) | 217 (54%) |
| PGA[b] of cleared or minimal N (%) | 18 (4%) | 277 (68%)[a] | 300 (73%)[a] | 241 (61%) | 279 (70%) |
| Number of patients ≤100 kg | 290 | 297 | 289 | 287 | 280 |
| PASI 75 response N (%) | 12 (4%) | 218 (73%) | 225 (78%) | 217 (76%) | 226 (81%) |
| Number of patients >100 kg | 120 | 112 | 121 | 110 | 119 |
| PASI 75 response N (%) | 3 (3%) | 55 (49%) | 86 (71%) | 59 (54%) | 88 (74%) |

[a]p < 0.001 for ustekinumab 45 mg or 90 mg in comparison with placebo (PBO).
[b]PGA = Physician Global Assessment

### LABEL TABLE 5

Summary of clinical response at week 12 in Psoriasis Study 3 (ACCEPT)

| | Psoriasis Study 3 | | |
|---|---|---|---|
| | Etanercept 24 doses (50 mg twice a week) | Ustekinumab 2 doses (week 0 and week 4) | |
| | | 45 mg | 90 mg |
| Number of patients randomised | 347 | 209 | 347 |
| PASI 50 response N (%) | 286 (82%) | 181 (87%) | 320 (92%)[a] |
| PASI 75 response N (%) | 197 (57%) | 141 (67%)[b] | 256 (74%)[a] |
| PASI 90 response N (%) | 80 (23%) | 76 (36%)[a] | 155 (45%)[a] |
| PGA of cleared or minimal N (%) | 170 (49%) | 136 (65%)[a] | 245 (71%)[a] |
| Number of patients ≤100 kg | 251 | 151 | 244 |
| PASI 75 response N (%) | 154 (61%) | 109 (72%) | 189 (77%) |
| Number of patients >100 kg | 96 | 58 | 103 |
| PASI 75 response N (%) | 43 (45%) | 32 (55%) | 67 (65%) |

[a]p < 0.001 for ustekinumab 45 mg or 90 mg in comparison with etanercept.
[b]p = 0.012 for ustekinumab 45 mg in comparison with etanercept.

In Psoriasis Study 1 maintenance of PASI 75 was significantly superior with continuous treatment compared with treatment withdrawal (p<0.001). Similar results were seen with each dose of ustekinumab. At 1 year (week 52), 89% of patients re-randomised to maintenance treatment were PASI 75 responders compared with 63% of patients re-randomised to placebo (treatment withdrawal) (p<0.001). At 18 months (week 76), 84% of patients re-randomised to maintenance treatment were PASI 75 responders compared with 19% of patients re-randomised to placebo (treatment withdrawal). At 3 years (week 148), 82% of patients re-randomised to maintenance treatment were PASI 75 responders. At 5 years (week 244), 80% of patients re-randomised to maintenance treatment were PASI 75 responders.

In patients re-randomised to placebo, and who reinitiated their original ustekinumab treatment regimen after loss of ≥50% of PASI improvement 85% regained PASI 75 response within 12 weeks after re-initiating therapy.

In Psoriasis Study 1, at week 2 and week 12, significantly greater improvements from baseline were demonstrated in the DLQI in each ustekinumab treatment group compared with placebo. The improvement was sustained through week 28. Similarly, significant improvements were seen in Psoriasis Study 2 at week 4 and 12, which were sustained through week 24. In Psoriasis Study 1, improvements in nail psoriasis (Nail Psoriasis Severity Index), in the physical and mental component summary scores of the SF-36 and in the Itch Visual Analogue Scale (VAS) were also significant in each ustekinumab treatment group compared with placebo. In Psoriasis Study 2, the Hospital Anxiety and Depression Scale (HADS) and Work Limitations Questionnaire (WLQ)

US 10,961,307 B2

91

were also significantly improved in each ustekinumab treatment group compared with placebo.

Psoriatic Arthritis (PsA) (Adults)

Ustekinumab has been shown to improve signs and symptoms, physical function and health-related quality of life, and reduce the rate of progression of peripheral joint damage in adult patients with active PsA.

The safety and efficacy of ustekinumab was assessed in 927 patients in two randomised, double-blind, placebo-controlled studies in patients with active PsA (≥5 swollen joints and ≥5 tender joints) despite non-steroidal anti-inflammatory (NSAID) or disease modifying antirheumatic (DMARD) therapy. Patients in these studies had a diagnosis of PsA for at least 6 months. Patients with each subtype of PsA were enrolled, including polyarticular arthritis with no evidence of rheumatoid nodules (39%), spondylitis with peripheral arthritis (28%), asymmetric peripheral arthritis (21%), distal interphalangeal involvement (12%) and arthritis mutilans (0.5%). Over 70% and 40% of the patients in both studies had enthesitis and dactylitis at baseline, respec-

92

tively. Patients were randomised to receive treatment with ustekinumab 45 mg, 90 mg, or placebo subcutaneously at Weeks 0 and 4 followed by every 12 weeks (q12w) dosing. Approximately 50% of patients continued on stable doses of MTX (≤25 mg/week).

In PsA Study 1 (PSUMMIT I) and PsA Study 2 (PSUMMIT II), 80% and 86% of the patients, respectively, had been previously treated with DMARDs. In Study 1 previous treatment with anti-tumour necrosis factor (TNF)α agent was not allowed. In Study 2, the majority of patients (58%, n=180) had been previously treated with one or more anti-TNFα agent(s), of whom over 70% had discontinued their anti-TNFα treatment for lack of efficacy or intolerance at any time.

Signs and Symptoms

Treatment with ustekinumab resulted in significant improvements in the measures of disease activity compared to placebo at week 24. The primary endpoint was the percentage of patients who achieved American College of Rheumatology (ACR) 20 response at week 24. The key efficacy results are shown in Label Table 6 below.

LABEL TABLE 6

Number of patients who achieved clinical response in Psoriatic arthritis Study 1 (PSUMMIT I) and Study 2 (PSUMMIT II) at week 24

| | Psoriatic arthritis Study 1 | | | Psoriatic arthritis Study 2 | | |
|---|---|---|---|---|---|---|
| | PBO | 45 mg | 90 mg | PBO | 45 mg | 90 mg |
| Number of patients randomised | 206 | 205 | 204 | 104 | 103 | 105 |
| ACR 20 response, N (%) | 47 (23%) | 87 (42%)[a] | 101 (50%)[a] | 21 (20%) | 45 (44%)[a] | 46 (44%)[a] |
| ACR 50 response, N (%) | 18 (9%) | 51 (25%)[a] | 57 (28%)[a] | 7 (7%) | 18 (17%)[b] | 24 (23%)[a] |
| ACR 70 response, N (%) | 5 (2%) | 25 (12%)[a] | 29 (14%)[a] | 3 (3%) | 7 (7%)[c] | 9 (9%)[c] |
| Number of patients with ≥3% BSA[d] | 146 | 145 | 149 | 80 | 80 | 81 |
| PASI 75 response, N (%) | 16 (11%) | 83 (57%)[a] | 93 (62%)[a] | 4 (5%) | 41 (51%)[a] | 45 (56%)[a] |
| PASI 90 response, N (%) | 4 (3%) | 60 (41%)[a] | 65 (44%)[a] | 3 (4%) | 24 (30%)[a] | 36 (44%)[a] |
| Combined PASI 75 and ACR 20 response, N (%) | 8 (5%) | 40 (28%)[a] | 62 (42%)[a] | 2 (3%) | 24 (30%)[a] | 31 (38%)[a] |
| Number of patients ≤100 kg | 154 | 153 | 154 | 74 | 74 | 73 |
| ACR 20 response, N (%) | 39 (25%) | 67 (44%) | 78 (51%) | 17 (23%) | 32 (43%) | 34 (47%) |
| Number of patients with ≥3% BSA[d] | 105 | 105 | 111 | 54 | 58 | 57 |
| PASI 75 response, N (%) | 14 (13%) | 64 (61%) | 73 (66%) | 4 (7%) | 31 (53%) | 32 (56%) |
| Number of patients >100 kg | 52 | 52 | 50 | 30 | 29 | 31 |
| ACR 20 response, N (%) | 8 (15%) | 20 (38%) | 23 (46%) | 4 (13%) | 13 (45%) | 12 (39%) |
| Number of patients with ≥3% BSA[d] | 41 | 40 | 38 | 26 | 22 | 24 |
| PASI 75 response, N (%) | 2 (5%) | 19 (48%) | 20 (53%) | 0 | 10 (45%) | 13 (54%) |

[a]p < 0.001

[b]p < 0.05

[c]p = NS

[d]Number of patients with ≥3% BSA psoriasis skin involvement at baseline

US 10,961,307 B2

93

ACR 20, 50 and 70 responses continued to improve or were maintained through week 52 (PsA Study 1 and 2) and week 100 (PsA Study 1). In PsA Study 1, ACR 20 responses at week 100 were achieved by 57% and 64%, for 45 mg and 90 mg, respectively. In PsA Study 2, ACR 20 responses at week 52 were achieved by 47% and 48%, for 45 mg and 90 mg, respectively.

The proportion of patients achieving a modified PsA response criteria (PsARC) response was also significantly greater in the ustekinumab groups compared to placebo at week 24. PsARC responses were maintained through weeks 52 and 100. A higher proportion of patients treated with ustekinumab who had spondylitis with peripheral arthritis as their primary presentation, demonstrated 50 and 70 percent improvement in Bath Ankylosing Spondylitis Disease Activity Index (BASDAI) scores compared with placebo at week 24.

Responses observed in the ustekinumab treated groups were similar in patients receiving and not receiving concomitant MTX, and were maintained through weeks 52 and 100. Patients previously treated with anti-TNFα agents who received ustekinumab achieved a greater response at week 24 than patients receiving placebo (ACR 20 response at week 24 for 45 mg and 90 mg was 37% and 34%, respectively, compared with placebo 15%; p<0.05), and responses were maintained through week 52.

