## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JANSSEN BIOTECH, INC.,

                 Plaintiff,

v.

AMGEN, INC.

                 Defendant.

C.A. No. 22-1549-MN



## OPENING BRIEF IN SUPPORT OF
## <u>PLAINTIFF JANSSEN'S MOTION FOR A PRELIMINARY INJUNCTION</u>

OF COUNSEL:
Michael A. Morin
David P. Frazier
Inge A. Osman
Cecilia Sanabria
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC  20004
(202) 637-2200

Michael Seringhaus
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
(650) 328-4600

Gabrielle LaHatte
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA  94111
(415) 491-0600

Dated:  March 6, 2023

MCCARTER & ENGLISH, LLP
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King St.
Wilmington, DE 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

*Attorneys for Plaintiff*
*Janssen Biotech, Inc.*

## TABLE OF CONTENTS

Nature And Stage Of The Proceedings ................................................................................ 1

Summary Of Argument ....................................................................................................... 1

Concise Statement Of Facts ............................................................................................... 2

    A.    STELARA® ........................................................................................... 3

    B.    The Manufacturing Patents ................................................................. 5

        1.    Adjusting Glycans With Putrescine Levels ............................. 5

        2.    Adjusting C-Terminal Variants With Arginine Levels ............ 6

    C.    Amgen's Biosimilar ABP 654 ............................................................. 7

Argument ........................................................................................................................... 9

I.    Janssen Is Likely To Succeed On The Merits ............................................................ 9

    A.    ABP 654 Infringes The '168 Patent By Using Putrescine to Control Glycans ................................................................................................. 10

    B.    ABP 654 Infringes The '858 Patent By Using Arginine Levels To Control For C-Terminal Variants ..................................................................... 11

II.    Janssen Will Suffer Irreparable Harm Without a Preliminary Injunction ...................... 12

    A.    STELARA® Would Suffer Lasting Loss Of Market Share ................... 13

    B.    STELARA® Would Suffer Irreversible Price Erosion Across All Indications ....................................................................................... 15

    C.    Janssen Would Suffer Irreparable Disruption Of Its Contracts With PBMs And Related Loss Of Goodwill .......................................................... 17

III.    The Equities Favor A Preliminary Injunction ............................................................ 18

Conclusion ....................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Abbott Labs. v. Sandoz, Inc.*,
    544 F.3d 1341 (Fed. Cir. 2008) .......................................................................... 12, 15

*Amgen v. Sandoz*,
    No. 14-04741, D.I. 56 (N.D. Cal. Feb. 5, 2015) ...................................................... 13

*Aria Diagnostics, Inc. v. Sequenom, Inc.*,
    726 F.3d 1296 (Fed. Cir. 2013) .......................................................................... 13, 15

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
    664 F.3d 922 (Fed. Cir. 2012) ....................................................................... 9, 13, 15

*Eli Lilly & Co. v. Teva Pharms. USA, Inc.*,
    609 F. Supp. 2d 786 (S.D. Ind. 2009) ...................................................................... 15

*Fed. Trade Comm'n v. Qualcomm Inc.*,
    935 F.3d 752 (9th Cir. 2019) ................................................................................... 18

*Fields PAG, Inc. v. CDK Glob., LLC*,
    No. 16-CV-01876-MCA-MAH, 2016 WL 9185293 (D.N.J. June 10, 2016) ......................... 18

*Glaxo Grp. Ltd. v. Apotex, Inc.*,
    64 F. App'x 751 (Fed. Cir. 2003) ............................................................................ 19

*Impax Lab'ys, Inc. v. Aventis Pharms., Inc.*,
    235 F. Supp. 2d 390 (D. Del. 2002) ......................................................................... 19

*Novartis Pharms. Corp. v. Accord Healthcare Inc.*,
    No. 18-1043-LPS, 2019 WL 2588450 (D. Del. June 24, 2019) ......................... 16, 19

*Ortho McNeil Pharm., Inc. v. Barr Lab'ys, Inc.*,
    No. 03-4678 (SRC), 2009 WL 2182665 (D.N.J. July 22, 2009) .............................. 19

*Polymer Techs., Inc. v. Bridwell*,
    103 F.3d 970 (Fed. Cir. 1996) ................................................................................. 16

*Sandoz Inc. v. Amgen Inc.*,
    137 S. Ct. 1664 (2017) .............................................................................................. 9

*Sanofi-Synthelabo v. Apotex, Inc.*,
    470 F.3d 1368 (Fed. Cir. 2007) ............................................................................... 19

*Smith Int'l, Inc. v. Hughes Tools Co.*,
   718 F.2d 1573 (Fed. Cir. 1983) ................................................................................ 19

## STATUTES

35 U.S.C. § 271 ............................................................................................................... 9

35 U.S.C. § 282(a) ........................................................................................................... 9

42 U.S.C. § 262 ........................................................................................................... 8, 9