For patients with enthesitis and/or dactylitis at baseline, in PsA Study 1 significant improvement in enthesitis and dactylitis score was observed in the ustekinumab groups compared with placebo at week 24. In PsA Study 2 significant improvement in enthesitis score and numerical improvement (not statistically significant) in dactylitis score was observed in the ustekinumab 90 mg group compared with placebo at week 24. Improvements in enthesitis score and dactylitis score were maintained through weeks 52 and 100.

Radiographic Response

Structural damage in both hands and feet was expressed as change in total van der Heijde-Sharp score (vdH-S score), modified for PsA by addition of hand distal interphalangeal joints, compared to baseline. A pre-specified integrated analysis combining data from 927 subjects in both PsA Study 1 and 2 was performed. Ustekinumab demonstrated a statistically significant decrease in the rate of progression of structural damage compared to placebo, as measured by change from baseline to week 24 in the total modified vdH-S score (mean±SD score was 0.97±3.85 in the placebo group compared with 0.40±2.11 and 0.39±2.40 in the ustekinumab 45 mg (p<0.05) and 90 mg (p<0.001) groups, respectively). This effect is driven by PsA Study 1. The effect is considered demonstrated irrespective of concomitant MTX use, and was maintained through Weeks 52 (integrated analysis) and 100 (PsA Study 1).

Physical Function and Health-Related Quality of Life

Ustekinumab-treated patients showed significant improvement in physical function as assessed by the Disability Index of the Health Assessment Questionnaire (HAQ-DI) at week 24. The proportion of patients achieving a clinically meaningful ≥0.3 improvement in HAQ-DI score from baseline was also significantly greater in the ustekinumab groups when compared with placebo. Improvement in HAQ-DI score from baseline was maintained through Weeks 52 and 100.

94

There was significant improvement in DLQI scores in the ustekinumab groups as compared with placebo at week 24, which was maintained through weeks 52 and 100. In PsA Study 2 there was a significant improvement in Functional Assessment of Chronic Illness Therapy-Fatigue (FACIT-F) scores in the ustekinumab groups when compared with placebo at week 24. The proportion of patients achieving a clinically significant improvement in fatigue (4 points in FACIT-F) was also significantly greater in the ustekinumab groups compared with placebo. Improvements in FACIT scores were maintained through week 52.

Paediatric Population

The European Medicines Agency has deferred the obligation to submit the results of studies with ustekinumab in one or more subsets of the paediatric population aged 6 to 11 years in moderate to severe plaque psoriasis and juvenile idiopathic arthritis (see section 4.2 for information on paediatric use).

Paediatric Plaque Psoriasis

Ustekinumab has been shown to improve signs and symptoms, and health related quality of life in paediatric patients 12 years and older with plaque psoriasis.

The efficacy of ustekinumab was studied in 110 paediatric patients aged 12 to 17 years with moderate to severe plaque psoriasis in a multicenter, Phase 3, randomised, double blind, placebo controlled study (CADMUS). Patients were randomised to receive either placebo (n=37), or the recommended dose of ustekinumab (see section 4.2; n=36) or half of the recommended dose of ustekinumab (n=37) by subcutaneous injection at Weeks 0 and 4 followed by every 12 week (q12w) dosing. At week 12, placebo treated patients crossed over to receive ustekinumab.

Patients with PASI≥12, PGA≥3 and BSA involvement of at least 10%, who were candidates for systemic therapy or phototherapy, were eligible for the study. Approximately 60% of the patients had prior exposure to conventional systemic therapy or phototherapy. Approximately 11% of the patients had prior exposure to biologics.

The primary endpoint was the proportion of patients who achieve a PGA score of cleared (0) or minimal (1) at week 12. Secondary endpoints included PASI 75, PASI 90, change from baseline in Children's Dermatology Life Quality Index (CDLQI), change from baseline in the total scale score of PedsQL (Paediatric Quality of Life Inventory) at week 12. At week 12, subjects treated with ustekinumab showed significantly greater improvement in their psoriasis and health related quality of life compared with placebo (Table 7).

All patients were followed for efficacy for up to 52 weeks following first administration of study agent. The proportion of patients with a PGA score of cleared (0) or minimal (1) and the proportion achieving PASI 75 showed separation between the ustekinumab treated group and placebo at the first post-baseline visit at week 4, reaching a maximum by week 12.

Improvements in PGA, PASI, CDLQI and PedsQL were maintained through week 52 (Label Table 7).

US 10,961,307 B2

LABEL TABLE 7

Summary of primary and secondary endpoints at week
12 and week 52 Paediatric psoriasis study (CADMUS)

| | Week 12 | | Week 52 |
|---|---|---|---|
| | Placebo N (%) | Recommended dose of Ustekinumab N (%) | Recommended dose of Ustekinumab N (%) |
| Patients randomised | 37 | 36 | 35 |
| PGA | | | |
| PGA of cleared (0) or minimal (1) | 2 (5.4%) | 25 (69.4%)[a] | 20 (57.1%) |
| PGA of Cleared (0) | 1 (2.7%) | 17 (47.2%)[a] | 13 (37.1%) |
| PASI | | | |
| PASI 75 responders | 4 (10.8%) | 29 (80.6%)[a] | 28 (80.0%) |
| PASI 90 responders | 2 (5.4%) | 22 (61.1%)[a] | 23 (65.7%) |
| PASI 100 responders | 1 (2.7%) | 14 (38.9%)[a] | 13 (37.1%) |
| CDLQI | | | |
| CDLQI of 0 or 1[b] | 6 (16.2%) | 18 (50.0%)[c] | 20 (57.1%) |
| PedsQL | | | |
| Change from baseline Mean (SD)[d] | 3.35 (10.04) | 8.03 (10.44)[e] | 7.26 (10.92) |

[a] p < 0.001
[b] CDLQI: The CDLQI is a dermatology instrument to assess the effect of a skin problem on the health-related quality of life in the paediatric population. CDLQI of 0 or 1 indicates no effect on quality of life.
[c] p = 0.002
[d] PedsQL: The PedsQL Total Scale Score is a general health-related quality of life measure developed for use in children and adolescent populations. For the placebo group at week 12, N = 36
[e] p = 0.028

During the placebo controlled period through week 12, the efficacy of both the recommended and half of the recommended dose groups were generally comparable at the primary endpoint (69.4% and 67.6% respectively) although there was evidence of a dose response for higher level efficacy criteria (e.g. PGA of cleared (0), PASI 90). Beyond week 12, efficacy was generally higher and better sustained in the recommended dose group compared with half of the recommended dosage group in which a modest loss of efficacy was more frequently observed toward the end of each 12 week dosing interval. The safety profiles of the recommended dose and half of the recommended dose were comparable.

Crohn's Disease

The safety and efficacy of ustekinumab was assessed in three randomized, double-blind, placebo-controlled, multi-center studies in adult patients with moderately to severely active Crohn's disease (Crohn's Disease Activity Index [CDAI] score of ≥220 and ≤450). The clinical development program consisted of two 8-week intravenous induction studies (UNITI-1 and UNITI-2) followed by a 44 week subcutaneous randomized withdrawal maintenance study (IM-UNITI) representing 52 weeks of therapy.

The induction studies included 1409 (UNITI-1, n=769; UNITI-2 n=640) patients. The primary endpoint for both induction studies was the proportion of subjects in clinical response (defined as a reduction in CDAI score of ≥100 points) at week 6. Efficacy data were collected and analyzed through week 8 for both studies. Concomitant doses of oral corticosteroids, immunomodulators, aminosalicylates and antibiotics were permitted and 75% of patients continued to receive at least one of these medications. In both studies, patients were randomised to receive a single intravenous administration of either the recommended tiered dose of approximately 6 mg/kg (see section 4.2 of the STELARA 130 mg Concentrate for solution for infusion SmPC), a fixed dose of 130 mg ustekinumab, or placebo at week 0.

Patients in UNITI-1 had failed or were intolerant to prior anti-TNFα therapy. Approximately 48% of the patients had failed 1 prior anti-TNFα therapy and 52% had failed 2 or 3 prior anti-TNFα therapies. In this study, 29.1% of the patients had an inadequate initial response (primary non-responders), 69.4% responded but lost response (secondary non-responders), and 36.4% were intolerant to anti-TNFα therapies.

Patients in UNITI-2 had failed at least one conventional therapy, including corticosteroids or immunomodulators, and were either anti-TNF-α naïve (68.6%) or had previously received but not failed anti-TNFα therapy (31.4%).

In both UNITI-1 and UNITI-2, a significantly greater proportion of patients were in clinical response and remission in the ustekinumab treated group compared to placebo (Label Table 8). Clinical response and remission were significant as early as week 3 in ustekinumab treated patients and continued to improve through week 8. In these induction studies, efficacy was higher and better sustained in the tiered dose group compared to the 130 mg dose group, and tiered dosing is therefore the recommended intravenous induction dose.

US 10,961,307 B2

97

98

### LABEL TABLE 8

Induction of Clinical Response and Remission in UNITI-1 and UNITI 2

| | UNITI-1* | | UNITI-2** | |
| --- | --- | --- | --- | --- |
| | Placebo<br>N = 247 | Recommended<br>dose of<br>ustekinumab<br>N = 249 | Placebo<br>N = 209 | Recommended<br>dose of<br>ustekinumab<br>N = 209 |
| Clinical Remission,<br>week 8 | 18 (7.3%) | 52 (20.9%)[a] | 41 (19.6%) | 84 (40.2%)[a] |
| Clinical Response<br>(100 point), week 6 | 53 (21.5%) | 84 (33.7%)[b] | 60 (28.7%) | 116 (55.5%)[a] |
| Clinical Response<br>(100 point), week 8 | 50 (20.2%) | 94 (37.8%)[a] | 67 (32.1%) | 121 (57.9%)[a] |
| 70 Point Response,<br>week 3 | 67 (27.1%) | 101 (40.6%)[b] | 66 (31.6%) | 106 (50.7%)[a] |
| 70 Point Response,<br>week 6 | 75 (30.4%) | 109 (43.8%)[b] | 81 (38.8%) | 135 (64.6%)[a] |

Clinical remission is defined as CDAI score <150; Clinical response is defined as reduction in CDAI score by at least 100 points or being in clinical remission

70 point response is defined as reduction in CDAI score by at least 70 points

*Anti-TNFα failures

**Conventional therapy failures

[a]p < 0.001

[b]p < 0.01

The maintenance study (IM-UNITI), evaluated 388 patients who achieved 100 point clinical response at week 8 of induction with ustekinumab in studies UNITI-1 and UNITI-2. Patients were randomized to receive a subcutaneous maintenance regimen of either 90 mg ustekinumab every 8 weeks, 90 mg ustekinumab every 12 weeks or placebo for 44 weeks (for recommended maintenance posology, see section 4.2).