███████████████████████████████████

## NATURE AND STAGE OF THE PROCEEDINGS

This lawsuit challenges Amgen's plan to launch a new drug (ABP 654) that infringes numerous patents protecting Janssen's groundbreaking advances.  On November 29, 2022, Janssen filed this suit seeking a declaratory judgment that Amgen infringes two patents: a compound patent and a method of treatment patent.  D.I. 1 ("Compl.").  On January 23, 2023, ███████████ ████████████████████████████████████████████████████ D.I. 20 ("Am. Compl.") at Ex. P, Stipulation.  After Janssen filed suit, Amgen provided Janssen with information about its manufacturing process.  That information established that Amgen infringes at least four additional Janssen patents relating to manufacturing antibodies, which Janssen then added to the case.  Am. Compl.  To streamline the proceedings, Janssen now seeks preliminary relief based only on two of those patents (the "Manufacturing Patents").[1]

## SUMMARY OF ARGUMENT

If Amgen's proposed launch of ABP 654 goes forward in ███████████, it will inflict irreparable harm on Janssen and irrevocably alter the market for STELARA®, Janssen's blockbuster biologic drug that has helped hundreds of thousands of patients suffering from serious autoimmune disorders.  To prevent these harms, Janssen seeks a preliminary injunction to block ABP 654's launch until this Court can resolve the underlying patent dispute on the merits.  Such relief is plainly warranted under the traditional four-factor test.

*First*, Janssen is likely to succeed on the merits.  As part of its efforts to develop STELARA® and other innovative drugs, Janssen has developed and acquired various patents, including the two Manufacturing Patents—directed to using living cells to manufacture therapeutic

---

[1] While this motion focuses on Amgen's infringement of the two Manufacturing Patents, Janssen reserves its rights to pursue additional injunctive relief based on the record evidence and/or if Amgen seeks to launch ABP 654 with a label that induces infringement of other Janssen patents.

antibodies—that form the basis of this motion.  Amgen directly infringes the Manufacturing Patents because it makes ABP 654 ███████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████  This was no accident.  Amgen deliberately targeted STELARA® and infringed the Manufacturing Patents to make ABP 654 as close a copy as possible.

*Second*, Amgen's proposed launch will cause Janssen irreparable harm that cannot be fully remedied with money damages.  Access to STELARA® is determined largely by Pharmacy Benefit Managers (PBMs) engaged by insurance companies to administer coverage for prescription drugs.  PBMs demand price concessions from manufacturers based upon the sales volumes of individual drugs and portfolios.  Amgen's infringing launch of ABP 654 will compromise Janssen's ability to maintain patient access to STELARA® and its broader portfolio, and result in irretrievable loss of STELARA® market share, as well as price erosion, loss of goodwill, and harm to Janssen's relationships with payors and customers.  By the time Janssen ultimately prevails at trial, it will be extraordinarily difficult—if not impossible—to fully quantify how STELARA® and other drugs would have fared absent Amgen's untimely launch.  And it will be virtually impossible to revert to the contractual status quo preceding that launch.

*Third*, the balance of hardships favors a preliminary injunction.  Such relief would cause Amgen no meaningful harm, other than delaying its ability to profit from its infringement.

*Fourth*, the public interest favors an injunction.  The core purposes of patent law support protecting Janssen's investments in R&D, and patients will not be harmed by an injunction.

For these reasons, injunctive relief is appropriate pending full adjudication on the merits.

## CONCISE STATEMENT OF FACTS

Janssen invents and manufactures groundbreaking pharmaceuticals treating medical

conditions affecting countless people around the world.  Beyond its own innovative research, Janssen acquires industry-leading technologies from smaller pharmaceutical companies and scales them at levels that make a serious impact on the nation's health.  As part of these efforts, Janssen developed the biologic at issue here, STELARA®, and acquired the Manufacturing Patents that Amgen currently infringes to produce ABP 654, its biosimilar copy of STELARA®.

### A.    STELARA®

STELARA® has helped hundreds of thousands of patients overcome serious autoimmune diseases, including psoriasis, psoriatic arthritis, Crohn's disease, and ulcerative colitis (UC). Autoimmune diseases are a class of conditions in which the body's immune system mistakenly attacks the body's own cells as if they were harmful foreign cells.  STELARA® is a breakthrough development in the treatment of such diseases.  It works by targeting and neutralizing certain proteins—interleukin-12 (IL-12) and interleukin-23 (IL-23)—that patients with autoimmune diseases produce in excess.  STELARA®'s novel approach has been particularly useful for patients who fail treatment with other drugs—like REMICADE®, HUMIRA®, and SIMPONI®—that present safety risks associated with immunosuppression.  Am. Compl. Ex. N, U.S. Patent No. 10,961,307 at 2:20-25.

Scientists at Janssen spent years inventing and developing ustekinumab, the active ingredient in STELARA®.  Ustekinumab is a fully human, high-affinity, neutralizing therapeutic antibody that targets IL-12 and IL-23.  Ustekinumab, and thus STELARA®, belong to the class of drugs called biologics, which are large-molecule drugs synthesized from living cells or organisms. To make STELARA®, ███████████████████████████████████████████████ ███████████████ Janssen then conducted over 100 clinical trials to identify the safest and most effective uses.  The FDA initially approved STELARA® to treat plaque psoriasis, but Janssen's ongoing research later led to approvals for psoriatic arthritis, Crohn's disease, and UC.