Significantly higher proportions of patients maintained clinical remission and response in the ustekinumab treated groups compared to the placebo group at week 44 (see Label Table 9).

### LABEL TABLE 9

Maintenance of Clinical Response and Remission in IM-UNITI
(week 44; 52 weeks from initiation of the induction dose)

| | Placebo*<br>N = 131[†] | 90 mg<br>ustekinumab<br>every 8 weeks<br>N = 128[†] | 90 mg<br>ustekinumab<br>every 12 weeks<br>N = 129[†] |
| --- | --- | --- | --- |
| Clinical Remission | 36% | 53%[b] | 49%[b] |
| Clinical Response | 44% | 59%[b] | 58%[b] |
| Corticosteroid-Free<br>Clinical<br>Remission | 30% | 47%[a] | 43%[c] |
| Clinical Remission<br>in patients: | | | |
| in remission at the<br>start of maintenance<br>therapy | 46% (36/79) | 67% (52/78)[a] | 56% (44/78) |
| who entered from<br>study CRD3002[‡] | 44% (31/70) | 63% (45/72)[c] | 57% (41/72) |

### LABEL TABLE 9-continued

Maintenance of Clinical Response and Remission in IM-UNITI
(week 44; 52 weeks from initiation of the induction dose)

| | Placebo*<br>N = 131[†] | 90 mg<br>ustekinumab<br>every 8 weeks<br>N = 128[†] | 90 mg<br>ustekinumab<br>every 12 weeks<br>N = 129[†] |
| --- | --- | --- | --- |
| who are Anti-TNFα<br>naïve | 49% (25/51) | 65% (34/52)[c] | 57% (30/53) |
| who entered from<br>study CRD3001[§] | 26% (16/61) | 41% (23/56) | 39% (22/57) |

Clinical remission is defined as CDAI score <150; Clinical response is defined as reduction in CDAI of at least 100 points or being in clinical remission

*The placebo group consisted of patients who were in response to ustekinumab and were randomized to receive placebo at the start of maintenance therapy.

[†]Patients who were in 100 point clinical response to ustekinumab at start of maintenance therapy

[‡]Patients who failed conventional therapy but not anti-TNFα therapy

[§]Patients who are anti-TNFα refractory/intolerant

[a]p < 0.01

[b]p < 0.05

[c]nominally significant (p < 0.05)

In IM-UNITI, 29 of 129 patients did not maintain response to ustekinumab when treated every 12 weeks and were allowed to dose adjust to receive ustekinumab every 8 weeks. Loss of response was defined as a CDAI score ≥220 points and a ≥100 point increase from the CDAI score at baseline. In these patients, clinical remission was achieved in 41.4% of patients 16 weeks after dose adjustment.

US 10,961,307 B2

99

Patients who were not in clinical response to ustekinumab induction at week 8 of the UNITI-1 and UNITI-2 induction studies (476 patients) entered into the non-randomized portion of the maintenance study (IM-UNITI) and received a 90 mg subcutaneous injection of ustekinumab at that time. Eight weeks later, 50.5% of the patients achieved clinical response and continued to receive maintenance dosing every 8 weeks; among these patients with continued maintenance dosing, a majority maintained response (68.1%) and achieved remission (50.2%) at week 44, at proportions that were similar to the patients who initially responded to ustekinumab induction.

Of 131 patients who responded to ustekinumab induction, and were randomized to the placebo group at the start of the maintenance study, 51 subsequently lost response and received 90 mg ustekinumab subcutaneously every 8 weeks. The majority of patients who lost response and resumed ustekinumab did so within 24 weeks of the induction infusion. Of these 51 patients, 70.6% achieved clinical response and 39.2% percent achieved clinical remission 16 weeks after receiving the first subcutaneous dose of ustekinumab.

In IM-UNITI, patients who completed the study through week 44 were eligible to continue treatment in a study extension. Among patients who entered the study extension, clinical remission and response were generally maintained through week 92 for both patients who had TNF-therapies and those who failed conventional therapies.

No new safety concerns were identified in this study extension with up to 2 years of treatment in patients with Crohn's Disease.

Endoscopy

Endoscopic appearance of the mucosa was evaluated in 252 patients with eligible baseline endoscopic disease activity in a substudy. The primary endpoint was change from baseline in Simplified Endoscopic Disease Severity Score for Crohn's Disease (SES-CD), a composite score across 5 ileo-colonic segments of presence/size of ulcers, proportion of mucosal surface covered by ulcers, proportion of mucosal surface affected by any other lesions and presence/type of narrowing/strictures. At week 8, after a single intravenous induction dose, the change in SES-CD score was greater in the ustekinumab group (n=155, mean change=−2.8) than in the placebo group (n=97, mean change=−0.7, p=0.012).

Fistula Response

In a subgroup of patients with draining fistulas at baseline (8.8%; n=26), 12/15 (80%) of ustekinumab-treated patients achieved a fistula response over 44 weeks (defined as ≥50% reduction from baseline of the induction study in the number of draining fistulas) compared to 5/11 (45.5%) exposed to placebo.

Health-Related Quality of Life

Health-related quality of life was assessed by Inflammatory Bowel Disease Questionnaire (IBDQ) and SF-36 questionnaires. At week 8, patients receiving ustekinumab showed statistically significantly greater and clinically meaningful improvements on IBDQ total score and SF-36 Mental Component Summary Score in both UNITI-1 and

100

UNITI-2, and SF-36 Physical Component Summary Score in UNITI-2, when compared to placebo. These improvements were generally better maintained in ustekinumab-treated patients in the IM-UNITI study through week 44 when compared to placebo. Improvement in health-related quality of life was generally maintained during the extension through week 92.

Ulcerative Colitis

The safety and efficacy of ustekinumab was assessed in two randomized, double-blind, placebo-controlled, multicenter studies in adult patients with moderately to severely active ulcerative colitis (Mayo score 6 to 12; Endoscopy subscore ≥2). The clinical development program consisted of one intravenous induction study (referred to as UNIFI-I) with treatment of up to 16 weeks followed by a 44 week subcutaneous randomized withdrawal maintenance study (referred to as UNIFI-M) representing at least 52 weeks of therapy.

Efficacy results presented for UNIFI-I and UNIFI-M were based on central review of endoscopies.

UNIFI-I included 961 patients. The primary endpoint for the induction study was the proportion of subjects in clinical remission at week 8. Patients were randomised to receive a single intravenous administration of either the recommended tiered dose of approximately 6 mg/kg (see Label Table 1, section 4.2), a fixed dose of 130 mg ustekinumab, or placebo at week 0.

Concomitant doses of oral corticosteroids, immunomodulators, and aminosalicylates were permitted and 90% of patients continued to receive at least one of these medications. Enrolled patients had to have failed conventional therapy (corticosteroids or immunomodulators) or at least one biologic (a TNFα antagonist and/or vedolizumab). 49% of patients had failed conventional therapy, but not a biologic (of which 94% where biological-naïve). 51% of patients had failed or were intolerant to a biologic. Approximately 50% of the patients had failed at least 1 prior anti-TNFα therapy (of which 48% were primary non-responders) and 17% had failed at least 1 anti-TNFα therapy and vedolizumab.

In UNIFI-I a significantly greater proportion of patients were in clinical remission in the ustekinumab treated group compared to placebo at week 8 (Label Table 10). As early as Week 2, the earliest scheduled study visit, and at each visit thereafter, a higher proportion of ustekinumab patients had no rectal bleeding or achieved normal stool frequency as compared with placebo patients. Significant differences in partial Mayo score and symptomatic remission were observed between ustekinumab and placebo as early as Week 2.

Efficacy was higher in the tiered dose group (6 mg/kg) compared to the 130 mg dose group in select endpoints, and tiered dosing is therefore the recommended intravenous induction dose.

US 10,961,307 B2

**101**

LABEL TABLE 10

Summary of Key Efficacy Outcomes in UNIFI-I (Week 8)

| | Placebo N = 319 | Recommended dose of ustekinumab$^\text{£}$ N = 322 |
|---|---|---|
| Clinical Remission* | 5% | 16%$^a$ |
| In patients who failed conventional therapy, but not a biologic | 9% (15/158) | 19% (29/156)$^c$ |
| In patients who failed biological therapy$^\P$ | 1% (2/161) | 13% (21/166)$^b$ |
| In patients who failed both a TNF and vedolizumab | 0% (0/47) | 10% (6/58%)$^c$ |
| Clinical Response$^\S$ | 31% | 62%$^a$ |
| In patients who failed conventional therapy, but not a biologic | 35% (56/158) | 67% (104/156)$^b$ |
| In patients who failed biological therapy$^\P$ | 27% (44/161) | 57% (95/166)$^b$ |
| In patients who failed both a TNF and vedolizumab | 28% (13/47) | 52% (30/58)$^c$ |
| Mucosal Healing$^\dagger$ | 14% | 27%$^a$ |
| In patients who failed conventional therapy, but not a biologic | 21% (33/158) | 33% (52/156)$^c$ |
| In patients who failed biological therapy | 7% (11/161) | 21% (35/166)$^b$ |

**102**

LABEL TABLE 10-continued

Summary of Key Efficacy Outcomes in UNIFI-I (Week 8)

| | Placebo N = 319 | Recommended dose of ustekinumab$^\text{£}$ N = 322 |
|---|---|---|
| Symptomatic Remission$^\ddagger$ | 23% | 45%$^b$ |
| Combined Symptomatic Remission and Mucosal Healing$^4$ | 8% | 21%$^b$ |

$^\text{£}$Infusion dose of ustekinumab using the weight-based dosage regimen specified in Table 5
*Clinical remission is defined as Mayo score ≤2 points, with no individual subscore >1.
$^\S$Clinical response is defined as a decrease from baseline in the Mayo score by ≥30% and ≥3 points, with either a decrease from baseline in the rectal bleeding subscore ≥1 or a rectal bleeding subscore of 0 or 1.
$^\P$A TNFα antagonist and/or vedolizumab.
$^\dagger$Mucosal healing is defined as a Mayo endoscopic subscore of 0 or 1.
$^\ddagger$Symptomatic remission is defined as a Mayo stool frequency subscore of 0 or 1 and a rectal bleeding subscore of 0.
$^4$ Combined symptomatic remission and mucosal healing is defined as a stool frequency subscore of 0 or 1, a rectal bleeding subscore of 0, and an endoscopy subscore of 0 or 1.
$^a$p < 0.001
$^b$Nominally significant (p < 0.001)
$^c$Nominally significant (p < 0.05)

UNIFI-M, evaluated 523 patients who achieved clinical response with single IV administration of ustekinumab in UNIFI-I. Patients were randomized to receive a subcutaneous maintenance regimen of either 90 mg ustekinumab every 8 weeks, 90 mg ustekinumab every 12 weeks or placebo for 44 weeks (for recommended maintenance posology, see section 4.2 of the STELARA Solution for injection (vial) and Solution for injection in pre filled syringe SmPC).