Beyond STELARA®, Janssen has made significant investments in research and development of other biologics, including by acquiring antibody manufacturing technologies. In 2020, Janssen purchased Momenta Pharmaceuticals, Inc., a company whose research and development included methods of manufacturing antibodies like STELARA®. As a result of its Momenta acquisition, Janssen owns the Manufacturing Patents asserted in this litigation.

Today, STELARA® is Janssen's largest-selling product, delivering roughly $6.4 billion in U.S. sales revenue in 2022. Ex. C5 at A2981-85. Janssen reinvests a substantial portion of these revenues to fund research and development of novel (and potentially life-saving) drugs, as well as patient programs that provide financial and medical support. Smith Decl. ¶¶ 48-61. For example, Janssen offers several programs to help onboard patients, including co-pay assistance, infusion support, injection training, treatment support and education, and insurance and affordability support. *See* Ex. B3 at A1252, A1256.

Janssen sells STELARA® ████████████████████████—who in turn sell to specialty pharmacies, hospitals, health care providers, and infusion therapy providers—who then provide it to patients (who typically pay with insurance). Smith Decl. ¶ 11. Insurance companies engage PBMs to manage their prescription drug benefits. *Id.* ¶¶ 7-9. PBMs largely control patient access to STELARA® and other prescription drugs using lists called "formularies." These formularies classify covered drugs into tiers and determine whether and when the drugs will be reimbursed by payors, and at what rates. *Id.* ¶¶ 17-20.

PBMs exact significant rebates and other concessions from manufacturers, leveraging their control over the formularies. *Id.* ¶ 13. PBMs pit manufacturers against each other, demanding rebates on individual drugs and manufacturers' portfolios, to optimize their aggregate concessions.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.

### B.      The Manufacturing Patents

Janssen's Manufacturing Patents resulted from substantial investment in developing manufacturing processes to control certain antibody characteristics known as "post-translational modifications." Croughan ¶¶ 31-49. These are chemical changes to an antibody. Even antibodies with identical amino acid sequences can have different post-translational modifications, which can result in different biological properties—which can impact efficacy and safety. *Id.* ¶¶ 47-49. As a result, controlling the post-translational modifications is a key aspect of biologic and biosimilar production.

Dr. Holly Prentice, the sole inventor of both Manufacturing Patents, investigated and developed methods of controlling two particular types of post-translational modifications. The first—in U.S. Patent No. 9,217,168 (the "'168 patent")—is a novel method of controlling "glycans." The second—in U.S. Patent No. 9,475,858 (the "'858 patent")—is a novel method of controlling "C-terminal variants." Both patents describe novel methods of controlling antibody characteristics by selecting certain chemicals, in specific amounts, to be used in the cell culture medium (i.e., the liquid in which cells grow to express antibodies).

### 1.      Adjusting Glycans With Putrescine Levels

The '168 patent recites methods of controlling glycans, which are types of post-translational modifications—specifically, carbohydrates attached to certain of an antibody's amino acids. Glycans come in several forms, and antibodies typically have a characteristic *distribution* of those forms. Croughan ¶¶ 45-46, 49. As with other post-translational modifications, different forms (and distributions) of glycans can alter the biological properties of

the antibody—even for antibodies that are otherwise identical.  *Id.* ¶¶ 37, 48.  For example, the body can more quickly eliminate antibodies having ***high mannose glycans*** (potentially lowering the antibody's efficacy or requiring higher dosing), whereas the presence of ***sialylated glycans*** can impart anti-inflammatory effects.  *Id.* ¶ 48.

Dr. Prentice developed and designed a novel cell culture medium to tailor antibody characteristics, including glycan profiles, by varying the amount of a chemical called ***putrescine*** in the medium.  Janssen's '168 patent relates to this invention.  For example, Claim 23 (which depends from any one of several claims, including Claim 1, as shown below) recites adding specific amounts of ***putrescine*** to control levels of high mannose glycans and sialylated glycans:

> 1. A method of producing a recombinant protein preparation having a target value of one or more of galactosylated glycans, high mannose glycans, and sialylated glycans, the method comprising:
>    - (a) providing a cell genetically engineered to express a recombinant protein;
>    - (b) culturing the cell in a culture medium comprising 0.1 mg/L to 10 mg/L putrescine under conditions in which the cell expresses the recombinant protein; and
>    - (c) harvesting a preparation of the recombinant protein produced by the cell that meets the target value of the one or more of galactosylated glycans, high mannose glycans, and sialylated glycans,
>      wherein the target value of galactosylated glycans, or sialylated glycans is a level at least 10% higher than a level of galactosylated glycans, or sialylated glycans in a preparation produced by culturing the cell in the medium not comprising 0.1 mg/L to 10 mg/L putrescine; or
>      wherein the target value of high mannose glycans is a level at least 10% lower than a level of high mannose glycans in a preparation produced by culturing the cell in the medium not comprising 0.1 mg/L to 10 mg/L putrescine.

23. . . . wherein the cell is a Chinese Hamster Ovary (CHO) cell.

## 2.    Adjusting C-Terminal Variants With Arginine Levels

The second of the two Manufacturing Patents, the '858 patent, recites methods of controlling another type of post-translational modification, called "C-terminal variants."  Even

antibodies having otherwise identical amino acid sequences can nonetheless differ based on the presence or absence of one extra amino acid, usually a lysine, at the end of the antibody's amino acid chains.  Croughan ¶¶ 39-43.  An antibody can have zero, one, or two such terminal lysines. Together, these are called the "C-terminal variants."  Controlling C-terminal variants can help a biosimilar maker achieve close similarity to the reference product, as well as product consistency among its own lots.  *Id*. ¶¶ 63-64.