Significantly greater proportions of patients were in clinical remission in both ustekinumab treated groups compared to the placebo group at week 44 (see Label Table 11).

LABEL TABLE 11

Summary of Key Efficacy Measures in UNIFI-M (week 44; 52 weeks from initiation of the induction dose)

| | Placebo* N = 175 | 90 mg ustekinumab every 8 Weeks N = 176 | 90 mg ustekinumab every 12 Weeks N = 172 |
|---|---|---|---|
| Clinical Remission** | 24% | 44%$^a$ | 38%$^b$ |
| In patients who failed conventional therapy, but not a biologic | 31% (27/87) | 48% (41/85)$^d$ | 49% (50/102)$^d$ |
| In patients who failed biological therapy$^\P$ | 17% (15/88) | 40% (36/91)$^c$ | 23% (16/70)$^d$ |
| In patients who failed both a TNF and vedolizumab | 15% (4/27) | 33% (7/21)$^e$ | 23% (5/22)$^e$ |
| Maintenance of Clinical Response through week 44$^\S$ | 45% | 71%$^a$ | 68%$^a$ |
| In patients who failed conventional therapy, but not a biologic | 51% (44/87) | 78% (66/85)$^c$ | 77% (78/102)$^c$ |
| In patients who failed biological therapy$^\P$ | 39% (34/88) | 65% (59/91)$^c$ | 56% (39/70)$^d$ |
| In patients who failed both a TNF and vedolizumab | 41% (11/27) | 67% (14/21)$^e$ | 50% (11/22)$^e$ |
| Mucosal Healing$^\dagger$ | 29% | 51%$^a$ | 44%$^b$ |
| Maintenance of Clinical Remission through week 44$^\text{£}$ | 38% (17/45) | 58% (22/38) | 65% (26/40)$^c$ |
| Corticosteroid Free Clinical Remission$^\text{€}$ | 23% | 42%$^a$ | 38%$^b$ |
| Durable Remission$^\|$ | 35% | 57%$^c$ | 48%$^d$ |

US 10,961,307 B2

LABEL TABLE 11-continued

| | Placebo*<br>N = 175 | 90 mg<br>ustekinumab<br>every<br>8 Weeks<br>N = 176 | 90 mg<br>ustekinumab<br>every<br>12 Weeks<br>N = 172 |
|---|---|---|---|
| | Summary of Key Efficacy Measures in UNIFI-M (week 44;<br>52 weeks from initiation of the induction dose) | | |
| Symptomatic Remission[‡] | 45% | 68%[c] | 62%[d] |
| Combined Symptomatic Remission and Mucosal Healing[↓] | 28% | 48%[c] | 41%[d] |

*Following response to IV ustekinumab.
**Clinical remission is defined as Mayo score ≤2 points, with no individual subscore >1.
[§]Clinical response is defined as a decrease from baseline in the Mayo score by ≥30% and ≥3 points, with either a decrease from baseline in the rectal bleeding subscore ≥1 or a rectal bleeding subscore of 0 or 1.
[A]A TNFα antagonist and/or vedolizumab.
[†]Mucosal healing is defined as a Mayo endoscopic sub-score of 0 or 1.
[£]Maintenance of clinical remission through Week 44 is defined as patients in clinical remission through Week 44 among patients in clinical remission at maintenance baseline.
[c]Corticosteroid-free clinical remission is defined as patients in clinical remission and not receiving corticosteroids at Week 44.
[]Durable Remission is defined as partial Mayo remission at ≥80% of all visits prior to Week 44 and in partial Mayo remission at last visit (Week 44).
[‡]Symptomatic remission is defined as a Mayo stool frequency subscore of 0 or 1 and a rectal bleeding subscore of 0.
[↓]Combined symptomatic remission and mucosal healing is defined as a stool frequency subscore of 0 or 1, a rectal bleeding subscore of 0, and an endoscopy subscore of 0 or 1.
[a]p < 0.001
[b]p < 0.05
[c]Nominally significant (p < 0.001)
[d]Nominally significant (p < 0.05)
[e]Not statistically significant

The beneficial effect of ustekinumab on clinical response, mucosal healing and clinical remission was observed in induction and in maintenance both in patients who failed conventional therapy but not a biologic therapy, as well as in those who had failed at least one prior TNFα antagonist therapy including in patients with a primary non-response to TNFα antagonist therapy. A beneficial effect was also observed in induction in patients who failed at least one prior TNFα antagonist therapy and vedolizumab, however the number of patients in this subgroup was too small to draw definitive conclusions about the beneficial effect in this group during maintenance.

Week 16 Responders to Ustekinumab Induction

Ustekinumab treated patients who were not in response at week 8 of UNIFI-I received an administration of 90 mg SC ustekinumab at week 8 (36% of patients). Of those patients, 9% of patients who were initially randomized to the recommended induction dose achieved clinical remission and 58% achieved clinical response at Week 16.

Patients who were not in clinical response to ustekinumab induction at week 8 of the UNFI-I study but were in response at week 16 (157 patients) entered into the non-randomized portion of UNIFI-M and continued to receive maintenance dosing every 8 weeks; among these patients, a majority (62%) maintained response and 30% achieved remission at week 44.

Endoscopic Normalization

Endoscopic normalization was defined as a Mayo endoscopic subscore of 0 and was observed as early as week 8 of UNIFI-I. At week 44 of UNIFI-M, it was achieved in 24% and 29% of patients treated with ustekinumab every 12 or 8 weeks, respectively, as compared to 18% of patients in the placebo group.

Histologic & Histo Endoscopic Mucosal Healing

Histologic healing (defined as neutrophil infiltration in <5% of crypts, no crypt destruction, and no erosions, ulcerations, or granulation tissue) was assessed at week 8 of UNIFI-I and Week 44 of UNIFI-M. At week 8, after a single intravenous induction dose, significantly greater proportions of patients in the recommended dose group achieved histologic healing (36%) compared with patients in the placebo group (22%). At Week 44 maintenance of this effect was observed with significantly more patients in histologic healing in the every 12 week (54%) and every 8 week (59%) ustekinumab groups as compared to placebo (33%).

A combined endpoint of histo-endoscopic mucosal healing defined as subjects having both mucosal healing and histologic healing was evaluated at week 8 of UNIFI-I and week 44 of UNIFI-M. Patients receiving ustekinumab at the recommended dose showed significant improvements on the histo-endoscopic mucosal healing endpoint at week 8 in the ustekinumab group (18%) as compared to the placebo group (9%). At week 44, maintenance of this effect was observed with significantly more patients in histo-endoscopic mucosal healing in the every 12 week (39%) and every 8 week (46%) ustekinumab groups as compared to placebo (24%).

Health-Related Quality of Life

Health-related quality of life was assessed by Inflammatory Bowel Disease Questionnaire (IBDQ), SF-36 and EuroQoL-5D (EQ-5D) questionnaires.

At week 8 of UNIFI-I, patients receiving ustekinumab showed significantly greater and clinically meaningful improvements on IBDQ total score, EQ-5D and EQ-5D VAS, and SF-36 Mental Component Summary Score and SF-36 Physical Component Summary Score when compared to placebo. These improvements were maintained in ustekinumab-treated patients in UNIFI-M through week 44.

Patients receiving ustekinumab experienced significantly more improvements in work productivity as assessed by greater reductions in overall work impairment and in activity impairment as assessed by the WPAI-GH questionnaire than patients receiving placebo.

US 10,961,307 B2

105

Hospitalizations and Ulcerative Colitis (UC) Related Surgeries

Through week 8 of UNIFI-I, the proportions of subjects with UC disease related hospitalizations were significantly lower for subjects in the ustekinumab recommended dose group (1.6%, 5/322) compared with subjects in the placebo group (4.4%, 14/319) and no subjects underwent UC disease related surgeries in subjects receiving ustekinumab at the recommended induction dose compared to 0.6% (2/319) subjects in the placebo group.

Through week 44 of UNIFI-M, a significantly lower number of UC-related hospitalizations was observed in subjects in the combined ustekinumab group (2.0%, 7/348) as compared with subjects in the placebo group (5.7%, 10/175). A numerically lower number of subjects in the ustekinumab group (0.6%, 2/348) underwent UC disease related surgeries compared with subjects in the placebo group (1.7%, 3/175) through week 44.

Immunogenicity

Antibodies to ustekinumab may develop during ustekinumab treatment and most are neutralising. The formation of anti-ustekinumab antibodies is associated with both increased clearance and reduced efficacy of ustekinumab, except in patients with Crohn's disease or ulcerative colitis where no reduced efficacy was observed. There is no apparent correlation between the presence of anti-ustekinumab antibodies and the occurrence of injection site reactions.