Dr. Prentice developed methods of modifying the antibody manufacturing process to adjust and control the C-terminal variants produced for a given preparation of antibody.  For example, Claim 33 of the '858 patent (which depends from Claim 20) recites adding a specific amount of *arginine* to control the distribution of C-terminal variants:

> 20. A method of manufacturing a preparation of a recombinant antibody, comprising:
>     culturing a cell in a medium comprising 2 g/L arginine to 8 g/L arginine under conditions in which the cell expresses a recombinant antibody;
>     isolating the recombinant antibody, thereby producing a preparation of the recombinant antibody; and
>     formulating the preparation into a drug product if the preparation meets a target value of C-terminal variants of the recombinant antibody, wherein the C-terminal variants differ in amino acid sequence only by the presence or absence of a lysine at their carboxyl termini.

> 33.  . . . wherein the cell is a CHO [Chinese hamster ovary] cell.

Thus, both Manufacturing Patents claim methods of adjusting cell growth media to achieve desired characteristics—either adjusting *arginine* levels to control C-terminal variants, or adjusting *putrescine* levels to control glycans to make a biosimilar product.

## C.    Amgen's Biosimilar ABP 654

Amgen manufactures its proposed biosimilar of STELARA®, ABP 654, using the techniques Dr. Prentice invented for controlling relevant post-translational modifications. Specifically, Amgen infringes the Manufacturing Patents by deliberately targeting the claimed

effects and including the claimed levels of arginine and putrescine to achieve them.  *See infra* I.

By Amgen's own admission, ABP 654 adds nothing new to the treatment of autoimmune diseases.  Indeed, Amgen has publicly stated that its Phase III study "evaluating the efficacy and safety of ABP 654 compared to STELARA® … demonstrat[ed] **no clinically meaningful differences between ABP 654 and STELARA**."  Am. Compl. at Ex. B at 1 (emphasis added); *see also id.* at Ex. C; *id.* at Ex. D at 41.  Amgen is also conducting a Phase III study to investigate interchangeability of ABP 654 for STELARA®.  *See id.* at Ex. E; *id.* at Ex. F at 40.

On ▮▮▮▮▮▮▮▮▮▮ Amgen submitted ▮▮ abbreviated Biologics License Applications ("aBLAs") to the FDA pursuant to the Biologics Price Competition and Innovation Act (BPCIA), seeking approval to market ABP 654.[2]  The BPCIA provides an abbreviated regulatory pathway by which biosimilar makers can apply to market their copies of existing biologic drugs.  42 U.S.C. § 262.  The BPCIA requires a deliberate exchange of patent information between Janssen and Amgen (colloquially referred to as the "Patent Dance") to ensure issues of patent infringement and validity can be resolved *before* the biosimilar is launched.  42 U.S.C. § 262(l).

A week after submitting its aBLAs, Amgen gave Janssen a formal notice pursuant to the BPCIA signaling its intent to begin selling its infringing biosimilar product at least 180-days after its notice (May 6, 2023), or upon FDA approval.  Am. Compl. ¶ 8; *id.* at Ex. A.  The purpose of that 180-day notice is to authorize and trigger a separate declaratory judgment action by the biologic maker, to ensure that any patent issues can be litigated before the biosimilar launches.  *See* 42 U.S.C. § 262(l)(8).  Amgen also stated its intent "to commercially market its ABP 654 drug products with a full label that includes all the FDA approved indications for the STELARA® drug products."  Am. Compl. at Ex. A.  Those indications include Janssen's patented use of ustekinumab

---

[2] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

to treat UC, which is also at issue in this case. *See, e.g.*, *id.* at ¶¶ 58-60.

## ARGUMENT

Janssen seeks a preliminary injunction barring Amgen's infringement of the Manufacturing Patents during the pendency of this litigation. Janssen's requested relief is grounded in both the BPCIA and 35 U.S.C. § 271(e)(4)(B). "The BPCIA sets forth a carefully calibrated scheme" for adjudicating patent disputes, which is intended to give parties "the opportunity to litigate the relevant patents *before* the biosimilar is marketed." *Sandoz Inc. v. Amgen Inc.*, 137 S. Ct. 1664, 1671-72 (2017) (emphasis added). As part of that scheme, the BPCIA grants reference product sponsors, like Janssen, the ability to "seek a preliminary injunction prohibiting the [biosimilar] applicant from engaging in the commercial manufacture or sale" of its product upon receipt of the 180-day notice. 42 U.S.C. § 262(l)(8)(B). Likewise, the Patent Act provides this Court with the authority to grant "injunctive relief … against an infringer to prevent the commercial manufacture, use, offer to sell, or sale" of the infringing "biological product." 35 U.S.C. § 271(e)(4)(B).

Whether to grant a preliminary injunction lies within the Court's discretion, based upon its assessment of four factors: (1) the movant's likelihood of success on the merits of the underlying litigation, (2) whether irreparable harm is likely if the injunction is not granted, (3) the balance of hardships as between the litigants, and (4) the public interest. *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 926 (Fed. Cir. 2012). All four factors support Janssen.