Paediatric Population

The European Medicines Agency has deferred the obligation to submit the results of studies with ustekinumab in one or more subsets of the paediatric population in Crohn's Disease and ulcerative colitis (see section 4.2 for information on paediatric use).

5.2 Pharmacokinetic Properties

Absorption

The median time to reach the maximum serum concentration ($t_{max}$) was 8.5 days after a single 90 mg subcutaneous administration in healthy subjects. The median $t_{max}$ values of ustekinumab following a single subcutaneous administration of either 45 mg or 90 mg in patients with psoriasis were comparable to those observed in healthy subjects.

The absolute bioavailability of ustekinumab following a single subcutaneous administration was estimated to be 57.2% in patients with psoriasis.

Distribution

Median volume of distribution during the terminal phase (Vz) following a single intravenous administration to patients with psoriasis ranged from 57 to 83 mL/kg.

Biotransformation

The exact metabolic pathway for ustekinumab is unknown.

Elimination

Median systemic clearance (CL) following a single intravenous administration to patients with psoriasis ranged from 1.99 to 2.34 mL/day/kg. Median half-life ($t_{1/2}$) of ustekinumab was approximately 3 weeks in patients with psoriasis, psoriatic arthritis, Crohn's disease or ulcerative colitis, ranging from 15 to 32 days across all psoriasis and psoriatic arthritis studies. In a population pharmacokinetic analysis, the apparent clearance (CL/F) and apparent volume of distribution (V/F) were 0.465 l/day and 15.71, respectively, in patients with psoriasis. The CL/F of ustekinumab was not impacted by gender. Population pharmacokinetic analysis showed that there was a trend towards a higher clearance of ustekinumab in patients who tested positive for antibodies to ustekinumab.

106

Dose Linearity

The systemic exposure of ustekinumab ($C_{max}$ and AUC) increased in an approximately dose-proportional manner after a single intravenous administration at doses ranging from 0.09 mg/kg to 4.5 mg/kg or following a single subcutaneous administration at doses ranging from approximately 24 mg to 240 mg in patients with psoriasis.

Single Dose Versus Multiple Doses

Serum concentration-time profiles of ustekinumab were generally predictable after single or multiple subcutaneous dose administrations. In patients with psoriasis, steady-state serum concentrations of ustekinumab were achieved by week 28 after initial subcutaneous doses at Weeks 0 and 4 followed by doses every 12 weeks. The median steady-state trough concentration ranged from 0.21 µg/mL to 0.26 µg/mL (45 mg) and from 0.47 µg/mL to 0.49 µg/mL (90 mg). There was no apparent accumulation in serum ustekinumab concentration over time when given subcutaneously every 12 weeks.

In patients with Crohn's disease and ulcerative colitis, following an intravenous dose of ~6 mg/kg, starting at week 8, subcutaneous maintenance dosing of 90 mg ustekinumab was administered every 8 or 12 weeks. Steady state ustekinumab concentration was achieved by the start of the second maintenance dose. In patients with Crohn's disease, median steady-state trough concentrations ranged from 1.97 µg/mL to 2.24 µg/mL and from 0.61 µg/mL to 0.76 µg/mL for 90 mg ustekinumab every 8 weeks or every 12 weeks respectively. In patients with ulcerative colitis, median steady-state trough concentrations ranged from 2.69 µg/mL to 3.09 µg/mL and from 0.92 µg/mL to 1.19 µg/mL for 90 mg ustekinumab every 8 weeks or every 12 weeks. The steady-state trough ustekinumab levels resulting from 90 mg ustekinumab every 8 weeks were associated with higher clinical remission rates as compared to the steady-state trough levels following 90 mg every 12 weeks.

Impact of Weight on Pharmacokinetics

In a population pharmacokinetic analysis using data from patients with psoriasis, body weight was found to be the most significant covariate affecting the clearance of ustekinumab. The median CL/F in patients with weight>100 kg was approximately 55% higher compared to patients with weight≤100 kg. The median V/F in patients with weight>100 kg was approximately 37% higher as compared to patients with weight≤100 kg. The median trough serum concentrations of ustekinumab in patients with higher weight (>100 kg) in the 90 mg group were comparable to those in patients with lower weight (≤100 kg) in the 45 mg group. Similar results were obtained from a confirmatory population pharmacokinetic analysis using data from patients with psoriatic arthritis.

Dosing Frequency Adjustment

In patients with Crohn's disease and ulcerative colitis, based on observed data and population PK analyses, randomized subjects who lost response to treatment had lower serum ustekinumab concentrations over time compared with subjects who did not lose response. In Crohn's disease, dose adjustment from 90 mg every 12 weeks to 90 mg every 8 weeks was associated with an increase in trough serum ustekinumab concentrations and an accompanying increase in efficacy. In ulcerative colitis, population PK model based

US 10,961,307 B2

107

108

simulations demonstrated that adjusting dosing from 90 mg every 12 weeks to every 8 weeks would be expected to result in a 3-fold increase in steady-state trough ustekinumab concentrations. Additionally on the basis of clinical trial data in patients with ulcerative colitis, a positive exposure-response relationship was established between trough concentrations, and clinical remission and mucosal healing.

Special Populations

No pharmacokinetic data are available in patients with impaired renal or hepatic function. No specific studies have been conducted in elderly patients.

The pharmacokinetics of ustekinumab were generally comparable between Asian and non-Asian patients with psoriasis and ulcerative colitis.

In patients with Crohn's disease and ulcerative colitis, variability in ustekinumab clearance was affected by body weight, serum albumin level, sex, and antibody to ustekinumab status while body weight was the main covariate affecting the volume of distribution. Additionally in Crohn's disease, clearance was affected by C-reactive protein, TNF antagonist failure status and race (Asian versus non-Asian). The impact of these covariates was within ±20% of the typical or reference value of the respective PK parameter, thus dose adjustment is not warranted for these covariates. Concomitant use of immunomodulators did not have a significant impact on ustekinumab disposition.

In the population pharmacokinetic analysis, there were no indications of an effect of tobacco or alcohol on the pharmacokinetics of ustekinumab.

Serum ustekinumab concentrations in paediatric psoriasis patients 12 to 17 years of age, treated with the recommended weight-based dose were generally comparable to those in the adult psoriasis population treated with the adult dose, while serum ustekinumab concentrations in paediatric psoriasis patients treated with half of the recommended weight-based dose were generally lower than those in adults.

Regulation of CYP450 Enzymes

The effects of IL-12 or IL-23 on the regulation of CYP450 enzymes were evaluated in an in vitro study using human hepatocytes, which showed that IL-12 and/or IL-23 at levels of 10 ng/mL did not alter human CYP450 enzyme activities (CYP1A2, 2B6, 2C9, 2C19, 2D6, or 3A4; see section 4.5).

5.3 Preclinical Safety Data

Non-clinical data reveal no special hazard (e.g. organ toxicity) for humans based on studies of repeated-dose toxicity and developmental and reproductive toxicity, including safety pharmacology evaluations. In developmental and reproductive toxicity studies in cynomolgus monkeys, neither adverse effects on male fertility indices nor birth defects or developmental toxicity were observed. No adverse effects on female fertility indices were observed using an analogous antibody to IL-12/23 in mice.

Dose levels in animal studies were up to approximately 45-fold higher than the highest equivalent dose intended to be administered to psoriasis patients and resulted in peak serum concentrations in monkeys that were more than 100-fold higher than observed in humans.

Carcinogenicity studies were not performed with ustekinumab due to the lack of appropriate models for an antibody with no cross-reactivity to rodent IL-12/23 p40.

6. Pharmaceutical Particulars

6.1 List of Excipients

L-histidine

L-histidine monohydrochloride monohydrate

Polysorbate 80

Sucrose

Water for injections

6.2 Incompatibilities

In the absence of compatibility studies, this medicinal product must not be mixed with other medicinal products.

6.3 Shelf life

STELARA 45 mg solution for injection

2 years

STELARA 90 mg solution for injection

2 years

STELARA 45 mg solution for injection in pre-filled syringe

3 years

STELARA 90 mg solution for injection in pre-filled syringe

3 years

6.4 Special Precautions for Storage

Store in a refrigerator (2° C.-8° C.). Do not freeze.

Keep the vial or pre-filled syringe in the outer carton in order to protect from light.

6.5 Nature and Contents of Container

STELARA 45 mg Solution for Injection

0.5 mL solution in a type I glass 2 mL vial closed with a coated butyl rubber stopper.

STELARA 90 mg Solution for Injection

1 mL solution in a type I glass 2 mL vial closed with a coated butyl rubber stopper.

STELARA 45 mg Solution for Injection in Pre-Filled Syringe

0.5 mL solution in a type I glass 1 mL syringe with a fixed stainless steel needle and a needle cover containing dry natural rubber (a derivative of latex). The syringe is fitted with a passive safety guard.

STELARA 90 mg Solution for Injection in Pre-Filled Syringe

1 mL solution in a type I glass 1 mL syringe with a fixed stainless steel needle and a needle cover containing dry natural rubber (a derivative of latex). The syringe is fitted with a passive safety guard.

STELARA is available in a 1 vial pack or a pack of 1 pre-filled syringe.

6.6 Special Precautions for Disposal and Other Handling

The solution in the STELARA vial or pre-filled syringe should not be shaken. The solution should be visually inspected for particulate matter or discoloration prior to subcutaneous administration. The solution is clear to slightly opalescent, colourless to light yellow and may contain a few small translucent or white particles of protein. This appearance is not unusual for proteinaceous solutions. The medicinal product should not be used if the solution is discoloured or cloudy, or if foreign particulate matter is present. Before administration, STELARA should be allowed to reach room temperature (approximately half an hour). Detailed instructions for use are provided in the package leaflet.

US 10,961,307 B2

**109**

STELARA does not contain preservatives; therefore any unused medicinal product remaining in the vial and the syringe should not be used. STELARA is supplied as a sterile, single-use vial or single-use pre-filled syringe. The syringe, needle and vial must never be re-used. Any unused medicinal product or waste material should be disposed of in accordance with local requirements.