## I.     JANSSEN IS LIKELY TO SUCCEED ON THE MERITS

Amgen need only infringe *one claim* of *either* Manufacturing Patent to support a preliminary injunction. ABP 654 infringes claims of both.[3]

---

[3] The asserted patents are presumed valid. *See* 35 U.S.C. § 282(a). To date, Amgen has not challenged validity.

### A.  ABP 654 Infringes The '168 Patent By Using Putrescine to Control Glycans

ABP 654 infringes at least Claim 23 of the '168 patent.  As noted, the '168 patent discloses and claims novel methods of producing a recombinant antibody, including by adding defined amounts of **putrescine** to the cell culture preparation to affect glycans.  *Supra* at I.B.1.

Claim 23 of the '168 patent is directed to a method of (1) producing a recombinant antibody in a medium that comprises putrescine in an amount between 0.1 mg/L and 10 mg/L, and (2) harvesting an antibody that meets a target value of glycan forms (e.g., **high mannose** glycans or **sialylated** glycans) where that target value is changed by at least 10% compared to what it would have been without the specified amount of putrescine.  *Supra* at I.B.1.

As Janssen's expert Dr. Matthew Croughan explains, Amgen's method of manufacturing ABP 654 infringes at least Claim 23.  Croughan Decl. ¶¶ 202, 243.  Amgen's method involves ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Croughan Decl. ¶ 167.

████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████ As Dr. Croughan explains, Amgen's use of cell culture media containing ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████ Croughan Decl. ¶¶ 163-167, 212-235; Ex.

A24 at A648-56.

Adjusting and targeting certain glycan levels of ABP 654 can serve two purposes.  First, controlling glycan profiles in ███████████████████████████████████████████ ████████████████████████████████████████ *Id.* ¶¶ 156-162.  Amgen's use of ██████ ████████████████████████████████████████████████████████ *Id.* ¶¶ 239 and 241; Ex. A2 at A028-29 (32:40-33:38), A044-45 (Figs. 2-4).  Second, controlling glycan profiles in ABP 654 through the claimed method helps ████████████████████ ███████████████████████████████████████████████████████ ██████████████████████ Croughan Decl. ¶¶ 163-167.  Indeed, ███████████ ██████████████████████████████ *Id.* ¶¶ 163-167.  And that close similarity to STELARA® is particularly important to Amgen, given its public statement that it intends to seek approval of ABP 654 as *interchangeable* to STELARA®.  *See* Am. Compl., Ex. F at 40.  An interchangeability designation would allow ABP 654 to be substituted for STELARA® at the pharmacy level, without notice to—or permission from—physicians or patients.

## B.   ABP 654 Infringes The '858 Patent By Using Arginine Levels To Control For C-Terminal Variants

ABP 654 also infringes at least Claim 33 of the '858 patent.  As explained above, the '858 patent claims novel methods of producing a recombinant antibody using a cell culture with defined amounts of arginine to affect the distribution of C-terminal variants.  *Supra* at B.2.  Specifically, Claim 33 of the '858 patent is directed to methods of producing a recombinant antibody by culturing Chinese hamster ovary (CHO) cells in a medium that comprises arginine in an amount between 2 g/L and 8 g/L, and formulating the preparation into a drug product if the preparation meets a target value of C-terminal variants of the recombinant antibody.  *Id.*

Amgen's method of manufacturing ABP 654 infringes at least Claim 33 of the '858 patent.

Croughan Decl. ¶¶ 168, 200.  Amgen's cell culture media ██████████████████████

████████████████████████████ which is within the claimed range of the '858 patent (i.e.,

within 2–8 g/L).  *Id.* ¶¶ 119, 175; Ex. A18 at 497; Ex. A19 at A518.  And as with glycan levels,



████████████████████████████████████████████, as claimed in the '858 patent.

Croughan Decl. ¶¶ 140-151, 178-195; Ex. A32 at A1048; Ex. C2 at A2915; Ex. C3 at A2939; Exs.

A31-A33 at A1041, A1048, and A1055 ████████████████████████

███████████████████████████.

    As with glycans, adjusting the C-terminal variant levels of ABP 654 can contribute to

██████████████████████.  Croughan Decl. ¶¶ 143-151, 181-193, 196.

## II.   JANSSEN WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION

    Janssen will suffer immediate, substantial, and irreparable harm if Amgen is not enjoined

from launching ABP 654.  Once Amgen launches, the leading PBMs will demand renegotiation

of the complex web of contracts governing STELARA® on their formularies.  The inevitable result

will be (1) long-lasting loss of market share across all indications of STELARA®, (2) irreversible

price erosion, and (3) massive disruption to Janssen's existing contractual relationships with

payors, harming its goodwill, reputation, and consumer relations, as well as the market trajectory

of Janssen's full suite of drugs.

    Such varied harms cannot be adequately remedied through monetary damages.  As the

Federal Circuit has recognized, "erosion of markets, customers, and prices, is rarely reversible."

*Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir. 2008); *see also Aria Diagnostics, Inc.*

*v. Sequenom, Inc.*, 726 F.3d 1296, 1304 (Fed. Cir. 2013) ("price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm") (citation omitted).   Even if Janssen ultimately prevails at trial, it will be difficult—if not impossible—to fully quantify how STELARA® and other contractually linked drugs would have fared absent Amgen's premature launch.  And even if ABP 654 were subsequently removed from the market, its presence would have already irreparably altered the market and Janssen's contracts.

### A.    STELARA® Would Suffer Lasting Loss Of Market Share

A premature launch of ABP 654 would cause Janssen to suffer accelerated, long-term loss of market share.   Amgen would force Janssen into a Hobson's choice: either compete with ABP 654 on price, preserving market share but eviscerating revenues, or keep price the same and lose market share.  Either option would dramatically reduce Janssen's revenue and lead to other harms, none of which are remediable.  As Amgen itself has argued, "[i]n the context of patent litigation, '[t]here is no effective way to measure the loss of sales or potential growth—to ascertain the people who do not knock on the door or to identify the specific persons who do not reorder because of the existence of the infringer.'"  Ex. C4 at A2975, *Amgen v. Sandoz*, No. 14-04741, D.I. 56 (N.D. Cal. Feb. 5, 2015) ("Amgen PI Mot.") (quoting *CellzDirect*, 664 F.3d at 930). Where, as here, the loss of market share cannot be easily quantified and compensated on the back end, a preliminary injunction is necessary and appropriate.

Indeed, Amgen plans to sell ABP 654 *in order to* capture market share from STELARA®. As Amgen itself has noted, biosimilar entrants typically are successful at doing just that: "Biosimilars have gained significant share in the majority of therapeutic areas where they have been introduced."  Ex. B27 at A2449 (noting that "[f]or therapeutic areas with biosimilars launched in the last 3 years, the average share was 75%").  Indeed, a recent report issued by Cardinal Health confirms that "[a]doption of biosimilars typically accelerates quickly after market introduction."

Ex. B25 at A2396; *see also* Ex. B26 at A2428.

Like all biosimilar companies attempting to gain market share, Amgen will do so by compromising Janssen's preferred position on the formularies generated by PBMs. *Supra* at I.A. If Amgen is permitted to launch ABP 654, PBMs could threaten to drop STELARA® from the formularies entirely, replacing it with ABP 654. Smith Decl. ¶ 35; *see* Ex. B27 at A2513 (noting that each of the three largest PBMs previously discontinued coverage of an original reference product in favor of a biosimilar). Confusion or concerns about whether STELARA® remains covered by insurance may drive practitioners to alternative products. And even if STELARA® remains covered, it could be moved to a disfavored formulary tier, thus harming sales.

This loss of market share would be irreparable. Even at a later damages trial, it will be difficult, if not impossible, to fully quantify the harm. ███████████████████████████

███████████████  ████████████████████████████████████████████████████████

████████████████████████████████████████████ Ex. B6 at A1286; Jarosz Decl. ¶¶ 57-62, 70; Ex. B1 at A1158; Ex. B10 at A1436. The entrance of Amgen's illegal, infringing biosimilar will only add to that unpredictability. And the variability of that range is further compounded by the expected launch of HUMIRA® biosimilars for the treatment of similar diseases this year. Jarosz Decl. ¶¶ 58, 122-125. Although history provides strong evidence that biosimilars erode a branded product's market share, it does not provide clear guidance for quantifying that harm. For example, three years after its first biosimilar launch, AVASTIN® retained only 18% of the market. Jarosz Decl. ¶ 59. By contrast, after three years, branded RITUXAN® was able to retain 36%. *Id.* ¶ 60. Over time, the percentage of market-share loss attributable to Amgen will only become harder to quantify, especially if more biosimilars enter the market and patients become accustomed to drugs other than STELARA®. Jarosz Decl. ¶¶ 113-

116, 122-125.

The Federal Circuit has recognized that losses of market share can establish irreparable harm.  In *Abbott Labs*, the court affirmed a preliminary injunction blocking Sandoz from entering the market with a generic that likely infringed Abbott's patents.  544 F.3d at 1343-61.  Sandoz argued that any harm to Abbott was not irreparable because two other generics had already entered the market.  *Id.* at 1361.  But the court disagreed, concluding that "the market share and revenue loss" is irreparable because it "cannot be quantified or adequately compensated."  *Id.* at 1361-63.

A district court reached the same conclusion in *Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, 609 F. Supp. 2d 786 (S.D. Ind. 2009).  As that court explained, because "Lilly would no longer maintain marketing exclusivity," it would face a "rapid loss of market share and revenue that [would] be difficult, if not impossible for Lilly to recover, even if the Court were to later rule in favor of Lilly."  *Id.* at 811 (footnote and citation omitted).  Because it will likewise be nearly impossible to fully quantify the damage to Janssen, the Court should grant an injunction.