7. Marketing Authorisation Holder
   Janssen-Cilag International NV
   Turnhoutseweg 30
   2340 Beerse
   Belgium

8. Marketing Authorisation Number(S)
   STELARA 45 mg Solution for Injection
   EU/1/08/494/001

**110**

STELARA 90 mg Solution for Injection
   EU/1/08/494/002
STELARA 45 mg Solution for Injection in Pre-Filled Syringe
   EU/1/08/494/003
STELARA 90 mg Solution for Injection in Pre-Filled Syringe
   EU/1/08/494/004

9. Date of First Authorisation/Renewal of the Authorisation
   Date of first authorisation: 16 Jan. 2009
   Date of latest renewal: 19 Sep. 2013

10. Date of Revision of the Text
   Detailed information on this medicinal product is available on the website of the European Medicines Agency http://www.ema.europa.eu/

---

```
                        SEQUENCE LISTING


    <160> NUMBER OF SEQ ID NOS: 11


    <210> SEQ ID NO 1
    <211> LENGTH: 5
    <212> TYPE: PRT
    <213> ORGANISM: Artificial Sequence
    <220> FEATURE:
    <223> OTHER INFORMATION: anti-IL-12/IL-23p40 antibody complementarity
          determining region heavy chain 1


    <400> SEQUENCE: 1


    Thr Tyr Trp Leu Gly
    1               5


    <210> SEQ ID NO 2
    <211> LENGTH: 17
    <212> TYPE: PRT
    <213> ORGANISM: Artificial Sequence
    <220> FEATURE:
    <223> OTHER INFORMATION: anti-IL-12/IL-23p40 antibody complementarity
          determining region heavy chain 2


    <400> SEQUENCE: 2


    Ile Met Ser Pro Val Asp Ser Asp Ile Arg Tyr Ser Pro Ser Phe Gln
    1               5                   10                  15

    Gly


    <210> SEQ ID NO 3
    <211> LENGTH: 10
    <212> TYPE: PRT
    <213> ORGANISM: Artificial Sequence
    <220> FEATURE:
    <223> OTHER INFORMATION: anti-IL-12/IL-23p40 antibody complementarity
          determining region heavy chain 3


    <400> SEQUENCE: 3


    Arg Arg Pro Gly Gln Gly Tyr Phe Asp Phe
    1               5                   10


    <210> SEQ ID NO 4
    <211> LENGTH: 11
    <212> TYPE: PRT
    <213> ORGANISM: Artificial Sequence
    <220> FEATURE:
    <223> OTHER INFORMATION: anti-IL-12/IL-23p40 antibody complementarity
          determining region light chain 1


    <400> SEQUENCE: 4


    Arg Ala Ser Gln Gly Ile Ser Ser Trp Leu Ala
    1               5                   10
```

US 10,961,307 B2

111                                                                  112

-continued

```
<210> SEQ ID NO 5
<211> LENGTH: 7
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: anti-IL-12/IL-23p40 antibody complementarity
      determining region light chain 2

<400> SEQUENCE: 5

Ala Ala Ser Ser Leu Gln Ser
1               5


<210> SEQ ID NO 6
<211> LENGTH: 9
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: anti-IL-12/IL-23p40 antibody complementarity
      determining region light chain 3

<400> SEQUENCE: 6

Gln Gln Tyr Asn Ile Tyr Pro Tyr Thr
1               5


<210> SEQ ID NO 7
<211> LENGTH: 119
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: anti-IL-12/IL-23p40 antibody variable heavy
      chain region

<400> SEQUENCE: 7

Glu Val Gln Leu Val Gln Ser Gly Ala Glu Val Lys Lys Pro Gly Glu
1               5                   10                  15

Ser Leu Lys Ile Ser Cys Lys Gly Ser Gly Tyr Ser Phe Thr Thr Tyr
            20                  25                  30

Trp Leu Gly Trp Val Arg Gln Met Pro Gly Lys Gly Leu Asp Trp Ile
        35                  40                  45

Gly Ile Met Ser Pro Val Asp Ser Asp Ile Arg Tyr Ser Pro Ser Phe
    50                  55                  60

Gln Gly Gln Val Thr Met Ser Val Asp Lys Ser Ile Thr Thr Ala Tyr
65                  70                  75                  80

Leu Gln Trp Asn Ser Leu Lys Ala Ser Asp Thr Ala Met Tyr Tyr Cys
                85                  90                  95

Ala Arg Arg Arg Pro Gly Gln Gly Tyr Phe Asp Phe Trp Gly Gln Gly
            100                 105                 110

Thr Leu Val Thr Val Ser Ser
        115


<210> SEQ ID NO 8
<211> LENGTH: 108
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: anti-IL-12/IL-23p40 antibody variable light
      chain region

<400> SEQUENCE: 8

Asp Ile Gln Met Thr Gln Ser Pro Ser Ser Leu Ser Ala Ser Val Gly
1               5                   10                  15

Asp Arg Val Thr Ile Thr Cys Arg Ala Ser Gln Gly Ile Ser Ser Trp
```

US 10,961,307 B2

| 113 | 114 |

-continued

```
                20              25              30
Leu Ala Trp Tyr Gln Gln Lys Pro Glu Lys Ala Pro Lys Ser Leu Ile
            35              40              45

Tyr Ala Ala Ser Ser Leu Gln Ser Gly Val Pro Ser Arg Phe Ser Gly
        50              55              60

Ser Gly Ser Gly Thr Asp Phe Thr Leu Thr Ile Ser Ser Leu Gln Pro
    65              70              75              80

Glu Asp Phe Ala Thr Tyr Tyr Cys Gln Gln Tyr Asn Ile Tyr Pro Tyr
            85              90              95

Thr Phe Gly Gln Gly Thr Lys Leu Glu Ile Lys Arg
            100             105


<210> SEQ ID NO 9
<211> LENGTH: 503
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Human IL-12 with alpha and beta subunits

<400> SEQUENCE: 9

Arg Asn Leu Pro Val Ala Thr Pro Asp Pro Gly Met Phe Pro Cys Leu
1               5               10              15

His His Ser Gln Asn Leu Leu Arg Ala Val Ser Asn Met Leu Gln Lys
            20              25              30

Ala Arg Gln Thr Leu Glu Phe Tyr Pro Cys Thr Ser Glu Glu Ile Asp
        35              40              45

His Glu Asp Ile Thr Lys Asp Lys Thr Ser Thr Val Glu Ala Cys Leu
    50              55              60

Pro Leu Glu Leu Thr Lys Asn Glu Ser Cys Leu Asn Ser Arg Glu Thr
65              70              75              80

Ser Phe Ile Thr Asn Gly Ser Cys Leu Ala Ser Arg Lys Thr Ser Phe
            85              90              95

Met Met Ala Leu Cys Leu Ser Ser Ile Tyr Glu Asp Leu Lys Met Tyr
            100             105             110

Gln Val Glu Phe Lys Thr Met Asn Ala Lys Leu Leu Met Asp Pro Lys
            115             120             125

Arg Gln Ile Phe Leu Asp Gln Asn Met Leu Ala Val Ile Asp Glu Leu
        130             135             140

Met Gln Ala Leu Asn Phe Asn Ser Glu Thr Val Pro Gln Lys Ser Ser
145             150             155             160

Leu Glu Glu Pro Asp Phe Tyr Lys Thr Lys Ile Lys Leu Cys Ile Leu
            165             170             175

Leu His Ala Phe Arg Ile Arg Ala Val Thr Ile Asp Arg Val Met Ser
            180             185             190

Tyr Leu Asn Ala Ser Ile Trp Glu Leu Lys Lys Asp Val Tyr Val Val
            195             200             205

Glu Leu Asp Trp Tyr Pro Asp Ala Pro Gly Glu Met Val Val Leu Thr
        210             215             220

Cys Asp Thr Pro Glu Glu Asp Gly Ile Thr Trp Thr Leu Asp Gln Ser
225             230             235             240

Ser Glu Val Leu Gly Ser Gly Lys Thr Leu Thr Ile Gln Val Lys Glu
            245             250             255

Phe Gly Asp Ala Gly Gln Tyr Thr Cys His Lys Gly Gly Glu Val Leu
            260             265             270

Ser His Ser Leu Leu Leu Leu His Lys Lys Glu Asp Gly Ile Trp Ser
```

-continued

```
              275              280              285
Thr Asp Ile Leu Lys Asp Gln Lys Glu Pro Lys Asn Lys Thr Phe Leu
         290              295              300

Arg Cys Glu Ala Lys Asn Tyr Ser Gly Arg Phe Thr Cys Trp Trp Leu
305              310              315              320

Thr Thr Ile Ser Thr Asp Leu Thr Phe Ser Val Lys Ser Ser Arg Gly
              325              330              335

Ser Ser Asp Pro Gln Gly Val Thr Cys Gly Ala Ala Thr Leu Ser Ala
         340              345              350

Glu Arg Val Arg Gly Asp Asn Lys Glu Tyr Glu Tyr Ser Val Glu Cys
         355              360              365

Gln Glu Asp Ser Ala Cys Pro Ala Ala Glu Glu Ser Leu Pro Ile Glu
370              375              380

Val Met Val Asp Ala Val His Lys Leu Lys Tyr Glu Asn Tyr Thr Ser
385              390              395              400

Ser Phe Phe Ile Arg Asp Ile Ile Lys Pro Asp Pro Pro Lys Asn Leu
              405              410              415

Gln Leu Lys Pro Leu Lys Asn Ser Arg Gln Val Glu Val Ser Trp Glu
         420              425              430

Tyr Pro Asp Thr Trp Ser Thr Pro His Ser Tyr Phe Ser Leu Thr Phe
         435              440              445

Cys Val Gln Val Gln Gly Lys Ser Lys Arg Glu Lys Lys Asp Arg Val
         450              455              460

Phe Thr Asp Lys Thr Ser Ala Thr Val Ile Cys Arg Lys Asn Ala Ser
465              470              475              480

Ile Ser Val Arg Ala Gln Asp Arg Tyr Tyr Ser Ser Ser Trp Ser Glu
              485              490              495

Trp Ala Ser Val Pro Cys Ser
         500
```

<210> SEQ ID NO 10
<211> LENGTH: 449
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: anti-IL-12/IL-23p40 antibody heavy chain