### B.    STELARA® Would Suffer Irreversible Price Erosion Across All Indications

Amgen's infringing launch of ABP 654 would also inflict harm through the premature, long-term, and irreversible price erosion of STELARA®.  Jarosz Decl. ¶¶ 131-141; *see CellzDirect*, 664 F.3d at 930 (citations omitted) (acknowledging price erosion as an irreparable harm); *Aria Diagnostics*, 726 F.3d at 1304 (same).  Amgen will almost certainly sell ABP 654 at a lower price than STELARA®.  Amgen's own analysis concludes that "biosimilars typically launch at a discount to reference product."  Ex. B27 at A2447; Jarosz Decl. ¶ 57.  Price would be the key factor Amgen could use to incentivize PBMs to add ABP 654 to their formularies because, as Amgen concedes, ABP 654 does not offer any differentiating characteristics in terms of performance or safety profile.  *See* Am. Compl. at Ex. F at 40, 43.

Notably, Amgen itself has previously launched four biosimilars (of other biologics, not

STELARA®), in each case at a significant discount—ranging from 15% to 57% off the wholesale acquisition cost of the reference product.  Ex. B27 at A2447, Fig. 4.  Faced with Amgen's cut-price biosimilar, PBMs would pressure Janssen to provide price concessions to retain its position on formularies.

Amgen has cited exactly this sort of price erosion when defending its own branded products.  For example, Amgen previously argued that a competitor's premature entry into the market would force Amgen to slash the price of its branded drug and raise serious "concerns about price erosion that courts recognize as irreparable harm."  Ex. C4 at A2973-74; *see also id.* at A2976 ("The law recognizes this price erosion as irreparable harm.").  The same is true here.

Even if ABP 654 were later removed from the market, Janssen would be unable to return to the original net purchase price.  Jarosz Decl. ¶ 97; Smith Decl. ¶ 40.  Any attempt to raise prices to pre-entry levels would be met with considerable resistance, if not refusal, by payors.  Jarosz Decl. ¶ 97; Smith Decl. ¶ 45; *see Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975-76 (Fed. Cir. 1996) (finding irreparable harm because requiring purchasers to pay higher prices after paying lower prices "is not a reliable business option").  As this Court has previously explained, "After what might be as long as a year of generic competition by the time we get to trial and I get a post-trial opinion done, [the innovator] will not be able to raise the price back to where it is now." *Novartis Pharms. Corp. v. Accord Healthcare Inc.*, No. 18-1043-LPS, 2019 WL 2588450, at *4 (D. Del. June 24, 2019).  Once again, Amgen has made this exact point.  *See* Ex. C4 at A2974 ("The price erosion for [Amgen's products upon generic entry] would be permanent and irrevocable.").  Here, it is extremely difficult—if not impossible—to quantify the long-lasting harm Janssen will suffer.  Jarosz Decl. ¶¶ 54-62, 104-130.

**C.     Janssen Would Suffer Irreparable Disruption Of Its Contracts With PBMs And Related Loss Of Goodwill**

Amgen's premature launch would also inflict irreparable harm by disrupting Janssen's contractual relationships with PBMs and more generally diminishing its goodwill among physicians, pharmacies, patients, and payors.  If ABP 654 prematurely enters the market, PBMs will demand additional rebates from Janssen, and could drop STELARA® from their formularies entirely or at least reduce its current position.  ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████  They are virtually certain to do so if and when ABP 654 hits the market.  *Id.*

Significantly,  ████████████████████████████████████████████████

███████████████████████████, ████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████  *Id.* ¶ 30.  The impact of this loss will be all but impossible to fully quantify in terms of loss of market share, price erosion, and the public's reduced access to these groundbreaking treatment options.  And even if these losses were fully quantifiable, it would be extraordinarily difficult for Janssen to obtain damages associated with ████████████████

███████████████████████.  *Id.* ¶ 42.

Moreover,  ██████████████████████████████ means that if Janssen ultimately wins this case on the merits, it would likely be impossible to unwind any ████████████  In the year or more that it takes to resolve this case, ABP 654 will have significantly eroded the price of STELARA®.  Smith Decl. ¶ 40.  As a result, even if Janssen prevails, it will not be able to meet the PBMs' demands for rebates as it can today based on STELARA®'s sales.  Preserving the status

quo through a preliminary injunction will avoid upending ████████████████████

████████████████████████████████████████████████████. *See, e.g.*, *Fed.*

*Trade Comm'n v. Qualcomm Inc.*, 935 F.3d 752, 756 (9th Cir. 2019) (granting stay so as to avoid

"requir[ing] Qualcomm to enter new contractual relationships and renegotiate existing ones on a

large scale," thus avoiding that which could not "be easily undone"); *see also, e.g.*, *Fields PAG,*

*Inc. v. CDK Glob., LLC*, No. 16-CV-01876-MCA-MAH, 2016 WL 9185293, at *4 (D.N.J. June

10, 2016) (finding irreparable harm based on disruption to existing contracts requiring

renegotiation).

      Finally, the reputational harm caused by disruption ████████████████ will

likewise be virtually impossible to quantify, especially with respect to Janssen's patient

relationships.  If Janssen loses its formulary position, many insurers will no longer cover

STELARA®, forcing patients to obtain paperwork and permission to switch to another medication,

which can lead to gaps or disruption in treatment.  Smith Decl. ¶ 45.  Such a change will be

especially disruptive for patients who currently rely on Janssen's co-pay support program.  As

Amgen itself has acknowledged, "there is no effective way to quantify the effect of [a generic's]

entry into the market on Amgen's reputation—all the more reason to conclude the harm is

irreparable."  Ex. C4 at A2975.  The same goes for Janssen here.