<400> SEQUENCE: 10

```
Glu Val Gln Leu Val Gln Ser Gly Ala Glu Val Lys Lys Pro Gly Glu
1               5               10              15

Ser Leu Lys Ile Ser Cys Lys Gly Ser Gly Tyr Ser Phe Thr Thr Tyr
         20              25              30

Trp Leu Gly Trp Val Arg Gln Met Pro Gly Lys Gly Leu Asp Trp Ile
         35              40              45

Gly Ile Met Ser Pro Val Asp Ser Asp Ile Arg Tyr Ser Pro Ser Phe
50              55              60

Gln Gly Gln Val Thr Met Ser Val Asp Lys Ser Ile Thr Thr Ala Tyr
65              70              75              80

Leu Gln Trp Asn Ser Leu Lys Ala Ser Asp Thr Ala Met Tyr Tyr Cys
              85              90              95

Ala Arg Arg Arg Pro Gly Gln Gly Tyr Phe Asp Phe Trp Gly Gln Gly
              100             105             110

Thr Leu Val Thr Val Ser Ser Ser Thr Lys Gly Pro Ser Val Phe
         115             120             125

Pro Leu Ala Pro Ser Ser Lys Ser Thr Ser Gly Gly Thr Ala Ala Leu
```

US 10,961,307 B2

117                                                                118

-continued

```
              130               135               140
Gly Cys Leu Val Lys Asp Tyr Phe Pro Glu Pro Val Thr Val Ser Trp
145                 150                 155                 160

Asn Ser Gly Ala Leu Thr Ser Gly Val His Thr Phe Pro Ala Val Leu
                165                 170                 175

Gln Ser Ser Gly Leu Tyr Ser Leu Ser Ser Val Val Thr Val Pro Ser
                180                 185                 190

Ser Ser Leu Gly Thr Gln Thr Tyr Ile Cys Asn Val Asn His Lys Pro
            195                 200                 205

Ser Asn Thr Lys Val Asp Lys Arg Val Glu Pro Lys Ser Cys Asp Lys
        210                 215                 220

Thr His Thr Cys Pro Pro Cys Pro Ala Pro Glu Leu Leu Gly Gly Pro
225                 230                 235                 240

Ser Val Phe Leu Phe Pro Pro Lys Pro Lys Asp Thr Leu Met Ile Ser
                245                 250                 255

Arg Thr Pro Glu Val Thr Cys Val Val Val Asp Val Ser His Glu Asp
                260                 265                 270

Pro Glu Val Lys Phe Asn Trp Tyr Val Asp Gly Val Glu Val His Asn
            275                 280                 285

Ala Lys Thr Lys Pro Arg Glu Glu Gln Tyr Asn Ser Thr Tyr Arg Val
290                 295                 300

Val Ser Val Leu Thr Val Leu His Gln Asp Trp Leu Asn Gly Lys Glu
305                 310                 315                 320

Tyr Lys Cys Lys Val Ser Asn Lys Ala Leu Pro Ala Pro Ile Glu Lys
                325                 330                 335

Thr Ile Ser Lys Ala Lys Gly Gln Pro Arg Glu Pro Gln Val Tyr Thr
                340                 345                 350

Leu Pro Pro Ser Arg Asp Glu Leu Thr Lys Asn Gln Val Ser Leu Thr
            355                 360                 365

Cys Leu Val Lys Gly Phe Tyr Pro Ser Asp Ile Ala Val Glu Trp Glu
        370                 375                 380

Ser Asn Gly Gln Pro Glu Asn Asn Tyr Lys Thr Thr Pro Pro Val Leu
385                 390                 395                 400

Asp Ser Asp Gly Ser Phe Phe Leu Tyr Ser Lys Leu Thr Val Asp Lys
                405                 410                 415

Ser Arg Trp Gln Gln Gly Asn Val Phe Ser Cys Ser Val Met His Glu
            420                 425                 430

Ala Leu His Asn His Tyr Thr Gln Lys Ser Leu Ser Leu Ser Pro Gly
            435                 440                 445

Lys
```

```
<210> SEQ ID NO 11
<211> LENGTH: 214
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: anti-IL-12/IL-23p40 antibody light chain

<400> SEQUENCE: 11

Asp Ile Gln Met Thr Gln Ser Pro Ser Ser Leu Ser Ala Ser Val Gly
1                   5                   10                  15

Asp Arg Val Thr Ile Thr Cys Arg Ala Ser Gln Gly Ile Ser Ser Trp
                20                  25                  30

Leu Ala Trp Tyr Gln Gln Lys Pro Glu Lys Ala Pro Lys Ser Leu Ile
            35                  40                  45
```

US 10,961,307 B2

119                                                    120

-continued

```
Tyr Ala Ala Ser Ser Leu Gln Ser Gly Val Pro Ser Arg Phe Ser Gly
    50                  55                  60

Ser Gly Ser Gly Thr Asp Phe Thr Leu Thr Ile Ser Ser Leu Gln Pro
65                  70                  75                  80

Glu Asp Phe Ala Thr Tyr Tyr Cys Gln Gln Tyr Asn Ile Tyr Pro Tyr
                85                  90                  95

Thr Phe Gly Gln Gly Thr Lys Leu Glu Ile Lys Arg Thr Val Ala Ala
            100                 105                 110

Pro Ser Val Phe Ile Phe Pro Pro Ser Asp Glu Gln Leu Lys Ser Gly
        115                 120                 125

Thr Ala Ser Val Val Cys Leu Leu Asn Asn Phe Tyr Pro Arg Glu Ala
    130                 135                 140

Lys Val Gln Trp Lys Val Asp Asn Ala Leu Gln Ser Gly Asn Ser Gln
145                 150                 155                 160

Glu Ser Val Thr Glu Gln Asp Ser Lys Asp Ser Thr Tyr Ser Leu Ser
                165                 170                 175

Ser Thr Leu Thr Leu Ser Lys Ala Asp Tyr Glu Lys His Lys Val Tyr
            180                 185                 190

Ala Cys Glu Val Thr His Gln Gly Leu Ser Ser Pro Val Thr Lys Ser
        195                 200                 205

Phe Asn Arg Gly Glu Cys
    210
```

What is claimed:

1. A method of treating moderately to severely active ulcerative colitis (UC) in a subject in need thereof, comprising administering to the subject a pharmaceutical composition comprising a clinically proven safe and clinically proven effective amount of an anti-IL-12/IL-23p40 antibody, wherein the antibody comprises a heavy chain variable region and a light chain variable region, the heavy chain variable region comprising: a complementarity determining region heavy chain 1 (CDRH1) amino acid sequence of SEQ ID NO:1; a CDRH2 amino acid sequence of SEQ ID NO:2; and a CDRH3 amino acid sequence of SEQ ID NO:3; and the light chain variable region comprising: a complementarity determining region light chain 1 (CDRL1) amino acid sequence of SEQ ID NO:4; a CDRL2 amino acid sequence of SEQ ID NO:5; and a CDRL3 amino acid sequence of SEQ ID NO:6, wherein after treating with the antibody, the subject is a responder to treatment by at least one measure of response to treatment selected from the group consisting of: (i) clinical remission based on at least one of the global definition of clinical remission with Mayo score ≤2 points with no individual subscore >1 and the US definition of clinical remission with absolute stool number ≤3, rectal bleeding subscore of 0 and Mayo endoscopy subscore of 0 or 1, (ii) endoscopic healing with a Mayo endoscopy subscore of 0 or 1, (iii) clinical response based on the Mayo endoscopy subscore, (iv) improvements from baseline in Inflammatory Bowel Disease Questionnaire (IBDQ) score, (v) mucosal healing, (vi) decrease from baseline in Mayo score, and (vii) clinical response as determined by a decrease from baseline in the Mayo score by ≥30% and ≥3 points and a decrease from baseline in the rectal bleeding subscore ≥1 points or a rectal bleeding subscore of 0 or 1.

2. The method of claim 1, wherein the antibody comprises the heavy chain variable region of the amino acid sequence

of SEQ ID NO:7 and the light chain variable region of the amino acid sequence of SEQ ID NO:8.

3. The method of claim 1, wherein the antibody comprises a heavy chain of the amino acid sequence of SEQ ID NO:10 and a light chain of the amino acid sequence of SEQ ID NO:11.

4. The method of any one of claims 1-3, wherein the antibody is in a pharmaceutical composition for intravenous administration comprising a solution comprising 10 mM L-histidine, 8.5% (w/v) sucrose, 0.04% (w/v) polysorbate 80, 0.4 mg/mL L-methionine, and 20 μg/mL EDTA disodium salt, dehydrate, at pH 6.0.

5. The method of any one of claims 1-3, wherein the antibody is in a pharmaceutical composition for subcutaneous administration comprising a solution comprising 6.7 mM L-histidine, 7.6% (w/v) sucrose, 0.004% (w/v) polysorbate 80, at pH 6.0.

6. The method of claim 4, wherein the antibody is administered intravenously to the subject at week 0 of the treatment, at a dosage of about 6.0 mg/kg body weight of the subject or 130 mg per administration.

7. The method of claim 6, wherein the antibody is further administered subcutaneously to the subject at week 8 of the treatment, at a dosage of about 90 mg per administration.

8. The method of claim 7, wherein the subject had previously failed or was intolerant of at least one therapy selected from the group consisting of an anti-TNF, vedolizumab, corticosteroids, azathioprine (AZA), and 6 mercaptopurine (6 MP), or the subject had demonstrated corticosteroid dependence.

9. The method of claim 7, wherein the antibody is administered in a maintenance dose every 8 weeks after the treatment at week 8 or every 12 weeks after the treatment at week 8.

10. The method of claim 9, wherein the subject is identified as having a clinical remission based on at least one of

US 10,961,307 B2

121

122

the global definition and the US definition by week 16 of the treatment and the clinical remission continues at least 44 weeks after week 0.

**11**. The method of claim **9**, wherein the subject is in corticosteroid-free clinical remission at least 44 weeks after week 0.

**12**. The method of claim **8**, wherein the subject is identified as having an endoscopic healing continuing at least 44 weeks after week 0.