## III.  THE EQUITIES FAVOR A PRELIMINARY INJUNCTION

      Finally, the balance of hardships and the public interest favor a preliminary injunction.  The

harms to Janssen of denying a preliminary injunction greatly outweigh any possible harms to

Amgen of granting one.  STELARA® accounts for ████████ of J&J's U.S. pharmaceutical

sales and supports J&J's substantial continuing investment in R&D.  Ex. B10 at A1425; Smith

Decl. ¶¶ 48-54.  If ABP 654 prematurely enters the market, it will irreparably shrink Janssen's

market share, erode STELARA®'s net purchase price, delay or eliminate promising medical trials

funded by STELARA®, and irretrievably damage Janssen's contractual relationships.  *Supra* at II.
By contrast, the chief harm to Amgen would be delaying it from profiting from its infringement.
Courts have found minimal hardship to an alleged infringer who is not on the market yet or is in
the early stages of marketing.  *See, e.g.*, *Glaxo Grp. Ltd. v. Apotex, Inc.*, 64 F. App'x 751, 756
(Fed. Cir. 2003) ("The district court did not clearly err in finding that, without the preliminary
injunction, Glaxo would lose the value of its patent while Apotex would only lose the ability to go
on to the market and begin earning profits earlier."); *Novartis Pharms. Corp.*, 2019 WL 2588450,
at *6 (same); *Impax Lab'ys, Inc. v. Aventis Pharms., Inc.*, 235 F. Supp. 2d 390, 396 (D. Del. 2002)
(same).

Amgen's at-risk launch will also harm the public interest.  "[P]ublic policy favors [the]
protection of the rights secured by . . . valid patents."  *Smith Int'l, Inc. v. Hughes Tools Co.*, 718
F.2d 1573, 1581 (Fed. Cir. 1983).  Enforcing patent rights is especially important in the
pharmaceutical space, where new drugs can save lives and alleviate suffering.  Developing new
treatments depends on the expectation of patent protection, given the extensive costs of bringing a
new drug to market and the substantial risks of failure.  Jarosz Decl. ¶ 159.  Thus, "the public
interest favors encouraging investment in drug development by protecting and enforcing ... valid
pharmaceutical patent[s]."  *Ortho McNeil Pharm., Inc. v. Barr Lab'ys, Inc.*, No. 03-4678 (SRC),
2009 WL 2182665, at *11 (D.N.J. July 22, 2009); *see Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d
1368, 1383-84 (Fed. Cir. 2007).  As Amgen itself explained, "there is a strong public interest in
encouraging investment in drug development."  Ex. C4 at A2975.

Patients will ultimately benefit from a preliminary injunction in this case.  STELARA®
already provides all the medical benefit that ABP 654 could offer—and Janssen stands willing and
able to supply patients with all the STELARA® they need.  Smith Decl. ¶¶ 55-56.  Janssen also

invests heavily in numerous support programs for patients using STELARA®, including a copay support program, benefit investigation services, programs for underinsured or uninsured patients, and a "Nurse Navigator" program that assists STELARA® patients at home.  *Id.* ¶¶ 57-59.  As a result of Janssen's copay support system, some patients will likely pay **lower** out-of-pocket costs when treated with STELARA® than they would if treated with ABP 654, even if the latter were sold at a lower price.  *Id.* ¶ 60.  On the flip side, if Amgen's entry causes STELARA® to lose its formulary placement, patients who rely on Janssen's copay support system may be forced to switch to ABP 654, thereby losing access to that financial support and causing disruption in treatment that would be further magnified if and when Janssen obtains a permanent injunction.  *Id.* ¶ 45.

Finally, the launch of ABP 654 would impact Janssen's ability to fund research and development of new breakthrough treatments.  The vast majority of pharmaceutical research in the United States is funded by existing sales.  And STELARA® revenues are a substantial contributor to the R&D budget of Janssen's parent company, J&J, not least because STELARA® revenues are a substantial fraction of J&J's income.  *See* Ex. C1 at A2911-13 (in 1Q-3Q 2022, U.S. STELARA® revenues were 57.9% of all U.S. J&J Immunology product revenues and 13.2% of total U.S. revenues); Smith Decl. ¶¶ 48-54.  If Janssen is forced to prematurely lower the price of STELARA®, it will likely also be forced to make corresponding cuts to its ongoing research.  Smith Decl. ¶¶ 48-54.  The public interest thus strongly favors preliminary injunctive relief here.

## CONCLUSION

For the foregoing reasons, the Court should issue a preliminary injunction enjoining Amgen from commercial manufacture or use, offers to sell, sales within the United States, or importation for commercial purposes into the United States of the ABP 654 biosimilar product.

- 20 -

March 6, 2023

OF COUNSEL:

Michael A. Morin
David P. Frazier
Inge A. Osman
Cecilia Sanabria
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC  20004c
(202) 637-2200

Michael Seringhaus
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
(650) 328-4600

Gabrielle LaHatte
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA  94111
(415) 491-0600

MCCARTER & ENGLISH, LLP

*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King St.
Wilmington, DE 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

*Attorneys for Plaintiff*
*Janssen Biotech, Inc.*