**13**. The method of claim **9**, wherein the subject is identified as achieving a clinical response based on the Mayo endoscopy subscore continuing at least 44 weeks after week 0.

**14**. The method of claim **9**, wherein the subject is identified as having improvements from baseline in Inflammatory Bowel Disease Questionnaire (IBDQ) score continuing at least 44 weeks after week 0.

**15**. The method of claim **9**, wherein the subject is identified as having a mucosal healing continuing at least 44 weeks after week 0.

**16**. The method of claim **9**, wherein the subject identified as having a decrease from baseline in Mayo score continuing at least 44 weeks after week 0.

**17**. The method of claim **9**, wherein the subject is identified as having a normalization of one or more biomarkers selected from the group consisting of C-reactive protein, fecal lactoferrin and fecal calprotectin continuing at least 44 weeks after week 0.

**18**. The method of claim **9**, wherein the subject is in clinical response as determined by a decrease from baseline in the Mayo score by ≥30% and ≥3 points and a decrease from baseline in the rectal bleeding subscore ≥1 points or a rectal bleeding subscore of 0 or 1 continuing at least 44 weeks after week 0.

**19**. A method of treating moderately to severely active ulcerative colitis (UC) in a subject in need thereof, comprising:

a. intravenously administering to the subject an anti-IL-12/IL-23p40 antibody in a first pharmaceutical composition at a dosage of about 6.0 mg/kg body weight of the subject or 130 mg per administration at week 0 of the treatment, and

b. subcutaneously administering to the subject the anti-IL-12/IL-23p40 antibody in a second pharmaceutical composition at a dosage of 90 mg per administration at week 8 of the treatment,

wherein the antibody comprises a heavy chain variable region and a light chain variable region, the heavy chain variable region comprising: a complementarity determining region heavy chain 1 (CDRH1) amino acid sequence of SEQ ID NO:1; a CDRH2 amino acid sequence of SEQ ID NO:2; and a CDRH3 amino acid sequence of SEQ ID NO:3; and the light chain variable region comprising: a complementarity determining region light chain 1 (CDRL1) amino acid sequence of SEQ ID NO:4; a CDRL2 amino acid sequence of SEQ ID NO:5; and a CDRL3 amino acid sequence of SEQ ID NO:6; and

wherein the subject is a responder to treatment by at least one measure of response to treatment selected from the group consisting of: (i) having a clinical remission based on at least one of the global definition of clinical remission with Mayo score ≤2 points with no individual subscore >1 and the US definition of clinical remission with absolute stool number ≤3, rectal bleeding subscore of 0 and Mayo endoscopy subscore of 0 or 1, (ii) having an endo-

scopic healing with a Mayo endoscopy subscore of 0 or 1, (iii) achieving a clinical response based on the Mayo endoscopy subscore, (iv) having improvements from baseline in Inflammatory Bowel Disease Questionnaire (IBDQ) score, (v) having a mucosal healing, (vi) having a decrease from baseline in Mayo score, and (vii) in clinical response as determined by a decrease from baseline in the Mayo score by ≥30% and ≥3 points and a decrease from baseline in the rectal bleeding subscore ≥1 points or a rectal bleeding subscore of 0 or 1, and had previously failed or was intolerant of at least one therapy selected from the group consisting of: an anti-TNF, vedolizumab, corticosteroids, azathioprine (AZA), and 6 mercaptopurine (6 MP), or the subject had demonstrated corticosteroid dependence.

**20**. The method of claim **19**, wherein the antibody comprises the heavy chain variable region of the amino acid sequence of SEQ ID NO:7 and the light chain variable region of the amino acid sequence of SEQ ID NO:8.

**21**. The method of claim **19**, wherein the antibody comprises a heavy chain of the amino acid sequence of SEQ ID NO:10 and a light chain of the amino acid sequence of SEQ ID NO:11.

**22**. The method of any one of claims **19-21**, wherein the pharmaceutical composition for intravenous administration further comprises a solution comprising 10 mM L-histidine, 8.5% (w/v) sucrose, 0.04% (w/v) polysorbate 80, 0.4 mg/mL L-methionine, and 20 μg/mL EDTA disodium salt, dehydrate, at pH 6.0.

**23**. The method of claim **22**, wherein the pharmaceutical composition for subcutaneous administration further comprises a solution comprising 6.7 mM L-histidine, 7.6% (w/v) sucrose, 0.004% (w/v) polysorbate 80, at pH 6.0.

**24**. The method of any one of claims **19-21**, wherein the subject is identified as having a clinical remission based on at least one of the global definition and the US definition by week 16 of the treatment.

**25**. The method of any one of claims **19-21**, wherein the subject is identified as having an endoscopic healing by week 16 of the treatment.

**26**. The method of any one of claims **19-21**, wherein the subject is identified as achieving a clinical response based on the Mayo endoscopy subscore by week 16 of the treatment.

**27**. The method of any one of claims **19-21**, wherein the subject is identified as having improvements from baseline in Inflammatory Bowel Disease Questionnaire (IBDQ) score by week 16 of the treatment.

**28**. The method of any one of claims **19-21**, wherein the subject is identified as having a mucosal healing by week 16 of the treatment.

**29**. The method of any one of claims **19-21**, wherein the subject is identified as having a decrease from baseline in Mayo score by week 16 of the treatment.

**30**. The method of any one of claims **19-21**, wherein the subject is identified as having a normalization of one or more biomarkers selected from the group consisting of C-reactive protein, fecal lactoferrin and fecal calprotectin by week 16 of the treatment.

**31**. The method of any one of claims **19-21**, wherein the subject is in clinical response as determined by a decrease from baseline in the Mayo score by ≥30% and ≥3 points and a decrease from baseline in the rectal bleeding subscore ≥1 points or a rectal bleeding subscore of 0 or 1 by week 16 of the treatment.

US 10,961,307 B2

123

**32**. The method of any one of claims **19-21**, wherein the subject is not a responder to the treatment with the antibody by week 8 and is a responder to the treatment by week 16 of the treatment.

**33**. A method of treating moderately to severely active ulcerative colitis (UC) in a subject in need thereof, comprising:

a. intravenously administering to the subject an anti-IL-12/IL-23p40 antibody in a first pharmaceutical composition at a dosage of about 6.0 mg/kg body weight of the subject or 130 mg per administration at week 0 of the treatment, and

b. subcutaneously administering to the subject the anti-IL-12/IL-23p40 antibody in a second pharmaceutical composition at a dosage of 90 mg per administration at week 8 of the treatment,

wherein the antibody comprises a heavy chain variable region and a light chain variable region, the heavy chain variable region comprising: a complementarity determining region heavy chain 1 (CDRH1) amino acid sequence of SEQ ID NO:1; a CDRH2 amino acid sequence of SEQ ID NO:2; and a CDRH3 amino acid sequence of SEQ ID NO:3; and the light chain variable region comprising: a complementarity determining region light chain 1 (CDRL1) amino acid sequence of SEQ ID NO:4; a CDRL2 amino acid sequence of SEQ ID NO:5; and a CDRL3 amino acid sequence of SEQ ID NO:6, followed by a maintenance therapy,

wherein the maintenance therapy comprises subcutaneously administering to the subject the anti-IL-12/IL-23p40 antibody at a dosage of 90 mg per administration, once every 8 weeks or once every 12 weeks, and wherein the maintenance therapy is provided for 44 weeks and after treating with the antibody, the subject is a responder to treatment by at least one measure of response to treatment selected from the group consisting of: (i) having a clinical remission based on at least one of the global definition of clinical remission with Mayo score ≤2 points with no individual subscore >1 and the US definition of clinical remission with absolute stool number ≤3, rectal bleeding subscore of 0 and Mayo endoscopy subscore of 0 or 1, (ii) having an endoscopic healing with a Mayo endoscopy subscore of 0 or 1, (iii) achieving a clinical response based on the Mayo endoscopy subscore, (iv) having improvements from baseline in Inflammatory Bowel Disease

124

Questionnaire (IBDQ) score, (v) having a mucosal healing, (vi) having a decrease from baseline in Mayo score, and (vii) in clinical response as determined by a decrease from baseline in the Mayo score by ≥30% and ≥3 points and a decrease from baseline in the rectal bleeding subscore ≥1 points or a rectal bleeding subscore of 0 or 1.

**34**. A method of treating moderately to severely active ulcerative colitis (UC) in a subject in need thereof, comprising:

a. intravenously administering to the subject an anti-IL-12/IL-23p40 antibody comprising a heavy chain variable region of the amino acid sequence of SEQ ID NO:7 and a light chain variable region of the amino acid sequence of SEQ ID NO:8, in a first pharmaceutical composition at a dosage of about 6.0 mg/kg body weight of the subject or 130 mg per administration at week 0 of the treatment, and

b. subcutaneously administering to the subject the anti-IL-12/IL-23p40 antibody in a second pharmaceutical composition at a dosage of 90 mg per administration at week 8 of the treatment, followed by a maintenance therapy, wherein the maintenance therapy comprises subcutaneously administering to the subject the anti-IL-12/IL-23p40 antibody at a dosage of 90 mg per administration, once every 8 weeks or once every 12 weeks, and after treating with the antibody, the subject is a responder to treatment by at least one measure of response to treatment selected from the group consisting of: (i) having a clinical remission based on at least one of the global definition of clinical remission with Mayo score ≤2 points with no individual subscore >1 and the US definition of clinical remission with absolute stool number ≤3, rectal bleeding subscore of 0 and Mayo endoscopy subscore of 0 or 1, (ii) having an endoscopic healing with a Mayo endoscopy subscore of 0 or 1, (iii) achieving a clinical response based on the Mayo endoscopy subscore, (iv) having improvements from baseline in Inflammatory Bowel Disease Questionnaire (IBDQ) score, (v) having a mucosal healing, (vi) having a decrease from baseline in Mayo score, and (vii) in clinical response as determined by a decrease from baseline in the Mayo score by ≥30% and ≥3 points and a decrease from baseline in the rectal bleeding subscore ≥1 points or a rectal bleeding subscore of 0 or 1.

* * * * *